IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL A. LAPORTA, as
Guardian of the Estate and
Person of Michael D. LaPorta,
A Disabled Person,

               Plaintiff,

      v.

CITY OF CHICAGO, a Municipal
Corporation; and GORDON
LOUNGE, INC. d/b/a
BREWBAKERS,

            Defendants.

Case No. 14 C 9665

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

In a Seventh Amended Complaint, Plaintiff Michael A. LaPorta, as guardian of his disabled son Michael D. LaPorta, brings eight counts against Defendant City of Chicago ("the City") and one count against Defendant Gordon Lounge, Inc. d/b/a Brewbakers ("Brewbakers") that is not at issue here. Counts I and IX are state-law tort claims against the City, whereas Plaintiff brings Counts III through VIII under 42 U.S.C. § 1983 and *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658 (1978). Plaintiff has moved for partial summary judgment on the *Monell* claims [ECF No. 238], and the City has cross-moved on all eight of Plaintiff's claims against it [ECF No. 241]. For the reasons to follow, the Court denies both Motions with the

exception of the City's Motion as to state law Counts I and IX, which is granted. In addition, the Court bifurcates the trial so that adjudication of Count III will commence only after the jury returns a verdict on the other claims against the City.

## I. BACKGROUND

The facts of this case lend themselves to an Alcoholics Anonymous pamphlet. In the wee hours of January 12, 2010, off-duty Chicago Police Officer Patrick Kelly ("Kelly") and his lifelong friend, Michael D. LaPorta ("LaPorta"), were hanging out alone at Kelly's house after a night of heavy drinking at various bars, including Brewbakers. Kelly's Sig Sauer P226 service weapon somehow discharged a single bullet into LaPorta's head, about two inches above and behind his left ear, causing LaPorta to sustain grave injuries that have left him paralyzed. (ECF No. 283 ("Def.'s Resp.") ¶ 13; ECF No. 301 ("Def.'s Resp. to Pl.'s SAUF") ¶ 2.) LaPorta maintains that Kelly shot him; Kelly and the City claim that LaPorta attempted to commit suicide using Kelly's gun; both men give sharply conflicting accounts of the events at Kelly's house on the night in question. (*See, e.g., id.* ¶ 4; ECF No. 268 ("Pl.'s Resp.") ¶ 10.) The following facts are undisputed unless otherwise noted.

- 2 -

Around 4:35 a.m. on January 12, 2010, Kelly placed two calls to emergency services for help, identifying himself as an off-duty officer and shouting "abusive" profanities when imploring emergency personnel to hurry. (Def.'s Resp. ¶ 14.) Kelly appeared intoxicated to the responding paramedics and officers. (Def.'s Resp. ¶ 18.) He tried to access the ambulance by banging on its windows, causing a paramedic to fear for her safety and prompting her to yell at the other officers to secure the scene and Kelly. (*Id.* ¶¶ 19-20.) Kelly refused to step away from the ambulance; instead, he got in the face of the officer-in-charge, Sergeant Charmane Kielbasa, and hurled unsavory epithets at her (*i.e.,* "north side bitch," "whore," "motherfucker," "fucking cunt"). (*Id.* ¶ 21.) Sergeant Kielbasa detected a strong odor of alcohol on Kelly, felt threatened by him, and thought he was going to strike her. (*Id.* ¶ 23.) At approximately 4:52 a.m., Kelly was placed under arrest for assaulting her, resisted arrest, and was then tackled to the ground. (*Id.* ¶ 24.) Once placed in the back of a cruiser, Kelly tried to kick out the rear window of the vehicle and subsequently refused to heed the commands of the arresting officers, whom he deemed of insufficient rank. (*Id.* ¶ 25.) Although charged with assault, Kelly was never charged with aggravated assault or resisting arrest. (*Id.* ¶ 27.) (The court

ultimately entered a directed verdict for Kelly in the assault case. (Pl.'s Resp. ¶ 37.))

Phone records indicate that, at various times just before and after the LaPorta shooting, Kelly placed and received calls from friends and personal acquaintances affiliated with CPD. The detective-in-charge on the scene eventually noticed the presence of Allyson Bogdalek, a fellow officer who had been drinking with LaPorta and Kelly the night before; he recognized her because he had previously worked for Bogdalek's father, a Chicago Police Department ("CPD") sergeant. (Def.'s Resp. to Pl.'s SAUF ¶ 31.) Melissa Spagnola, Kelly's former girlfriend, also appeared on the scene with her uncle, a retired CPD officer, who spoke with an investigating officer about Kelly. (*Id.* ¶ 34.) Whereas LaPorta's cell phone was inventoried - and his text messages reviewed - as part of the investigation, Kelly's was not. (Def.'s Resp. ¶ 30.)

Kelly was at the scene for over an hour before he was taken to the police station and placed in a detention room. After his requests to wash his hands and use the bathroom were repeatedly denied, Kelly urinated in a corner of the detention room. (Def.'s Resp. ¶¶ 35, 37; *see also,* Pl.'s Ex. 73.) Within twenty minutes of Kelly urinating, CPD investigator Joseph Dunigan performed a gunshot residue test on Kelly's hands. (Def.'s Resp.

- 4 -

¶ 35; *see also,* Pl.'s Ex. 73.) Dunigan voiced disapproval that Kelly had already urinated because, as Dunigan put it, some suspects "piss on their hand" to confound the residue test. (Pl.'s Ex. 73 at 6:54.) Although the results of the test did not indicate that Kelly had gunshot residue particles on his hands, they left open the possibility that particles could have been "removed by activity." (Pl.'s Resp. ¶ 24.) Kelly then demanded that the officers call his father, John Kelly, so that his father could call a lawyer. This prompted the officers to ask, "Was your father police?" Kelly responded that "he was." (Def.'s Resp. ¶ 35.) (Kelly's father served as a CPD patrol officer from 1971 to 1979. (Pl.'s Resp. to Def.'s SAUF ¶ 14.)) Approximately eight hours after the incident – at 12:17 p.m. on January 12, 2010 – Kelly took a breathalyzer test and blew a 0.093. (Def.'s Resp. ¶¶ 11, 38.) From this, Illinois State Police extrapolated Kelly's blood alcohol content to have been between 0.169 and 0.246 at the time of the shooting. (*Id.* ¶ 39.)

CPD officers interviewed a friend of LaPorta, Matthew Remegi ("Remegi"), and attempted to convince him that LaPorta shot himself. Remegi thrice responded that LaPorta would never have attempted to kill himself and eventually ended the interview because the officers persisted in their suicide theory. (Def.'s Resp. ¶¶ 42, 77.) Separately, Kelly told

detectives that LaPorta was having difficulties in his personal life, including problems with his then live-in girlfriend and possible abuse of pain pills he had been prescribed in connection with a previous injury. (Pl.'s Resp. ¶ 22.)

Kelly was released from custody at around 1:20 p.m. on January 12, 2010 and did not make his compelled statement to the Independent Police Review Authority ("IPRA") until January 11, 2011 – 364 days after the shooting. (Def.'s Resp. ¶ 43.) Kelly told the IPRA investigator that he was an alcoholic but that he did not believe he was intoxicated on the night of the shooting. (*Id.* ¶¶ 39, 50; ECF No. 304 ("Pl.'s Resp. to Def.'s SAUF") ¶ 11.) Forensic analysis of the bullet extracted from LaPorta's skull determined that it and the fifteen bullets remaining in Kelly's service weapon were "9mm Luger + P cartridges," one of several CPD-approved types of ammunition. (Def.'s Resp. to Pl.'s SAUF ¶ 36.) The Complaint Register log for the LaPorta incident alleged that Kelly was (1) "intoxicated while off duty"; (2) "[f]ailed to secure his weapon"; (3) "[a]ssaulted Sergeant Kielbasa"; (4) "[v]erbally abused" her"; (5) "[b]rought discredit on the Department, in that he interfered with the Chicago Fire Department personnel that were attempting to treat Michael La Porta [*sic*]"; (6) "[s]hot Michael La Porta [*sic*]"; and (7) "[p]rovided false statements to investigating police

officers and detectives regarding this incident when he indicated that Michael La Porta [*sic*] shot himself." (Def.'s Resp. ¶ 28; Pl.'s Resp. ¶ 30.) Allegations 1 through 5 of the Complaint Register ("CR") were sustained against Kelly, meaning that they were "supported by substantial evidence to justify disciplinary action." (Def.'s Resp. ¶ 28; Pl.'s Resp. ¶ 40.) Allegations 6 and 7 were added after the IPRA investigator interviewed LaPorta's uncle, who opined that Kelly's account was not consistent with how the Sig Sauer P226 operates; neither allegation was sustained, and no criminal charges were brought against Kelly other than the aforementioned assault count. (Pl.'s Resp. ¶¶ 33-38, 41.)

The IPRA investigator ultimately recommended that Kelly receive a 180-day suspension for the sustained violations pertaining to the LaPorta shooting, but IPRA Chief Administrator Ilana Rosenzweig without any explanation commuted Kelly's suspension to 60 days. (Def.'s Resp. ¶ 49; Pl.'s Resp. ¶ 39.) In April 2010, Kelly was referred by CPD for a fitness-for-duty evaluation, and the evaluating psychologist deemed him unfit for duty. In July 2010, Kelly was re-evaluated and found fit for duty. (Pl.'s Resp. ¶ 28.) IPRA suspended its investigation into the LaPorta shooting on July 26, 2012 but moved to re-open it on July 26, 2016 after years of civil litigation. (Def.'s Resp.

¶ 47.) Kelly remains employed as a CPD officer to this day. (Def.'s Resp. ¶ 50.)

