**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIRST MIDWEST BANK, as Guardian of the estate and person of Michael D. LaPorta, a disabled person, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 14 CV 9665 |
| | ) | Honorable Judge Leinenweber |
| v. | ) ) | |
| CITY OF CHICAGO, a municipal corporation; | ) ) | *Removed from the Circuit Court of Cook County, Case No. 10 L 11901* |
| Defendant. | ) | |

## DEFENDANT CITY OF CHICAGO'S RULE 50(b) RENEWED MOTION
## FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

Introduction …………………………………………………………………….. 1

I. Plaintiff Failed to Prove a Constitutional Violation ………………………............. 1

   A. The City is Not Liable for Conduct of a Private Actor …………………............. 2

   B. Plaintiff Failed to Adduce Sufficient Evidence that Kelly Intentionally or
      With Reckless Indifference Shot LaPorta ……………………………………….. 6

II. The Jury's Finding of Monell Liability is not Supported by the Evidence ……....... 9

   A. The Evidence Does Not Demonstrate the Existence of Widespread Practices
      of Failing to Maintain an Adequate Early Warning System or Failing to
      Discipline …............................................................................................................ 11

      1. Failure to Maintain an Adequate Early Warning System ………………….. 12

      2. Failure to Discipline …………………………………………………………….. 15

      3. Failure to Investigate ……………………………………………………………. 19

   B. There Was Insufficient Evidence to Establish that the City's Policymaker
      was Deliberately Indifferent …………………………………………………....... 21

      1. There Was No Evidence of Deliberate Indifference by the Chicago
      City Council to Any Failure to Maintain an Adequate Early Warning
      System ………………………………………………………………………… 22

      2. There Was No Evidence of Deliberate Indifference by the Chicago City
      Council to Any Widespread Practice of Failing to Discipline ……………....... 23

   C. There Was a Legally Insufficient Evidentiary Basis to Establish that a
      Widespread Practice was the Cause of Plaintiff's Injury ……………………... 25

Cases

*Alexander v. South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) ........................................................ 5

*American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 52 (1999) .................. 3

*Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir.2008) ................................. 26

*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ............................................................ 3

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) ............................................. 10, 26, 27

*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) ......................................... 1, 6

*Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) ............................................................... 10, 21

*County of Sacramento v. Lewis*, 523 U.S. 833, 845-6 (1998) ..................................................... 2

*Craft v. Flagg*, No. 06 C 1451, 2010 WL 5363914, at *2 (N.D. Ill. Dec. 13, 2010) .................. 27

*Czajkowski v. City of Chicago*, 810 F.Supp. 1428, 1439 (N.D.Ill.1992) .................................... 23

*D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 800 (7th Cir. 2015) ...................................... 4

*Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) ........................................................ 11

*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1988) ............... 3

*Doe ex rel. Magee v. Covington County School District ex rel. Keyes*, 675 F.3d 849 (5th Cir. 2012) ........................................................................................................................................ 5

*Fairley v. Andrews*, 430 F. Supp. 2d 786, 801 (N.D. Ill. 2006) ............................................... 11

*Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 164 (1978) ..................................................... 3

*Gibson v. City of Chicago* 910 F.2d 1510, 1521 (7th Cir. 1990) ............................................. 5

*Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) ................................... 11, 16, 18, 20

*Hammond Group., Ltd. v. Spalding & Evenflo Cos.*, 69 F.3d 845, 848 (7th Cir. 1995). ............... 1

*In re Cohen*, 507 F.3d 610, 614 (7th Cir.2007) ...................................................................... 9

*Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995) ................................................... 11

*Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ...................................................... 5

*Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 536-8 (1999) .................................................... 6

*Latuszkin v. City of Chicago*, 250 F.3d 502 (7th Cir. 2001) ................................................... 4

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 937 (1982) ................................................. 2

*Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 283 (7th Cir. 1986) ............................... 5

*McLin, et al. v. City of Chicago*, 742 F. Supp. 994 at 997–98 (N.D. Ill. 1990) ....................... 16

*Moore v. City of Chicago*, No. 02 C 5130, 2007 WL 3037121, at * 11. (N.D. Ill. Oct.15, 2007) 21

*Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) .................................................. 19

*Pembaur*, 475 U.S. 468, 483 (1986) ............................................................................... 21, 23

*Rochin v. California*, 342 U.S. 165 (1952) ........................................................................... 2

*Rossi v. City of Chicago*, 790 F.3d 792, 737 (7th Cir. 2015) .............................................. 9, 16

*Ruiz-Cortez v. City of Chicago*, 2016 WL 6270768, at *22 (N.D. Ill. 2016) ........................... 26

*Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir.2010) ............................... 5

*Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.2006) ................................................. 5

*Tabor v. City of Chicago*, 10 F.Supp.2d 988, 993 (N.D.Ill.1998) .......................................... 11

*Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir.1992) ........................................... 23

*Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) ............................................. 11

*United States v. Landry*, 257 F.2d 425, 431 (7th Cir.1958) ................................................ 9

ii

*United States v. Reed*, 991 F.2d 399, 400 (7th Cir. 1993) ............................................................. 8

*Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008). ................................................................ 4

*Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) ..................................................... 26

*Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993) ..................................................... 21

*Wilson v. Cook County*, 742 F.3d 775, 783–84 (7th Cir. 2014) ..................................................... 25

*Wilson-Trattner v. Campbell*, 2016 WL 2894444, *7 (S.D. Ind. May, 18, 2016) .......................... 4

*Wilson-Trattner v. Campbell,* 863 F.3d 589 (7th Cir. 2017) .................................................. 3, 4, 9

Defendant City of Chicago, by its undersigned counsel, hereby moves for judgment as a matter of law, pursuant to Fed. R. Evid. 50(b). In support, the City states as follows:

## INTRODUCTION

Plaintiff failed to present sufficient evidence for the jury to find in his favor on his *Monell* claim. On October 18, 2017, at the close of Plaintiff's case, Defendant moved for a directed verdict pursuant to Fed. R. Civ. P. 50(a). The Court denied that motion in an oral ruling the same day. On October 26, 2017, the jury returned a verdict for Plaintiff based on two of his *Monell* theories, failure to maintain an adequate early warning system and failure to discipline, and found that these failures caused Patrick Kelly intentionally or with reckless indifference to shoot Michael LaPorta. Judgment was entered on the docket on October 30, 2017. (Dkt. 443.)

Rule 50(b) allows for a renewed motion for judgment as a matter of law, after the denial of a Rule 50(a) motion and within 28 days of the entry of judgment, on the ground that there was no legally sufficient evidentiary basis for a reasonable jury to have found for the non-moving party. The Court must determine whether the evidence, viewed in the light most favorable to the non-movant, is sufficient to sustain the verdict. *Hammond Group., Ltd. v. Spalding & Evenflo Cos*., 69 F.3d 845, 848 (7th Cir. 1995). Because there is no legally sufficient evidentiary basis for the verdict here, the City is entitled to judgment as a matter of law.