### A. Kelly's History Prior to the LaPorta Shooting

Kelly began his career as a police officer on January 26, 2004, when he entered CPD's police academy. (Pl.'s Resp. ¶ 59.) Before he could begin at the academy, Kelly had to procure an approved firearm to serve as his duty weapon pursuant to CPD general orders, and he in fact purchased the same Sig Sauer P226 used to shoot LaPorta. (*Id.* ¶¶ 46, 60.) Kelly's employee training records indicate that he passed a "Firearms Safety – Gun Locks" course on April 24, 2006. (*Ibid.*)

Kelly has a checkered history on the police force; he accumulated at least eighteen (18) CRs in the five years prior to the LaPorta shooting. (Def.'s Resp. ¶ 51.) As suggested above, there are several possible dispositions of CRs: exonerated, meaning that the incident occurred but the actions of the accused were lawful and proper; unfounded, which means that an allegation is false or not factual; not sustained, indicating insufficient evidence either to prove or disprove the allegation; no affidavit, signifying that the investigation was terminated because a sworn affidavit from the complainant was not received within a certain time; and sustained, meaning that "the allegation is supported by substantial evidence to justify

disciplinary action." (Def.'s Resp. ¶¶ 62-63; Pl.'s Resp. to Def.'s SAUF ¶ 17.) The following graph lists each of Kelly's CRs prior to the LaPorta shooting alongside the date on which they were filed, the allegation, and the outcome:

| No. | Incident Date | Allegation | Disposition/Outcome |
|-----|---------------|------------|---------------------|
| 1 | 01/02/2005 | Excessive force – kicking, punching, and choking arrestee | Unfounded and not sustained |
| 2 | 01/19/2005 | Unbecoming conduct in issuing citation | Not sustained |
| 3 | 06/22/2005 | False arrest | Unfounded; letter of declination signed |
| 4 | 08/04/2005 | Excessive force during arrest | Exonerated |
| 5 | 09/19/2005 | Off-duty domestic battery of Fran Brogan | Sustained, then overridden to not sustained |
| 6 | 04/21/2006 | Excessive force | No affidavit |
| 7 | 05/13/2006 | Failure to make arrest | No affidavit |
| 8 | 06/12/2006 | Off-duty battery of Patrick Brogan | No affidavit; letter of declination signed |
| 9 | 10/08/2006 | Verbal threats to citizen | No affidavit |
| 10 | 10/17/2006 | False traffic citation | Not sustained |
| 11 | 12/05/2006 | False citation | Closed and included in non-disciplinary intervention program |
| 12 | 07/28/2007 | Excessive force – 1 of 2 officers who kicked complainant on ground | Unfounded, but the subject of a 2008 civil lawsuit |
| 13 | 08/19/2007 | Unlawful search | No affidavit |
| 14 | 09/05/2007 | False arrest | No affidavit |
| 15 | 05/18/2008 | Called woman a bad mother and threatened to mace her son | Closed and included in non-disciplinary intervention program |

| 16 | 06/03/2008 | Failure to inventory property | No affidavit |
| 17 | 12/30/2008 | Excessive force – pepper spray | Unfounded |
| 18 | 07/27/2009 | Derogatory and racist statements | No affidavit |

(Pl.'s Resp. ¶¶ 61, 64; *see also,* Pl.'s Exs. 47-48.)  In addition, Kelly may have been the subject of a further CR regarding an incident on September 23, 2008 in which five complainants alleged that officers unknown physically mistreated them and forced one of them onto the ground, stepped on his neck, and handcuffed him too tightly. (Pl.'s Resp. ¶¶ 61-63; Pl.'s Ex. 47 at RFC-LaPorta 21088-89.)  That CR was closed because of "no affidavit." (Pl.'s Ex. 47 at RFC-LaPorta 21090.)

CRs 5 and 8 concern two instances of Kelly's off-duty violent conduct.  The predicate of CR 5 was a domestic violence incident in which Kelly first shoved to the street his then-girlfriend, Fran Brogan, with whom he was living, after the two had been out drinking at a bar.  A sergeant and two officers were in the vicinity, witnessed the incident, confronted Kelly, and told him to go home.  When Brogan returned home from the bar, Kelly pushed her to the ground, kicked her, and struck her with some sort of object.  The beating left Brogan bloodied; she sustained an abrasion on her nose, a contusion on her right

elbow, and a head wound that ultimately required stitches. (Def.'s Resp. ¶ 61; Pl.'s Resp. ¶¶ 67-68; *see also,* Pl.'s Ex. 49.) Brogan signed an affidavit to move the CR forward with the Office of Professional Standards ("OPS"), the precursor to IPRA; but she declined to pursue criminal charges against Kelly. Under Illinois law and CPD policy, officers can still make arrests for domestic battery in the absence of a criminal complaint if there are visible injuries. (Def.'s Resp. ¶ 71.) An OPS official investigated the CR, interviewed both Kelly and Brogan, and noted that Kelly's "responses regarding the unknown officers confronting him on the street bring question to his overall credibility" and that his "responses regarding the physical altercation inside the residence also bring question to his overall credibility." (Pl.'s Resp. ¶ 69; *see also,* Pl.'s Ex. 52 ("Morris Dep.") at 80:17-81:9 (reciting three instances in which OPS investigators found Kelly's credibility lacking).) This official recommended that Brogan's CR be sustained, and his supervisor agreed. (Def.'s Resp. ¶ 62.) However, OPS Chief Administrator Tisa Morris overrode their recommendation, deciding not to sustain the CR but providing no specific evidentiary basis for doing so. (Def.'s Resp. ¶ 63; Pl.'s Resp. ¶ 70; Pl.'s Ex. 53; *see,* Morris Dep. at 122:9-14.) Kelly was

never arrested or subjected to criminal prosecution for this incident.

CR 8 pertains to a second off-duty episode of alcohol-induced violence, this time involving Kelly and Fran Brogan's brother, Patrick Brogan. Kelly was out at a bar drinking with both Brogans but went home early to Fran Brogan's house. When the others returned, Kelly and Patrick Brogan got into a verbal argument; Kelly threw a TV remote at his head, resulting in a broken nose and a laceration above his right eye. (Def.'s Resp. ¶ 68; Pl.'s Resp. ¶ 72.) Kelly was arrested for simple battery, and Patrick Brogan signed off on a criminal complaint for battery. However, Patrick Brogan decided not to proceed with the CR, refusing about eight days after the incident to sign a sworn affidavit and instead signing a letter declining to pursue the matter further. (Def.'s Resp. ¶ 69; *see,* Def.'s Ex. 55.) The charges against Kelly were dropped.

For none of the 18 (or potentially 19) CRs recited above was Kelly disciplined. (Def.'s Resp. ¶ 55; Def.'s Resp. to Pl.'s SAUF ¶ 7.) Kelly was recommended for CPD's Behavioral Intervention System ("BIS") after CRs 5 and 8 but never for its Personnel Controls ("PC") program; both programs are non-disciplinary systems that seek to identify officers with a pattern of behavioral problems and provide them with corrective

counseling. (Def.'s Resp. ¶¶ 56-58, 103.) The PC program, however, addresses and tracks more serious conduct for later disciplinary action. (*Id.* ¶ 103.) At some point after CRs 5 and 8, Kelly was referred for a fitness-for-duty evaluation and found unfit for duty on June 30, 2006. (Pl.'s Resp. ¶¶ 73-74.) Pursuant to applicable provisions of the operative collective bargaining agreement ("CBA"), Kelly then obtained his own psychological evaluation to challenge the unfitness finding and convinced an arbitrator that he was fit for duty. (*Ibid.*)

Evidence in the record points to other indications prior to the LaPorta shooting that Kelly's drinking problem imperiled both his work as a police officer and his obligation to secure his gun. For instance, LaPorta's mother testified that Kelly bragged to her "about attending a motor vehicle test for the Chicago Police Department while being very intoxicated and, as a result, injuring his foot." (Def.'s Resp. ¶ 77; Pl.'s Ex. 58 ("P. LaPorta Dep.") at 120:1-8; *see,* FED. R. EVID. 801(d)(2)(D).) LaPorta's mother also overhead conversations between Kelly and LaPorta in 2006, 2007, and 2008 in which Kelly, after realizing that he had left his service weapon at Brewbakers the night before, asked LaPorta to accompany him to the bar to retrieve it. (Def.'s Resp. ¶ 77; P. LaPorta Dep. at 126:17-131:17; *see,*

FED. R. EVID. 803(1).) The extent of the City's knowledge of this behavior is unclear.

### B. Evidence Concerning CPD's Policies and Practices

Rule 14 of CPD's Rules and Regulations prohibits false reporting. Of the 203 CPD employees with sustained Rule 14 CRs from 2004-2011, 60 of them (approximately 30 percent) resigned or were discharged. The others suffered no sanction, were reprimanded, or were suspended. (Def.'s Resp. ¶ 82; Pl.'s Resp. to Def.'s SAUF ¶¶ 21, 26.) Rule 15 prohibits "intoxication on or off duty." (Def.'s Resp. ¶ 10.) Rule 22 prohibits failure to report to the CPD any violation of Rules or Regulations or other improper conduct that is contrary to the policies, orders, or directives of the department. (Pl.'s Resp. to Def.'s SAUF ¶ 26.) General Order U04-02 provides that an officer is to "secure their prescribed duty weapon when the prescribed duty weapon is not on their person." (*Id.* ¶ 12; Pl.'s Resp. ¶ 46.)

According to Chicago records, over 45 percent of complaints against CPD officers between 2004 and 2011 closed with a finding of "no affidavit." (Def.'s Resp. ¶ 94; Def.'s Resp. to Pl.'s SAUF ¶ 15.) Of the 968 domestic battery complaints lodged against CPD officers from 2004-2011, 22 percent were dismissed for no affidavit and 17 percent were sustained. Approximately 20 percent of these sustained CRs resulted in the resignation or

discharge of the officer involved; the other 80 percent entailed discipline ranging from no action to reprimand to days of suspension. Thus, 3 percent of all domestic battery CRs during this timeframe resulted in the accused officer's separation from CPD employment. (Def.'s Resp. ¶ 81.)

The operative CBA negotiated between the City Council and the Fraternal Order of Police provides – consonant with Illinois law – that any complaint against an officer must be supported by a sworn affidavit from the complaining witness. (Def.'s Resp. ¶ 90.) The CBA also requires removal from an officer's record of any sustained complaint of misconduct not accompanied by disciplinary action within the last year. (*Id.* ¶ 94.) The CBA further affords an officer 24 hours after an officer-involved shooting to give a statement and permits officers to review audio and video evidence before doing so. (*Id.* ¶ 95; Def.'s Resp. to Pl.'s SAUF ¶ 16.) Under the CBA, Internal Affairs investigators cannot look back at an officer's complaint history unless a complaint is sustained and may only use a sustained complaint for progressive discipline. (*Id.* ¶ 108.) In 2010 and years prior, officers accused of non-shooting misconduct were not interviewed until the end of the investigation – after all other evidence had been gathered. (*Id.* ¶ 96.)