## I. PLAINTIFF FAILED TO PROVE A CONSTITUTIONAL VIOLATION.

To prevail on a section 1983 claim, a plaintiff must establish by a preponderance of the evidence "(1) [that] plaintiff's harm was caused by a constitutional violation, and (2) if so, [that] the city is responsible for that violation." *Collins v. City of Harker Heights, Tex*., 503 U.S. 115, 120 (1992). Here, Plaintiff claims that Kelly violated his Fourteenth Amendment substantive due process right to bodily integrity by shooting LaPorta. But it was undisputed at trial that Kelly –

who was off duty, who was not acting as a police officer, and whose gun was his own personal property (Ex. A at 42, 224, 2271) – was not acting under color of law and was not a state actor at the time LaPorta was shot.  As a matter of law, then, Kelly was a private actor, and his actions therefore cannot have violated the constitution.  And without an underlying constitutional violation, the City is not liable.  But even on Plaintiff's theory that there was a constitutional violation, the City is entitled to judgment as a matter of law because Plaintiff failed to adduce sufficient evidence to prove that Kelly intentionally fired his gun to inflict harm on LaPorta or acted with reckless indifference.

### A.  The City Is Not Liable For Conduct Of A Private Actor.

The Supreme Court has "emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action *of government*." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-6 (1998) (internal citation omitted) (emphasis added); *accord Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 937 (1982) (only conduct "that may be fairly characterized as 'state action'" can violate Fourteenth Amendment; for liability, person inflicting injury must be "a person who may fairly be said to be a state actor"). Due process protects against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.*  The Supreme Court recognized a substantive due process right to bodily integrity in *Rochin v. California*, 342 U.S. 165 (1952), where the plaintiff alleged "conscience shocking" behavior, namely, having a criminal suspect's stomach pumped for evidence, by a police officer who was acting under color of law.  *Id.* at 172.  Plaintiff failed to prove such a violation here.

In this case, Plaintiff's theory of liability under *Monell* was that although Kelly was not acting under color of law, he injured LaPorta because the City, inter alia, lacked an adequate early warning system and failed to discipline its officers. (Ex. A at 176-177; 2147).  But without

evidence that the person inflicting the injury was acting under color of law or was a state actor, there is no constitutional violation and the government is not liable. That is because the Constitution does not require the government to protect individuals from harm inflicted by private actors. As the Supreme Court held in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1988), "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. *DeShaney* involved a *Monell* claim against Winnebago County; as the Court explained, because plaintiff's underlying claims arose from acts of private violence by Joshua DeShaney's father, they did not implicate due process and the Court "ha[d] no occasion to consider . . . whether the allegations in the complaint are sufficient to support a § 1983 claim against the county and DSS under *Monell*." *Id.* at 202 n.10. In other words, because the act that harmed Joshua was private violence, there was no basis to hold the county liable, regardless of whether the county and its DSS had a municipal policy that caused his injuries. *DeShaney* thus illustrates that a plaintiff who cannot show that the actor violated the Constitution likewise cannot hold a local government liable for the actor's conduct. *See also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*) ("[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that [municipal wrongdoing is also alleged] . . . is quite beside the point"); *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ( "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action"); *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 164 (1978) (rejecting notion that a private party's "action is properly attributable to the State because the State has authorized and encouraged it").

*Wilson-Trattner v. Campbell,* 863 F.3d 589 (7th Cir. 2017), further demonstrates these principles. There, the Seventh Circuit rejected section 1983 claims against a county officer and

his superiors because the officer committed only acts of private violence against the plaintiff. *See id.* at 595. The court explained, citing *DeShaney*, that "[m]ere indifference or inaction" by a law enforcement agency when faced with acts of misconduct by one of its employees while off duty and otherwise not acting under color of law could not support the imposition of liability; and that was true even if that indifference or inaction emboldened the employee to engage in acts of violence that injured the plaintiff. *Id.* at 594-96. Among the claims the Seventh Circuit considered and rejected in *Wilson-Trattner* was a failure-to-train claim, which was brought against the county sheriff in his official capacity, *see id.* at 591, 593, and an official capacity claim is in effect a claim against the local government itself, *see Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008). In other words, the Seventh Circuit was presented with and rejected the plaintiff's effort to hold the local government liable based on its policies and practices because the plaintiff could not show that the government officer who injured her was a state actor. The court did so notwithstanding the fact that the plaintiff had argued, similar to the theory here, that a practice of ignoring allegations of misconduct emboldened the officer to abuse the plaintiff. *See Wilson-Trattner*, 863 F.3d at 596. Indeed, in dismissing this claim, the district court in *Wilson-Trattner* expressly ruled that it failed because *Monell* liability requires a showing that a municipal policy caused the deprivation of a constitutional right, and "[h]ere . . . there was no constitutional violation." *Wilson-Trattner v. Campbell*, 2016 WL 2894444, *7 (S.D. Ind. May, 18, 2016).

The holding of *Wilson-Trattner* is consistent not only with *DeShaney*, but with a long line of authority from the Seventh Circuit and elsewhere. *See Latuszkin v. City of Chicago,* 250 F.3d 502 (7th Cir. 2001) (*Monell* claim alleging municipal inaction toward unlawful activity by off-duty officers properly dismissed after finding the off-duty drunk driving officer was not acting under color of law); *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 800 (7th Cir. 2015); *Sallenger*

*v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Alexander v. South Bend*, 433 F.3d 550, 557 (7th Cir. 2006); *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 283 (7th Cir. 1986) (*Monell* "involve[s] the nature of the duty owed and the degree of causation required in a Section 1983 case against a governmental entity rather than the state action requirement of Section 1983"); *see also Doe ex rel. Magee v. Covington County School District ex rel. Keyes*, 675 F.3d 849 (5th Cir. 2012) (en banc); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

Applying these principles here shows that the City is entitled to judgment as a matter of law. At all times during the events of January 12, 2010, Kelly was a purely private actor, not acting under color of law. He was engaged in private acts in his own home after a night out drinking. Thus, any injury he inflicted on LaPorta is not a constitutional violation because it was not state action. The evidence that Kelly was employed as a police officer when the shooting occurred is irrelevant: it is undisputed that Kelly did nothing to cloak himself in government authority and was not carrying out his official duties. Plaintiff's section 1983 claim fails.

In *Gibson v. City of Chicago,* 910 F.2d 1510 (7th Cir. 1990), the court allowed discovery on a *Monell* failure to train claim where an off-duty officer was not acting under color of law. That decision, which stressed the "unique" procedural posture of that case, *id.* at 1521, does not compel a different result here. The court explained that its decision was "compatible" with *DeShaney* because "at this point in the litigation," it was required to accept as true Gibson's factual allegations, which the court suggested could fall within the state-created danger exception that the Supreme Court articulated in *DeShaney*. *Id.* at 1521 n.19. In other words, there was still a possibility Gibson could prove state action. In contrast, there was not even a claim here that Plaintiff satisfied any exception in *DeShaney*. Thus, plaintiff offered no evidence at trial going to

the applicability of any *DeShaney* exception, and did not request a jury instruction on any exception.  Thus, in contrast to *Gibson*, here there is no basis to give Plaintiff the benefit of any pleading standard.  Plaintiff's reading of *Gibson*, which would permit a municipality to be held liable under section 1983 without any showing that the individual who inflicted the injury was acting under color of law and without meeting any exception to *DeShaney*, has no basis in law and cannot support the verdict in this case.