Chicago Mayor Rahm Emmanuel in a 2015 speech to the City Council admitted that a "code of silence" pervades CPD pursuant to which certain officers exhibit a "tendency to ignore, deny or in some cases cover up the bad actions of a colleague or colleagues." (Def.'s Resp. ¶¶ 83–85; Def.'s Resp. to Pl.'s SAUF ¶ 11.) Additionally, the City created the Police Accountability Task Force ("PATF") to review CPD's system of training, oversight, discipline, and transparency. PATF released a report with its recommendations for reform in April 2016, finding "that the code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present," but instead is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions." Other witnesses in this case, including Assistant State's Attorney Lynn McCarthy, have prosecuted cases involving police officers committing official misconduct, obstruction of justice, or perjury to cover up for themselves or other officers. (Def.'s Resp. ¶ 88; Def.'s Resp. to Pl.'s SAUF ¶ 13.) The City produced a Rule 30(b)(6) deponent on behalf of the City Council (as policymaker for the City), Alderman Joseph Moore, who admitted to the existence of the code of silence within the CPD prior to 2011. In his estimation, "it would be a safe bet" that many members of the City Council would

- 16 -

have been familiar with the code of silence as far back as 2007. (Def.'s Resp. ¶¶ 89, 98; Moore Dep. 161:1-5.) Yet Tisa Morris, Chief Administrator of OPS from 2004 to 2007, testified in this case that she had "never thought about [the code of silence]." (Def.'s Resp. ¶ 87.)

Alderman Moore testified in this case that the City Council created IPRA ostensibly to "tighten up the procedures" with respect to officers exhibiting patterns of abuse. (Def.'s Resp. ¶ 97.) Yet, since IPRA's inception, the rate of sustained CRs against officers in excessive force cases has decreased, and less than 1 percent of officer-involved shootings from 2007 through 2014 were found unjustified. (Def.'s Resp. ¶ 99.) Alderman Moore recalled that "[w]e certainly were aware" of "concerns that the union contract impeded the ability of OPS to conduct fair and thorough investigations." (Ibid.; Pl.'s Ex. 66 ("Moore Dep.") at 149:3-24.) He stated that IPRA was similarly "impeded somewhat by the police contract that prevented referencing previous complaints, unfounded – you know, complaints that were either not pursued or were deemed unfounded." (Def.'s Resp. to Pl.'s SAUF ¶ 17.)

Between 2004 and 2007, OPS did not have an early warning system in place (although the Bureau of Internal Affairs may have assumed similar functions), and attempts in 2006 to put a

new BIS in place met with resistance from the Fraternal Order of Police. (Def.'s Resp. ¶ 104.) After IPRA set up its own BIS and PC programs in 2007, participation plummeted: in 2007, 276 officers were included in one of the two programs; in 2008, this number dropped to 219 and continued to plunge so that, by 2013, no officers were being actively managed through either program. (*Id.* ¶ 105.) An IPRA deponent in this case stated that he was unaware of an early warning system in place at IPRA, and Morris testified that she does not know what a behavioral intervention system is. (*Id.* ¶ 106.) What is more, an IPRA supervisor also testified that she has never received training on how to identify patterns of officer misconduct. (Def.'s Resp. to Pl.'s SAUF ¶ 28.)

Finally, on January 13, 2017, the United States Department of Justice and United States Attorney's Office for the Northern District of Illinois issued a report entitled "Investigation of the Chicago Police Department" (the "DOJ report"). Among other things, the DOJ report found that CPD's "early intervention system" exists in name only, does not assist in identifying or correcting problematic behavior, and does not use "long-available supervisory tools, such as a comprehensive early intervention system (EIS), to identify patterns of concerning officer behavior and prevent patterns of misconduct and poor

- 18 -

policing from developing or persisting." (Def.'s Resp. ¶ 110.)
Advances in technology and reform for the BIS and PC programs
were allowed to "wither on the vine" or were never implemented.
(*Id.* ¶ 103.) The report further concluded that "[t]he City,
police officers, and leadership within CPD and its police
officer union acknowledge that a code of silence among Chicago
police officers exists, extending to lying and affirmative
efforts to conceal evidence." (*Id.* ¶ 100; Def.'s Resp. to Pl.'s
SAUF ¶ 14.) It noted that IPRA "treat[s] such efforts to hide
evidence as ancillary and unexceptional misconduct, and often
do[es] not investigate it, causing officers to believe there is
not much to lose if they lie to cover up misconduct." (*Id.*
¶ 101.) The entities of accountability, according to the DOJ
report, accept the "cover-up culture" as "an immutable fact
rather than something to root out." (*Id.* ¶ 102.)

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine
dispute exists "if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party." *Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In evaluating
summary judgment motions, the Court must view the facts and draw

- 19 -

reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007). It does not make credibility determinations as to whose story is more believable, *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011), and considers only evidence that can be "presented in a form that would be admissible." FED. R. CIV. P. 56(c)(2).

### III.  <u>ANALYSIS</u>

Plaintiff asserts five separate *Monell* claims against the City, alleging that the existence of the following widespread policies, practices, or customs of the City proximately caused LaPorta's injury:  a code of silence that conceals officer misconduct (Count IV); failure to maintain an early warning system (Count V); failure to investigate officer misconduct (Count VI); failure to discipline officers who commit misconduct (Count VII); and failure to terminate Kelly for misconduct (Count VIII).  Plaintiff's attempt to establish liability of the City involves showing a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1013 (7th Cir. 2000).  Along with those *Monell* claims, Plaintiff brings against the City a count under 42 U.S.C. § 1983 for

denial of his right to access the courts (Count III) and two state-law tort claims (Counts I and IX).

Plaintiff has moved for summary judgment on all five *Monell* claims, and the City has cross-moved on all Plaintiff's claims against it.

### A.  Plaintiff's Motion for Partial Summary Judgment

To establish a *Monell* claim, a plaintiff must show that he or she suffered a deprivation of a constitutional right proximately caused by either (1) an express municipal policy; (2) a widespread common practice that by virtue of its ubiquity constitutes a *de facto* custom or usage with the force of law; or (3) a deliberate act of a decision-maker with final policymaking authority.  *See, Rossi v. City of Chicago,* 790 F.3d 729, 737 (7th Cir. 2015).  In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must prove causation by demonstrating that the municipality "is the 'moving force' behind the deprivation of constitutional rights." *Glisson v. Ind. Dep't of Corrs.,* 813 F.3d 662, 667 (7th Cir. 2016) (quotation omitted).

Plaintiff's five *Monell* claims against the City challenge separate facets of the City's relevant conduct towards officers in general and Kelly in particular.  The nub of these claims is that CPD's code of silence and its failure to investigate

- 21 -

officer misconduct and impose appropriate discipline, including termination, were pervasive *de facto* policies, practices, or customs that encouraged and emboldened Kelly to continue committing off-duty alcohol-fueled violence against people close to him. Thus, the gravamen of Plaintiff's *Monell* theory is "that it is the unwritten policy and practice in the CPD to protect and shield off-duty police officers who commit violence against citizens, and that because of this institutionalized differential treatment, off-duty officers are encouraged to believe that they can use violence with impunity." *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1715621, at *6 (N.D. Ill. Mar. 20, 2003).

Plaintiff's Motion for Partial Summary Judgment founders on the threshold § 1983 requirement of a constitutional injury. *See, e.g., Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir. 1990) ("[A]n essential element of recovery under 42 U.S.C. § 1983 is the demonstration of a deprivation of a constitutionally protected right."). The crux of the case for *Monell* liability here – although the issue tellingly receives short shrift in Plaintiff's briefs - is that LaPorta's substantive due process right to bodily integrity was violated when he was shot in the head. (*See,* ECF No. ("Pl.'s Mem.") at 6-7.) While true that "[t]he protections of substantive due process have for the most

- 22 -

part been accorded to matters relating to . . . the right to bodily integrity," *Albright v. Oliver,* 510 U.S. 266, 272 (1994), a particular bodily invasion triggers substantive due process protections only if a governmental actor can be said to have committed it. *See, e.g., Wragg v. Village of Thornton,* 604 F.3d 464, 467 (7th Cir. 2010) ("Klaczak was a governmental actor, not a private actor, as he undisputedly committed the abusive acts against Wragg in the line of his duty as a fire chief. So Wragg had a substantive due process right not to be harmed by Klaczak.") (internal citation omitted); *Strong v. Wisconsin,* 544 F.Supp.2d 748, 760 (W.D. Wis. 2008) ("[T]he 'liberty' guaranteed by the Fourteenth Amendment includes freedom from personal intrusion *by the government* . . . .") (emphasis added) (citations omitted). And even a bodily invasion by a government actor does not necessarily suffice for a constitutional violation. For example, it is not the fact of being shot by a police officer but the circumstances giving rise to the shooting that determine whether the victim suffered deprivation of a constitutional right. *See, e.g., Jenkins v. Bartlett,* 487 F.3d 482, 491-93 (7th Cir. 2007) (affirming preclusion of plaintiff's *Monell* claim in light of jury's finding that police shooting victim's constitutional rights were not violated when officer shot and killed him as he attempted to flee custody); *accord,*

*Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 853-54 (1998) (holding that high-speed police chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to § 1983 liability under Fourteenth Amendment for deprivation of substantive due process).

At the heart of this case is whether Kelly (either accidentally or intentionally) shot LaPorta with his service weapon or whether LaPorta attempted to commit suicide by shooting himself with Kelly's (either secured or unsecured) service weapon. Both parties proffer expert testimony on the question of who shot whom, the weight of which is for the jury to evaluate. What is pellucid is that this pointed factual dispute dooms Plaintiff's Motion because "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill.,* 630 F.3d 499, 504 (7th Cir. 2010); *see also, Los Angeles v. Heller,* 475 U.S. 796 (1986). Plaintiff has pointed to no authority for the proposition that an individual's choice to harm himself can as a matter of law constitute a substantive due process violation. *See, Reno v. Flores,* 507 U.S. 292, 303 (1993) ("The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it."). Indeed, the only cases the Court could uncover

- 24 -

involving § 1983 claims arising out of a plaintiff's suicide occurred in the context of detention officials alleged to have violated the *Eighth* Amendment because they were subjectively aware that a detainee constituted a suicide risk, *see, e.g., Collins v. Seeman,* 462 F.3d 757 (7th Cir. 2006), or exposed the detainee to a greater risk of suicide, *see, e.g., Collignon v. Milwaukee Cnty.,* 163 F.3d 982 (7th Cir. 1998). Such a "special relationship" of custody is conspicuously absent here.