Because Plaintiff failed to prove a constitutional violation, the judgment should be vacated and judgment should be entered for the City.

### B.      Plaintiff Failed To Adduce Sufficient Evidence That Kelly Intentionally Or With Reckless Indifference Shot LaPorta.

In the alternative, even if, as the Court ruled, Plaintiff could show a constitutional violation if Kelly intentionally or with reckless indifference shot LaPorta, Plaintiff failed to meet that burden at trial.[1] (See Dkt. 405 at 24-25.) The evidence does not establish that Kelly intentionally fired his gun at LaPorta's head or acted with reckless indifference.

To the contrary, the evidence showed that Kelly and LaPorta were like brothers, and were best friends since childhood. (Ex. A at 1408-1409, 2139-2140; Ex. B[2], 10/20/17 Tr. at 124, 160-

---

[1] In accord with the court's summary judgment ruling, the shocks-the-conscience standard should have been applied to evaluate Kelly's conduct, because only the "most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Cty. of Sacramento*, 523 U.S. at 846 (citing *Collins*, 503 U.S. at 129). Accordingly, proof of negligence or even mere recklessness cannot establish a constitutional violation.  As explained at pages 5-9 of the City's Rule 59 motion, which is filed simultaneously with this motion, this Court erroneously declined the City's instruction on the "shocks the conscience" standard.  The Court instead instructed the jury on a "reckless indifference" standard that has no basis in the law of substantive due process. The Seventh Circuit has defined reckless indifference as "at least [an] act in the face of a perceived risk that its actions will violate federal law," and a "positive element of conscious wrongdoing is always required." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 974 (7th Cir. 2013) (citing *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 536-8 (1999) (internal quotations omitted). The standard is applied in to an award of punitive damages.

[2] In this Motion, references to pages in Ex. A are to the certified trial transcript, whereas those transcripts pages contained in Ex. B are to unofficial transcripts. Due to the length of the trial and other delays not occasioned by the City's conduct, the full certified transcript was not yet available at the time this motion was filed. As a result, transcripts contained in Ex. B are designated as "draft" and that they are "not suitable for citation." The City, with leave of court, will seek to substitute corresponding certified transcript pages once they become available.

161) They visited two bars together and then returned to Kelly's house, where LaPorta intended drink more and stay the night. (Ex. A at 2341; Ex. B at 10/20/17 Tr. 152-154.) There is no evidence that at any point over the course of the evening Kelly displayed animosity, hostility or violent behavior generally or with respect to LaPorta. (Ex. A at 419, 543-547, 1793). There was also no evidence that Kelly was ever previously violent toward LaPorta, or of any preexisting animosity between the two. In fact, LaPorta's own brother, who was also like a brother to Kelly, testified that he did not believe Kelly would ever intentionally hurt LaPorta, let alone attempt to kill him. (Ex. A at 2117, 2119, 2131-2132, 2137-2139)

Plaintiff elicited testimony from LaPorta that he did not fire the gun, (Ex. A at 2327), and on cross examination he testified that he never saw a gun that night and never saw Kelly approach him from any direction before he was shot. (Ex. A at 2343- 2344.) This does not remotely suggest intent or reckless indifference by Kelly. There was no testimony from LaPorta suggesting that Kelly brandished the gun, pointed it towards LaPorta, or otherwise handled it in such a way as to somehow support a finding of reckless indifference. Nor was there any evidence that Kelly had a motive to shoot LaPorta. LaPorta testified that Kelly was hitting his dog while LaPorta was praising it and that LaPorta "said, I'm leaving. And I went to – I went to leave, and then, uh, I went to leave, and then I saw [sic] the click." (Ex. A at 2326) No reasonable juror could conclude that this disagreement would supply any motive to shoot LaPorta in the head to cause him harm.

Kelly's assertion of his Fifth Amendment right to refuse to answer certain questions at trial relating to LaPorta's account of the incident also does not support a finding of intent or reckless indifference. Kelly did invoke his rights in response to questions about being the one to fire the weapon, beating his dog, and LaPorta wanting to leave, but Kelly was never asked whether he intentionally fired his weapon at LaPorta, or intended to cause him harm, or whether Kelly acted

with reckless indifference. (Ex. A at 2262-2268)  Thus, Kelly did not assert his Fifth Amendment right not to answer any such question, and there can be no adverse inference that Kelly would have answered such a question against his own interest in avoiding criminal prosecution or disciplinary action.

Nor did any of the testimony from forensic expert supply evidence of intent or reckless indifference. Indeed, neither of Plaintiff's forensic experts even knew of or took LaPorta's account into consideration when forming their opinions. (Ex. A at 642; 1927-1928).  Mariusz Ziejewski, a biomechanical engineering expert, opined that Kelly's account of where LaPorta was standing when he was shot was not consistent with "science," because LaPorta was in the general vicinity but not facing the direction (toward the bedroom) that Kelly described.  (Ex. A at 580, 613).  This is not evidence that Kelly intentionally shot at LaPorta, seeking to cause him harm, or that he acted in the face of a perceived risk that his actions would violate the law.  And although David Balash, a firearms examiner, opined that Kelly was the one who fired the weapon, (Ex. A at 1912), this also does not show that Kelly intentionally fired it at LaPorta seeking to cause him harm or that Kelly acted with reckless indifference.  Additionally, it was undisputed that Kelly was highly intoxicated. (Ex. A at 1643-1644) There was evidence that Kelly's blood alcohol was between .169 and .246, more than three times the legal limit to operate a motor vehicle in Illinois. (Ex. A at 1644, 1838.)  This extreme level of intoxication suggests that Kelly could not have had the capacity even to form the intent to shoot and harm LaPorta, *see United States v. Reed*, 991 F.2d 399, 400 (7th Cir. 1993) (voluntary intoxication falls within defense of "diminished capacity," which is applicable to specific intent crimes.), or to act even in the face of a known risk that he would violate the law.

In the end, then, the jury's verdict can be based only on speculation, which is not "a substitute for proof." *United States v. Landry*, 257 F.2d 425, 431 (7th Cir.1958); *see also In re Cohen*, 507 F.3d 610, 614 (7th Cir.2007) (speculation is not evidence). Without evidence of intent or reckless indifference, Plaintiff cannot establish that Kelly violated LaPorta's constitutional rights. The City is therefore entitled to judgment as a matter of law.