Doubtless Plaintiff will object that, at the motion-to-dismiss stage, the Court found sufficient to state a claim the allegations that "Kelly's service weapon discharged while Kelly and LaPorta were alone at Kelly's residence, and that a bullet from the weapon struck LaPorta in the back of the head." *LaPorta v. City of Chicago,* 102 F.Supp.3d 1014, 1020 (N.D. Ill. 2015). However, a claim's plausibility is different in kind from its sufficiency to entitle the plaintiff to summary judgment. Consistent with the Court's prior analysis, "a serious injury resulting in disability" does indeed "rise[] above a trivial battery" and can suffice to establish a violation of the "constitutionally protected right to bodily integrity." *Ibid.* But the evidence at summary judgment must suffice to show that the alleged battery was, in fact, a battery

– that is, an unconsented-to offensive touching of the plaintiff by another.

The Court acknowledges some authority cabining *Heller*'s rule that a municipality is not liable in damages for its employees' actions that inflicted no constitutional harm. In some circumstances, an individual official or employee need not deprive the plaintiff of constitutional rights for *Monell* liability to attach to the municipality for *its* deprivation of the plaintiff's constitutional rights. For example, in *Fagan v. City of Vineland,* 22 F.3d 1283 (3d Cir. 1994), the court held that "a municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution." *Id.* at 1292-94. Nonetheless, the court firmly reiterated that "[t]he plaintiff must also show that the city's policy actually caused a constitutional injury." *Id.* at 1291 (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389-90, 392 (1989)). Similarly, in *Speer v. City of Wynne, Ark.,* 276 F.3d 980 (8th Cir. 2002), the court noted that "situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no individual's

actions are sufficient to establish personal liability for the violation." *Id.* at 986; *cf.*, *Alexander v. City of South Bend,* 433 F.3d 550, 557 (7th Cir. 2006) (noting that a municipality may not be held liable under *Monell* for failure to supervise its police officers when the plaintiff fails to demonstrate *any* constitutional violation); *Mendez v. Vill. of Tinley Park,* No. 07 C 6498, 2008 WL 427791, at *2 (N.D. Ill. Feb. 14, 2008) ("However, since *the incident* did not involve a deprivation of a federally guaranteed right, the facts do not support a *Monell* claim.") (Leinenweber, J.) (emphasis added).

Viewed in the light most favorable to the non-movant – here, the City – the undisputed facts here present no analogue to *Fagan* or *Speer*. First, if Kelly culpably failed to secure his service weapon at his home, then unlike in *Fagan,* he was not "following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights." *Fagan,* 22 F.3d at 1292. On the contrary, no one disputes that the City *de jure* requires off-duty officers to secure their service weapons. Second, even if the jury were to find that Kelly failed to secure his service weapon pursuant to some negligent non-enforcement of the City's express gun storage policy, there would still be no colorable claim that this policy deprived LaPorta of a substantive due process right. *See, e.g., Lewis,*

- 27 -

523 U.S. at 848-49 ("We have . . . rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.") (citation omitted); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197 (1989) ("[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). Alas, the Supreme Court has "always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. Harker Heights, Tex.,* 503 U.S. 115, 125 (1992) (citation omitted). Third, whatever it demonstrates about the City's knowledge of Kelly's penchant for on-duty misconduct and off-duty drunken violence, the record does not clearly establish that the City was deliberately indifferent to the harm that might befall suicidal persons with whom Kelly came into contact. *Board of Cnty. Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 410 (1997) ("[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

action.") (internal quotation marks omitted). Specific to Kelly, Plaintiff has adduced no evidence that anyone other than LaPorta and his mother knew of his history of improperly leaving his service weapon at bars or that any of his CRs prior to the LaPorta shooting concerned improperly securing his firearm.

What is more, the Seventh Circuit has distinguished *Heller* based on *Speer* in a fashion that shows why Plaintiff is not entitled to summary judgment. In *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293 (7th Cir. 2010), the court rejected the defendant's argument that *Heller* precludes finding a municipality liable under *Monell* where none of its employees violated the plaintiff's constitutional rights. The court noted *Heller*'s absence of "any affirmative defenses that the individual officer may have asserted":

> The absence of these defenses is significant. If, for instance, the officer had pled an affirmative defense such as good faith, then the jury might have found that the plaintiff's constitutional rights were indeed violated, but that the officer could not be held liable. In that case, one can still argue that the City's policies caused the harm, even if the officer was not individually culpable. Without any affirmative defenses, a verdict in favor of the officer necessarily meant that the jury did not believe the officer violated the plaintiff's constitutional rights. And since the City's liability was based on the officer's actions, it too was entitled to a verdict in its favor.

*Id.* at 304-05 (citation omitted).  Hence the Seventh Circuit's holding in *Thomas* that "the jury could have found that the CMTs were not deliberately indifferent to Smith's medical needs, but simply could not respond adequately because of the well-documented breakdowns in the County's policies for retrieving medical request forms." *Ibid.*  Irrespective of any municipal employee's conduct, the plaintiff in *Thomas* still suffered a cognizable deprivation of his substantive due process rights at the hands of the challenged City policy.  Yet these two facets of *Thomas* do not obtain in this case.  As explained above, absent being shot by Kelly, LaPorta was not deprived of his right to bodily integrity merely because shortcomings in the City's enforcement of its gun storage policy may have enabled him to access Kelly's service weapon more readily.  And if Kelly did pull the trigger, then he could have no recourse to the kind of good faith or qualified immunity defenses that would otherwise suspend *Heller*'s operation.

Even holding all this in abeyance, there remains at the very least a substantial question whether the City's challenged policies were the "moving force" behind any purported constitutional violation.  Such questions of proximate causation are best left to the jury outside of extreme cases lacking any quantum of causation evidence.  *Thomas,* 604 F.3d at 303 ("[T]he

- 30 -

jury must make a factual determination as to whether the evidence demonstrates that the [City] had a widespread practice that [caused] the alleged constitutional harm.").

Because the City can be liable only if it or Kelly violated one of LaPorta's constitutionally guaranteed rights - and the undisputed facts in the record do not establish that LaPorta suffered deprivation of a constitutional right - Plaintiff is not entitled to judgment as a matter of law on any of his *Monell* claims. Thus, Plaintiff's Motion for Partial Summary Judgment is denied.

## B. The City's Motion for Summary Judgment

### 1. The Federal Section 1983 Claims (Counts III through VIII)

#### a. The *Monell Claims (Counts IV through VIII)*

As stated above, Plaintiff challenges CPD's code of silence and its failure to investigate officer misconduct and impose appropriate discipline as pervasive *de facto* policies, practices, or customs that encouraged and emboldened Kelly to continue committing off-duty violence against people close to him. Plaintiff factors heavily in the causation calculus Kelly's incident of domestic violence against Fran Brogan; because this alone furnished grounds for criminally prosecuting or at the

very least firing Kelly, Plaintiff claims, Kelly would not have had his service weapon on the night in question.

The City parries the lunge of Plaintiff's *Monell* claims with a mélange of arguments. The City contends that LaPorta suffered no deprivation of a due process right because, regardless of who shot LaPorta, Kelly was not acting under color of law and there is no duty to protect citizens from private violence. The City also argues that Plaintiff fails to adduce evidence sufficient to show the existence of the policies, practices, or customs in question – namely, the code of silence and the lack of sufficient supervisory and disciplinary measures. Next, according to the City, Plaintiff fails to show that the City acted with deliberate indifference, as required for Plaintiff to make out a *prima facie* case on his failure-to-discipline *Monell* claim. Finally, the City argues that no reasonable jury could find that any of its policies, practices, or customs proximately caused LaPorta's injuries.

## I. Constitutional deprivation

The City first levels a challenge to Plaintiff's showing of a constitutional deprivation. Per the Court's earlier analysis, the summary judgment record only permits imposing liability on the City if Kelly shot LaPorta; a non-detained individual's self-harm is not an actionable constitutional harm. The City

repeatedly maintains that the identity of LaPorta's shooter is not a material fact because, even if it was Kelly, he was not acting under color of law at the time, a requirement of § 1983. Because Kelly was thus a private citizen, the City claims, it had no affirmative duty to protect LaPorta from Kelly's acts under *DeShaney.*

The City's color-of-law argument dies a swift death at the hands of *Gibson v. City of Chicago,* 910 F.2d 1510, 1519 (7th Cir. 1990). In that § 1983 action, the Seventh Circuit found that a police officer on medical leave as mentally unfit for duty and in receipt of a specific order to cease using police powers was not acting under color of law when he shot the victim. It nonetheless held that the City was not entitled to summary judgment because it was the City's policy of allowing the deranged police officer to retain his service revolver and bullets that the plaintiff challenged under *Monell. See, id.* at 1517-20 ("Gibson contends that the City's policy of allowing a deranged police officer to retain his service revolver and bullets is the state action that deprived him of his life. Consequently, the City is not entitled to summary judgment on the ground that [the officer] did not act under color of state law.") As the Seventh Circuit noted, the officer need not have been acting under color of law at the time of the accident

because, in this flavor of *Monell,* the "municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the 'color of law' requirement under § 1983." *Id.* at 1519.

The City characterizes *Gibson* as either bad law or factually distinguishable from the case at bar. (*See,* Def.'s Mem. at 10-13 (arguing that "*Gibson* is a derelict in the stream of the law" (internal quotation marks omitted)).). But all the salient data points plot a course consistent with *Gibson,* declining to impose a color-of-law requirement where the municipal policy under which the official proceeded is alleged to have itself caused the injury. *See, e.g., Cazares* v. *Frugoli,* No. 13 C 5626, 2017 WL 1196978, at *13-14 (N.D. Ill. Mar. 31, 2017) (holding that *Gibson* precluded any color-of-law escape hatch where plaintiff claimed under *Monell* that the City's code of silence and failure to investigate and impose discipline for officer misconduct emboldened an off-duty officer to drive drunk in his personal car, thereby causing the injuries of victims whom he struck and killed); *Almaguer v. Cook Cnty.*, No. 08 C 587, 2012 WL 4498097, at *6 (N.D. Ill. Sept. 27, 2012) ("A conclusion that an individual state employee did not act under color of state law does not allow for summary judgment on a municipal liability claim."), *on reconsideration in part,* No.