## II. THE JURY'S FINDING OF *MONELL* LIABILITY IS NOT SUPPORTED BY THE EVIDENCE.

Plaintiff's theory was that the City was liable under *Monell* based on "a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy." *Rossi v. City of Chicago*, 790 F.3d 792, 737 (7th Cir. 2015). Plaintiff presented evidence and argument purporting to show five widespread practices: failure to maintain an adequate early warning system ("EWS"), a code of silence, failure to terminate, failure to discipline, and failure to investigate officer misconduct. (Ex. A at 176-177; Ex. B, 10/24/17 Tr. at 79; Ex. C Verdict Form). The jury found only that failures to maintain an adequate EWS and failure to discipline caused Kelly to shoot LaPorta. (Ex. C, Verdict Form). The jury also found widespread practice of failure to investigate officer misconduct but did not find that the widespread practice of failure to investigate caused Kelly to shoot LaPorta. Thus, this motion will address the evidentiary basis only for the EWS, discipline and investigate theories.

Plaintiff has never argued that the claimed widespread practices at issue are in and of themselves unconstitutional. And, indeed, the Constitution does not require the investigation of police misconduct, discipline for police misconduct or that a police department maintain an EWS. *See, e.g., Wilson-Trattner*, 863 F.3d at 594-95 (no due process right to enforcement of the law). Rather, the widespread practices the jury found here are those of "inaction," which may be

problematic only if they cause constitutional violations. Where, as here, "municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 394-95 (1989) (O'Conner, J., concurring in part, dissenting in part); *see also Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (citing *Harris*, 489 U.S. at 395). Indeed, municipal liability premised upon policies that are not facially unconstitutional but that may instead "launch a series of events that ultimately causes a violation of federal rights" requires that "rigorous standards of culpability and causation" are applied "to ensure that the municipality is not held liable solely for the actions of its employee. *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 405 (1997); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (Rehnquist, J. plurality opinion) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation."). In particular, "it is not enough… to merely identify conduct properly attributable to the municipality, [t]he plaintiff must also demonstrate that through its *deliberate* conduct, the municipality was 'the moving force' behind the injury alleged." *Brown,* 520 U.S. at 403 (emphasis in original).

As explained further below, these standards required Plaintiff to show that the two practices the jury identified were widespread, that the City's policymaker (the Chicago City Council) was deliberately indifferent to constitutional violations occurring as a result of the purportedly widespread practices, and that those same practices caused LaPorta's injuries. The evidence presented at trial was not legally sufficient to support any of these required showings.

A.    **The Evidence Does Not Demonstrate the Existence of Widespread Practices of Failing to Maintain an Adequate Early Warning System, Failing to Discipline or Failing to Investigate.**

The Seventh Circuit has not adopted "any bright-line rules defining a widespread custom or practice," *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010), except that to "prove an official policy, custom, or practice within the meaning of *Monell*, [the plaintiff] must show more than the deficiencies specific to his own experience." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). Otherwise, the claim against the municipality is nothing more than one for vicarious liability, which *Monell* expressly prohibits. "Thus, under the *Monell* widespread practice theory, Plaintiffs must establish an unconstitutional pattern of conduct, including incidents other than ones involving them, to give rise to the inference that an unconstitutional custom, policy, or practice exists." *Fairley v. Andrews*, 430 F. Supp. 2d 786, 801 (N.D. Ill. 2006), *aff'd sub nom. Fairley v. Fermaint*, 482 F.3d 897 (7th Cir. 2007) (citing *Tabor v. City of Chicago*, 10 F.Supp.2d 988, 993 (N.D.Ill.1998)); *Ronald Palmer v. Marion County*, 327 F.3d 588 at 595-96 (7th Cir. 2003). In other words, a widespread practice theory requires evidence that the practice is in fact "widespread," and that specific constitutional violations attributed to that practice were not just isolated incidents. *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (requiring "examples of other…police officers taking actions similar to those complained of here").

The evidence in this case was not that the City did not have an EWS at all or that it did not ever investigate or discipline officers for misconduct. Instead, Plaintiff's theory was that City's EWS, investigations and discipline were not good enough. Evidence that policies are "not good enough" cannot possibly suffice to satisfy the "rigorous standards" of culpability and causation required for municipal liability. In addition, beyond his allegations about his own circumstances,

Plaintiff presented no evidence of any other specific incidents of constitutional violations attributable to these alleged policies. The City is therefore entitled to judgment notwithstanding the verdict.

### 1) Failure to Maintain an Adequate Early Warning System

Plaintiff's police procedure expert, Lou Reiter, explained that an EWS is a remediation-based, non-disciplinary, supervisory program used in law enforcement to identify officers not conforming to the expectations of the department. (Ex. A at 301, 355-356). He relied on the description of Donald O'Neill, the director of CPD's Human Resources Department from 2014 to 2016, of CPD's EWS program, which, while not actually called "EWS," includes the Behavioral Intervention System ("BIS"), Personnel Concerns ("PC"), and Fitness for Duty "FFD" programs. (Ex. A at 294-295, 324-325; Ex. B, 10/23/17 Tr. at 113-115). O'Neill explained that BIS and PC look at various relevant, vetted criteria, which include the frequency of not-sustained allegations of excessive force during a one-year time period, as a factor that may warrant the recommendation that an officer be placed in the BIS or PC programs. (Ex. B, 10/23/17 Tr. at 115-120, 129). If BIS is not effective in bringing about change the officer's behavior that warranted inclusion in the program, the officer may then be placed in PC, which is a more rigorous remedial program that sets specific parameters unique to the officer's own reasons for entry into the program and which the officer must meet to avoid termination. (Ex. A 329-330; Ex. B, 10/23/17 Tr. at 114-115). Direct referrals to FFD can be made or a referral to FFD can be included as part of an officer's enrollment in BIS or PC. (Ex. B, 10/23/17 Tr. at 120-122.) The City pioneered the development of an EWS in the form of BIS and PC in the 1990s; even today, less than 10% of all law enforcement agencies have such systems in place. (Ex. B, 10/23/17 Tr. at 37, 115). Reiter testified that CPD's written

EWS policies were "adequate." (Ex. A at 324-325, 330, 374). Thus, the undisputed evidence in this case is that the City maintained, at least on paper, an adequate EWS system.