08 C 587, 2013 WL 388992 (N.D. Ill. Jan. 31, 2013), *aff'd sub nom. Wilson v. Cook Cnty.,* 742 F.3d 775 (7th Cir. 2014); *Obrycka v. City of Chicago,* No. 07 C 2372, 2012 WL 601810, at *6 (N.D. Ill. Feb. 23, 2012) (holding that, in a *Monell* claim, "the municipality itself is the state actor and its action in maintaining the alleged policy at issue supplies the 'color of law' requirement under § 1983.") (citing *Gibson,* 910 F.2d at 1519-20); *Garcia,* 2003 WL 1845397, at *2 (same).

In the same vein, the City's invocation of *DeShaney* for the principle that it had no duty to protect LaPorta from purely private violence misconstrues Plaintiff's *Monell* claim. "*DeShaney* is not the appropriate legal framework with which to analyze Plaintiffs' *Monell* claims, which allege that the City's policies caused the harm." *Cazares,* 2017 WL 1196978, at *14-15; *see also, Rossi,* 790 F.3d at 734, 737 (declining to evaluate under *DeShaney* plaintiff's *Monell* claims that CPD's code of silence "shields police officers from investigation and promotes a culture of misconduct among police that contributed to his assault"); *Obrycka,* 2012 WL 601810, at *6 (examining plaintiff's claims that CPD's code of silence caused her constitutional deprivation "under the *Monell* framework and not *DeShaney*"). While *DeShaney* may retain force on the City's version of the disputed facts, in which LaPorta attempted to commit suicide by

shooting himself with Kelly's gun, this is not the litmus test for summary judgment to the City.

*Wilson-Trattner v. Campbell,* 863 F.3d 589 (7th Cir. 2017), is not to the contrary. There, the Seventh Circuit upheld the district court's grant of summary judgment to individual officers on the plaintiff's substantive due process claim under the *DeShaney* framework. But that case is distinguishable both legally and factually. The court there never once mentioned "*Monell*" liability or the plaintiff's claims against the officers' police departments; this is because the district court was presented only with the summary judgment motions of the individual officers. Factually, too, *Wilson-Trattner* does not control here; there, the plaintiff challenged the adequacy of defendants' response to her repeated complaints of domestic abuse at the hands of an off-duty police officer. As the Court more fully explores in adjudicating Plaintiff's state-law claims, this case does not involve the structural adequacy of police responses to emergencies. (*See,* Section III.B.2, *infra*.)

Thus, the Court does not analyze Plaintiff's *Monell* claims under *DeShaney*'s state-created danger exception. Instead, to establish liability against the City, Plaintiff need only show that LaPorta suffered a deprivation of a constitutional right, the "moving force" behind which was the challenged City policy,

practice, or custom. *Teesdale v. City of Chicago,* 690 F.3d 829, 833 (7th Cir. 2012) (quotation omitted). Because whether LaPorta's substantive due process right to bodily integrity was violated is thus a disputed issue of material fact precluding summary judgment, the Court next turns to the City's arguments concerning the policies themselves and proximate causation.

II. Widespread customs, policies, or practices

Plaintiff attempts to establish his *Monell* claims by presenting evidence that the City has a well-settled, widespread practice or custom of impeding or interfering with police misconduct investigations and that an attendant code of silence pervades CPD whereby officers conceal each other's misconduct in contravention of their sworn duties. Plaintiff submits that the *de facto* policies and code of silence trace to CPD's and the City's failures to investigate allegations of police misconduct, to maintain an early warning system, to enforce regulations against its own officers related to assaulting citizens and being intoxicated, to accept citizen complaints against police officers more readily, to interview suspected officers promptly or take witness statements and preserve evidence, and to discipline officers adequately. According to Plaintiff, many of these failures are exacerbated by or attributable to provisions of the operative CBA between the City Council and the Fraternal

- 37 -

Order of Police that require, for example, a sworn affidavit of the complainant for CR investigations to proceed and removal of sustained complaints of misconduct from a CPD officer's records if they are accompanied by no disciplinary action.

The City, however, contends that there is no genuine issue of material fact as to whether it had a widespread custom, policy, or practice of failing to investigate and discipline officers or a code of silence. It claims that Plaintiff has not shown the code of silence at work during the investigation of the LaPorta shooting, in other complaints against Kelly, or in other facets of CPD's operation.

Viewing the facts and the inferences therefrom in the light most favorable to Plaintiff (the non-movant), the Court first finds that the aftermath of the LaPorta shooting supports a reasonable inference that CPD officers engaged in the code of silence when interacting with Kelly. For example, Plaintiff has adduced evidence that Kelly should have been charged with aggravated assault and resisting arrest for his actions associated with Sergeant Kielbasa. There is also disputed evidence that Kelly placed several calls after the shooting to individuals variously connected with law enforcement and CPD, leading to the presence and intercession of some of these individuals on the scene. *See, e.g., Obrycka,* 2012 WL 601910,

at *8 ("Moreover, other evidence in the record supports Obrycka's code of silence theory, including the fact that after [the officer] punched and kicked Obrycka and realized that his conduct was videotaped, [the officer] and his partner made dozens of telephone calls to each other and other Chicago police officers, including police detectives.") Plaintiff also adduced evidence that Kelly's conduct at the police station prior to administration of the gunshot residue test – particularly, his urinating in the detention room – would have been viewed with far greater scrutiny had Kelly not been a CPD officer. Another salient piece of evidence is the repeated overtures by CPD officers to LaPorta's friend, Matthew Remegi, in an attempt to elicit his statement that LaPorta was suicidal. Finally, it is undisputed that Kelly was not breathalyzed until approximately eight hours after the incident took place – and over six hours after Kelly was taken to the police station. Plaintiff offers expert testimony that these and other investigative shortcomings attending the LaPorta shooting violated the protocol that otherwise would have applied to civilians and constituted manifestations of a code of silence. This panoply of evidence suffices to create a jury question on whether the code of silence was at work during the investigation into the LaPorta shooting.

With respect to investigation and disposition of Kelly's other CRs, Plaintiff has again offered evidence sufficient to create a genuine dispute of material fact as to whether CPD's challenged policies were at work. Apart from expert testimony directed to the adequacy of these investigations, there is undisputed factual evidence that an independent OPS investigator and his supervisor determined that Kelly's statements with respect to the Fran Brogan CR lacked credibility and recommended that the CR be sustained against Kelly. Yet this recommendation was summarily overturned, and OPS's Tia Morris could provide no concrete rationale for doing so. That none of Kelly's 18 or 19 CRs incurred prior to the LaPorta incident resulted in a sustained finding is further evidence from which a reasonable juror could infer that Kelly was reaping the benefits of the code of silence even before the LaPorta shooting. *See, e.g., Beck v. City of Pittsburgh,* 89 F.3d 966, 970 (3d Cir. 1996) ("None of the . . . complaints was sustained and none of them resulted in discipline. None of these dispositions was overruled by the Chief of Police or his assistant."); *Cazares,* 2017 WL 1196978, at *18 (finding that evidence of benefiting from the code of silence included CPD's failure to investigate two specific off-duty accidents "and the fact that [the officer]

was the subject of 18 CRs . . . none of [which] were sustained").

Finally, and contrary to the City's argument, Plaintiff has adduced evidence sufficient to create a jury question as to whether there is a code of silence writ large shielding officers other than Kelly and adversely affecting others besides LaPorta. In the Seventh Circuit, while "there is no clear consensus as to how frequently [a practice] must occur to impose *Monell* liability," there must be sufficient evidence "that there is a policy at issue rather than a random event." *Thomas,* 604 F.3d at 303. The City's main argument is that, absent hearsay evidence inadmissible at trial, Plaintiff brings evidence only specific to LaPorta's experience. This is flatly incorrect. Whereas the Mayor's statements and the contents of the City-commissioned PATF report constitute admissions of a party opponent under FED. R. EVID. 801(d)(2)(D), *see, Nekolny v. Painter,* 653 F.2d 1164, 1171 (7th Cir. 1981) (requiring only that the statement "concern a matter within the scope of agency or employment"); *Sadrud-Din v. City of Chicago,* 883 F.Supp. 270, 273-74 (N.D. Ill. 1995) (finding statements of non-party police officers in newspaper reporter's notes and published article admissible as statements of party opponents), hearsay contents of the PATF and DOJ reports are admissible as "factual findings

from a legally authorized investigation." FED. R. EVID. 803(8)(A)(iii); *see, e.g., Daniel v. Cook County,* 833 F.3d 728, 740-42 (7th Cir. 2016) ("As noted above, a plaintiff cannot ultimately prove a *Monell* claim based on only his own case or even a handful of others. . . . Yet such systemic failings are exactly what the Department of Justice experts were looking for and found in Cook County."); *Dixon v. Cnty. of Cook,* 819 F.3d 343, 349 (7th Cir. 2016) (reversing grant of summary judgment to Cook County because, based on a DOJ report, "a reasonable jury could find that pervasive systematic deficiencies in the detention center's healthcare system were the moving force behind Dixon's injury"); *Martinez v. Cook County,* 2012 WL 6186601, at *4 n.7 (N.D. Ill. Dec. 12, 2012) ("[C]ourts have found Department of Justice letters of this exact type, when relevant, admissible under Federal Rule of Evidence 803(8).") (collecting cases). As in *Cazares,* "the Mayor's acknowledgment of a code of silence, along with the findings of the City's Police Accountability Task Force and the DOJ's report, provide further, significant evidence regarding the existence of a code of silence within the CPD." *Cazares,* 2017 WL 1196978, at *18.

To the City's various "deliberate indifference" arguments for summary judgment based on *Moore v. City of Chicago,* No. 02 C 5130, 2007 WL 3037121 (N.D. Ill. Oct. 15, 2007), in which the

court granted summary judgment to the City in large part based on the City's efforts to address insufficient disciplinary procedures, the Court responds that subsequent cases have declined to follow *Moore* in the presence of evidence that such efforts amounted to mere "lip service" to an acknowledged oversight problem. *See, Johnson v. City of Chicago,* No. 05 C 6545, 2009 WL 1657547, at *9-10 (N.D. Ill. June 9, 2009) (finding that the plaintiff adduced sufficient evidence "to suggest that the City's efforts are merely cosmetic and not truly intended to address the alleged widespread practice of failing to investigate and discipline rogue police officers"); *Arias v. Allegretti,* No. 05 C 5940, 2008 WL 191185, at *3-4 (N.D. Ill. Jan. 22, 2008) (same). Plaintiff has adduced comparable evidence that the City knew its steps to address the code of silence had been widely ignored, ineffectual, or unimplemented. For example, according to CPD's own statistics, with the change from OPS to IPRA in 2007 came a decrease in the number of sustained findings against CPD officers. Similarly, key personnel tasked with administering the City's claimed early warning system testified that they had received no training on how to identify problematic patterns of behavior among officers.