Reiter instead focused on Kelly alone and statistics in the Police Accountability Task Force ("PATF") Report to opine generally that the EWS program was not being "utilized" properly. (Ex. A at 363, 371, 374). But that evidence did not support his opinion. Reiter testified that Kelly should have been referred to CPD's EWS program in 2005 or 2006 because of the excessive force complaints against him (which included the two Brogan incidents[3]) but was not; Reiter conceded, however, that before 2010 Kelly was referred twice (for the first Brogan incident in 2005 and, again, for the second Brogan incident in 2006) to the FFD program (which he characterized as BIS). (Ex. A at 325-326, 370).[4] Reiter further acknowledged that Kelly was referred for mental health counseling services as part of that program and O'Neill confirmed in greater detail that Kelly did receive such services in relation to both off-duty incidents. (Ex. A at 326; Ex. B, 10/23/17 Tr. at 125, 128). Specifically, through the FFD program, Kelly was found unfit by a licensed psychologist, and was referred for and participated in regular counseling services. (Id. at 127-128.) He was ultimately deemed fit and was restored to duty after engaging in counseling and additional evaluations by an independent psychologist. (Ex. A at 370; Ex. B, 10/23/17 Tr. at 127-128, 133). Further, there was no evidence presented of any complaints (or even instances not resulting in a complaint) of off-duty misconduct by Kelly for the next four years, suggesting, if anything, that CPD's EWS services had an impact on Kelly's behavior. In short, the evidence presented at trial showed that CPD's EWS was utilized for Kelly. Reiter offered no examples of any officers who

---

[3] The 2005 Brogan incident was an off-duty domestic incident between Kelly and his girlfriend, the incident the following was a fight initiated by his girlfriend's brother. (Ex. A at 340)

[4] Kelly did not meet the BIS criteria of having three or more not-sustained excessive force complaints in a one-year period. (Ex. B, 10/23/17 Tr. at 118-120). Again, though, Reiter did not criticize the criteria for placement in the various programs comprising CPD's EWS, and found the written policies that guide that system "adequate." (Ex. A at 324-325, 374).

should have been enrolled in the EWS and were not. Nor did Reiter offer evidence linking an adequate but purportedly improperly "utilized" EWS to any constitutional violations. In fact, Plaintiff called no other witness on these issues.

Reiter did speculate that an officer "might think" he could act with impunity if he knew, among other things, that he met the criteria for the EWS program but was not enrolled, but there was no evidence that this theory applied to Kelly or any other officer. (Ex. A at 305, 325-7, 329.) And Reiter's observation ignored that Kelly was enrolled in FFD in relation to the Brogan incidents. Further, Reiter provided no evidence that it would even be possible to show that adequate utilization of an EWS program reduces constitutional violations. Nor did Reiter offer any evidence that some other, differently maintained or utilized EWS would have identified Kelly as being at risk to commit acts of off-duty violence linked to alcohol abuse any better than FFD did, and influenced his future behavior in a way that would have prevented LaPorta from being shot. In fact, there was no evidence presented that *any* EWS system was ever found to have actually influenced future behavior.

Plaintiff's only other evidence in support of this theory was information contained in the PATF Report regarding enrollment in CPD's BIS and PC programs from the years 2007-2015. But rather than supporting Plaintiff's theory, the PATF data showed that from 2007-2010, the only timeframe during which an EWS could have impacted Kelly's behavior, the programs were being utilized. (Ex. A at 328; Ex. B, 10/23/17 Tr. at 130-131.) And there was no evidence that the numbers during the relevant timeframe were evidence of underutilization; instead, Reiter pointed to the numbers *after* 2010 as evidence of underutilization. (Ex. A at 328.) Evidence regarding the adequacy of the BIS and PC programs after 2010 is irrelevant to establishing its adequacy in 2010 and before. In addition, the PATF data utilized by Plaintiff did not include any FFD statistics,

painting an incomplete picture of the EWS. (Ex. A. at 2353.) The same holds true for the conclusory observations in both the PATF and DOJ Reports (on which Plaintiff also relied) that CPD's EWS is not functioning in a way that identifies officer in need of intervention. (Ex. A at 2238-2249 (reading DOJ Report); 2349-2361 (reading PATF Report)) Moreover, because those reports were published in 2016 and 2017, respectively, their observations about the "current status" of the program say nothing about the effectiveness of the EWS program during the relevant timeframe for this case.

Plaintiff also offered no evidence that any criteria exists by which to evaluate the efficacy or "adequacy" of utilization of an EWS program. Without evidence of any meaningful standard by which to judge these programs, there was no basis for a jury to conclude CPD's program fell short.

In the end, the only reasonable interpretation of the evidence is that CPD did have a EWS program that, as Plaintiff's police practices expert acknowledged, met law enforcement standards; that it was being utilized between 2004 and 2010, which is the only timeframe during which such a program could have influenced Kelly's conduct; and that Kelly was, in fact, referred to and participated in the program. Plaintiff therefore failed to prove the existence of a widespread practice of failing to maintain an "adequate early warning system."

### 2) Failure To Discipline

As Plaintiff made clear in his opening statement and throughout the trial, his failure to discipline claim was based solely on evidence relating to Kelly – specifically, "whether the City . . . should have disciplined Patrick Kelly for his repeated acts of misconduct before so that he knew that there were consequences for punishment [sic] for his misconduct." (Ex A at 177).

A single officer's disciplinary record is a legally insufficient evidentiary basis from which to find a widespread, entrenched practice in a police department with more than 13,000 officers. (Ex. A at 929) "[T]he gravamen [of a *Monell* claim] is not individual misconduct by police officers (that is covered elsewhere under § 1983), but a widespread practice that permeates a critical mass of an institutional body.  In other words, *Monell* claims focus on institutional behavior; for this reason, misbehavior by one or a group of officials is only relevant where it can be tied to the policy, customs, or practices of the institution as a whole." *Rossi,* 790 F.3d at 737.  Thus, a plaintiff needs evidence of a pattern of conduct "sufficiently widespread in terms of duration and/or frequency" to give rise to an inference of actual or constructive knowledge on the part of the municipality; without that, the municipality is not liable.  *McLin, et al. v. City of Chicago*, 742 F. Supp. 994 at 997–98 (N.D. Ill. 1990); *Gill,* 850 F.3d at 344.  Accordingly, discipline, or lack thereof, for one single officer, even over the course of six years, does not come close to establishing a widespread practice of failure to discipline.

In addition, as this Court recognized in its summary judgment ruling, the failure to discipline claim focused on the adequacy of discipline. (See Dkt, 405 at 12). That claim necessarily requires proof that upon a finding of misconduct (as opposed to upon receiving an allegation of misconduct, which was an issue covered by the failure to investigate claim), the City failed to impose discipline or imposed inadequate discipline. Plaintiff offered no such evidence with respect to Kelly.  For the one complaint against Kelly that was sustained, the LaPorta incident, Kelly *was* disciplined.  IPRA sustained allegations against Kelly for failing to secure his weapon, intoxication off-duty, and for his conduct toward Sgt. Kielbasa. (Ex. A at 837-1842.)  He received a 60-day suspension without pay. (Ex. B, 10/23/17 Tr. at 111-112).