Nor is the City immunized by Kelly's referral for a fitness-for-duty evaluation at some point after the off-duty CRs

or the fact that his CRs were disposed of as unfounded, not sustained, or lacking an affidavit. *See, e.g., Vann v. City of N.Y.,* 72 F.3d 1040, 1049 (2d Cir. 1995) ("[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."); *id.* at 1050 ("[A]fter a problem officer was restored to full-duty status, the Department's supervisory units paid virtually no attention to the filing of new complaints against such officers even though such filings should have been red-flag warnings of possibly renewed and future misconduct.") As the *Vann* court held, any "contention that the Department's treatment of all three postreinstatement complaints against [the officer] did not bespeak indifference because the complaints were 'unsubstantiated' is a matter for argument to the jury." *Ibid.* To the extent Plaintiff is required to show the City's deliberate indifference with respect to CPD's investigating, supervising, and disciplining its officers, he survives summary judgment on the issue by introducing a plethora of statistical evidence, public statements and/or testimony of CPD and City officials, expert analyses, and governmental reports evincing the City Council's knowledge of the constitutional violations attending the City's *de facto* policies and CPD's code of

- 44 -

silence. *See, e.g., Quade v. Kaplan,* No. 06 C 1505, 2008 WL 905187, at *18 ("A custom of failing to discipline police officers can be shown to be deliberately indifferent if the need for further discipline is so obvious and disciplinary procedures so inadequate as to be likely to result in the violation of constitutional rights that a jury could attribute to the policymakers a deliberate indifference to the need to discipline the police force.") (internal quotation marks and citation omitted); *see also, Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006 (7th Cir. 2006) (noting that a plaintiff may prove deliberate indifference by showing "failure to act in response to repeated complaints of constitutional violations by its officers") (citations omitted); *cf., Green v. City of Chicago,* No. 11 C 7067, 2015 WL 2194174, at *8 (N.D. Ill. May 7, 2015) ("Plaintiffs cannot prove that the City's final policymakers acted with 'deliberate indifference' or turned a blind eye to a pattern of violations when the Plaintiffs have offered no evidence to show that the final policymakers had reason to be aware that the policies or practices posed any risks.") (citation omitted).

In any event, the Court doubts whether the concept of deliberate indifference has much purchase where, as here, the plaintiff does not attack a facially lawful policy or municipal

action but instead alleges unlawful, *de facto* policies of impeding and interfering with police misconduct investigations. *See, Obrycka,* 2012 WL 601810, at *9-10. Rather than deliberate indifference, the degree of fault in such scenarios is better defined with reference to the "state of mind required to prove the underlying violation." *Bryan Cnty.,* 520 U.S. at 407-08. Because Plaintiff has coupled *Monell* allegations with invocation of LaPorta's fundamental liberty interest in bodily integrity, recovery on substantive due process grounds depends on whether the municipality "exercised its power without reasonable justification in a manner that 'shocks the conscience.'" *Bettendorf v. St. Croix Cnty.,* 631 F.3d 421, 426 (7th Cir. 2011). Plaintiff easily clears this hurdle by presenting evidence of widespread policies and a code of silence "that allow for police misconduct and brutality without the fear of repercussions, thus affording 'brutality the cloak of law.'" *Obrycka,* 2012 WL 601810, at *10 (citing *Rochin v. California,* 342 U.S. 165, 173 (1952)). Thus, Plaintiff has raised a genuine issue of material fact regarding the culpability requirement – namely, that the City's policies and code of silence "shock the conscience" because they are "intended to injure in some way unjustifiable by any government interest." *Lewis,* 523 U.S. at 849.

- 46 -

Taken in the light most favorable to Plaintiff, the factual record creates a genuine dispute of material fact as to the existence of a pervasive code of silence within CPD and other *de facto* policies that would lead Kelly to believe he could inflict alcohol-fueled violence with impunity in his personal life.

### III. Causation

Plaintiff's argument for proximate causation is bipartite. First, Plaintiff claims that the City's *de facto* policies and code of silence emboldened Kelly to continue committing off-duty acts of alcohol-fueled violence, proximately causing him to drink to excess and shoot LaPorta with his service weapon. Second, Plaintiff claims that, had the City properly disciplined Kelly for his infractions – particularly the domestic violence incident with Fran Brogan – he would not have had access to his service weapon because he would have at least been fired and, if convicted criminally, ineligible under federal law even to carry a firearm. (In 1996, the Lautenberg Amendment established specific elements that would bar possession of firearms and ammunition for anyone convicted of a domestic violence-related crime. 18 U.S.C. § 922(g)(9). The law provides no exception for law enforcement officers.)

The City, on the other hand, maintains that Plaintiff's *Monell* claims are improper attempts to hold it vicariously

liable for Kelly's private acts and that Plaintiff's assertions of how the City's *de facto* policies and code of silence proximately caused his injury are speculative. The City places particular emphasis on the fact that Kelly owned his service weapon outright, the inference being that even Kelly's termination from CPD would not have changed the fact that he would nonetheless have still possessed the same gun used to shoot Kelly on the night in question.

The critical question is whether the City's *de facto* policies – with CPD's attendant code of silence - were the "moving force" behind Kelly's actions such that execution of the policies "inflicts the injuries that the government as an entity is responsible [for] under § 1983." *Estate of Novack ex rel. Turbin v. Cnty. of Wood,* 226 F.3d 525, 531 (7th Cir. 2000) (quotation omitted). There must be a "direct causal link" between the alleged policy or practice and the constitutional violation. *Obrycka,* 2012 WL 601810, at *9. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir. 1990).

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find

- 48 -

that Kelly's off-duty decisions to drink to excess and shoot LaPorta with his service weapon were caused by a belief that he was impervious to consequences due to CPD's administrative lapses and willingness to tolerate a code of silence. This is so despite the fact that Kelly's prior CRs did not involve use of a gun to injure others. In fact, there is a much closer nexus here - between LaPorta's injury and Kelly's CRs for on-duty excessive force and off-duty drunken violence - than in other cases where the City was nonetheless denied summary judgment. *See, e.g., Cazares,* 2017 WL 1196978 ("Before the fatal accident, [the officer] had been the subject of numerous citizen complaints, none of which were sustained or resulted in discipline. Although none of these allegations related to [the officer's] use of alcohol, a reasonable jury could infer that the lack of investigation or discipline resulting from these official investigations led [the officer] to believe that he was immune from discipline for any of his actions, on or off-duty."). Indeed, "a reasonable fact-finder, viewing the facts in the light most favorable to Plaintiff[], could very well believe that [Kelly] routinely engaged in violent and dangerous 'off-duty' conduct, in particular while drinking and dealing with situations involving his family" and/or close friends. *Panas v. City of Philadelphia,* 871 F.Supp.2d 370, 379 (E.D. Pa.

- 49 -

2012); *see also, Bielevicz,* 915 F.2d at 851-52 ("[I]t is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future."). Thus, a fact-finder could reasonably infer that the pervasive tolerance of and lack of accountability for Kelly's behavior emboldened him to continue misbehaving throughout his tenure as a police officer. *See, e.g., Brandon v. Holt,* 469 U.S. 464, 467 (1985) (upholding judgment against municipality under § 1983 where plaintiffs alleged that they were attacked by officer whose dangerous propensities were well-known within his precinct and deficient procedures for discovering officer misconduct prevented police chief from learning of officer's past violent behavior). Like the off-duty officer in *Cazares,* a jury could reasonably infer that Kelly felt emboldened and able to act with impunity after 19 separate allegations of misconduct, including two for the alcohol-induced batteries of his then-live-in girlfriend and her brother, respectively, resulted in no sustained CRs, no behavioral intervention or modification, and no civil or administrative sanction.

Similarly, there is a material dispute of fact concerning whether Kelly would *not* have possessed his service weapon had he been discharged from employment with CPD as a result of his many on- and off-duty infractions or criminally prosecuted as a

result of the domestic violence incident with Fran Brogan.  The
City protests that it is speculation to assume that a criminal
investigation of Kelly's domestic battery of Fran Brogan – as
opposed to an administrative finding sustaining the CR - would
have ensued absent the City's *de facto* policies and code of
silence.  The City then points to evidence that there is no set
protocol for handling CPD officers administratively found to
have committed domestic violence.  Yet what defeats summary
judgment is precisely this indeterminacy – along with the
woefully underdeveloped nature of the factual record on the
issue of what confiscation protocols the City follows *vis-à-vis*
a discharged CPD officer's service weapon and/or ammunition.
Left for the trier of fact is the potential applicability of the
*Cazares* court's proximate cause analysis:  when coupled with
other facts suggesting application of the code of silence to an
officer's past behavior, that "the law regarding DUI in Illinois
[] would have suspended his driver's license if the Chicago
police officers" had dealt with the officer as the plaintiff
urged made it "even more likely" that the City's *de facto*
policies and code of silence caused the plaintiffs' injuries.
*Cazares,* 2017 WL 1196978, at *19.  Here, Plaintiff presses that,
had the Fran Brogan CR been properly investigated or resulted in
criminal prosecution of Kelly, police regulations or federal

law, respectively, would have prevented Kelly from accessing his service weapon on the night in question.

The Court acknowledges the lack of any substantive due process right to have someone else prosecuted. *See, e.g., Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 768 (2005) ("[T]he benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations."). But Plaintiff's claim is not that the City's failure to prosecute Kelly itself deprived him of constitutional rights. His (actionable) claim is that Kelly's deprivation of his constitutional rights was caused by the City's *de facto* policies and code of silence, perhaps the most crucial manifestation of which was the City's failure to at least find Kelly administratively culpable for the battery and potentially to prosecute him criminally. Consequently, there remains a genuine dispute of material fact whether applicable regulations or federal law would have prohibited Kelly from possessing a firearm at the time of the LaPorta shooting if he "was an average citizen, not protected by the code of silence." *Cazares,* 2017 WL 1196978, at *16.