With respect to the other allegations of misconduct against Kelly, Plaintiff presented evidence tending to show that only one of them – the 2005 Brogan domestic violence incident – should have resulted in discipline. In fact, although over the course of his career Kelly was the subject of other allegations of misconduct, Plaintiff did not present evidence that any of those complaints should have been sustained or that Kelly should have otherwise been disciplined. While Plaintiff presented evidence about Kelly's other CRs through Reiter and other witnesses, he did not elicit any opinion from Reiter, or offer any evidence from any other source, that any CR other than that pertaining to the 2005 Brogan incident should have been sustained. (Ex. A at 371-373.) Without that evidence, evidence regarding other *allegations* of misconduct relating to any CR other than Brogan's cannot support a finding that there existed a widespread practice premised on failure to discipline.[5] To be sure, insofar as the 2005 Brogan complaint is concerned, although the OPS investigator recommended that this CR be sustained, OPS Chief Tisa Morris overrode that recommendation, (Ex. A at 1205-1206, 1225), and Kelly was not disciplined for that incident. (Ex. A at 962.) But even if this single decision was evidence that CPD has a practice of failing to impose discipline where discipline was warranted, one instance is insufficient as a matter of law to show a widespread practice.

In contrast to the paucity of evidence showing a policy of failing to discipline, there was evidence of CPD disciplinary records showing that complaints involving violations of Rule 14 (which prohibits false statements or reports) and domestic violence incidents were sustained and disciplined was imposed during the relevant timeframe of 2004 to 2010. (Ex. B, 10/23/17 Tr. at

---

[5] Arguably, evidence about Kelly's other CRs may have been relevant to Plaintiff's theory that the City has a widespread practice of failing to investigate allegations of misconduct and/or a code of silence, but because Plaintiff did not prevail on those theories, given the absence of evidence that those other CRs should have been sustained, those CRs are irrelevant and should be disregarded for purposes of assessing whether the City has a widespread practice of failing to discipline.

215-216, 218-219, 227-228). Plaintiffs identified no evidence to suggest that this discipline was inadequate. Similarly, while Plaintiff's expert, Dr. Rothman, testified about statistical data contained in CPD annual reports about sustained rates and ranges of discipline imposed, he did not opine that more complaints should have been sustained or that the discipline imposed was inadequate. (Ex. A at 2210-2213). As for Reiter, he offered no opinion regarding Dr. Rothman's analysis, and, like Dr. Rothman, he provided no opinion regarding the adequacy of the City's discipline for sustained complaints. In fact, Reiter could not even say whether, over the course of his 25 years of experience opining on the City's police practices, any of the thousands of CRs he reviewed should have been sustained but were not, let alone whether any discipline was imposed or was inadequate. (Ex. A at 371)

Specifically, while the jury heard conclusory statements from the DOJ Report about "rare instances" of sustained complaints and "haphazard and unpredictable discipline," (Ex. A at 2238-2249), this evidence does not support Plaintiff's failure-to-discipline theory because it does not contain any of the actual "examples of other… police officers taking actions similar to those complained of here" required to prove a *Monell* widespread practice. *Gill*, 850 F.3d at 344. In addition, the DOJ Report reached its findings based on CPD materials dated between 2011 and 2016, (Ex. A at 2239-240), and therefore those findings do not address the timeframe relevant to this case. Similarly conclusory evidence from outside the relevant timeframe was introduced from the PATF Report. (Ex. A at 2349-2361). Because neither Report provides any specific evidentiary basis for its conclusions, much less specific examples dating from the relevant timeframe, the findings contained in those Reports are not evidence of a widespread practice of failing to discipline.

In short, Plaintiff adduced evidence of, at most, a single instance in which the City failed to impose adequate discipline – the 2005 Brogan incident – which occurred more than four years before the LaPorta incident. An isolated instance is legally insufficient to establish a widespread practice of failing to discipline. *See Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("[T]wo incidents of misconduct…in a period of one year certainly fails to meet the test of a widespread unconstitutional practice…that is so well settled that it constitutes a custom or usage with the force of law."). Moreover, no evidence linked a practice of failing to discipline to any constitutional violation. The complete lack of an evidentiary basis supporting a widespread practice of failing to discipline warrants judgment as a matter of law for the City on Plaintiff's failure-to-discipline theory.

### 3) Failure To Investigate

For the many of same reasons discussed above, the evidence elicited at trial was insufficient to establish a widespread practice of failing to investigate. First, Plaintiff's reliance on Kelly's disciplinary history (*see e.g.* Ex. A at 316-20), is, for the reasons discussed above, a legally insufficient evidentiary basis from which to find a widespread, entrenched practice in a police department with more than 13,000 officers. Plaintiff's additional reliance upon Dr. Rothman's testimony that 46 percent of complaints made between December 31, 2004 and January 12, 2011 are categorized as "no-affidavit" and not investigated, (Ex. A at 2199-2202, 2211-14), does not cure the deficiency in Plaintiff's almost exclusive reliance upon Kelly's disciplinary history. "No Affidavit" complaints are designated as such because Illinois State law requires that in order for a misconduct complaint to proceed against a member of law enforcement it must be accompanied by an affidavit attesting to the veracity of the complaint. *See* Uniform Peace Officers Disciplinary Act, 50 ILCS 725/3.8. A municipal policy cannot be premised upon compliance with an obligation

imposed by Illinois State law, otherwise it would be placed in the untenable position of being forced to violate state law to avoid *Monell* liability. Moreover, Dr. Rothman's testimony that complaints were sustained 5 percent of the time during the same time period cannot be relied upon to support Plaintiff's widespread practice theory of failing to investigate. Rothman made clear that he did not compare CPD's sustained rate to any other law enforcement agency sustained rate. (Ex. A at 2214.) And, Dr. Roberts, the City's expert, testified that the City's sustained rate was not statistically different than other comparable police departments. (Ex. B, 10/19/17 Tr. at 208). Accordingly, the evidence Plaintiff relied upon was insufficient as a matter of law to show a widespread practice of failing to discipline.

Plaintiff's only other evidence in support of this theory was the observations contained in the PATF Report and the DOJ Report discussed above. The flaws discussed with respect to the reliance upon these Reports in support of Plaintiff's failure to discipline theory doom Plaintiff's reliance upon this theory as well. Specifically, conclusory statements from the DOJ Report about "rare instances" of sustained complaints and "haphazard and unpredictable discipline," (Ex. A at 2238-2249), does not support Plaintiff's failure-to-investigate theory because it does not contain any of the actual "examples of other… police officers taking actions similar to those complained of here" required to prove a *Monell* widespread practice. *Gill*, 850 F.3d at 344. Additionally, the timeframe of the CPD materials relied upon by the DOJ (2011 to 2016) do not address the timeframe relevant to this case. Similarly conclusory evidence from outside the relevant timeframe was introduced from the PATF Report. (Ex. A at 2349-2361). As discussed above, neither report provides any specific evidentiary basis for its conclusions or specific examples dating from the relevant timeframe, and therefore, the findings contained in those Reports are not evidence of a widespread practice of failing to investigate. Moreover, no evidence linked a practice of failing to

investigate to any constitutional violation. Thus, the complete lack of an evidentiary basis supporting a widespread practice of failing to investigate warrants judgment as a matter of law for the City on Plaintiff's failure-to-investigate theory.