- 52 -

The City cites *Othman v. City of Chicago,* 2014 WL 6566357 (N.D. Ill. Nov. 20, 2014), to argue that Kelly's ownership of his service weapon scuttles Plaintiff's *prima facie* causation showing. Although the court in *Othman* did mention that the defendant officer owned the firearm used to shoot the plaintiff, this was only one of a multitude of facts that undercut the tenability of the causal chain. *See, Othman,* 2014 WL 6566357, at *7-9 (granting summary judgment to the City on plaintiff's *Monell* claim where the City had neither reason to know of constitutionally deficient practices *nor authority to retrieve the defendant officer's weapon from him while he was merely on medical leave*, and plaintiff argued that "the 14 shots fired by [the defendant officer] constitute a 'series of bad acts' that provided the City's final policymakers with notice of the purported constitutional violations") (emphasis added). Clearly, the only commonality between *Othman* and this case is the (alleged) shooter's ownership of his service weapon. That does not suffice to take the proximate cause inquiry into the realm of "extreme circumstances" and out of the hands of the jury, where it belongs. *See, e.g., Gayton v. McCoy,* 593 F.3d 610, 624 (7th Cir. 2010) ("While generally the issue of proximate cause is a jury question, in extreme circumstances . . . the question of proximate cause is an issue of law properly resolved by a

court."). The causation question is the bailiwick of the jury where, "as in *Gibson*, the City 'affirmatively trained and outfitted one of its employees with the means to exercise deadly force, yet failed to recover that equipment from its employee even after it [allegedly knew] that the employee was unfit to exercise police authority.'" *Sadrud-Din v. City of Chicago*, 883 F.Supp. 270, 278 (N.D. Ill. 1995) (citations omitted).

*   *   *

Therefore, genuine disputes of material fact foreclose the City's entitlement to summary judgment on Plaintiff's *Monell* claims. Accordingly, the Court denies the City's Motion for Summary Judgment in relevant part.

### b. *Denial of Right to Judicial Access (Count III)*

Plaintiff in Count III alleges that the City's defense of this lawsuit and general foot-dragging in disclosing Kelly's files and CR records were calculated to cover up or shield it from liability, thereby depriving Plaintiff of access to the courts. The relief Plaintiff seeks on this claim mirrors that for which he prays under each of the five *Monell* claims. (*Compare,* ECF No. 220 ("7AC") at Count III, *with, id.* at Counts IV-VIII.) To sustain this cause of action, Plaintiff's operative Complaint points to two buckets of information that the City failed timely to disclose.

First, although Plaintiff knew soon after initiating his 2010 state court lawsuit that repeated complaints had been filed against Kelly, it was only after *Kalven v. City of Chicago,* 7 N.E.3d 741 (Ill. App. 2014), which established the necessity of disclosing such information in response to Freedom of Information Act requests, that Plaintiff learned of the City's widespread policy of condoning such misconduct. Plaintiff then added the City as a defendant in the state court action, and the City removed the case to this Court on December 3, 2014.

Second, Plaintiff's operative complaint characterizes five efforts by the City to "conceal, suppress, and/or stall its investigation into the [LaPorta shooting], as well as conceal, suppress, and/or stall its findings from that investigation, forcing Plaintiff to repeatedly file Motions to Compel Evidence and Motions for Sanctions." (7AC ¶ 158.) According to Plaintiff, the City knowingly failed "to seasonably update discovery to disclose ongoing CRs against Kelly"; in addition, the City knowingly failed "to disclose to Plaintiff a 2014 officer-involved shooting by Kelly, which Plaintiff did not discover until June 25, 2016, resulting in a belated FOIA request to the Chicago Police Department and the City of Chicago"; third, the City knowingly failed "to disclose at least 9 additional known CRs registered against Kelly prior to" the

- 55 -

LaPorta shooting; fourth, the City knowingly failed to disclose "eight additional Summary Punishment Action Request ('SPAR') files and additional 8 IPRA log files, of which Plaintiff first became aware in July 2016, more than six years into the litigation"; and fifth, the City did not produce the IPRA file regarding the shooting until two years after IPRA had administratively closed the case. (*Id.* ¶ 159.) Highlighting the City's statute-of-limitations affirmative defense in its operative Answer, Plaintiff notes the potential for prejudice if the Court or the jury finds that the *Monell* claims are time-barred. (*See, id.* ¶ 163.)

The City responds that Plaintiff cannot sustain a right-of-access claim because Plaintiff has no proof of harm, "which can only come from a dispositive ruling on the antecedent cause of action." (ECF No. 241 ("Def.'s Mem.") at 40.) Grounding this argument is the requirement that the concealment of evidence was "to some extent successful in that it prevented him from pursuing his legal actions, contributed to the failure of those actions, or reduced the value of his actions." *Garcia,* 2003 WL 1715621, at *9 (citing *Vasquez v. Hernandez,* 60 F.3d 325, 328-29 (7th Cir. 1995)). Failing evidence that its conduct reduced the value of his legal actions or directly contributed to their failure, the City urges, Plaintiff's claim "is not even ripe for

adjudication because it has not yet even accrued." (Def.'s Mem. at 41.)

The First and Fourteenth Amendments protect "the right of individuals to seek legal redress for claims that have a reasonable basis in law." *Christopher v. Harbury,* 536 U.S. 403, 414-15 (2002). Interference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983. *Bounds v. Smith,* 430 U.S. 817, 822 (1977). Cognizable access-to-courts actions fall into two categories: (1) claims that official action frustrates a plaintiff or plaintiff class "in preparing and filing suits at the present time" and that seek "to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed"; and (2) claims "not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Id.* at 412-14.

This case does not implicate the first category, as Plaintiff does not allege that the City's obstruction is frustrating his "preparing and filing suits at the present time." To be actionable, then, Plaintiff's claim must fall

within the second category of cases in which "[t]he official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Christopher,* 536 U.S. at 414 (internal citations omitted). These cases "do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Ibid.* And because such claims are brought to secure relief "unobtainable in other suits, the remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim." *Id.* at 416.

In this case, Plaintiff has offered no facts or argument indicating that he lost a claim or accepted a lowball settlement as a result of the City's litigation conduct and disclosure delays. *See, Bell v. City of Milwaukee,* 746 F.2d 1205, 1262-65 (7th Cir. 1984), *overruled on other grounds, Russ v. Watts,* 414 F.3d 783 (7th Cir. 2005). Nothing has yet ended "poorly" for Plaintiff. *Christopher,* 536 U.S. at 414. And because Plaintiff's right-of-access action seeks the same relief against

the same defendant as do his *Monell* claims, it does not appear viable at present. *See, id.* at 416 n.13 (noting that an underlying action may have "already been tried to an inadequate result due to missing or fabricated evidence in an official cover-up, *or the claim may still be timely and subject to trial, but for a different remedy than the one sought under the access claim, or against different defendants*") (emphasis added) (citing *Bell v. Milwaukee,* 746 F.2d 1205, 1223 (7th Cir. 1984)). So if Plaintiff prevails on the legal actions that he alleges were delayed and frustrated by the City's conduct, then the harm from that delay and frustration can be redressed by inclusion of appropriate interest in any damages computation, a well-taken motion for sanctions, and an award of attorneys' fees under the fee-shifting mechanism governing successful § 1983 claims. *See,* 42 U.S.C. § 1988(b). Only if Plaintiff loses on statute-of-limitations grounds will he have suffered anything more than the sort of inconvenient delay that the Seventh Circuit has found insufficient to constitute actionable harm to a plaintiff's right of access. *See, Vasquez v. Hernandez,* 60 F.3d 325, 329 (7th Cir. 1995) (finding no constitutional violation for denial of judicial access where culpable police cover-up delayed by six months plaintiff's nonetheless timely lawsuit, with eventual

corrective measures and disclosure providing information vital to plaintiff's case).

Because it can only be determined whether the City's complained-of conduct "render[ed] hollow [Plaintiff's] right to seek redress" after adjudication of the underlying claims, *Vasquez,* 60 F.3d at 328, the Court hereby bifurcates trial into two phases such that Plaintiff's right-of-access claim can be tried once the jury has returned a verdict for or against the City. *See, Lynch v. Barrett,* 703 F.3d 1153, 1157 n.1 (10th Cir. 2013) ("Where a plaintiff prior to filing an underlying claim knows of facts suggesting an evidentiary cover-up by government officials, the underlying claim and the denial-of-access claim generally should be joined in the same action even if *that requires bifurcated trials*.") (emphasis added) (citing *Christopher,* 536 U.S. at 416); *Gaffney v. Riverboat Servs. of Ind., Inc.,* 451 F.3d 424, 442 (7th Cir. 2006) ("[B]ifurcation under Rule 42(b) is appropriate where claims are factually interlinked, such that a separate trial may be appropriate, but final resolution of one claim affects the resolution of the other.") (citation omitted).

The Court accordingly denies summary judgment to the City on Count III and instead bifurcates Plaintiff's right-of-access claim from the balance of the trial.

- 60 -

### 2. The State Law Claims (Counts I and IX)

Finally, Plaintiff asserts two claims under Illinois law against the City. Count I alleges that the City engaged in willful and wanton conduct when, with knowledge of Kelly's propensity for violence, it allowed Kelly to carry his service weapon while off duty and failed to train or supervise him regarding weapon storage. Willful and wanton conduct is a strain of fault that shares some commonalities with ordinary negligence but is distinct in that it evinces "a course of action that showed a deliberate intention to harm or an utter indifference to or conscious disregard for the plaintiff's welfare." *Floyd v. Rockford Park Dist.,* 823 N.E.2d 1004, 1009 (Ill. App. 2005) (internal citations omitted). The second state-law claim, Count IX, alleges negligent retention and supervision of Kelly.

The City launches a dual attack on Plaintiff's state-law claims that it believes entitle it to summary judgment even if Kelly shot LaPorta. First, the City argues that there is no proximate causation. Second, the City contends that it has immunity under various provisions of Illinois's Local Governmental and Governmental Employees Tort Immunity Act, 745 Ill. Comp. Stat. 10 *et seq.* (the "Act"). Because the immunity

analysis is persuasive, the Court need not consider the issue of proximate causation.