**B.    There was Insufficient Evidence to Establish that the City's Policymaker was Deliberately Indifferent.**

Municipal liability under section 1983 attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 468, 483 (1986). Deliberate indifference requires proof of both awareness of a pattern of constitutional violations "substantially certain" to result from the policy, and acquiescence to the pattern. *City of Canton*, 489 U.S. at 397 (O'Connor, concurring in part and dissenting in part); *see also Connick*, 563 U.S. at 61. But as the Seventh Circuit put it, "[f]ailing to eliminate a practice cannot be equated to approving it. Otherwise every inept police chief in the country would be deemed to approve, and therefore become answerable in damages to all the victims of, the misconduct of the officers under his command—indeed might (contrary to *DeShaney*[]) be deemed responsible for all the murders and robberies that he had through his carelessness failed to prevent." *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993); *see also Moore v. City of Chicago*, No. 02 C 5130, 2007 WL 3037121, at * 11. (N.D. Ill. Oct.15, 2007) (evidence of City Council's failed efforts to change its alleged practice of ignoring police misconduct did not demonstrate deliberate indifference).

Here, there was legally insufficient evidence from which a reasonable jury could find that the City's policymaker was deliberately indifferent to a widespread practice of failing to maintain an adequate EWS and/or failing to discipline.

1. **There Was No Evidence of Deliberate Indifference by the Chicago City Council to Any Failure to Maintain an Adequate Early Warning System.**

The only evidence purporting to relate to deliberate indifference to the lack of an adequate EWS was introduced through two questions to Alderman Joseph Moore, a Fed. R. Civ. Proc. 30(b)(6) witness who testified on behalf of the Chicago City Council. He was asked to confirm that the 2017 DOJ Report: (1) "criticized the lack of an early warning or early intervention system," and (2) "warned that the lack of having an early warning system could lead to repeated acts of abuse against the citizens leading to constitutional violations." (Ex. A at 903). Even if the findings in the DOJ Report pertained to the timeframe relevant to this case, which they do not, those findings could not establish deliberate indifference by the City Council to a purportedly widespread practice of failing to maintain an adequate EWS.

Even Reiter conceded that the City's EWS system was, on its face, an adequate system, (Ex. A at 374), and there was no evidence that the City's EWS, as it existed between 2004 and 2010, was improperly utilized such that it would have been was plainly obvious to the relevant policymaker that it would cause a deprivation of constitutional rights by officers. Further, the only evidence elicit from Alderman Moore regarding EWS was that City Council was made aware of that CPD's EWS had been "criticized" in the recent 2017 DOJ Report. (Ex. A at 903, 933). But that is not evidence that can even be considered with regard to deliberate indifference here because the Report does not reflect, and there was no other evidence to establish, that at any time before 2017, the City Council was aware of *any* inadequacies of CPD's EWS during the relevant timeframe of 2004 to 2010, nothing in the Report establish anything about the EWS being "plainly obvious," or that the Report reflected factual findings or conclusions relating to EWS during that timeframe.  Nor would that evidence be sufficient even it was relevant because it fails to establish

the Council engaged in "a deliberate choice to follow a course of action…among various alternatives." *Pembaur*, 475 U.S. 483. In short, there was no evidence that the City Council *knew*, during the relevant timeframe of 2004 to 2010, that CPD's facially adequate EWS system was nevertheless inadequate because it purportedly was not being utilized properly, and then acquiesced in that practice with the knowledge that the practice was substantially certain to result in constitutional violations. Without such evidence, which is needed to establish deliberate indifference, Plaintiff's *Monell* claim premised on a policy of maintaining an inadequate EWS fails and the City is entitled to judgment as a matter of law on that claim.

2. **There Was No Evidence of Deliberate Indifference by the Chicago City Council to Any Widespread Practice of Failing to Discipline.**

Again, Plaintiff relied only on Kelly's disciplinary history (and, even then, only on the 2005 Brogan incident) to establish a widespread practice of failing to discipline. But there was no evidence that the Chicago City Council was aware of the allegations of misconduct against Kelly, much less of the failure to discipline him for the Brogan incident. Likewise, there was no evidence that City Council was aware that constitutional violations were occurring or substantially likely to occur because one of its 13,000 police officers was not disciplined for one incident in 2005.

"A custom of failing to discipline police officers can be shown to be deliberately indifferent if the need for further discipline is so obvious and disciplinary procedures so inadequate as to be likely to result in the violation of constitutional rights such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline the police force." *Czajkowski v. City of Chicago*, 810 F.Supp. 1428, 1439 (N.D.Ill.1992) (citing *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir.1992)). Here, there was, at best, meager evidence to establish a practice of failing to discipline, and none to establish that the City's policymaker knew about and was

deliberately indifferent to the need for more discipline or that without it, officers were likely to violate the Constitution.

If anything, there was substantial evidence that the City Council was not deliberately indifferent. For example, Alderman Moore testified that the City Council passed an ordinance in 2007 that created IPRA to replace OPS in response to public criticism that CPD's disciplinary system was not effective enough at addressing police misconduct. (Ex. A at 840-846, 914-916). This ordinance made IPRA completely independent from CPD and subject to direct oversight by the Mayor and City Council. *Id.* at 840-846. Alderman Moore further testified to the City Council's oversight of CPD and how it regularly holds hearings focused on the issue of police accountability. (Ex. A at 914-916). Those hearings included but are not limited to annual budget hearings, which are also "accountability" sessions during which the Council scrutinizes the work of CPD and IPRA. *Id.* The Council sought out and hired highly qualified individuals to run IPRA, who made improvements to the accountability systems and who were held accountable for their work during the regular hearing held by the City Council. (Ex. A at 918-922). He explained that despite finite resources and the need to balance the various financial needs of CPD, IPRA (and now COPA), the City Council allocates all the resources it can to addressing an issue it takes very seriously - police accountability. (Ex. A at 916-918, 925-929, 946.) On that point, he further stated that "I would not doubt that there are also incidents where officers escape being disciplined, and that's why it's important to increase the resources for the body charged with conducting those sort of investigations." (Ex. A at 877).