The City argues that three separate provisions of the Act immunize it from liability. First, the City contends that section 2-109 grants it absolute immunity from both Plaintiff's ordinary negligence and willful and wanton claims. Section 2-109 provides that a "local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 Ill. Comp. Stat. 10/2-109. But this section doesn't advance the ball on the City's Motion for Summary Judgment because there is a genuine dispute of material fact as to whether Kelly shot LaPorta – and thus whether Kelly committed a tort. That Plaintiff has already settled with Kelly does not change the analysis, because "the release of an individual defendant through settlement does not automatically trigger a public entity's immunity under Section 2-109." *LaPorta,* 102 F.Supp.3d at 1020 (citing *Whitney v. City of Chicago,* 508 N.E.2d 293, 297 (Ill. App. 1987) (allowing negligent hiring claim to proceed even though individual defendants had settled)).

Next, the City points to section 4-102, which states that public entities are not liable "for failure to provide adequate police protection or service, failure to prevent the commission

of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." Ill Comp. Stat. 10/4-102. This provision mirrors the "public duty rule" under which a municipality cannot be held liable for its failure to provide routine governmental services, such as police and fire protection, absent a special duty to a particular individual. *Harinek v. 161 N. Clark St. Ltd. P'ship*, 692 N.E.2d 1177, 1183 (Ill. 1998). But section 4-102 cannot ride to the City's rescue here because Plaintiff's claim is not that the City breached its duty to him by failing to provide adequate police protection. *See, e.g., Colon v. Town of Cicero*, No. 12 C 5481, 2015 WL 9268208, at *2 (N.D. Ill. Dec. 21, 2015) (finding that "plaintiff's negligent hiring and supervision claims do not arise from an alleged failure to provide police protection" and so are not barred by § 4-102; distinguishing cases to the contrary on the grounds that they involved "the failure to investigate an accident and the failure to report an arrest"). On the contrary, Plaintiff's claim is that the City breached its duty by retaining an officer who posed a threat to the public – a duty which exists independently of its duty to furnish police protection. *See, Bates v. Doria*, 502 N.E.2d 454, 458 (Ill. App. 1986).

However, the City's invocation of section 2-201 is well taken. That section of the Act provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 Ill. Comp. Stat 10/2-201. While section 2-201 refers to a public employee, local governments are also clothed with immunity if their employees are not liable for the injury resulting from their acts or omissions. *See, Arteman v. Clinton Comm. Unit Sch. Dist. No. 15,* 763 N.E.2d 756, 762-63 (Ill. 2002) ("Because a local public entity is not liable for an injury resulting from an act or omission of its employees where the employee is not liable, this broad discretionary immunity applies to the entities themselves.") (internal quotation marks omitted) (citing 745 Ill. Comp. Stat. 10/2-109, 10/2-201). The Illinois Supreme Court has interpreted section 2-201 to require that the public employee's actions be "*both* a determination of policy *and* an exercise of discretion" for immunity to attach. *Van Meter v. Darien Park Dist.,* 799 N.E.2d 273, 283 (Ill. 2003) (emphasis added) (internal citation marks and citation omitted); *accord, Harinek,* 692 N.E.2d at 1181 ("The employee's position . . . may be one which involves either determining policy or exercising

- 64 -

discretion, but . . . the act or omission must be both a determination of policy and an exercise of discretion."). Conduct may be a determination of policy even if it does not occur at the planning level or involve the formulation of principles to achieve a common public benefit. *Harrison v. Hardin Co. Comm. Unit Sch. Dist. No. 1,* 758 N.E.2d 848, 853 (Ill. 2001) (characterizing actions towards one person as within the ambit of policy determinations). By contrast, section 2-201 does not cover the performance of ministerial actions – that is, those acts performed on a given state of facts in a prescribed manner, under the mandate of legal authority, and without reference to the official's discretion regarding the propriety of the act. *See, In re Chicago Flood Litig.,* 680 N.E.2d 265, 272 (Ill. 1997) (holding that ministerial acts implicate execution of set task that is "absolute, certain, and imperative"); *Snyder v. Curran T'ship,* 657 N.E.2d 988, 989 (Ill. 1995).

Plaintiff claims that the challenged municipal decisions to retain Kelly, allow him to carry his gun, and to supervise him insufficiently were ministerial functions – executed by rote adherence to a monolithic code of silence with no room for deviation. The Court first notes the cognitive dissonance required to claim, with one breath, that CPD's failure to

discipline and supervise police officers has erected a widespread municipal policy actionable under *Monell* and, with the other, to claim that deciding whether and whom to discipline and supervise is not a policymaking function. Perhaps Plaintiff would enjoy more state-law slack if his *Monell* claims derived from an *express* City Council policy by which officials and police agencies act negligently, or with willful and wanton disregard for rights, or strictly in keeping with the code of silence. But that's clearly irreconcilable with the arguments in this case and common sense (*i.e.,* the definition of "negligent"). The second problem confronting Plaintiff is that the mere presence of an overarching schema or plan for hiring, supervising, disciplining, or discharging employees does not render such tasks ministerial. *See, e.g., In re Chicago Flood Litig.,* 680 N.E.2d at 273 ("We agree with the appellate court that the City's supervision of Great Lakes' pile driving [after approving the pile driving plan] was discretionary rather than ministerial."); *Reed v. City of Chicago,* No. 01 C 7865, 2002 WL 406983, at *3 (N.D. Ill. Mar. 14, 2002) ("While there are most likely guidelines in hiring, training and supervising employees, all three acts still require discretion, balancing of interests, and judgment calls."); *Johnson v. Mers,* 664 N.E.2d 668, 675 (Ill. App. 1996) ("While [the municipality] did devise a hiring

plan which would include the application process, a polygraph examination, psychological testing, physical testing, and interviews, the decision to hire an officer ultimately required the exercise of discretion."). In any event, the facts before the Court simply furnish no basis for characterizing the challenged decisions, either those at the highest level of the City Council or CPD's specific conduct with respect to Kelly, as those whose execution was "absolute, certain, and imperative," "in obedience to legal authority and without reference to the official's discretion as to the propriety of the act." *In re Chicago Flood Litig.*, 680 N.E.2d at 272; *Snyder,* 657 N.E.2d at 993.

Plaintiff offers no examples of other courts finding on summary judgment that such decisions are ministerial and beyond the reach of the Act's immunity. Although the Court acknowledges that "more recent case law rejects" determining *from the allegations of the complaint* whether a particular municipal function implicates a determination of policy and an exercise of discretion, this case is at the summary judgment stage. Plaintiff's admonitions to avoid adjudicating "whether the complaint itself establishes as a matter of law that statutory immunity" applies are therefore immaterial here. *McDonald v. Camarillo,* No. 10 C 1233, 2010 WL 4483314, at *2

(N.D. Ill. Nov. 1, 2010). Rather than deciding immunity "on the basis of intuition," the Court has the "benefit" of boxes of exhibits concerning investigations of and discipline for CPD officer misconduct. *Patton v. Chicago Heights,* No. 09 C 5566, 2010 WL 1813478, at *3 (N.D. Ill. May 3, 2010).

Myriad cases decided on summary judgment characterize municipal decisions regarding discipline, supervision, and retention of an employee as discretionary and indebted to policymaking. *See, e.g., Mers,* 664 N.E.2d at 675 ("The decision to hire or not to hire a police officer is an inherently discretionary act and, thus, is subject to the immunities contained in the Immunity Act."), *cited with approval, Doe v. Vill. of Arlington Hts.,* 782 F.3d 911, 922 (7th Cir. 2015); *Brooks v. Daley,* 29 N.E.3d 1108, 1116–17 (Ill. App. 2015) ("Here, when Brooks was accused of sexual harassment, defendants made a decision concerning the effect that the allegations would have on efficacy and harmony in the workplace. Such a judgment call is both a policy determination and a discretionary action, since the outcome is not predetermined but left to defendants' judgment."); *Albert v. Bd. of Educ. of City of Chicago,* 24 N.E.3d 28, 46 (Ill. App. 2014) (affirming the lower court's reasoning that "[t]he act and omissions alleged on the part of the Board here involve decisions with regard to administering

student discipline and punishment involve [*sic*] the determination of policy and an exercise of discretion" because the "Board had to balance competing interests and make a judgment call, thus engaging in policy determination") (internal quotation marks omitted); *Hanania v. Loren-Maltese,* 319 F.Supp.2d 814, 834-36 (N.D. Ill. 2004) (holding that the city of Cicero was immune from liability for decisions to reduce the powers of the town collector's office and to fire its town collector); *Mann v. City of Chicago,* 182 F.3d 922 (Tbl.) (N.D. Ill. 1999) (affirming summary judgment on immunity grounds in favor of defendants because "Illinois appellate courts have held that the hiring and firing of employees is inherently discretionary, within the meaning of § 2-201 of the Tort Immunity Act") (citations omitted).

Because neither the facts nor the case law supports characterizing the municipal decisions at issue as ministerial, the City is entitled to judgment as a matter of law that it enjoys section 2-201 immunity from Plaintiff's state law claims. This conclusion applies with equal force to Plaintiff's willful-and-wanton claim, because there is no exception in section 2-201 for willful and wanton conduct. *See, e.g., In re Chicago Flood Litig.,* 680 N.E.2d at 273 ("The plain language of section 2-201 is unambiguous. That provision does not contain an immunity

exception for willful and wanton misconduct."); *Mers,* 664 N.E.2d at 675 ("The absence of language excepting wilful [*sic*] and wanton conduct in sections 2-201 and 3-108, where such language is contained in other sections, demonstrates that there is no exception for wilful [*sic*] and wanton conduct contained in sections 2-201 and 3-108."); *see also, Hanania,* 319 F.Supp.2d at 836 (finding no exception in section 2-201 for actions performed with "corrupt or malicious motives") (citing *Vill. of Bloomingdale v. CDG Enters., Inc.,* 752 N.E.2d 1090, 1098 (Ill. 2001)); *but see, Smith v. Waukegan Park Dist.,* 896 N.E.2d 232, (Ill. 2008) ("[W]e declare, under established Illinois law, [that] public entities possess no immunized discretion to discharge employees for exercising their workers' compensation rights.").

As such, the Court grants summary judgment to the City on Plaintiff's state law claims (Counts I and IX).

### IV. <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment [ECF No. 238] is denied, and Defendant City of Chicago's Motion for Summary Judgment [ECF No. 241] is granted in part as to Counts I and IX but denied as to the remaining counts.

Additionally, the Court bifurcates the trial so that adjudication of Count III will commence only after the jury returns a verdict on the other claims against the City.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:  September 29, 2017