In addition, Alderman Moore testified that when the Illinois General Assembly was considering legislation that could impede misconduct investigations, the City lobbied against the legislation. (Ex. A at 882-885). After losing that fight, the City continued to negotiate this issue

with the unions, and ultimately was successful in obtaining concessions relating to that legislation. (Ex. A at 883-884). Alderman Moore also testified about the City Council's efforts to ensure that the City is transparent on matters relating to police discipline. (Ex. A at 922-923.) Both IPRA and CPD publish annual reports that are available to the public and contain data and statistics regarding police discipline. (Ex. A at 908-909, 922, 936-937). Similarly, there was evidence at trial that the Police Board reports to the public about police disciplinary matters. (Ex. B, 10/23/17 Tr. at 221). To be sure, Alderman Moore acknowledged that the City Council is aware of criticism that the City's systems for identifying and disciplining police misconduct are not robust enough or could be better, (Ex. A at 851); however, this is not evidence of deliberate indifference. *See Wilson*, 6 F.3d at 1240 (explaining that "failing to eliminate a practice cannot be equated to approving it")

In the end, to find deliberate indifference on these facts would substitute conjecture and principles of mere negligence for the "rigorous standards" of culpability the Supreme Court requires to hold a municipality liable on a *Monell* claim. *Brown*, 520 U.S. at 405. As the Court has explained, "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412; *accord Wilson v. Cook County*, 742 F.3d 775, 783–84 (7th Cir. 2014). No reasonable jury could conclude based on the evidence presented here that the City Council should have known that because CPD had an adequate but purportedly improperly utilized EWS and/or because CPD had an alleged practice of failing to discipline that Kelly would shoot his longtime friend in the head and was deliberately indifferent to this known consequence.

### C. There was a Legally Insufficient Evidentiary Basis to Establish that a Widespread Practice was the Cause of Plaintiff's Injury

There also was insufficient evidence presented at trial tying the incident involving Kelly and LaPorta to any widespread practice of the City. "Causation is a standard element of tort liability, and includes two requirements: (1) the act must be the 'cause-in-fact' of the injury, i.e., 'the injury would not have occurred absent the conduct'; and (2) the act must be the 'proximate cause,' sometimes referred to as the 'legal cause,' of the injury, i.e., 'the injury is of a type that a reasonable person would see as a likely result of his or her conduct.'" *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (citing *Ciomber v. Cooperative Plus, Inc*., 527 F.3d 635, 640 n.1 (7th Cir.2008); s*ee also Ruiz-Cortez v. City of Chicago,* 2016 WL 6270768, at *22 (N.D. Ill. 2016). ("[B]oth but-for and proximate causation" must be established to link the challenged action to the constitutional deprivation.). The existence of "[a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" is exceedingly difficult to prove. *City of Canton*, 489 U.S. at 385. The "fact that a municipal 'policy' *might* lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between the … inadequacies alleged, and the particular constitutional violation at issue." *City of Oklahoma City*, 471 U.S. at 824 n.8 (emphasis added). Plaintiff failed to satisfy this rigorous standard here.

The evidence presented at trial suggested, at most, a general environment that could possibly lead to misconduct among officers, none of which is necessarily tied to any specific type of misconduct. But that is not enough. As explained, Supreme Court precedent required Plaintiff to present evidence of a direct causal link between any practice of failing to have an adequate EWS and/or failing to discipline, on the one hand, and, on the other, Kelly shooting his friend after night out of heavy drinking. Absent such evidence, the shooting cannot be "affirmative[ly] linked," *id.*, to any failure to discipline or maintain an adequate EWS.

With regard to the adequacy of the EWS, the only evidence relating to causation came from Reiter. He testified that the failure to have an adequate EWS "could or might cause an officer such as Patrick Kelly to act with impunity." (Ex. A at 319, 325-326) But, again, the Supreme Court has foreclosed liability on this basis, holding that *Monell's* causation requirement is "hardly satisfied" by evidence that a municipal policy "might" lead to unspecified police misconduct. *City of Oklahoma City*, 471 U.S. at 824 n.8; *see also Craft v. Flagg*, No. 06 C 1451, 2010 WL 5363914, at *2 (N.D. Ill. Dec. 13, 2010) (citing *City of Canton*, 489 U.S. at 391-92) ("Evidence that a municipality could have done something more or better is insufficient to establish causation in a § 1983 [*Monell*] claim."). And there was no evidence at all tending to establish that any practice by the City of failing to discipline was the but-for cause of LaPorta's shooting. In fact, Plaintiff's failure to appreciate his burden of proof regarding causation is exemplified by his counsel's closing argument: in closing, Plaintiff's counsel argued that he had to prove merely that LaPorta's injuries were a "foreseeable consequence of the City's actions." (Ex. B, 10/24/17 Tr. at 83, 102, 121.) As explained above, however, Plaintiff had to prove not only that a City policy was the proximate cause of LaPorta's injury, but also that it was the but- for cause.

In particular, to show but-for causation, Plaintiff had to show the following:

- the City maintained policies of inaction by way of its inadequate EWS and failure to discipline officers for misconduct;

- those inadequacies resulted in Kelly not being enrolled in the City's EWS and not being punished as a result of the 2005 Brogan incident;

- Kelly's familiarity with those failures led him to believe that *any* wrongful act he took would go unpunished – regardless of it being a violation of CPD rules or criminal laws; and

- this conscious belief caused Kelly, nearly five years after the Brogan incident and for unknown reasons, to fire a bullet into his longtime friend's head after the two enjoyed a night out drinking.

The evidence presented here was not sufficient to establish any of the elements in this attenuated causal chain, much less all of those elements. The evidence did not show, for example, that Kelly's off-duty drinking, and resulting violent acts, were the result of his purported belief that he would not be disciplined by his employer for those acts, rather than his own personal issues, including alcoholism and a tendency to engage in acts of violence. Indeed, if the evidence presented at trial were sufficient to establish causation for purposes of *Monell* liability here, it would be sufficient in any case in which any person the City employs as a police officer engages in any act of misconduct. That is not the law. To the contrary, the Supreme Court has made clear that there must be a robust and direct causal link between the claimed municipal policy and the specific conduct at issue to impose liability on a municipality.

Although Plaintiff's failure to present sufficient evidence that the City's purported practices were the but-for cause of LaPorta's shooting alone entitles the City to judgment as a matter of law, Plaintiff also failed to present sufficient evidence to establish proximate causation – that is, that this is the type of injury that a reasonable person would see as a likely result of any failure by the City to maintain an inadequate EWS or to discipline its officers for misconduct. Plaintiff presented no evidence of any other instance where any remotely similar tragedy happened that could have put the City on notice that its policies were likely to cause its police officers, while off duty and not engaged in any law enforcement activity, to shoot their friends because they believed they could get away with it. Therefore, the City is entitled to judgment as a matter of law for two reasons: Plaintiff failed to show that but-for the City's allegedly inadequate EWS and disciplinary practices, Kelly would not have shot his friend in the head, and Plaintiff further failed to show that it was a likely and foreseeable result of those supposed practices that Kelly would do so.

WHEREFORE, for all of the reasons discussed above, the judgment on the jury's verdict should be vacated and a directed verdict pursuant to Rule 50(b) should be entered for Defendant City of Chicago.

Dated:   November 24, 2017                          Respectfully submitted,

                                                    THE CITY OF CHICAGO

                                                    By: _____/s/___*Eileen E. Rosen*_____
                                                              One of their attorneys

Eileen E. Rosen
Stacy A. Benjamin
James B. Novy
Theresa Berousek Carney
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.494.1000
312.494.1001- fax
erosen@rfclaw.com