```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   MICHAEL A. LA PORTA, as Guardian)
     of the estate and person of    )
 4   Michael D. LaPorta, a disabled  )
     person,                         )
 5                                   )
                 Plaintiff,          )
 6                                   )
                 v.                  )  No. 14 CV 09665
 7                                   )
     CITY OF CHICAGO, a municipal    )
 8   corporation, et al.,            )  Chicago, Illinois
                                     )  October 2, 2017
 9               Defendants.         )  10:00 a.m.

10                          VOLUME 1
                     TRANSCRIPT OF PROCEEDINGS
11         BEFORE THE HONORABLE HARRY D. LEINENWEBER

12   APPEARANCES:

13   For the Plaintiff:       ROMANUCCI & BLANDIN, LLC
                              BY:  MR. ANTONIO M. ROMANUCCI
14                                 MR. MARTIN D. GOULD
                                   MR. BRUNO R. MARASSO
15                                 MS. DEBRA L. THOMAS
                                   MS. NICOLETTE A. WARD
16                            321 North Clark Street, Suite 900
                              Chicago, Illinois 60654
17                            (312) 458-1000

18                            SALVATO & O'TOOLE
                              BY:  MR. CARL S. SALVATO
19                            53 West Jackson Boulevard, Suite 1750
                              Chicago, Illinois 60604
20
     Court Reporter:          Judith A. Walsh, CSR, RDR, CRR
21                            Official Court Reporter
                              219 S. Dearborn Street, Room 1944
22                            Chicago, Illinois 60604
                              (312) 702-8865
23                            judith_walsh@ilnd.uscourts.gov

24

25
```

```
1   For Defendant City:        ROCK FUSCO & CONNELLY, LLC
                               BY:   MS. EILEEN E. ROSEN
2                                    MS. STACY A. BENJAMIN
                                     MR. JAMES B. NOVY
3                                    MS. THERESA B. CARNEY
                               321 North Clark Street
4                              Suite 2200
                               Chicago, Illinois 60654
5                              (312) 494-1000

6   For Defendant Gordon       HEINEKE & BURKE, LLC
    Lounge, Inc.:              BY:   MR. ROBERT M. BURKE, JR.
7                              Two North LaSalle Street, Suite 1110
                               Chicago, Illinois 60602
8                              (312) 580-7300

9   For Petitioner James E.    COZEN O'CONNOR
    Morrison:                  BY:   MS. ELISABETH C. ROSS
10                             123 North Wacker Drive, Suite 1800
                               Chicago, Illinois 60606
11                             (312) 474 4459

12  ALSO PRESENT:              MR. WILL DICKENSON,

13                             MR. ANTHONY MONACO.

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court:)

2          THE CLERK:  14 C 966 5, LaPorta versus City of

3     Chicago.

4          THE COURT:  Please be seated, everybody.

5          Are we ready for trial?  We've got some pretrial

6     motions that we have to take up.  Do you want to put your

7     appearances on file?

8          MS. ROSEN:  Eileen Rosen on behalf of defendant City

9     of Chicago.

10          MS. BENJAMIN:  Stacy Benjamin for defendant City of

11     Chicago.

12          MR. NOVY:  James Novy for defendant City of Chicago.

13          MS. CARNEY:  Theresa Carney on behalf of defendant

14     City of Chicago.

15          MR. BURKE:  Robert Burke for defendant Gordon Lounge.

16          MR. ROMANUCCI:  Your Honor, Tony Romanucci on behalf

17     of plaintiff.

18          MR. MARASSO:  Your Honor, Bruno Marasso on behalf of

19     plaintiff.

20          MR. GOULD:  Your Honor, Martin Gould on behalf of

21     plaintiff.

22          MS. WARD:  Your Honor, Nicolette Ward on behalf of

23     plaintiff.

24          MS. THOMAS:  Your Honor, Debra Thomas on behalf of

25     plaintiff.

1    MR. SALVATO:  Your Honor, Carl Salvato on behalf of
2  the plaintiff.
3    THE COURT:  All right.  We have the first order of
4  business, I think, is going to be the City's motion to stay
5  and certify the question of law for interlocutory appeal and
6  to stay the trial.  The defendant -- the plaintiff objects?
7    MR. ROMANUCCI:  Yes, your Honor.  The plaintiff
8  objects to this motion.
9    THE COURT:  All right.  I'm going to deny the motion.
10  One of the grounds is timeliness.  And although you only got a
11  decision last week, nevertheless, I'm mindful that the motion
12  wasn't fully briefed until this month, and it's -- with all
13  the other motions in limine and so forth, the Court was
14  certainly unable to provide a decision.  So it seems to me
15  it's much too late now to delay a trial which has been
16  scheduled for almost a year, I believe.  So I'm going to use
17  my discretion to deny the motion, and we will proceed with the
18  trial.
19    Now, there's a motion to enter -- petition for leave
20  to intervene in the case brought by James Morrison and the
21  American Addiction Centers, Inc.
22    MS. ROSS:  Good morning, your Honor.  Elizabeth Ross
23  on behalf of non-party petitioner, James Morrison.
24    MR. DICKENSON:  Good morning, Judge.  Will Dickenson
25  on behalf of American Addiction Centers.

1      THE COURT:  What -- what role do you wish to play in

2   the case?  The case is set for trial this morning.

3      MR. MONACO:  Judge, this is Anthony Monaco, and I'm a

4   lawyer involved in another case in state court that has

5   nothing to do with this case.  And it's my understanding that

6   the defendants in my other case want discovery materials in

7   this case, so there's confidentiality and protective orders in

8   both cases.

9      As I understand, the trial is about to begin.  Until

10  that evidence comes in and what is presented to this Court, I

11  suspect that confidentiality may no longer exist during the

12  trial.  So I think it's a bit premature to even get into this.

13  I think today's motion is just for leave to file something

14  under seal.  I don't object to that, but I just -- I don't

15  want to taken the Court's --

16     THE COURT:  Is that all you're asking for the moment,

17  is to file under seal?

18     MS. ROSS:  That is what is noticed for today, your

19  Honor.

20     THE COURT:  Is there any objection to that?

21     MR. MONACO:  No, Judge.

22     THE COURT:  By any --

23     MS. ROSEN:  Well, I guess I don't have an objection

24  to the motion for leave to file under seal.  I don't know what

25  they're -- what discovery they're seeking, and certainly, I

1   don't think that the parties in this case need to be concerned

2   with dealing with discovery matters in this other case or for

3   another case while we're in the middle of a trial.

4              THE COURT:  Mr.  Romanucci, what's your position?

5              MR. ROMANUCCI:  Your Honor, I don't have any

6   objection to it.

7              THE COURT:  Filing under seal?

8              MR. ROMANUCCI:  Correct.

9              THE COURT:  All right.  The motion to file under seal

10  is granted.  So we'll just leave the petition sit for the time

11  being, is that --

12             MR. ROMANUCCI:  Yes, Judge.

13             THE COURT:  -- and see how the trial comes out?

14             MS. ROSS:  Actually, your Honor, we would like, we

15  also -- and we would don't mean to inconvenience the Court,

16  especially at this time.  Our motion seeks information and

17  documents that would not interfere with the trial schedule.

18  We're just seeking documents that have already been tendered

19  to plaintiff in this trial.  And so we're just seeking that

20  same information.

21             Plaintiff in this trial actually has intervened in

22  our case in the state court case, so it's not quite accurate

23  that there are no overlapping issues.

24             THE COURT:  Well, is there any prejudice to you of

25  having to wait until the case is over?  I mean, it seems to me

1    that I don't want to be involved in trying to determine

2    confidentiality issues other than what pertains precisely to

3    this trial.  Now, if the document comes into evidence in this

4    trial, it seems to me that clearly, it's in the public domain.

5          So but -- you know, if you're seeking to require work

6    from me and from my -- I presume counsel during the course of

7    the trial and they're otherwise preoccupied, it seems to me,

8    unless there's some overarching prejudice to you by waiting --

9          MR. MONACO:  Judge, the problem is now she's arguing

10   the substance of whether she can intervene on a motion I've

11   not even seen yet.  She wants to file it under seal.  So there

12   will be absolutely no prejudice to wait.  And I don't think

13   it's appropriate to take up the Court's time at this point.

14   Once I see her motion to intervene, I may not even object.  I

15   may.  But I haven't even seen the motion yet.  So today's

16   hearing was to -- for leave to file a petition under seal.

17         THE COURT:  All right.  It's now filed under seal

18   without objection from either side, and we will take it up at

19   some time in the future.

20         MS. ROSEN:  Judge, there's one thing I want to raise.

21   It's my understanding just based on defense counsel's argument

22   that the plaintiff's attorney in this case, Mr. Romanucci,

23   intervened and obtained materials in their case which, having

24   just general understanding of what that lawsuit is about, we

25   were never provided any documents that he obtained.

1    The documents have to do with Jason Doe who plaintiff

2 has argued in this court is Pat Kelly.  And to the extent that

3 there is information related to Pat Kelly and whether or not

4 he was actually the shooter or whether Mikey LaPorta was the

5 shooter goes to our defense so --

6    THE COURT:  It seems to me, over a year ago an issue

7 similar to this was raised.

8    MR. ROMANUCCI:  True.

9    THE COURT:  And I don't remember in what the context

10 was and what the result was.

11    MR. ROMANUCCI:  So by history --

12    THE COURT:  There was a courtroom full of lawyers.

13    MR. ROMANUCCI:  Right.

14    THE COURT:  I remember that.

15    MR. ROMANUCCI:  So if I may, your Honor, by history,

16 if my memory is accurate, we came to you asking for consent to

17 intervene in the state court case.  You advised us and you

18 issued an order that it would not be appropriate for you to

19 order something for the state court to do, so we went to the

20 state court asking permission to intervene in that case, and

21 we did.  We were given leave to intervene in that case.

22    And in terms of the documents that we received that

23 we feel are germane and relevant to this case, it's only one

24 document, and that's the complaint that was filed by Jason Doe

25 in that case against the American Addiction Centers.  And that

1    is the only document that we purport to have which would be

2    used in this case.

3              THE COURT:  Did you turn that over to defense?

4              MS. ROSEN:  Well, if I could --

5              MR. ROMANUCCI:  They have that.  They absolutely have

6    that document.  It's been turned over.

7              MS. ROSEN:  The complaint?

8              MR. ROMANUCCI:  Yes.

9              MS. ROSEN:  Correct.  Is that the only -- I guess

10   what I'm not clear on is if that's the only document that they

11   obtained.

12             MR. ROMANUCCI:  Yes, sir.

13             THE COURT:  That's what he just said.  He's an

14   officer of the court, so I certainly will believe him unless

15   somebody can prove otherwise.

16             MS. ROSEN:  No, no, no.  All I'm saying is what I

17   heard --

18             THE COURT:  Yes.  That's what I heard him say.

19             MS. ROSEN:  The clarification is that what he thought

20   was germane to this case.  So as long as the representation is

21   that the only documents he obtained from the state court

22   litigation was the complaint, the only documents, whether

23   germane or not, then we don't have a problem.

24             THE COURT:  That's correct, is it not?

25             MR. ROMANUCCI:  Correct, your Honor.

1    THE COURT:  All right.  So we -- I have granted the
2  motion to file under seal.  We'll take up the issue of the
3  actual intervention at a later date.  Okay.  Thank you.
4    MS. ROSS:  Thanks, your Honor.
5    MR. MONACO:  Thanks, your Honor.
6    THE COURT:  Okay.  The next order of business would
7  be the ruling on the motions in limine, and I will --
8  substantial ones, so listen closely.  There was -- we'll take
9  the plaintiff's first.
10    The omnibus motion in limine was 1 through 6 and then
11  a motion to exclude non-party witnesses from the courtroom, 7.
12  And those were not objected to and are granted to the extent
13  they're relevant and they apply to both cases.
14    No. 9 was a motion to exclude LaPorta's failure to
15  pay income taxes.  My -- this will be granted in part and
16  denied in part.  The information to the extent that it's
17  relevant on cross-examination to his wage loss claim, the
18  motion will be denied.  However, the motion is granted to the
19  extent that there's an allegation that the conduct amounted to
20  tax fraud.  Leave that out of the case, any potential tax
21  fraud allegations.
22    No. 10, motion to exclude allegations of prejudice
23  regarding the delay informing the City of LaPorta's ability to
24  speak.  It's denied as it may be relevant to the argument that
25  the City may make as to the cause of delay in the

1    investigation as alleged by the plaintiff.

2            No. 11, motion to exclude the fight with

3    Mr. LaPorta's father, that's granted.  In the Court's opinion,

4    that is not relevant to the case and is prejudicial.

5            12, motion to exclude testimony regarding insurance

6    coverage, that's granted.  It did not appear to the Court that

7    that's relevant.

8            13, the 2002 citation against Mr. Kelly for fighting

9    by agreement, that's been already excluded by the Court, so

10   that motion is denied.

11           14, evidence of exclusion of evidence of previous

12   cervical injury is denied as it may be gone into in

13   cross-examination of plaintiff's medical expert.

14           15, James Caruso, that's granted without objection.

15           16, LaPorta's past use of alcohol and prescription

16   drugs, that's granted but subject to review as to possible use

17   in cross-examination of plaintiff's medical witnesses.  It may

18   be relevant to that.  The Court is unable at this point to

19   make a clear determination on that.

20           17, exclude references to Michael LaPorta's alleged

21   suicide attempt and to the diagnosis, lay diagnosis of

22   depression.  That's granted except to the extent that

23   plaintiff opens the door by introducing lay testimony that he

24   was not depressed.

25           18 is granted by agreement.

1  19 is granted to the extent that the City argues

2  pecuniary interest of the City would be harmed by liability

3  due to actions of off-duty police officers, but it's denied to

4  the extent that it would prevent the City from arguing its

5  defense that it was not responsible for officers who are off

6  duty.  That is, if the plaintiff has not proved its *Monell*

7  claim, the City certainly can argue that it hadn't proved its

8  *Monell* claim.  If he doesn't prove the *Monell* claim, then it

9  certainly is arguable that it's not liable for the actions of

10  off-duty police officers.

11  20 which seeks to prevent the City from denying the

12  existence of a code of silence, it's denied.  The mayor's

13  statements to the contrary are admissible but they are not

14  preclusive.

15  21, admissibility of police accountability task force

16  report and Department of Justice report, that's granted as to

17  the documents in general.  However, it's denied as to relevant

18  portions.  In other words, we're not going to give the jury

19  the entire documents, but those portions which may have some

20  relevance to this case, findings of fact that have any

21  relevance in this case would certainly be admissible pursuant

22  to the exception to the hearsay rule.  See the summary

23  judgment ruling.  I think it was at Page 41 and 42.

24  The mayor's public statements regarding the code of

25  silence, this is granted as an admission on behalf of the City

1    and, therefore, is not hearsay.

2            23, which is motion to exclude evidence of Michael

3    LaPorta's purported blood alcohol content, it's denied as to

4    the extent that it can possibly be used on cross-examination

5    of plaintiff's expert witnesses if relevant.  Otherwise, the

6    defendant, the City would need an expert of its own to show

7    whatever value it has.

8            24, regarding text messages, the text messages to --

9    can be used in cross-examining Julie Sandy.  The rest will be

10   excluded unless the City can establish specific relevance of a

11   particular text message.

12           25, to bar Jeffrey Noble's opinions regarding

13   legislative intent, that's granted -- it's denied to the

14   extent that plaintiff seeks to prevent him opining that, in

15   his opinion, the City is constrained by state law from

16   investigating complaints which are not started by an

17   affidavit.  He, however, cannot testify as to legislative

18   intent, but he can testify to his understanding of state law.

19           26, seeking to bar testimony of Aaron Brudenell as

20   cumulative.  Denied at this time as the City has not decided

21   who to call and, since he is a rebuttal witness, he would be

22   limited to rebut plaintiff's witnesses.

23           27, to bar Dr. Heilbronner, that's denied.  He may be

24   allowed to testify on memory and perception if he can do so

25   within a reasonable degree of certainty.

1     28, to bar Dr. Lazar re. life expectancy, denied if

2     he can do so to a reasonable degree of certainty.

3     29, to bar Barton Epstein re. blood splatter, denied

4     as he is a rebuttal witness.  And I would need to hear what

5     plaintiff's expert says and to determine whether or not,

6     whatever his testimony would be, would be proper rebuttal.

7     30, to bar Judith Roberts' testimony, denied since

8     she is a rebuttal witness to plaintiff's statistician.

9     However, she may not testify as to her understanding of police

10    practices, which plaintiff was concerned about and raised.

11    Now, the defense's motions in limine, 1 through 25.

12    Motion to bar Dr. Edward Rothman from testifying.  Plaintiff

13    agrees that Dr. Rothman is not qualified as a police

14    procedures and policy expert.  He does not intend to elicit

15    testimony from Dr. Rothman on qualitative conclusions

16    regarding the validity of complaints.

17    The motion is denied.  A *Monell* plaintiff may

18    introduce expert testimony of a statistician to analyze the

19    frequency of citizen complaints without expertise in police

20    practices.  The City's criticisms regarding what Rothman

21    reviewed go to the weight to be given his testimony and are an

22    appropriate basis for cross-examination but not for exclusion.

23    That's *Simmons versus City of Chicago*.  Similarly, his data

24    and methodology are not irrelevant or unreliable merely

25    because they encompass 2004 to 2016, as it was precisely in

1    the middle of that range when plaintiff's injury arose.  See

2    *Ruiz-Cortez versus City of Chicago*.

3        The Court reserves the right to exclude Dr. Rothman's

4    testimony on matters about which he lacks requisite

5    qualifications or did not review data, including how CPD's

6    rate of sustained CRs compares to other jurisdictions', what

7    constitutes meaningful discipline for a police officer, the

8    efficacy of Chicago Police Department's discipline and

9    practices, and how investigations are conducted, etcetera.

10       Motion to bar certain opinions of Lou Reiter.

11   Mr. Reiter is an expert in police procedures who has lectured

12   and published on domestic violence, is qualified to give

13   opinions on domestic violence.  That's granted in part.

14   Mr. Reiter may testify as to matters of domestic violence --

15   see *Cazares versus Frugoli* -- permitting Reiter to testify on

16   past failures to investigate and arrest an off-duty officer

17   for criminal offenses about which he has expertise.

18       However, he may not testify that the code of silence

19   or the Chicago Police Department's failures were the proximate

20   cause of Kelly's actions.  Mr. Reiter may testify about the

21   reasonableness of officers' conduct and any egregious

22   deficiencies in Chicago Police Department practices so long as

23   they are tethered to professional standards the Chicago Police

24   Department promulgates or that are adhered to in comparable

25   departments.

1          Reiter may also rely on the police accountability

2     task force report because of its admissibility.  See the

3     comments on summary judgment 41 and 42 and plaintiff's ruling

4     on motion in limine 21.  It is the kind of material experts in

5     the police procedures field would reasonably rely on in

6     forming opinions on the subject.

7          Finally, although Reiter may not testify as to

8     Kelly's subjective motivations, he may testify as to

9     observations based on his vast experience in and knowledge of

10    law enforcement such as, for example, that officers are more

11    likely to commit misconduct under certain circumstances.

12         Motion to bar Mark Perez from testifying.  Mr. Perez

13    did not only review Officer Kelly's CRs but also bases his

14    testimony on Chicago Police Department's own policies and

15    procedures as well as on guidelines promulgated by the

16    Department of Justice.  He will make no attempt to sort out

17    conflicting testimony or resolve any issues concerning Kelly's

18    credibility.

19         That's granted in part.  Mr. Perez may not testify to

20    the effect that deficiencies in the Chicago Police

21    Department's investigations were pursued to the code of

22    silence or otherwise attempt to divine the motives underlying

23    particular investigations, nor may he testify concerning

24    Officer Kelly's individual motivations.

25         However, Mr. Perez may testify as to any deficiencies

1    in the Chicago Police Department's investigations of Officer

2    Kelly or others based on his review of evidence and procedures

3    and his relevant knowledge as an expert, and while he may not

4    testify concerning the proximate cause of Kelly's actions, he

5    may opine on, for example, the likelihood of officer

6    misconduct under certain procedures.

7            Motion to bar Dr. Ziejewski's testimony that LaPorta

8    was unlikely to shoot with his left hand.  Dr. Ziejewski is an

9    expert on human body biomechanics and can rely on statements

10   by LaPorta's brother and mother for the basic fact that

11   LaPorta is right-hand dominant.

12           That motion is going to be denied.  It was not an

13   unreliable process or methodology for Dr. Ziejewski to ground

14   his premise that LaPorta is right-hand dominant in the

15   statements of people who know LaPorta best.  See *Smith versus*

16   *Ford Motor Company*.

17           The City is free to argue to the jury that

18   Dr. Ziejewski should not have relied on LaPorta's brother and

19   mother for the predicate that LaPorta was right-hand dominant.

20           Motion to bar David Balash from testifying.

21   Mr. Balash is qualified to give opinions as to the

22   reasonableness of investigations based on his expertise in

23   forensic science, firearms identification, and crime scene

24   reconstruction.  Motion is denied.

25           Mr. Balash has admitted that he is not qualified to

1   offer expert testimony regarding police procedures and

2   practices of the Chicago Police Department detectives, the

3   IPRA, or the State Attorney's office, but to the extent

4   Mr. Balash's opinions implicate such practices with respect to

5   the LaPorta shooting, he only appears to characterize them as

6   flawed based on his own expertise in forensic science.

7           The Court reserves the right to revisit this ruling

8   should Mr. Balash seek to opine more generally on these

9   entities' practices and procedures.

10          Motion to bar Greg Kulis from testifying.  The Court

11  has bifurcated the right-of-access claim so that the Court

12  will reserve ruling on that.

13          Motion to bar certain opinions of Wendie Howland,

14  that's granted in part because Ms. Howland is admittedly

15  unqualified on the topic of life expectancy.  She may not base

16  her opinion on LaPorta having a normal life expectancy.

17  However, she may use the life expectancy figures properly

18  admitted into evidence such as that provided by plaintiff's

19  qualified life expectancy expert, Dr. Senno.

20          Thus, Ms. Howland's testimony should be modified in

21  accordance with his opinion to reflect an estimated life

22  expectancy for LaPorta based on the expert testimony.

23          The motion to bar Michael LaPorta from testifying at

24  the trial.  This is denied.  The mere fact that defendant's

25  expert opines that LaPorta lacks the ability to recall what

1    happened on the night in question does not mean that "no one

2    could reasonably believe the witness could have observed,

3    remembered, communicated, or told the truth" as is necessary

4    to justify exclusion under Rule 601.  See *U.S. versus Gutman*.

5         Competency of a witness to testify as distinguished

6    from the issue of credibility is a limited threshold decision

7    as to whether a proffered witness is capable of testifying in

8    any meaningful fashion whatsoever.  See *U.S. versus Banks*.

9    LaPorta can provide meaningful testimony about what happened

10   on the night in question as he did at depositions and about

11   other relevant issues.

12        Motion to admit Kelly's deposition and bar reference

13   to his Fifth Amendment invocation.  That's granted in part

14   because plaintiff has -- had every motivation and opportunity

15   to cross-examine Officer Kelly at his 2012 deposition.  The

16   City may offer into evidence his original deposition testimony

17   if indeed he elects to invoke his Fifth Amendment rights when

18   called to the stand.  See Rule 804(b)(1).  Plaintiff may

19   adduce evidence that Kelly invoked the privilege at his 2016

20   deposition and may impeach Kelly accordingly.

21        In a civil case, an adverse inference may be drawn

22   against a witness who pleads the Fifth Amendment even if that

23   witness is not a party.  See *Daniels versus Pipefitters Local*

24   *597*.  The evidence will not be excluded on grounds of unfair

25   prejudice because it is extraordinarily relevant testimony

1    from the only eyewitness to the shooting other than

2    Mr. Kelly -- excuse me, Mr. LaPorta.

3         Motion to bar plaintiff from calling Mayor Emanuel at

4    trial, that's granted.  While the mayor's comments may be

5    offered into evidence -- see ruling on motion 22 -- plaintiff

6    may not call the mayor as a trial witness.  In denying

7    plaintiff's motion to compel the mayor's deposition, the Court

8    wondered why is the introduction of Emanuel's public remarks

9    regarding the code of silence insufficient.

10        Mayor Emanuel should not be taken away from his work

11   to spend hours or days answering lawyers' questions unless

12   there is a real need, and plaintiff fails to convince the

13   Court why there is such a need here.  See *Olivieri versus*

14   *Rodriguez*.

15        Motion to bar DOJ investigation and report.  The DOJ

16   report is admissible under Rule 803(8)(a)(ii) to the extent it

17   contains factual -- but I already discussed that, so we

18   won't -- the same ruling on that motion.

19        5, motion to bar police task force report, the same

20   ruling, denied for the same reason.

21        Motion to bar evidence regarding the current status

22   of the IPRA and/or the Chicago Police Department

23   investigations into the shooting, the LaPorta shooting, is

24   denied to the extent not moot.  Information on the current

25   status of IPRA and/or CPD investigations into the LaPorta

1   shooting while not relevant to the causation inquiry certainly

2   is relevant at least to plaintiff's showing that there are

3   widespread policies and practices of failing to investigate

4   officers charged with misconduct, see Count 6, and that the

5   City acted with deliberate indifference in "subsequent

6   acceptance of dangerous recklessness by the policy maker tends

7   to prove his preexisting disposition and policy."  See

8   *Bordanaro versus McLeod*.

9        Any prejudice to the City can be ameliorated by a

10  jury instruction not to consider such evidence other than on

11  the issue of the existence of policies and practices to which

12  the City was deliberately indifferent and potentially at the

13  trial's second phase on right-of-access count.

14       Motion to bar certain evidence re. the denial of

15  access claim, the ruling is reserved.

16       Motion to bar argument or speculation that Kelly

17  tampered with the crime scene after first responders arrived,

18  that's denied.  Counsel may make arguments reasonably inferred

19  from the evidence presented so long as the attorney argument

20  is fair commentary on the evidence and does not amount to

21  testifying or presenting evidence.  See *U.S. versus Doyle*.

22       Plaintiff intends to adduce evidence that, for

23  example, Kelly was at least at one point walking around the

24  crime scene unrestrained and that Kelly made and received

25  certain calls on his cell phone.  This is a sufficient quantum

1    of evidence to sustain the argument that Kelly tampered with

2    the crime scene after first responders arrived.  Whether the

3    evidence is sufficiently persuasive to sustain the argument is

4    for the jury.

5         Motion to bar Kelly's CRs, log numbers, and other

6    allegations of misconduct occurring after January 2010 is

7    denied to the extent not moot.  Evidence concerning Kelly's

8    misconduct subsequent to January 2010, while not relevant to

9    the causation inquiry, certainly is relevant at least to

10   plaintiff's showing that there are widespread policies and

11   practices of failing to investigate officers charged with

12   misconduct, Count 6, and that the City acted with deliberate

13   indifference, as "subsequent acceptance of dangerous

14   recklessness by the policy maker tends to prove his

15   preexisting disposition and policy."  See *Bordanaro versus*

16   *McLeod*.

17        Any prejudice to the City can be ameliorated through

18   a limiting instruction to the jury not to consider such

19   evidence other than on the issue of the existence of policies

20   and practices to which the City was deliberately indifferent.

21   See ruling on defendant's motion 6.

22        Motion to bar testimony of Kelly's behavior

23   pre-employment with CPD, this is granted.  It's already

24   excluded from the case.  The motion to exclude that evidence

25   is, therefore, granted.

1        Motion to bar argument and testimony that the City

2   failed to investigate when a citizen complaint did not contain

3   a sworn affidavit.  That's granted in part.  Plaintiff may not

4   argue that any CR closed on the basis of "no affidavit"

5   amounted to a culpable failure to investigate.

6        However, plaintiff may argue and adduce evidence that

7   the City failed to investigate a particular CR if one of the

8   applicable exceptions to the affidavit requirement in the

9   operative collective bargaining agreement would have applied

10  to the CR at issue.  See Illinois Statute 725/6, 50 Illinois

11  Statute 725/6, providing that the Act's provisions, including

12  its sworn affidavit requirement, only apply to the extent

13  there's no CBA provision addressing the issue.

14       Motion to bar Patricia LaPorta from testifying that

15  Kelly's father was a CPD commander.  This is granted as

16  unopposed.

17       Motion to bar testimony regarding the contents of

18  Patricia LaPorta's September 2012 affidavit, I'm going to

19  reserve that ruling.  Some of the statements in the affidavit

20  are based on her personal knowledge and are admissible to show

21  the City's notice of Kelly's behavior.  Others recite

22  statements by Kelly that are admissible for substantive truth

23  as non-hearsay admissions of the City's employee on matters

24  within the scope of his employment.

25       Motion to bar hearsay statements of unnamed physician

1    concerning how LaPorta was injured, that's granted as

2    unopposed.

3          15, motion to bar hearsay statements attributable to

4    LaPorta concerning how he was injured, reserve ruling.

5    Precisely what statements the City seeks to bar on hearsay is

6    unclear.  Some of the statements may fall under the hearsay

7    exception for statements made for the purpose of medical

8    diagnosis.

9          Depending on the circumstances of their making, still

10    other statements may constitute excited utterances.  Others,

11    however, appear to be double hearsay.  The Court will rule on

12    objections to particular statements as they arise and rule on

13    the hearsay issues at that time.

14          Motion to bar -- 16, motion to bar testimony

15    regarding how LaPorta was injured from lay witnesses without

16    personal knowledge, denied to the extent not moot.  Plaintiff

17    may offer the testimony of lay witnesses concerning their

18    perception of LaPorta at relevant times.  Because it is

19    helpful to clearly determine a fact in issue, this testimony

20    may also embrace the form of an ultimate opinion on LaPorta's

21    likelihood of suicide so long as it is rationally based on the

22    witness' perception and not indebted to scientific, technical,

23    or other specialized knowledge.

24          Motion to bar evidence regarding Alderman Moore's

25    personal opinions or beliefs or reading portions of his prior

1　testimony, denied in part, reserve ruling in part.  A Rule

2　30(b)(6) witness may testify to matters within his personal

3　knowledge.  See *PPM Finance versus Norandal USA*.

4　　　　Thus, Alderman Moore may testify as to knowledge he

5　gained in his official position, notwithstanding that the City

6　designated him as its Rule 30(b)(6) witness.  However, the

7　Court cannot yet determine whether the unspecified deposition

8　testimony would otherwise be admissible under Rule 804.

9　　　　Motion to bar plaintiff's expert witness from

10　providing non-disclosed opinions at trial.  This is granted in

11　part.  Because Dr. Ziejewski rendered 11 specific opinions in

12　his expert report -- none of which took the express position

13　that LaPorta did not shoot himself -- his opinion to this

14　effect in his deposition went beyond the scope of plaintiff's

15　disclosures.

16　　　　The Court thus excludes Dr. Ziejewski from testifying

17　as to his ultimate conclusion of who shot LaPorta.  However,

18　Jason Beckert's reliance on Locard's Principle of Transfer

19　Evidence does not exceed the scope of his report, as it is a

20　foundational schema behind forensic examination and not the

21　sort of opinion, data, or fact that Rule 26(a)(2)(B)

22　contemplates.

23　　　　Finally, Karl Reich's and David Balash's review of

24　photos and documents respectively that they had not reviewed

25　prior to their reports and depositions, even if technically

1   violating Rule 26(a)(2), did not cause sufficient prejudice to

2   warrant exclusion.  See *Gicla versus U.S.*  By the government's

3   own admission, neither experts' belated review of photos or

4   documents changed his opinion.

5       19, motion to bar lay testimony regarding operation

6   and mechanics of a Sig Sauer P226, that's denied.

7   Mr. Battistoni's contemplated testimony regarding whether, in

8   his experience, selling, shooting, and dismantling Sig Sauer

9   P226 firearms, they operate in a manner consistent with what

10  Chicago Police Department detectives told him, is admissible

11  lay testimony rationally based on Battistoni's perception,

12  helpful at least to determine the contours of the Chicago

13  Police Department's investigation of the LaPorta shooting and

14  not based on scientific, technical, or specialized knowledge.

15      To the extent that Battistoni's statements about the

16  Sig Sauer P226 cannot as lay testimony conclusively establish

17  how the gun actually works, a limiting instruction can help

18  cabin the jury's consideration of his testimony to the issue

19  of Chicago Police Department's investigation of the LaPorta

20  shooting.  That Battistoni convinced IPRA Investigator Kobel

21  of how the gun operates is relevant to plaintiff's claims in

22  this action.

23      Motion to bar lay testimony opining on Kelly or any

24  other officer believing they could act with impunity.  That's

25  denied.  Plaintiff's claims hinge on showing whether the

1    City's failures were the moving force behind Kelly's actions

2    on January 12, 2010, by leading him to believe that he could

3    act with impunity.  Although opining on Kelly's subjective

4    motivations for acting would clearly be inadmissible, lay

5    opinions of police officers based on their personal knowledge

6    of officers' behavioral problems and/or personal observations

7    of Kelly's behavior fall within the requirements of Rule 701,

8    and they are substantially more probative than prejudicial, so

9    the Court will not exclude them on 403 grounds.

10          21, motion to bar arguments that Chicago Police

11   Department officers colluded based on their shared

12   representation by Attorney Herbert.  That's granted.  Although

13   plaintiff is free to argue that particular facts or

14   circumstances give rise to a reasonable inference that Chicago

15   Police Department officers collude in general or colluded to

16   close ranks around Kelly -- see *U.S. versus Doyle* -- one such

17   circumstance that does not support that inference is the mere

18   fact of common representation by the same attorney.

19          This circumstance has little probative value with

20   respect to any claim of collusion, and it is vastly outweighed

21   by the prospect of jury confusion and the potential of unfair

22   prejudice to the City.

23          22, motion to bar testimony and argument regarding

24   Allyson Bogdalek's separation from the Chicago Police

25   Department, reserve ruling.  Although the City has included

1  Ms. Bogdalek on its list of witnesses, it also claims that she

2  will be unavailable to testify.  If the City calls her as a

3  witness, then Rule 608's framework will be implicated and Rule

4  804(b)(3)'s hearsay exception for statements against interest

5  will not obtain.

6          23, motion to bar testimony and arguments regarding

7  Kelly being racist or sexist.  It's granted.  While plaintiff

8  is perfectly free to explore the facts and circumstances of

9  CRs in which Kelly was alleged to have engaged in violence or

10  animosity towards women or racial minorities, any relevance to

11  this case of testimony or argument that he is a racist or

12  sexist cop is substantially outweighed by the danger of unfair

13  prejudice.

14          24, motion to bar evidence or arguments regarding

15  other events concerning allegations of police misconduct in

16  the media and police shootings, reserve ruling.  One of

17  plaintiff's proof elements is showing a widespread practice or

18  custom so well settled as to constitute a custom or usage with

19  the force of law.  This Court will decide objections to

20  plaintiff's arguments at the appropriate time but "is

21  unwilling to muzzle plaintiff's counsel at this early phase of

22  trial" with respect to other police misconduct.  See *Charles*

23  *versus Cotter* and *Regalado versus City of Chicago*.  Trial

24  judges have broad discretion in controlling counsel's

25  arguments and ensuring that arguments do not stray.

1          25, motion to bar plaintiff from arguing that

2    defendant has the burden to prove or disprove any element of

3    plaintiff's claim, that is granted as unopposed.

4          I think that covers them all.

5          MR. ROMANUCCI:  Your Honor?

6          THE COURT:  Yes, sir.

7          MR. ROMANUCCI:  On behalf of plaintiff, might I have

8    clarification --

9          THE COURT:  Yes, sir.

10          MR. ROMANUCCI:  -- on one of plaintiff's motions?

11    That was defense -- hold on one second.

12          THE COURT:  What was the --

13          MR. ROMANUCCI:  It was on Lou Reiter.  There were

14    several motions on Lou Reiter and bar motions on domestic

15    violence.  Do I have that as granted in part, denied in part?

16          THE COURT:  Which number?  You had a motion, or was

17    it --

18          MR. ROMANUCCI:  It's defendant No. 2.

19          THE COURT:  Oh, defendant's No. 2.  Oh, yes.  That's

20    granted in part.  Mr. Reiter may testify as to matters of

21    domestic violence.  He apparently was in *Cazares versus*

22    *Frugoli* which permitted him to testify on past failures to

23    investigate and arrest an off-duty officer for criminal

24    offenses about which he had expertise.  With *Hayes versus City*

25    *of Des Plaines*, Mr. Reiter has not received nor administered

1   any training in the area of prevention of suicide among

2   detainees nor any screening for such prevention.

3          However, he may not testify that the code of silence

4   or Chicago Police Department failures were the proximate cause

5   of Kelly's actions.  Mr. Reiter may testify about the

6   reasonableness of officers' conduct and any egregious

7   deficiencies in the police department's practices so long as

8   these are tethered to professional standards Chicago Police

9   Department promulgates or are adhered to in comparable

10  departments.

11         Mr. Reiter may also rely on police accountability

12  task force report because it's admissible.  Finally, although

13  Mr. Reiter may not testify as to Kelly's subjective

14  motivations, he may testify as to observations based on his

15  vast experience in and knowledge of law enforcement such as,

16  for example, that officers are more likely to commit

17  misconduct under certain circumstances.

18         MR. ROMANUCCI:  Thank you, your Honor.  And one more,

19  on defendant's motion in limine No. 12, I believe their motion

20  was to bar Patty LaPorta from testifying that Patrick Kelly's

21  father was a commander.  I don't believe that it's undisputed

22  that Patrick Kelly's father was a police officer.  That is an

23  undisputed fact.

24         Would that motion apply to Patty LaPorta not

25  testifying that Patrick Kelly's father was a police officer or

1   just to a commander?

2          MS. ROSEN:  Our motion also sought to bar reference

3   to the fact that he was a police officer 30 years ago for six

4   years.

5          MR. ROMANUCCI:  Part and parcel of one of our claims,

6   your Honor --

7          THE COURT:  I think what I said was that's granted as

8   unopposed, the testimony of Patricia LaPorta's belief that

9   Kelly's father was employed as a Chicago Police Department

10  commander.  However, plaintiff may adduce evidence from other

11  sources that Kelly's father was a Chicago Police Department

12  officer in the '70s because it is relevant to plaintiff's code

13  of silence claim, and there is little potential for prejudice

14  to the City.

15         MR. ROMANUCCI:  Thank you, your Honor.  That

16  clarifies it.

17         THE COURT:  All right.  Anything else?  If not, we

18  will -- a few -- my predilections I like to go through.

19  Recross and redirect, particularly redirect, should be -- or

20  recross and redirect should be severely limited solely to

21  matters raised for the first time, and re-recross and

22  re-redirect should never be attempted.

23         I do not like sidebars, so if at all possible,

24  obviously -- let me backtrack a little bit.  I probably failed

25  to mention that motions in limine are exactly that.  They're

1   motions in advance of the trial on an incomplete record.  So

2   the Court, obviously, can be mistaken on the rulings.  Also,

3   testimony, doors may be opened by one side or the other.  My

4   motions in limine, however, should be obeyed during the

5   opening statements and not countered unless the matter is

6   brought to my attention in a sidebar and that I express an

7   agreement with you, for example, that a door may have been

8   opened or not opened.

9          So to that extent, sidebars are okay.  However, I

10  have been doing this for a long time.  I think I know the

11  rules of evidence.  So if you raise an objection, you cite the

12  basis for your objection citing the rule of evidence that

13  you're relying on either by name or by number.  You can say

14  "hearsay," for example, or 404(b) or whatever, and I will rule

15  on based upon my observation and knowledge of the rules of

16  evidence.

17         If I'm unsure, I may ask for a sidebar, but I don't

18  need a sidebar every time you make an objection, is what I'm

19  trying to get across to you.  Just state the reason for your

20  objection, and I will rule on it based upon my observation of

21  what I hear during the course of the trial.  So we will

22  have -- if there is a matter of some importance that you wish

23  to bring to my attention, hopefully, it can wait until we have

24  a recess so we don't have the jury -- jurors do not like

25  sidebar conferences, and they don't like delays in the -- so

1    I'd prefer if we could do whatever important matters at

2    sidebar after the jurors have been excluded for, say, a

3    recess, but if absolutely necessary, I will, of course,

4    entertain a sidebar.

5              Every comment you wish to make to each other must go

6    through me.  In other words, I don't want you arguing with

7    each other.  If you have an objection, you raise it to me.  If

8    you have a comment, you raise it to me, and I will consider

9    it, and I will either agree with you or disagree with you, and

10   we'll proceed that way.  I don't think I need to tell that,

11   but every now and then we get lawyers that want to argue back

12   and forth, and I don't countenance that.

13             You do not need to ask leave to approach a witness to

14   present a document.  I have always held that that's really --

15   I've never in 31 years ever denied the right to approach a

16   witness, so you may do so without asking leave to approach.

17             We're going to have jury selection.  I think I

18   mentioned last time you were in, we'll pick a jury of 10.

19   Each side gets three peremptory challenges.  The way I have --

20   we'll do it again in this case.  We'll put 10 jurors in the

21   box, and I will conduct the voir dire.  After I have concluded

22   the voir dire, if you believe that some additional information

23   is necessary, you can ask for a sidebar, and I will consider

24   further questioning of that particular juror.

25             What I will do is go through all 10, and then after

1    we have 10 in the box, then you will exercise your peremptory

2    challenges simultaneously in writing, which means you'll write

3    on a piece of paper, "Defense wishes to strike juror No. 2"

4    and plaintiff says No. 8, for example, and I will, without --

5    I will not say who excused them.  I'll just excuse them, and

6    then we'll fill those, and we will go back and forth.

7            Now, in the event that you simultaneously strike the

8    same juror, the first time that happens, that's chargeable to

9    the plaintiff.  The second time that happens, that's

10   chargeable to defense.  For example, let's say plaintiff

11   strikes jurors 1 and 2, defense 2 and 3.  At that point,

12   plaintiff has exercised two and defense one, so we replace

13   those three and both sides strike replacement No. 3.  At that

14   time, the defense has exercised two and the plaintiff two.

15           And do not -- if you don't object to any of the

16   potential jurors, don't get up and say, "They're all fine."

17   Write down on a piece of paper, "Plaintiff does not object to

18   any" or "they're all okay to me," however you want to put it.

19           One thing you should be aware of is I do not -- the

20   way I do it, once the jurors are -- get through your

21   peremptory challenges, I'll swear them in, so there's no

22   back-striking.  So remember that.  So if you don't like, for

23   example, the sexual makeup of the jury, it's too late to

24   exercise challenges to a juror that has previously been

25   accepted.

1    I tend to be pretty liberal with excuses.  It's still

2  three to four weeks, is what your best estimates?

3    MR. ROMANUCCI:  Yes.  I would anticipate three weeks,

4  your Honor.

5    MS. ROSEN:  Three weeks seems, based on what we know

6  right now, your Honor.  I would say more two to three.

7    MR. ROMANUCCI:  It could go into a fourth week, but I

8  don't see it going four weeks.

9    THE COURT:  I'll say three weeks, possibly into four

10  weeks.  And I'll be pretty liberal.  That's a long time for

11  jurors to be away from their work.  So I'll be pretty liberal

12  with excuses, and I will ask them right off the bat, can they

13  devote three to four weeks, hopefully, three weeks, but it

14  might go into the fourth week.

15    Any questions before we bring the jurors up?

16    MR. ROMANUCCI:  Your Honor, just so I understand, I

17  understand your rule about notes.  Who do I pass -- or who do

18  we pass the notes to as to who we choose?

19    THE COURT:  What notes are you talking about?

20    MR. ROMANUCCI:  With respect to if we're using a

21  peremptory.

22    THE COURT:  Oh, to the clerk.  She'll be --

23    MR. ROMANUCCI:  To Wanda.

24    THE COURT:  Yes.  Ms. Parker will be here.  You can

25  give them to her.  I'm sorry.

1    MS. ROSEN:  Judge, I have a question about the

2   witnesses.  The plaintiff is calling many, many, many

3   witnesses that are City employees and that are also on the

4   City's witness list.  To the extent that the City actually has

5   additional testimony to elicit from those witnesses, we think

6   that rather than calling them back in the defendant's case --

7        THE COURT:  Yes, I was going to raise that.  If a

8   witness is called by the plaintiff, is it acceptable to both

9   sides that the defense perhaps exceed the direct examination

10   so they conclude the witness and not call them back?  It would

11   work both ways.

12        MR. ROMANUCCI:  It would be my preference not to

13   waive scope, your Honor.  They would be putting on their case

14   within ours.

15        THE COURT:  I don't know which witnesses -- are there

16   any --

17        MS. ROSEN:  Judge, I mean, it's -- there's -- you

18   know, there's the police officers that were all on the scene.

19   There's the detectives that did the investigation.  There's

20   the IPRA investigators.  There's Alderman Moore.  There's --

21   you know, there's a myriad of witnesses, that, you know, the

22   City could want testimony from that exceeds the scope, and to

23   have to bring all those people back again would unduly extend

24   the trial.

25        THE COURT:  Why don't we do it this way.  Why don't

1    we do it witness by witness.  If a witness is certainly like a

2    policy maker, I can understand where you wouldn't want the

3    witness, but if it's a person who is there strictly as a fact

4    witness, it seems to me it would be helpful not to have to

5    call that person back both from a time standpoint and from the

6    standpoint of the City.

7            MR. ROMANUCCI:  Your Honor, are there peremptory

8    challenges for alternates?

9            THE COURT:  We're not having alternates.  In a

10   civil -- there's no alternate juror.  You have to have six.

11   You can call more than six, up to 12, but you don't get more

12   than three.  So there's no alternates.  Whatever ones we end

13   up with, and I'm hoping that we can get 10 so that if we lose

14   one, two, three, or four, we don't have to start over again.

15           MR. ROMANUCCI:  Understood.  Your Honor, there's one

16   other housekeeping matter.  Mr. Burke is here on behalf of

17   Gordon's Lounge.

18           THE COURT:  Oh, yes.

19           MR. ROMANUCCI:  And we've reached agreement with them

20   on settlement, so we would like to at least inform your Honor

21   that we do have an agreement on settlement with Gordon Lounge

22   and we would like to excuse --

23           THE COURT:  I just won't mention them at all during

24   the case.  Is that --

25           MR. ROMANUCCI:  That's fair.

1          THE COURT:  All right.  So that's true, is it?

2          MR. BURKE:  It is true, Judge.

3          THE COURT:  So there's no particular reason for you

4     to have to stick around then.

5          MR. BURKE:  Correct.  Thank you.

6          THE COURT:  You're excused then.  I won't even

7     mention it to the jury because it's -- we'll just make sure

8     that whatever we hand out doesn't have "Gordon's Lounge" on

9     it.  So it's Gordon's Lounge, doing business as Brewbakers

10    that is settling, and they will be dismissed.

11         MR. ROMANUCCI:  That is correct, your Honor.

12         THE COURT:  Okay.  One other thing, I want to read a

13    statement of the case to the jury just to tell them what the

14    case is about.  And I have written one out.  I have no pride

15    of authorship.  If it's not acceptable in some way, shape, or

16    form, I would ask for your input, but my suggestion is to tell

17    the jury, and this is when they come in just so that they know

18    what the case is about, they know it's not a murder trial or

19    it's not an employment discrimination or something else:

20         On January 12, 2010, the plaintiff, Michael LaPorta,

21    suffered gunshot wounds to his head from the service weapon

22    belonging to Patrick Kelly, an off-duty Chicago police

23    officer.  The plaintiff contends that he was shot by Officer

24    Kelly.  Plaintiff also contends that the City of Chicago is

25    responsible for the actions of Officer Kelly even though he

1    was off duty at the time because it had widespread policies

2    and practices that sought to protect police officers who

3    commit violence against citizens while they're off duty so

4    that they are encouraged to believe that they can commit such

5    violence with impunity.

6          The City of Chicago contends that LaPorta shot

7    himself.  It also contends that it had no such policies and

8    practices so it is not responsible for the actions of its

9    police officers while they're off duty.  Plaintiff claims to

10   have suffered damages as a result of the shooting.

11         How is that?  Does that all sound all right?

12         MS. ROSEN:  Sounds fine, Judge.

13         MR. ROMANUCCI:  Your Honor, the plaintiff has no

14   objection to it.

15         THE COURT:  All right.  I'm just -- I will preface it

16   by saying that neither side is committed to this, that this is

17   my observation just so that they know what the case is about,

18   so I'll read them that, and then they come in.  I'll also then

19   ask you to introduce yourselves and the people at your table.

20         Mr. Romanucci, I'll ask you to -- and Ms. Rosen to do

21   the same for her table.

22         Now, there's one other motion, that is, that you --

23   plaintiff seeks to have the mother and brother sit at the

24   counsel table.  Is that correct?

25         MR. ROMANUCCI:  It would either be mother or brother,

1    and I'll let Mr. Gould speak to that if your Honor wishes.

2             MR. GOULD:  Yes, your Honor.  Because of Michael D.

3    LaPorta's physical limitations and his health, plaintiffs

4    anticipate that he would only be present during the opening

5    and the day he's testifying and, therefore, we'd like to

6    designate his mother and/or brother as his representative in

7    court.

8             THE COURT:  Is there objection?

9             MS. ROSEN:  There is, Judge.  They're witnesses in

10   the case, and we have the motion to exclude.  You know,

11   originally, Mr. LaPorta's father was the guardian, and

12   certainly as the guardian, he would be able to sit at the

13   table.  Plaintiff chose in the last couple weeks to substitute

14   him out as plaintiff and add in the bank.

15            So we object.  You know, Ms. -- his mother has

16   testimony about purported conversations she had with Kelly.

17   And these are witnesses.  They go beyond just damage

18   witnesses.  If they were just damage witnesses that can speak

19   to -- you know, that would be testifying about Mikey --

20   Mr. LaPorta's condition, we wouldn't, but they are -- they

21   have -- they have information and will be testifying about the

22   IPRA investigation, about the detective division

23   investigation, about purported conversations they had with

24   Mr. Kelly, and so we would object.

25            THE COURT:  All right.  I will allow one, just one of

1   them.  You can make your choice, whether it be the mother or

2   the son, but I don't want them back and forth, so the same

3   one, but I will overrule the objection and allow you to pick

4   one.

5          MR. ROMANUCCI:  And your Honor, I also want to state

6   that there is -- that Ms. Rosen is correct.  In the last

7   couple weeks, if your Honor recalls, we did substitute the

8   guardian of the estate, and Ms. Ensemble is here in court

9   today.  She's a representative of the bank.

10         So we'll -- we'll designate either Ms. Ensemble or

11  Mrs. LaPorta or Chris LaPorta to be seated at counsel table.

12         THE COURT:  All right.  We will stand until the

13  jurors are here, and then we'll start jury selection.

14      (Recess from 10:58 a.m. to 11:15 a.m.)

15      (Proceedings heard in open court.  Prospective jurors in.)

16         THE COURT:  Good morning, ladies and gentlemen.

17  You've been called here to participate in jury selection in a

18  case entitled Michael A. LaPorta -- or Michael A. LaPorta

19  versus City of Chicago.  And I'll give you a brief description

20  of the case as I understand it so that when I'm -- you're

21  being selected, undergoing the selection as jurors, you'll

22  know what some -- the reason for some of the questions we're

23  going to ask.

24         On January 12th, 2010, the plaintiff, Michael

25  LaPorta, suffered a gunshot wound to his head from the service

1    weapon belonging to Patrick Kelly, an off-duty Chicago police

2    officer.  The plaintiff, Mr. LaPorta, contends that he was

3    shot by Officer Kelly.

4           Plaintiff also contends that the City of Chicago is

5    responsible for the actions of Officer Kelly even though he

6    was off duty at the time because the City of Chicago had

7    widespread policies and practices that sought to protect

8    police officers who commit violence against citizens while

9    they're off duty so that they are encouraged to believe that

10   they can commit such violence with impunity.

11          The City of Chicago contends that Mr. LaPorta shot

12   himself.  It also contends that it had no such policies or

13   practices so that it is not responsible for the actions of the

14   police officers while they're off duty.  The plaintiff claims

15   to have suffered severe damages as a result of the shooting.

16          That's what this case is generally about.  Again,

17   that's my personal conclusion of what the case is about so the

18   parties, to the extent that I might be misinformed slightly on

19   some of the facts or contentions, that is not -- neither party

20   is bound to accept my complete statement there.

21          The participants in this case, Mr. -- plaintiff is

22   represented by Mr. Antonio Romanucci.  Would you represent --

23   excuse me, introduce the people at your table?

24          MR. ROMANUCCI:  Yes, your Honor.

25          Good morning, ladies and gentlemen.  My name is

1   Antonio Romanucci.  I'm one of the attorneys for the

2   plaintiff, Michael LaPorta.  And to my left here is Marty

3   Gould, Nicoletta Ward, Patty Kane with our trial team, Bruno

4   Marasso, and walking in the door right now is Bryce Hensley.

5   Thank you very much.

6            THE COURT:  Thank you.

7            The City of Chicago is represented by a number of

8   people.  Ms. Rosen, would you introduce the people at your

9   table.

10           MS. ROSEN:  Sure.  My name is Eileen Rosen.  I along

11  with Stacy Benjamin, James Novy, and Theresa Carney represent

12  the City of Chicago.

13           THE COURT:  All right.  Now, you've met the

14  participants in the case.  One of the things I need to tell

15  you, this case, we anticipate to take three weeks to trial,

16  and it's possible that the case might roll over into a fourth

17  week.  We expect the case to conclude in three.

18           However, just to be honest with you, it's a

19  possibility it might take slightly longer than that.  And I

20  realize that that is a significant period of time and that not

21  everybody is economically set so that they can devote that

22  time, so I would ask you, when you're undergoing selection as

23  a juror, if you wish to be excused -- and I can understand why

24  a person would want to be excused.  I'm not encouraging that.

25  But if you need to be excused for economic reasons or some

1    other reason, health reasons or whatever, I want you to bring

2    that up at the very beginning so that I can determine whether

3    or not you should be excused from participating in this case.

4              If you are excused by me, that does not excuse you

5    from participating in other case -- other jury cases so that

6    you would have to be available for selection in some other

7    case.  It would only -- I can only control what happens in

8    this court, but I will certainly entertain excuses of why it

9    might be very difficult for some of you to participate.

10             I would hope that as many of you as possible would

11   agree to participate in this case.  As you may or may not

12   recall your -- back in high school days when you took civics,

13   one of your responsibilities as a citizen is to serve your

14   country both in terms of war and strife but also as a juror.

15   That's one of our obligations as a citizen.

16             Our method of problem resolving, dispute resolution

17   takes place in a courtroom and in many -- most instances,

18   before a jury of what we call peers, in other words, people

19   drawn from everyday life who when presented with the facts can

20   give us a decision that represents the feeling of the

21   community.  You're all representative of the larger community

22   here in the Northern District of Illinois.

23             So it's important to -- you've been selected here by

24   lot.  You may not realize that, but you come from various

25   lists that are taken up by lot so that your being in this

1    courtroom in this particular time either represents good luck

2    on your part or maybe not so good luck, depending on your

3    point of view.

4         However, I would hope that as many of you as possible

5    would agree to participate in this case.  However, as I said,

6    I will be understanding because I can understand being away

7    from your work or from your family and so forth for three

8    weeks or more might pose a difficult time.

9         The other -- I should introduce myself.  I'm Judge

10   Leinenweber.  I've been assigned this case.  I'm a federal

11   district judge.  And the lady to my right is Ms. Wanda Parker.

12   She is the official member of the Clerk's office that keeps

13   records in this particular case and helps in various parts of

14   this case.

15        The lady on my left is Ms. Judy Walsh who is the

16   official court reporter.  And that's important in one respect,

17   that if you are undergoing questioning by me as what we call

18   voir dire of your acceptability as a juror in this particular

19   case, she takes down everything that's said, everything that I

20   say and everything that you as a potential juror will say, so

21   it's important that you verbalize your answer.

22        You shouldn't nod or make some like "uh-huh" or

23   "uh-uh" because they're pretty hard to distinguish in the

24   record, what's the difference between "uh-huh" and "uh-uh."  I

25   might be able to figure it out in the context, but it's

1    important that you say "yes," "no," or whatever is required to

2    correctly answer the question.

3            So one of the things that -- those of you who are

4    called up here will undergo a relatively short question and

5    answer session concerning some of your experiences, some of

6    your knowledge, and what you do.  Now, I might explain, we're

7    not just being nosy.  There is a purpose for this questioning

8    that we'll ask.

9            Under federal law, each side is entitled to have any

10    potential juror that has a previous view, I'd say unshakeable

11    view as to how a case such as this should come out, excuse

12    such a person for cause.  They also have the right under

13    federal law to excuse a certain number of jurors by exercising

14    what they -- we call a peremptory challenge, which means that

15    they can ask or have a particular person removed without

16    having to justify to the judge why they don't want them.

17            This is their right under federal law, and as the

18    judge, I must grant them that right.  So it's important that

19    they understand some things about you so they can exercise

20    their rights reasonably.  We're not just trying to be nosy.

21    Having said that, I don't believe that the questions are

22    particularly invasive, but to the extent that anything is, we

23    would apologize in advance, but it's necessary.

24            Is there anything else, Wanda, that I should --

25            THE CLERK:  Not that I can think of.

```
 1              THE COURT:  Oh, please rise and be sworn.
 2         (Venire sworn.)
 3              THE COURT:  Please be seated.
 4              Would you call 10 jurors?  We're going to have a jury
 5    of 10, so the first person whose name is called, take the seat
 6    closest to me and then second, third, fourth, fifth, sixth.  I
 7    think there's seven in the first row, and then there will be
 8    three in the back row.
 9              THE CLERK:  Roger Cummings.
10              Andrea Diven.
11              Eugenio Santiago.
12              Sunita Anand, A-n-a-n-d.
13              Annette Young.  You can come up this way -- yes.
14              Jennifer Hyatt.
15              Kevin Morris.
16              Maribel Cano, C-a-n-o.
17              Maria Ceballos.
18              Nicole Guerrero.
19              And Jocelyn Gerona.
20              THE COURT:  The first lady, is it Andrea Diven?
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  And where do you live?  When I say "where
23    do you live," you don't have to give me a street address, but
24    we're interested in like the north side of Chicago, the south
25    side of Chicago, the west side of Chicago.
```

1          PROSPECTIVE JUROR:  I live in North Aurora.

2          THE COURT:  Pardon?

3          PROSPECTIVE JUROR:  North Aurora.

4          THE COURT:  North Aurora.  Thank you.  How old are

5    you?

6          PROSPECTIVE JUROR:  51.

7          THE COURT:  What is your educational background?

8          PROSPECTIVE JUROR:  High school.

9          THE COURT:  And what is your employment?

10         PROSPECTIVE JUROR:  Assistant to a financial advisor,

11   part-time.

12         THE COURT:  Are you able to devote the three to four

13   weeks in this case?

14         PROSPECTIVE JUROR:  I'm not sure.

15         THE COURT:  When you say you're not sure --

16         PROSPECTIVE JUROR:  Well, financially, it would

17   be very -- it would be difficult.  I only work part-time, but

18   I would like to serve as a juror.  I'm not sure.  I'll just

19   say yes.

20         THE COURT:  Okay.  Have you heard -- I know I just

21   gave you a very brief description of the case.  Have you heard

22   anything about this case?

23         PROSPECTIVE JUROR:  I have not.

24         THE COURT:  Okay.  Did you recognize anybody who was

25   introduced to you?

1          PROSPECTIVE JUROR:  I did not.

2          THE COURT:  Have you or your family member ever

3     worked in a police capacity?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Have you or your family member ever

6     worked for the City of Chicago?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Have you or any family member ever had a

9     negative experience with a Chicago police officer?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Have you ever had a negative experience

12    with any policeman?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Have you or any of your family members

15    ever been crime victims?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Have you or any of your family members

18    ever been arrested for a serious crime?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Do you know anyone who has committed or

21    attempted to commit suicide?

22         PROSPECTIVE JUROR:  I do not.

23         THE COURT:  Do you know anyone who has suffered a

24    serious traumatic brain injury?

25         PROSPECTIVE JUROR:  I do not.

1      THE COURT:  Have you served on a jury before?

2      PROSPECTIVE JUROR:  No.

3      THE COURT:  Have you ever filed a lawsuit or have you

4  ever been sued?

5      PROSPECTIVE JUROR:  No.

6      THE COURT:  If the plaintiff establishes liability on

7  serious damages, would you be willing to award him substantial

8  damages?

9      PROSPECTIVE JUROR:  Yes.

10      THE COURT:  If, on the other hand, the plaintiff

11  fails to establish liability, would you be willing to find in

12  favor of the City of Chicago and award no damages?

13      PROSPECTIVE JUROR:  Yes.

14      THE COURT:  Is there any reason at all that you could

15  not be a fair juror to both sides in this particular case?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  The next gentleman is Eugenio Santiago.

18      PROSPECTIVE JUROR:  Correct.

19      THE COURT:  Where do you live, sir?

20      PROSPECTIVE JUROR:  On the north side of Chicago.

21      THE COURT:  And how old are you?

22      PROSPECTIVE JUROR:  I'm 64 now.

23      THE COURT:  What is your educational background?

24      PROSPECTIVE JUROR:  High school.

25      THE COURT:  And what is your business or occupation?

1          PROSPECTIVE JUROR:  I'm a caregiver.

2          THE COURT:  All right.  Are you able to devote three

3    to four weeks?

4          PROSPECTIVE JUROR:  It's going to be impossible

5    because I -- the person that I'm a caregiver for is my

6    mother-in-law, and I have no one there to basically take care

7    of her.

8          THE COURT:  Thank you, sir.  I'll excuse you.  Thank

9    you, sir.

10          THE CLERK:  You can leave for the day.  Call the jury

11    department tomorrow after 4:30.

12          THE COURT:  The next lady is Sunita Anand.

13          PROSPECTIVE JUROR:  That's correct.

14          THE COURT:  Where do you live, ma'am?

15          PROSPECTIVE JUROR:  I live in the southwest suburbs.

16          THE COURT:  Okay.  How old are you?

17          PROSPECTIVE JUROR:  50.

18          THE COURT:  What is your educational background?

19          PROSPECTIVE JUROR:  I'm an undergrad.

20          THE COURT:  And what is your employment?

21          What is your employment?

22          PROSPECTIVE JUROR:  I'm an executive assistant.

23          THE COURT:  Are you able to devote three to four

24    weeks for this case?

25          PROSPECTIVE JUROR:  No, because I have to travel to

1   help my mom with her knee replacement surgery in two weeks.

2          THE COURT:  All right.  Thank you.  I'll excuse you.

3          PROSPECTIVE JUROR:  Thank you.

4          THE CLERK:  Just call the jury department tomorrow

5   after 4:30.

6          THE COURT:  The next lady is Annette Young.

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Where do you live, ma'am?

9          PROSPECTIVE JUROR:  South side of Chicago.

10         THE COURT:  How old are you?

11         PROSPECTIVE JUROR:  69.

12         THE COURT:  What is your educational background?

13         PROSPECTIVE JUROR:  High school.

14         THE COURT:  And what is your business or occupation?

15         PROSPECTIVE JUROR:  I'm retired.

16         THE COURT:  All right.  Are you able to devote three

17  to four weeks for this case?

18         PROSPECTIVE JUROR:  No, I'm not.

19         THE COURT:  Why not?

20         PROSPECTIVE JUROR:  In two days, I have to go get a

21  heart monitor in.  I must do that.

22         THE COURT:  Okay.  Thank you.  I'll excuse you.

23         THE CLERK:  If anyone is excused for the day, just go

24  home, call the jury department tomorrow after 4:30.

25         THE COURT:  The next person, Jennifer Wyatt.

1              PROSPECTIVE JUROR:  Hyatt.

2              THE COURT:  Hyatt.  Excuse me.  Where do you live,

3    ma'am?

4              PROSPECTIVE JUROR:  Forest Park.

5              THE COURT:  How old are you?

6              PROSPECTIVE JUROR:  43.

7              THE COURT:  What is your educational background?

8              PROSPECTIVE JUROR:  High school.

9              THE COURT:  And what is your business or occupation?

10             PROSPECTIVE JUROR:  I'm a web developer.

11             THE COURT:  All right.  Now, are you able to devote

12   three weeks to this trial?

13             PROSPECTIVE JUROR:  I'm in the process of

14   transferring to another position, so it might be difficult for

15   my company more than it would be for me.

16             THE COURT:  Do you think you could do it?

17             PROSPECTIVE JUROR:  I think it's going to put a

18   strain on them, so I'm going to say I would like to decline.

19             THE COURT:  All right.  I'll excuse you.  Thank you.

20             The next gentleman is Kevin Morris; is that right,

21   sir?

22             PROSPECTIVE JUROR:  That's correct.

23             THE COURT:  Where do you live, sir?

24             PROSPECTIVE JUROR:  I live in Summit.

25             THE COURT:  And how old are you?

1          PROSPECTIVE JUROR:  I'm 53.

2          THE COURT:  What is your educational background?

3          PROSPECTIVE JUROR:  Two years of junior college.

4          THE COURT:  And what is your employment, sir?

5          PROSPECTIVE JUROR:  I'm a part-time forklift

6     driver --

7          THE COURT:  All right.

8          PROSPECTIVE JUROR:  -- second shift.  During first

9     shift, I take care of my mother.  She just turned 86

10    yesterday, so that's why -- I'm taking care of her on first

11    shift, I go to work on second, and my 18-year-old son, he

12    looks after her, you know, while I'm at work.

13         THE COURT:  Would you not be able then to serve as a

14    juror in this case?

15         PROSPECTIVE JUROR:  I think that's going to be a

16    strain because he's also in -- he works at Blast Gym and goes

17    to Moraine Valley right now, so I can't just drop all that

18    weight on him.  Plus as far as my job, I just switched to the

19    second shift.  I got off of first shift to go to second shift

20    just for those arrangements itself.

21         THE COURT:  All right.  I'll excuse you.  Thank you.

22         The next lady is Maribel Cano; is that right?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  And where do you live, ma'am?

25         PROSPECTIVE JUROR:  In Montgomery.

```
 1                 THE COURT:  And how old are you?
 2                 PROSPECTIVE JUROR:  29.
 3                 THE COURT:  What is your educational background?
 4                 PROSPECTIVE JUROR:  Some college.
 5                 THE COURT:  And what is your business or occupation?
 6                 PROSPECTIVE JUROR:  I'm a paralegal.
 7                 THE COURT:  Are you able to devote three to four
 8   weeks?
 9                 PROSPECTIVE JUROR:  No, but yeah.  Yes.
10                 THE COURT:  Okay.  Have you heard anything about this
11   case?
12                 PROSPECTIVE JUROR:  No.
13                 THE COURT:  Do you recognize anyone who was
14   introduced to you?
15                 PROSPECTIVE JUROR:  No.
16                 THE COURT:  Have you or your family ever worked in a
17   police capacity?
18                 PROSPECTIVE JUROR:  No.
19                 THE COURT:  Have you or your family ever worked for
20   the City of Chicago?
21                 PROSPECTIVE JUROR:  No.
22                 THE COURT:  Have you or your family member ever had a
23   negative experience with a Chicago police officer?
24                 PROSPECTIVE JUROR:  No.
25                 THE COURT:  How about with any police officer,
```

1    period?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Do you have a view of the Chicago Police

4    Department, either negative, positive, or neutral?

5              PROSPECTIVE JUROR:  What was the question again?

6              THE COURT:  Pardon?

7              PROSPECTIVE JUROR:  What was that again?

8              THE COURT:  Do you have a view of the City of Chicago

9    Police Department which is perhaps either negative, positive,

10   or neutral?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Neutral?

13             PROSPECTIVE JUROR:  Neutral.

14             THE COURT:  Okay.  Have you or any family member ever

15   been a crime victim?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Have you or a family member ever been

18   arrested for a serious crime?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Have you, anybody -- do you know anyone

21   who has committed or attempted to commit suicide?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Pardon?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Who would that be?

1          PROSPECTIVE JUROR:  A family member, cousin.

2          THE COURT:  Pardon?

3          PROSPECTIVE JUROR:  A family member, cousin.

4          THE COURT:  A cousin.  All right.  Was the person

5   successful?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  Do you know of anyone who has

8   suffered a serious traumatic brain injury?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Have you served on a jury before?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Have you ever filed a lawsuit or been

13   sued --

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  -- personally?

16          If plaintiff establishes liability on serious

17   damages, would you be willing to award substantial damages?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  If, on the other hand, the plaintiff

20   fails to establish liability, would you be willing to find in

21   favor of the City of Chicago and award no damages?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Is there any reason you couldn't be a

24   fair and impartial juror in this case?

25          PROSPECTIVE JUROR:  No.

1          THE COURT:  Okay.  Thank you.

2          The next person is Maria Ceballos?

3          PROSPECTIVE JUROR:  Ceballos.

4          THE COURT:  Ceballos.

5          PROSPECTIVE JUROR:  Ceballos.

6          THE COURT:  Pardon?

7          PROSPECTIVE JUROR:  Ceballos.

8          THE COURT:  Ceballos.  I'm getting closer.

9          PROSPECTIVE JUROR:  Correct.

10          THE COURT:  Where do you live?

11          PROSPECTIVE JUROR:  In Chicago, in the north side of

12   Chicago.

13          THE COURT:  How old are you?

14          PROSPECTIVE JUROR:  57.

15          THE COURT:  What is your educational background?

16          PROSPECTIVE JUROR:  High school.

17          THE COURT:  And what is your employment?

18          PROSPECTIVE JUROR:  Nanny.

19          THE COURT:  And are you able to devote three weeks or

20   so to this trial?

21          PROSPECTIVE JUROR:  I think it's very hard for me

22   because the kind of job that I have with this family, they

23   have only me to take care of the children, and I'm alone.  I'm

24   survive by myself.  So I'm not sure really, honestly.  I'm not

25   sure because in my position, it's very hard compared with

1   other people that have family or other income with them and

2   different reasons that are very different.

3            THE COURT:  Okay.  I'll excuse you.  Thank you.

4            The next person is Nicole Guerrero.

5            PROSPECTIVE JUROR:  Guerrero.

6            THE COURT:  You're Jocelyn Gerona?

7            PROSPECTIVE JUROR:  Gerona.

8            THE COURT:  Gerona.  Okay.  That's fine.  We'll take

9   you first.  Where do you live, Ms. Gerona?

10            PROSPECTIVE JUROR:  Crest Hill, Illinois.

11            THE COURT:  How old are you?

12            PROSPECTIVE JUROR:  49.

13            THE COURT:  What is your educational background?

14            PROSPECTIVE JUROR:  College.

15            THE COURT:  And what is your employment?

16            PROSPECTIVE JUROR:  Registered nurse.

17            THE COURT:  And are you -- would you be able to

18   devote three weeks or slightly more to this case?

19            PROSPECTIVE JUROR:  Actually, no, because my dad is

20   sick.  I'm from the Philippines.  I'm planning to see him at

21   the end of this month.

22            THE COURT:  We will be finished by the end of the

23   month.  Does that make a difference?

24            PROSPECTIVE JUROR:  Okay.

25            THE COURT:  Is that okay then?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  I said the end of the month, we're

3  talking about October 29th.  We expect the case to be over by

4  then, no problem.  Okay.  Have you heard about this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Okay.  And did you recognize anybody who

7  was introduced to you?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Have you or your family member ever

10  worked in a police capacity for any police force?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Have you or your family member ever

13  worked for the City of Chicago?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Have you or your family member ever had a

16  negative experience with a Chicago police officer?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Or with any police officer anywhere?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Do you have a view of the City of Chicago

21  Police Department, either negative, positive, or neutral?

22  What would you say your view is?

23          PROSPECTIVE JUROR:  I'm sorry.  I didn't get that

24  question.  Can you repeat it, please?

25          THE COURT:  Do you have a view of the City of Chicago

1   Police Department, either negative, positive, or would you say

2   your view of the Chicago Police Department is neutral?

3               PROSPECTIVE JUROR:  Neutral.

4               THE COURT:  Okay.  Have you or any family member ever

5   been a crime victim?

6               PROSPECTIVE JUROR:  No.

7               THE COURT:  Have you or your family member ever been

8   arrested for a serious crime?

9               PROSPECTIVE JUROR:  No.

10              THE COURT:  Do you know anyone who has committed or

11  attempted to commit suicide?

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  Do you know anyone who has suffered a

14  serious traumatic brain injury?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  Have you served on a jury before?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Have you ever filed a lawsuit or have you

19  been sued by someone else?

20              PROSPECTIVE JUROR:  Is this more like small claims

21  that was already cleared?

22              THE COURT:  For rent or something like that?

23              PROSPECTIVE JUROR:  Yeah, it was just like about this

24  credit card companies, but it was all cleared up.

25              THE COURT:  Oh, okay.  It was cleared up?

1            PROSPECTIVE JUROR: Uh-huh.

2            THE COURT: Okay. If plaintiff establishes liability

3 and serious damages, would you be willing to award substantial

4 damages?

5            In other words, the plaintiff will be asking for

6 money, and if they establish liability, in other words, they

7 established that they're entitled to money from the City of

8 Chicago, would you -- and they establish that they had very

9 serious injury, would you be willing to award substantial

10 damages, in other words, money damages? Would you be willing

11 to do that?

12            PROSPECTIVE JUROR: Yes.

13            THE COURT: But, on the other hand, if the plaintiff

14 fails to establish liability, would you be willing to find in

15 favor of the City of Chicago and award no damages?

16            PROSPECTIVE JUROR: Yes.

17            THE COURT: Okay. Is there any reason you couldn't

18 be a fair and impartial juror in this case?

19            PROSPECTIVE JUROR: No.

20            THE COURT: Thank you.

21            Now Nicole Guerrero. Did I pronounce it right?

22            PROSPECTIVE JUROR: That's fine, yes.

23            THE COURT: Where do you live?

24            PROSPECTIVE JUROR: Naperville.

25            THE COURT: And how old are you?

1          PROSPECTIVE JUROR:  35.

2          THE COURT:  What's your educational background?

3          PROSPECTIVE JUROR:  Master's degree.

4          THE COURT:  And what is your business or occupation?

5          PROSPECTIVE JUROR:  I'm a teacher.

6          THE COURT:  Are you able to devote three weeks or so

7   for this case?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Have you heard anything about this case?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Do you recognize -- did you recognize

12  anybody who was introduced to you?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Have you or any family member ever worked

15  in a police capacity?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Have you or any family member ever worked

18  for the City of Chicago?

19         PROSPECTIVE JUROR:  I worked for CPS for one year,

20  public schools.

21         THE COURT:  Okay.  Have you or any of your family

22  members ever had a negative experience with a Chicago police

23  officer?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  With any police officer?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Do you have a view of the City of Chicago

3    Police Department, negative, positive, or would you say you're

4    neutral?

5          PROSPECTIVE JUROR:  Neutral.

6          THE COURT:  Okay.  Have you or any family member been

7    a crime victim?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Have you or any family member ever been

10   arrested for a serious crime.

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Do you know anyone who has committed or

13   attempted to commit suicide?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  Do you know anyone who has suffered a

16   serious traumatic brain injury?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Have you served on a jury before?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Have you ever filed a lawsuit or been

21   sued?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  If plaintiff establishes liability on

24   serious damages, would you be willing to award substantial

25   damages?

1                PROSPECTIVE JUROR:  Yes.

2                THE COURT:  On the other hand, if the plaintiff fails

3    to establish liability, would you be willing to find in favor

4    of Chicago and award no damages?

5                PROSPECTIVE JUROR:  Yes.

6                THE COURT:  Is there any reason you couldn't be a

7    fair and impartial juror?

8                PROSPECTIVE JUROR:  No.

9                THE COURT:  All right.  Would you, madam, take a seat

10   in the back row back there, and we'll call six more, please.

11               THE CLERK:  Michelle Fifer.

12               Tatiana Ortiz.

13               Robbin Maynard.

14               Javier Zavala.

15               Donald Buckingham.

16               Mr. Zavala -- okay.  He's out of order, just so you

17   know.

18               THE COURT:  That's all right.  We'll figure it out.

19               THE CLERK:  Edward O'Malley.  Just six.

20               THE COURT:  You are Michelle Fifer; is that correct,

21   madam?

22               PROSPECTIVE JUROR:  Yes.

23               THE COURT:  Where do you live?

24               PROSPECTIVE JUROR:  Plainfield.

25               THE COURT:  And how old are you?

1          PROSPECTIVE JUROR:  46.

2          THE COURT:  What is your educational background?

3          PROSPECTIVE JUROR:  Some college.

4          THE COURT:  And what is your business or occupation?

5          PROSPECTIVE JUROR:  Training officer.

6          THE COURT:  Are you able to devote three weeks to the

7   trial?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  Have you heard anything about this

10  case?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Did you recognize anyone who was

13  introduced to you?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  Have you or any family member ever worked

16  in a police capacity?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Have you or any family member ever worked

19  for the City of Chicago?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Have you or any family member ever had a

22  negative experience with a Chicago police officer?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Or with any police officer?

25         PROSPECTIVE JUROR:  No.

1          THE COURT:  Do you have a view of the City of Chicago

2    police, positive, negative, or neutral?  What would you

3    classify your view of Chicago?

4          PROSPECTIVE JUROR:  Neutral.

5          THE COURT:  Okay.  Do you have a -- excuse me.  Have

6    you or any family member ever been a crime victim?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Have you or any family member ever been

9    arrested for a serious crime?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Do you know anyone who has committed or

12   attempted suicide?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  And who would that be?

15         PROSPECTIVE JUROR:  One of the ladies that go to my

16   church.

17         THE COURT:  Okay.  So it's not a relative or anybody

18   like that?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Do you know anyone who has suffered a

21   serious traumatic brain injury?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Have you served on a jury before?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Have you ever filed a lawsuit or been

1  sued by someone else?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  If plaintiff establishes liability on

4  serious damages, would you be willing to award substantial

5  damages?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  If, on the other hand, the plaintiff

8  fails to establish liability, would you be willing to find in

9  favor of the City of Chicago and award no damages?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Is there any reason you couldn't be a

12  fair and impartial juror in this case?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  All right.  The next is Tatiana Ortiz?

15          PROSPECTIVE JUROR:  Tatiana.

16          THE COURT:  Tatiana Ortiz.

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  I think maybe I didn't pronounce that

19  right.

20          PROSPECTIVE JUROR:  Yes.  It's close enough.  It's

21  fine.  Tatiana.

22          THE COURT:  People have trouble with my name, too.

23          Where do you live?

24          PROSPECTIVE JUROR:  The north side of Chicago.

25          THE COURT:  And how old are you?

1          PROSPECTIVE JUROR:  28.

2          THE COURT:  What is your educational background?

3          PROSPECTIVE JUROR:  Bachelor's degree.

4          THE COURT:  And what is your business or occupation?

5          PROSPECTIVE JUROR:  I'm a special education student

6  classroom assistant.

7          THE COURT:  Are you able to devote three weeks to

8  this case?

9          PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  Okay.  Have you heard anything about this

11  case?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Do you recognize anyone who was

14  introduced to you?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Have you or any family member ever worked

17  in a police capacity?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Have you or your family member ever

20  worked for the City of Chicago?

21          PROSPECTIVE JUROR:  I work, me and a few relatives

22  work for Chicago Public Schools and at the Chicago Fire

23  Department.

24          THE COURT:  Okay.  That would be, what, cousins?

25          PROSPECTIVE JUROR:  Mother, sister are also teachers,

1      and then --

2              THE COURT:  They work for the public schools?

3              PROSPECTIVE JUROR:  Yes.  And then an uncle is a

4      retired firefighter.

5              THE COURT:  Okay.  Technically, I don't think the

6      Chicago Public Schools are the same as the City of Chicago,

7      but I understand -- that's good that you included that.

8              Have you or any member of your family ever had a

9      negative experience with a Chicago police officer?

10             PROSPECTIVE JUROR:  No, sir.

11             THE COURT:  Or with any police officer anywhere?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Do you have a view of the City of Chicago

14     police, would you classify as negative, positive, or neutral?

15             PROSPECTIVE JUROR:  Neutral.

16             THE COURT:  Have you or any family member ever been a

17     crime victim?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Have you or any family member ever been

20     arrested for a serious crime?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Do you know anyone who has committed or

23     attempted suicide?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  And how -- what would that person be with

1    you, the connection?

2          PROSPECTIVE JUROR:  My mother.

3          THE COURT:  And did she -- excuse me.  Was she

4    successful?

5          PROSPECTIVE JUROR:  No, sir.

6          THE COURT:  How long ago did that happen?

7          PROSPECTIVE JUROR:  Years, at least like ten years

8    ago.

9          THE COURT:  Do you know anyone who has suffered a

10   serious traumatic brain injury?

11         PROSPECTIVE JUROR:  No, sir.

12         THE COURT:  Have you served on a jury before?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Have you ever filed a lawsuit or been

15   sued?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  If plaintiff establishes liability and

18   serious damages, would you be willing to award substantial

19   damages?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  If, on the other hand, plaintiff fails to

22   establish liability, would you be willing to find in favor of

23   the City of Chicago and award no damages?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Is there any reason you couldn't be a

1    fair and impartial juror in this case?

2            PROSPECTIVE JUROR:  No, sir.

3            THE COURT:  All right.  The next lady is Robbin

4    Maynard?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Where do you live?

7            PROSPECTIVE JUROR:  The suburbs.

8            THE COURT:  All right.  And how old are you?

9            PROSPECTIVE JUROR:  58.

10           THE COURT:  What is your educational background?

11           PROSPECTIVE JUROR:  Some college.

12           THE COURT:  And what is your occupation or

13   employment?

14           PROSPECTIVE JUROR:  I'm on disability, Social

15   Security.

16           THE COURT:  Okay.  Are you able to devote three

17   weeks, three to four weeks?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  Why not?

20           PROSPECTIVE JUROR:  I be in a lot of pain.  It's hard

21   to sit a long time.  I get pain in my lower back going down to

22   my legs and my hands and arms get numb.

23           THE COURT:  All right.  I'll excuse you.  Thank you.

24           The next gentleman, Javier Zavala.

25           PROSPECTIVE JUROR:  Yes, I am, sir.

1    THE COURT:  You can stay where you are.  That's all

2  right.  Where do you live, sir?

3    PROSPECTIVE JUROR:  North side of Chicago.

4    THE COURT:  How old are you?

5    PROSPECTIVE JUROR:  42.

6    THE COURT:  What is your educational background?

7    PROSPECTIVE JUROR:  In Mexico, bachelor degree.

8    THE COURT:  And what is your employment?

9    PROSPECTIVE JUROR:  Uber driver.

10    THE COURT:  Are you able to devote three to four

11  weeks for this trial?

12    PROSPECTIVE JUROR:  It depends if you consider my --

13  my English language limitation.  I cannot follow long

14  conversations.

15    THE COURT:  Are you having difficulty following my

16  questioning and listening to it?  I mean, how -- what would

17  you say your ability is to comprehend English?  As long as

18  people speak clearly, are you able to follow?

19    PROSPECTIVE JUROR:  I can follow short conversations

20  but not long conversations.

21    THE COURT:  All right.  I'll excuse you, sir.

22    PROSPECTIVE JUROR:  Thank you, sir.

23    THE COURT:  The next gentleman is Donald Buckingham.

24  Where do you live, sir?

25    PROSPECTIVE JUROR:  In the northwest suburbs.

1          THE COURT:  How old are you?

2          PROSPECTIVE JUROR:  64.

3          THE COURT:  What is your educational background?

4          PROSPECTIVE JUROR:  CPA for accounting.

5          THE COURT:  And what is your business or occupation?

6          PROSPECTIVE JUROR:  I'm retired.

7          THE COURT:  And are you able to devote three weeks,

8   three or four weeks to this case?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.  Have you heard anything about this

11  case?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Did you recognize anybody who was

14  introduced to you?

15         PROSPECTIVE JUROR:  No, I did not.

16         THE COURT:  Have you or any family member ever worked

17  in a police capacity?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Have you or any family member ever worked

20  for the City of Chicago?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Have you or any of your family member, to

23  your knowledge, ever had a negative experience with a Chicago

24  police officer?

25         PROSPECTIVE JUROR:  No.

1          THE COURT:  With any police officer?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And just tell us briefly when it was and

4     what was the nature of the dispute.

5          PROSPECTIVE JUROR:  My wife was trailed by a police

6     in the north suburbs on her bumper about three feet off for

7     about ten miles, so she stopped the car and got out and walked

8     back and talked to him.

9          THE COURT:  And --

10         PROSPECTIVE JUROR:  She got, you know, his name and

11    number because he was scaring her.

12         THE COURT:  That wouldn't -- let me ask you this.

13    That experience that somebody had, would that have any kind of

14    a negative impact in this case?

15         PROSPECTIVE JUROR:  No, not me.

16         THE COURT:  Do you have a view of the City of Chicago

17    Police Department, and would you classify it as negative,

18    positive, or neutral?

19         PROSPECTIVE JUROR:  Neutral.

20         THE COURT:  Okay.  Have you or any family member ever

21    been a crime victim?

22         PROSPECTIVE JUROR:  I have, yes.

23         THE COURT:  And tell us, when it was and what

24    happened.

25         PROSPECTIVE JUROR:  It was probably 10 years ago, a

1    guy tried to mug me in New Orleans.  He didn't succeed.

2              THE COURT:  Did they catch the guy?

3              PROSPECTIVE JUROR:  No.  He got away.

4              THE COURT:  Have you or any family member ever been

5    arrested for a serious crime?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Do you know anyone who has committed or

8    attempted suicide?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  And who would that be?

11             PROSPECTIVE JUROR:  A former colleague.

12             THE COURT:  And how long ago would that have been?

13             PROSPECTIVE JUROR:  That would have been 20 years

14   ago.

15             THE COURT:  Do you know anyone who has suffered a

16   serious traumatic brain injury?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Have you been on -- served on a jury

19   before?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Have you ever filed a lawsuit or been

22   sued?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  If plaintiff establishes liability and

25   serious damages, would you be willing to award substantial

77

1    damages?

2                PROSPECTIVE JUROR:  Yes.

3                THE COURT:  If, on the other hand, plaintiff fails to

4    establish liability, would you be willing to find in favor of

5    the City of Chicago and award no damages?

6                PROSPECTIVE JUROR:  Yes.

7                THE COURT:  Is there any reason you couldn't be fair?

8                PROSPECTIVE JUROR:  No.

9                THE COURT:  All right.  Let's see.

10               THE CLERK:  O'Malley.

11               THE COURT:  Edward O'Malley, where do you live, sir?

12               PROSPECTIVE JUROR:  DuPage County.

13               THE COURT:  And how old are you?

14               PROSPECTIVE JUROR:  51.

15               THE COURT:  What's your educational background?

16               PROSPECTIVE JUROR:  Bachelor's degree.

17               THE COURT:  And what is your employment?

18               PROSPECTIVE JUROR:  Private equity.

19               THE COURT:  And describe a little bit, what do you do

20   in private equity?

21               PROSPECTIVE JUROR:  I have a diverse portfolio, and I

22   judge quarterly.

23               THE COURT:  Are you able to devote three weeks or so

24   to this trial?

25               PROSPECTIVE JUROR:  Yes.

1      THE COURT:  Okay.  Do you know anything about this

2   case?

3      PROSPECTIVE JUROR:  Yes.

4      THE COURT:  Tell us what you know about it or how you

5   know about it.

6      PROSPECTIVE JUROR:  Well, I -- it sounds familiar.  I

7   recognize some of the names.  I recognize the name of the

8   police officer.

9      THE COURT:  Okay.  Kelly is a relatively common name.

10     PROSPECTIVE JUROR:  I know.  Is it Pat Kelly?

11     THE COURT:  Yes.

12     PROSPECTIVE JUROR:  I know four Pat Kelly's.  I don't

13  know if --

14     THE COURT:  I think we all probably know a Pat Kelly

15  or so.

16     PROSPECTIVE JUROR:  I'm not sure.  I don't know this

17  officer personally, but I might know somebody who -- I don't

18  know.  I don't know.

19     THE COURT:  All right.  When you say you know of him

20  or you've heard of him --

21     PROSPECTIVE JUROR:  I think there was something in

22  the newspaper.

23     THE COURT:  There may have been.  Did you form any

24  opinions?  Let me ask you that.

25     PROSPECTIVE JUROR:  Yes.

1        THE COURT:  And what type of opinion?  When you say

2   you formed an opinion, would it have to do with this specific

3   case?

4        PROSPECTIVE JUROR:  I generally, kind of, would back

5   the badge.

6        THE COURT:  Okay.  I think I'll excuse you, sir.

7   Thank you.

8        THE CLERK:  Three more.

9        THE COURT:  We need -- would you three take the

10  back -- in the back row, and then we'll call -- how many more

11  do we need?  We need three more to fill out our 10.

12       THE CLERK:  Peggy Motzko.

13       Can you grab that mike when you go down?  Okay.

14  There you go.

15       Barbara Martinez-Romero.

16       Francis Bialas.

17       THE COURT:  You are Peggy, is it Motzko?

18       PROSPECTIVE JUROR:  Motzko.

19       THE COURT:  Motzko.  Where do you live?

20       PROSPECTIVE JUROR:  Far northern suburbs, Round Lake

21  Beach.

22       THE COURT:  How old are you?

23       PROSPECTIVE JUROR:  52.

24       THE COURT:  What is your educational background?

25       PROSPECTIVE JUROR:  Some college.

1          THE COURT:  And what is your employment?

2          PROSPECTIVE JUROR:  I'm currently unemployed.

3          THE COURT:  What did you do when you last worked?

4          PROSPECTIVE JUROR:  Logistics.

5          THE COURT:  Okay.  Are you able to devote three

6     weeks, three to four weeks to this case?

7          PROSPECTIVE JUROR:  At this time, it would be very

8     hard for me to travel.  It costs at least $20 a day on the

9     train.

10          THE COURT:  The government will pay you $50 a day to

11     sit as a juror.  Does that -- will that help?

12          PROSPECTIVE JUROR:  I think it would be very hard for

13     me.  I'm --

14          THE COURT:  Would you be able to do it then?  Based

15     on -- you will get, is it --

16          THE CLERK:  I'm not quite sure, Judge.

17          THE COURT:  It's around $50 anyway.  Anyway, it's

18     more than 20.  I know that.  I think it's 50.  So would that

19     make it possible for you to sit as a juror?

20          PROSPECTIVE JUROR:  I also have lower back issues.

21          THE COURT:  Pardon?

22          PROSPECTIVE JUROR:  I also have lower back issues.

23          THE COURT:  All right.  I'll excuse you.  Thank you.

24          THE CLERK:  I'll just call another one.  Victoria

25     Mentgen, M-e-n-t-g-e-n.  You can -- Ms. Motzko, you can leave

1    for the day and call the jury department tomorrow.

2        THE COURT:  You are Barbara Martinez-Romero; is that

3    correct?

4        PROSPECTIVE JUROR:  Yes.

5        THE COURT:  Where do you live?

6        PROSPECTIVE JUROR:  I live in Calumet City.

7        THE COURT:  How old are you?

8        PROSPECTIVE JUROR:  I'm 24.

9        THE COURT:  What is your educational background?

10       PROSPECTIVE JUROR:  Some college.

11       THE COURT:  And what is your business or employment?

12       PROSPECTIVE JUROR:  I'm a nurse assistant at Christ

13   part-time.  I'm also a full-time student at St. Xavier

14   University.

15       THE COURT:  Are you able to devote three to four

16   weeks to this case?

17       PROSPECTIVE JUROR:  I am not.

18       THE COURT:  Why is that?

19       PROSPECTIVE JUROR:  Currently, I'm on my last

20   semester of completing nursing school.  I'm taking a

21   seven-week course which will end in about three weeks roughly,

22   and within that time, I have two exams and clinical --

23       THE COURT:  All right.  I'll excuse you.

24       PROSPECTIVE JUROR:  Thank you.

25       THE COURT:  The next gentleman is Francis Bialas.

1    Did I pronounce it right?

2             PROSPECTIVE JUROR:  Yes, Bialas.

3             THE COURT:  Bialas.  Where do you live, sir?

4             PROSPECTIVE JUROR:  I live in Orland Park.

5             THE COURT:  How old are you?

6             PROSPECTIVE JUROR:  64.

7             THE COURT:  What is your educational background.

8             PROSPECTIVE JUROR:  I have a college degree.

9             THE COURT:  And what is your business or occupation?

10            PROSPECTIVE JUROR:  I work for United Parcel Service.

11            THE COURT:  Are you able to devote three weeks or

12   more to this case?

13            PROSPECTIVE JUROR:  Yes.

14            THE COURT:  Okay.  Have you heard anything about this

15   case?

16            PROSPECTIVE JUROR:  No.

17            THE COURT:  Did you recognize anybody who was

18   introduced to you?

19            PROSPECTIVE JUROR:  No.

20            THE COURT:  Have you or any family member worked in a

21   police capacity?

22            PROSPECTIVE JUROR:  No.

23            THE COURT:  Have you or any of your family members

24   ever worked for the City of Chicago?

25            PROSPECTIVE JUROR:  No.

1          THE COURT:  Have you or any family member ever had a

2   negative experience with a Chicago police officer?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  How about any police officer anywhere?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  All right.  Your view of the City of

7   Chicago Police Department, would you classify it as negative,

8   positive, or neutral?

9          PROSPECTIVE JUROR:  Neutral.

10          THE COURT:  Have you or any family member ever been a

11   crime victim?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Have you or any family member ever been

14   arrested for a serious crime?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Do you know anyone who has committed or

17   attempted suicide?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Do you know anyone who has suffered a

20   serious traumatic brain injury?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Have you served on a jury before?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Have you ever filed a lawsuit or been

25   sued?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  If plaintiff establishes liability and

3    serious damages, would you be willing to award him substantial

4    damages?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  If, on the other hand, plaintiff fails to

7    establish liability, would you be willing to find in favor of

8    the City of Chicago and award no damages?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Is there any reason you couldn't be a

11   fair and impartial juror in this case?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Okay.  The next lady is Victoria, is it

14   Mentgen?  Did I pronounce that right?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Where do you live?

17         PROSPECTIVE JUROR:  Joliet.

18         THE COURT:  How old are you?

19         PROSPECTIVE JUROR:  48.

20         THE COURT:  What is your educational background?

21         PROSPECTIVE JUROR:  Bachelor's degree.

22         THE COURT:  And your business or occupation?

23         PROSPECTIVE JUROR:  I'm an accountant.

24         THE COURT:  Are you able to devote three to four

25   weeks for this case?

1                    PROSPECTIVE JUROR:  Yes.

2                    THE COURT:  Okay.  Have you heard anything about this

3    case?

4                    PROSPECTIVE JUROR:  No.

5                    THE COURT:  Did you recognize anyone who was

6    introduced to you?

7                    PROSPECTIVE JUROR:  No.

8                    THE COURT:  Have you or any family member ever worked

9    in a police capacity?

10                   PROSPECTIVE JUROR:  No.

11                   THE COURT:  Have you or any family member ever worked

12   for the City of Chicago?

13                   PROSPECTIVE JUROR:  No.

14                   THE COURT:  Have you or any family member ever had

15   any negative experience with a Chicago police officer?

16                   PROSPECTIVE JUROR:  No.

17                   THE COURT:  How about any police officer anywhere?

18                   PROSPECTIVE JUROR:  No.

19                   THE COURT:  All right.  Do you have a view of the

20   City of Chicago Police Department, and would you classify it

21   as negative, positive, or neutral?

22                   PROSPECTIVE JUROR:  Neutral.

23                   THE COURT:  All right.  Have you or any family member

24   ever been a crime victim?

25                   PROSPECTIVE JUROR:  No.

```
1              THE COURT:  Have you or a family member ever been
2    arrested for a serious crime?
3              PROSPECTIVE JUROR:  No.
4              THE COURT:  Do you know anyone who has committed or
5    attempted suicide?
6              PROSPECTIVE JUROR:  No.
7              THE COURT:  Do you know anyone who has suffered a
8    serious traumatic brain injury?
9              PROSPECTIVE JUROR:  No.
10             THE COURT:  Have you served on a jury before?
11             PROSPECTIVE JUROR:  Yes.
12             THE COURT:  When and where?
13             PROSPECTIVE JUROR:  Probably about 10 years ago.  It
14   was a domestic violence case.
15             THE COURT:  That was a --
16             PROSPECTIVE JUROR:  It was a Will County court case.
17             THE COURT:  Criminal case?
18             PROSPECTIVE JUROR:  Yes.
19             THE COURT:  Okay.  You actually decided the case?
20             PROSPECTIVE JUROR:  Yes.
21             THE COURT:  Okay.  Have you ever filed a lawsuit or
22   been sued?
23             PROSPECTIVE JUROR:  No.
24             THE COURT:  If plaintiff establishes liability on
25   serious damages, would you be willing to award substantial
```

1   damages?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  If, on the other hand, the plaintiff

4   fails to establish liability, would you be willing to find in

5   favor of the City of Chicago and award no damages?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Is there any reason you couldn't be fair

8   and impartial in this case?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  Thank you.

11          Let's see.

12          THE CLERK:  We need to call one more.  Michael

13  Mansell.  And that's 10.

14          THE COURT:  You are Michael Mansell; is that correct,

15  sir?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Where do you live, sir?

18          PROSPECTIVE JUROR:  North side, northern Lake County.

19          THE COURT:  Okay.  How old are you?

20          PROSPECTIVE JUROR:  51.

21          THE COURT:  What's your educational background?

22          PROSPECTIVE JUROR:  Master's degree.

23          THE COURT:  And what is your business or occupation?

24          PROSPECTIVE JUROR:  Teacher.

25          THE COURT:  Where do you teach or what level?

1              PROSPECTIVE JUROR:  I teach at Libertyville High
2     School.
3              THE COURT:  Okay.  What do you teach, what subject?
4              PROSPECTIVE JUROR:  Social studies, government, U.S.
5     history, consumer ed, and geography.
6              THE COURT:  Are you able to devote three to four
7     weeks to this case?
8              PROSPECTIVE JUROR:  If needed, yes.
9              THE COURT:  Okay.  Do you know anything about this
10    case?
11             PROSPECTIVE JUROR:  No.
12             THE COURT:  Did you recognize anybody who was
13    introduced to you?
14             PROSPECTIVE JUROR:  No.
15             THE COURT:  Have you or any of your family members
16    ever worked in a police capacity?
17             PROSPECTIVE JUROR:  In the '80s, I interned with the
18    district State police.
19             THE COURT:  That was the State police; is that right?
20             PROSPECTIVE JUROR:  Yes.
21             THE COURT:  But you did not --
22             PROSPECTIVE JUROR:  That was just through school.  It
23    was an internship.
24             THE COURT:  Okay.  Have you or any family member ever
25    worked for the City of Chicago?

1      PROSPECTIVE JUROR:  No.

2      THE COURT:  Have you or any family member ever had a

3   negative experience with a Chicago police officer?

4      PROSPECTIVE JUROR:  No.

5      THE COURT:  How about a police officer anywhere?

6      PROSPECTIVE JUROR:  No.

7      THE COURT:  Have you -- your view of the City of

8   Chicago Police Department, would you classify it as negative,

9   positive, or neutral?

10      PROSPECTIVE JUROR:  Neutral.

11      THE COURT:  Have you or any family member ever been a

12   crime victim?

13      PROSPECTIVE JUROR:  In the '80s, I had my car broken

14   into.

15      THE COURT:  Okay.  Did they ever catch the guy?

16      PROSPECTIVE JUROR:  No.  Then got away.

17      THE COURT:  Have you or any family member ever been

18   arrested for a serious crime?

19      PROSPECTIVE JUROR:  No.

20      THE COURT:  Do you know anyone who has committed or

21   attempted suicide?

22      PROSPECTIVE JUROR:  Multiple people.

23      THE COURT:  When you say "multiple people" --

24      PROSPECTIVE JUROR:  I work with at-risk kids, so I've

25   had students that have committed suicide.  I had a friend when

1    I growing up that committed suicide, and I witnessed a
2    Northwestern police officer shoot himself.
3              THE COURT:  Do you know anyone who has suffered a
4    serious traumatic brain injury?
5              PROSPECTIVE JUROR:  No.
6              THE COURT:  Have you served on a jury before?
7              PROSPECTIVE JUROR:  No, I haven't.
8              THE COURT:  Have you filed a lawsuit or -- ever file
9    a lawsuit or have you ever been sued?
10             PROSPECTIVE JUROR:  No.
11             THE COURT:  If plaintiff establishes liability and
12   serious damages, would you be willing to award substantial
13   damages?
14             PROSPECTIVE JUROR:  Yes.
15             THE COURT:  If, on the other hand, plaintiff fails to
16   establish liability, would you be willing to find in favor of
17   the City of Chicago and award no damages?
18             PROSPECTIVE JUROR:  Yes.
19             THE COURT:  Okay.  Is there any reason you couldn't
20   be fair and impartial?
21             PROSPECTIVE JUROR:  No.
22             THE COURT:  Could I see the lawyers at a sidebar,
23   please?
24        (Proceedings heard at sidebar:)
25             THE COURT:  Any additional questions you wish me to

1    ask?

2           MR. ROMANUCCI:  Yes, your Honor.  I mean, if we start

3    with just Mr. Mansell right now, he indicated that he was

4    with -- has multiple people that he knows that have attempted

5    suicide.  I believe that he would have some special knowledge,

6    so I would ask either for a motion for cause now or if your

7    Honor denies that, at least to ask the questions to determine

8    whether or not he could be excused for cause based upon his

9    special knowledge of working with people who are at risk and

10   attempt suicide.

11          THE COURT:  I'm not sure.  What do you want me to ask

12   him again?

13          MR. ROMANUCCI:  Mr. Mansell?

14          THE COURT:  Yes.

15          MR. ROMANUCCI:  What his special knowledge is.

16          THE COURT:  He said "at risk," but I'll ask him to

17   clarify it.

18          MR. ROMANUCCI:  Please.

19          THE COURT:  I will not excuse him for cause, at least

20   at this point.

21          MR. ROMANUCCI:  At this point.  Ms. Mentgen, Victoria

22   Mentgen, she sat on a jury on a domestic violence case,

23   whether or not sitting on that case, if she hears evidence in

24   this case about domestic violence would cause any negative or

25   positive experiences for her.

1          THE COURT:  I'll think about that one.

2          MR. ROMANUCCI:  Then there were several people,

3   Ms. Tatiana Ortiz, Mr. Buckingham, and Ms. Cano, all three of

4   them indicated that they knew someone who had committed

5   suicide.  Again, would having that experience, you know,

6   hearing the evidence in this case affect them one way or

7   another.

8          THE COURT:  Which ones were those again?  I just want

9   to get the names.

10          MR. ROMANUCCI:  Tatiana Ortiz, Mr. Buckingham, and

11   then Maribel Cano.

12          THE COURT:  She said she knew somebody who --

13          MS. ROSEN:  Her cousin.

14          THE COURT:  All right.

15          MS. ROSEN:  And then Fifer also said somebody at

16   church.

17          THE COURT:  Yes.  I think that we have her.  Fifer,

18   she's the banker.  It wasn't the church one, was it?

19          MS. ROSEN:  Training officer, Fifer.

20          MR. ROMANUCCI:  Which one, your Honor?

21          MS. ROSEN:  Fifer.

22          THE COURT:  Was that suicide?

23          MR. ROMANUCCI:  Yes.  She said she knew somebody.  I

24   think I missed that one.

25          THE COURT:  All right.

1         MR. ROMANUCCI: And then also Ms. Cano, she said

2  she's a paralegal, what law firm and what type of practice do

3  they have.

4         THE COURT: What about you, any -- anything? We're

5  doing actually a little better than I thought, people willing

6  to sit.

7         All right. I'll ask those questions.

8         MR. ROMANUCCI: All right. Your Honor, on

9  Ms. Guerrero, I don't think we got where she teaches, Nicole

10  Guerrero.

11         MS. ROSEN: Judge, if we could ask just everybody if

12  they have any knowledge of anybody that's experienced domestic

13  violence.

14         THE COURT: That has experienced domestic violence?

15         MS. ROSEN: Knows of anybody who has had -- you know,

16  knows of somebody that's been the victim of domestic violence

17  or has been accused of domestic violence.

18         THE COURT: All right. I'll ask that.

19    (Proceedings heard in open court:)

20         THE COURT: I've been asked to ask a few follow-up

21  questions. One of the questions for all of you because I

22  didn't ask this specifically, are any of -- do any of you have

23  knowledge of specific instances where -- of domestic violence?

24         Apparently, no one. All right.

25         Then Ms. Cano, the question came up, what law firm do

1    you work for, and what type of law do they practice?

2            PROSPECTIVE JUROR:  I work at law, Elder law.

3            THE CLERK:  I think it was cut off.  See if that

4    switch --

5            THE COURT:  Elder law?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Let's see.  You knew someone who

8    committed suicide, is that --

9            PROSPECTIVE JUROR:  Yes, correct.

10           THE COURT:  And how long ago was that?

11           PROSPECTIVE JUROR:  I'd say like eight to ten years

12   ago maybe.

13           THE COURT:  All right.  Would that -- do you have any

14   strong views about suicide, what causes suicide or anything

15   like that?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  Also, Michelle Fifer, you knew someone

18   who committed suicide; is that correct?

19           PROSPECTIVE JUROR:  She wasn't successful.

20           THE COURT:  Pardon?

21           PROSPECTIVE JUROR:  Yes.  She wasn't successful.

22           THE COURT:  Is there any -- do you have any special

23   knowledge about suicide as a gain from that knowledge?

24           PROSPECTIVE JUROR:  No, not really.

25           THE COURT:  And Tatiana Ortiz, I believe you knew

1  someone who committed suicide; is that correct?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Do you have any knowledge about suicide

4  or what causes people to do that or anything like that?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.  Ms. Guerrero, where do you teach?

7              PROSPECTIVE JUROR:  I teach in Glen Ellyn.  I'm an

8  eighth grade math teacher.

9              THE COURT:  Okay.  And Mr. Buckingham, you know

10  someone who committed suicide; is that correct?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Do you have any specialized knowledge

13  about suicide or anything like that?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Ms. Mentgen, you were on a jury, domestic

16  violence case.  Can you give us a little more information on

17  that?  Do you remember what the case was about?  I mean, was

18  it a husband/wife?

19             PROSPECTIVE JUROR:  It was a husband/wife issue.

20  Yeah, it was just --

21             THE COURT:  How long ago was that?

22             PROSPECTIVE JUROR:  About ten years ago.

23             THE COURT:  Okay.  Did you form any opinions as to

24  the cause of domestic violence or anything like that as a

25  result?

1     PROSPECTIVE JUROR:  No.

2     THE COURT:  I believe that's it.  Do you want to

3 indicate your choices, please?

4   (Pause.)

5     THE COURT:  All right.  The following will be

6 excused:  Michael Mansell, Donald Buckingham, Tatiana Ortiz,

7 and Victoria Mentgen.

8     Will the rest of you please stand and be sworn.

9   (Jurors sworn.)

10     THE CLERK:  Okay.  You can be seated.

11     THE COURT:  So we need four more.  Would you, sir,

12 take a seat in the back row, please?

13     THE CLERK:  Jacqueline Dye.

14   Sally Berardi.

15   Rafael Marquez.

16   And Estella Abundiz.

17     THE COURT:  You are Jacqueline Dye; is that correct?

18     PROSPECTIVE JUROR:  Yes.

19     THE COURT:  Where do you live, ma'am?

20     PROSPECTIVE JUROR:  Bensenville.

21     THE COURT:  And how old are you?

22     PROSPECTIVE JUROR:  39.

23     THE COURT:  What is your educational background?

24     PROSPECTIVE JUROR:  College diploma.

25     THE COURT:  What is your business or occupation?

1          PROSPECTIVE JUROR:  I am a prayer minister.

2          THE COURT:  Okay.  Are you able to devote three to

3     four weeks to this case?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Have you heard anything about this case?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Do you recognize anybody who was

8     introduced to you?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Have you or any family member ever --

11    excuse me, ever worked in a police capacity?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Have you or any family member ever worked

14    for the City of Chicago?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Have you or any family member ever had a

17    negative experience with a Chicago police officer?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Do you have -- or any police officer, for

20    that matter?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Your view of the City of Chicago Police

23    Department, would you classify it as negative, positive, or

24    neutral?

25         PROSPECTIVE JUROR:  Neutral.

1          THE COURT:  Have you or any family member ever been a

2  crime victim?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  And tell us when and what the

5  circumstances were.

6          PROSPECTIVE JUROR:  About ten years ago, when I was

7  living in the city, my home was broken into, and my car was

8  stolen.

9          THE COURT:  Did they catch the person?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Have you or any family member been

12 arrested for a serious crime?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Do you know anyone who has committed or

15 attempted to commit suicide?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Do you know anyone who has suffered a

18 serious traumatic brain injury?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Have you served on a jury before?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Have you ever filed a lawsuit or have you

23 ever been sued?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  If plaintiff establishes liability and

1  serious damages, would you be willing to award substantial

2  damages?

3         PROSPECTIVE JUROR:  Yes.

4         THE COURT:  If, on the other hand, plaintiff fails to

5  establish liability, would you be willing to find in favor of

6  the City of Chicago and award no damages?

7         PROSPECTIVE JUROR:  Yes.

8         THE COURT:  Is there any reason you couldn't be a

9  fair and impartial juror in this case?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  The next lady, Sally Berardi.

12         PROSPECTIVE JUROR:  That's correct.

13         THE COURT:  Where do you live?

14         PROSPECTIVE JUROR:  St. Charles.

15         THE COURT:  How old are you?

16         PROSPECTIVE JUROR:  64.

17         THE COURT:  What's your educational background?

18         PROSPECTIVE JUROR:  Some college.

19         THE COURT:  And what is your business or occupation?

20         PROSPECTIVE JUROR:  I'm a photographer/printer.

21         THE COURT:  Are you able to devote three to four

22  weeks to this case?

23         PROSPECTIVE JUROR:  This would be really hard.  My

24  husband's 82 and has emphysema and really relies on me.

25         THE COURT:  All right.  I'll excuse you.  Thank you.

1          The next person is Rafael Marquez?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Where do you live, sir?

4          PROSPECTIVE JUROR:  In Cicero.

5          THE COURT:  And how old are you, sir?

6          PROSPECTIVE JUROR:  56.

7          THE COURT:  What is your educational background?

8          PROSPECTIVE JUROR:  Not good.  Mexico.

9          THE COURT:  And what was it?

10         PROSPECTIVE JUROR:  High school.

11         THE COURT:  Okay.  And what is your business or

12  occupation here, sir?

13         PROSPECTIVE JUROR:  Well, I just got a new job, for,

14  like, a year, I got a new job, and they just hired me

15  permanent, like, two months ago.

16         THE COURT:  So you -- would it be difficult for you

17  to devote three to four weeks?

18         PROSPECTIVE JUROR:  I would.

19         THE COURT:  I'll excuse you, sir.

20         PROSPECTIVE JUROR:  Thank you.

21         THE COURT:  The next lady, Estella Abundiz?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Did I pronounce that right?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Where do you live?

1      PROSPECTIVE JUROR:  I live in Palatine.

2      THE COURT:  How old are you?

3      PROSPECTIVE JUROR:  I'm 63.

4      THE COURT:  What's your educational background?

5      PROSPECTIVE JUROR:  I'm retired -- oh, I'm sorry.

6  High school.

7      THE COURT:  And what is your -- you are retired; is

8  that correct?

9      PROSPECTIVE JUROR:  Yes.

10      THE COURT:  Okay.  Are you able to devote three to

11  four weeks to this case?

12      PROSPECTIVE JUROR:  Yes.

13      THE COURT:  Pardon?

14      PROSPECTIVE JUROR:  Yes.

15      THE COURT:  Okay.  Do you know anything about this

16  case?

17      PROSPECTIVE JUROR:  No.

18      THE COURT:  Have you -- did you recognize anybody who

19  was introduced to you?

20      PROSPECTIVE JUROR:  No.

21      THE COURT:  Have you or your family ever worked in a

22  police capacity?

23      PROSPECTIVE JUROR:  No.

24      THE COURT:  And have you or any of your family

25  members ever worked for the City of Chicago?

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Have you or any family member had a

3  negative experience with a Chicago police officer?

4           PROSPECTIVE JUROR:  No.

5           THE COURT:  How about a police officer anywhere?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  Okay.  Your view of the City of Chicago

8  Police Department, would you describe it as negative,

9  positive, or neutral?

10          PROSPECTIVE JUROR:  Positive.

11          THE COURT:  So you don't have any strong views

12  against the Chicago Police Department, do you think?

13          PROSPECTIVE JUROR:  I have a positive view because I

14  have -- they have always helped me and --

15          THE COURT:  Okay.

16          PROSPECTIVE JUROR:  I don't have anything bad to say

17  about them.

18          THE COURT:  Okay.  That's fine.  That's good.  Have

19  you or your family member ever been a crime victim?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Have you or your family member ever been

22  arrested for a serious crime?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Do you know anyone who has committed or

25  attempted to commit suicide?

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  Do you know anyone who has suffered a

3    serious traumatic brain injury?

4            PROSPECTIVE JUROR:  No, no.

5            THE COURT:  Have you served on a jury before?

6            PROSPECTIVE JUROR:  Like six years ago, a car

7    accident.

8            THE COURT:  Somebody was asking money damages as a

9    result?

10           PROSPECTIVE JUROR:  Yes, yes.

11           THE COURT:  Was that at -- in Chicago?

12           PROSPECTIVE JUROR:  Yes, the Daley Center.

13           THE COURT:  Okay.  You sat on the jury and decided;

14   is that correct?

15           PROSPECTIVE JUROR:  Yes, but our group was let go

16   before they decided the case.

17           THE COURT:  Oh, they settled it before you decided?

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Okay.  That sometimes happens.

20           Have you ever filed a lawsuit, or have you ever been

21   sued?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  If plaintiff establishes liability and

24   serious damages, would you be willing to award substantial

25   damages to him?

1           PROSPECTIVE JUROR:  Yes, yes.

2           THE COURT:  If, on the other hand, he fails to

3    establish liability, would you be willing to find in favor of

4    Chicago and award no damages?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Any reason you couldn't be a fair and

7    impartial juror in this case?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  All right.  Would you call one more,

10   Wanda?

11          THE CLERK:  We need two.

12          THE COURT:  Two more, yes.  Sorry.

13          THE CLERK:  Laurel Larsen.

14          And Creon Creonopoulos.

15          THE COURT:  You are Laurel Larsen; is that correct?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Where do you live?

18          PROSPECTIVE JUROR:  Northwest side of Chicago.

19          THE COURT:  And how old are you?

20          PROSPECTIVE JUROR:  56.

21          THE COURT:  What is your educational background?

22          PROSPECTIVE JUROR:  College.

23          THE COURT:  And what is your business or occupation?

24          PROSPECTIVE JUROR:  I'm a part-time pharmacist.

25          THE COURT:  Are you able to devote three to four

1    weeks to this case?

2           PROSPECTIVE JUROR:  Well, in this case it would be a

3    financial hardship because I don't get paid as a part-timer.

4    I would lose wages.

5           THE COURT:  Okay.  I'll excuse you.  Thank you.

6           The next gentleman, is it Creon Creonopoulos?

7           PROSPECTIVE JUROR:  Correct.

8           THE COURT:  Did I pronounce it right?

9           PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  Where do you live, sir?

11          PROSPECTIVE JUROR:  Near north side.

12          THE COURT:  How old are you?

13          PROSPECTIVE JUROR:  I'm 28.

14          THE COURT:  What is your educational background?

15          PROSPECTIVE JUROR:  Bachelor's degree.

16          THE COURT:  What is your business or occupation?

17          PROSPECTIVE JUROR:  I'm a software developer.

18          THE COURT:  Are you able to devote three to four

19   weeks to this case?

20          PROSPECTIVE JUROR:  I believe so, yes.

21          THE COURT:  Okay.  Have you heard anything about this

22   case?

23          PROSPECTIVE JUROR:  I have not.

24          THE COURT:  Did you recognize anyone who was

25   introduced to you?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you or any family member ever worked

3     in a police capacity?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Have you or your family member ever

6     worked for the City of Chicago?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Have you or any family member ever had a

9     negative experience with a Chicago police officer?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  How about any police officer anywhere?

12          PROSPECTIVE JUROR:  Nope.

13          THE COURT:  Do you have -- your view of the City of

14     Chicago police, would you classify it as negative, positive,

15     or neutral?

16          PROSPECTIVE JUROR:  Neutral.

17          THE COURT:  Have you or your family member ever been

18     a crime victim?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Have you or your family member ever been

21     arrested for a serious crime?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Do you know anyone who has committed or

24     attempted to commit suicide?

25          PROSPECTIVE JUROR:  No.

1          THE COURT:  Do you know anyone who has suffered a

2   serious traumatic brain injury?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Have you served on a jury before?

5          PROSPECTIVE JUROR:  I have not.

6          THE COURT:  Have you ever filed a lawsuit or been

7   sued?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  If plaintiff establishes liability and

10  serious damages, would you be willing to award substantial

11  damages?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  If, on the other hand, plaintiff fails to

14  establish liability, would you be willing to find in favor of

15  the City of Chicago and award no damages?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Is there any reason you couldn't be fair

18  to either side?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  All right.  What do we need, two more?

21         THE CLERK:  One more.  Brett White.

22         THE COURT:  You are Brett White?

23         PROSPECTIVE JUROR:  Correct.

24         THE COURT:  Where do you live, sir?

25         PROSPECTIVE JUROR:  Lake County.

1          THE COURT:  And how old are you?

2          PROSPECTIVE JUROR:  40.

3          THE COURT:  What is your educational background?

4          PROSPECTIVE JUROR:  High school.

5          THE COURT:  And what is your business or occupation?

6          PROSPECTIVE JUROR:  Garbage man.

7          THE COURT:  You work for a private or city or

8    municipal or what?

9          PROSPECTIVE JUROR:  It's private.

10         THE COURT:  Okay.  Have you -- are you able to devote

11   three to four weeks to this case?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  And have you heard anything about this

14   case?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Did you recognize anyone who was

17   introduced to you?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Have you or any family member ever worked

20   in a police capacity?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Have you or any family member ever worked

23   for the City of Chicago?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Have you or any family member ever had,

 1    to your knowledge, a negative experience with a Chicago police

 2    officer?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  How about a police officer anywhere?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  Do you have a view -- your view of the

 7    City of Chicago Police Department, would you consider it

 8    negative, positive, or neutral?

 9              PROSPECTIVE JUROR:  Neutral.

10              THE COURT:  Okay.  Have you or any family member ever

11    been a crime victim?

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  Have you or any family member ever been

14    arrested for a serious crime?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  Do you know anyone who has committed or

17    attempted suicide?

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  Do you know anyone who has suffered a

20    serious traumatic brain injury?

21              PROSPECTIVE JUROR:  Nope.

22              THE COURT:  Have you served on a jury before?

23              PROSPECTIVE JUROR:  Nope.

24              THE COURT:  Have you ever filed a lawsuit or been

25    sued?

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  If plaintiff establishes liability and

3    serious damages, would you be willing to award substantial

4    damages?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  If, on the other hand, plaintiff fails to

7    establish liability, would you be willing to find in favor of

8    the City of Chicago and award no damages?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Any reason you couldn't be fair to either

11   side?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Okay.  Could I see the lawyers at

14   sidebar, please?

15        (Proceedings heard at sidebar:)

16             THE COURT:  These all seem pretty -- any specific

17   questions you want to follow up?

18             MR. ROMANUCCI:  With respect to Estella Abundiz, your

19   Honor, if you could follow up asking her about why she had

20   positive experiences with the police.  She's the only juror so

21   far who has indicated that she feels positively about police,

22   whereas everyone else --

23             THE COURT:  Is neutral.

24             MR. ROMANUCCI:  And then also, what sort of

25   occupation.  We certainly want to know whether or not those

1    positive experiences with the police would affect her ability

2    to sit.

3              THE COURT:  All right.

4              MS. ROSEN:  And then, Judge, if we could get

5    follow-up to Ms. Dye, she says she's a prayer minister.  If

6    you could ask her what that is and if there's a particular

7    church that she's affiliated with.

8              THE COURT:  All right.  Is that it?  Okay.  Thank

9    you.

10        (Proceedings heard in open court:)

11             THE COURT:  Just a couple of follow-up questions.

12   Ms. Dye, what exactly do you do as a prayer minister?

13             PROSPECTIVE JUROR:  We have -- my pastor has a call

14   center where people call in for prayer.  I answer the phones.

15             THE COURT:  What church is that?

16             PROSPECTIVE JUROR:  Living Word Christian Center in

17   Forest Park.

18             THE COURT:  Okay.  Thank you.

19             Ms. Abundiz, what was your occupation prior to

20   retiring?

21             PROSPECTIVE JUROR:  I used to work for the State's

22   Attorney's Office.

23             THE COURT:  Where?

24             PROSPECTIVE JUROR:  Child support division, 28 North

25   Clark.

1      THE COURT:  Okay.  And you have had positive

2  experiences with the City of Chicago police; is that right?

3      PROSPECTIVE JUROR:  Yes.

4      THE COURT:  And what -- can you tell us what the --

5  causes you to view the Chicago police in a positive view?  Is

6  there any specific instances, working with --

7      PROSPECTIVE JUROR:  Yes.  Because -- well, there's

8  many instances, but one of them is we were having trouble with

9  the tenants, and the police came.  And they were very clear

10  that we were in the right, so --

11      THE COURT:  All right.  What exactly did you do for

12  the State's Attorney?

13      PROSPECTIVE JUROR:  I was a data entry clerk.

14      THE COURT:  Okay.  Thank you.

15    (Pause.)

16      THE COURT:  All right.  Ms. Dye will be excused, and

17  Ms. Abundiz will be excused.

18      You can swear in the other two, and we need two more.

19      THE CLERK:  Can you raise your right hands?

20    (Jurors sworn.)

21      THE COURT:  You can be seated there.

22      Call two more, please.

23      THE CLERK:  Biren Patel.

24      And Richard Roth.

25      THE COURT:  The second gentleman, you're Biren Patel?

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  Where do you live, sir?

3      PROSPECTIVE JUROR:  Glendale Heights.

4      THE COURT:  How old are you?

5      PROSPECTIVE JUROR:  34.

6      THE COURT:  What's your educational background?

7      PROSPECTIVE JUROR:  Bachelor's in mechanical

8  engineering.

9      THE COURT:  And what is your business or occupation?

10      PROSPECTIVE JUROR:  Currently, unemployed.

11      THE COURT:  Are you able to devote three to four

12  weeks to this case?

13      PROSPECTIVE JUROR:  Yes.

14      THE COURT:  Okay.  And have you heard anything about

15  this case?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  What was your occupation before you --

18  what did you previously do?

19      PROSPECTIVE JUROR:  Project management consulting.

20      THE COURT:  What type of projects, can you give a

21  little description?

22      PROSPECTIVE JUROR:  Life science, industrial, really

23  just about anything that the companies would hire us for.

24      THE COURT:  All right.

25      PROSPECTIVE JUROR:  Product development, research and

1    development.

2              THE COURT:  All right.  Have you heard anything about

3    this case?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Did you recognize anyone who was

6    introduced to you?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Have you or any family member ever worked

9    in a police capacity?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Have you or any family member ever worked

12   for the City of Chicago?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Have you or any family member ever had a

15   negative experience with a Chicago police officer?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  And when was that, and can you give us a

18   brief description of what it was about?

19             PROSPECTIVE JUROR:  About 2008, Christmastime, it was

20   actually me.  I was in the city of Chicago driving going over

21   to a church event, and I was pulled over, and the police

22   department had -- well, the police officers had started asking

23   me questions if I stole the vehicle or not even though I was

24   in a suit and it was my own vehicle.  And they also searched

25   my car and everything.

1          THE COURT:  All right.  That experience, would that
2     have an impact on you in being fair in this case?
3          PROSPECTIVE JUROR:  I want to say it shouldn't, but I
4     wouldn't be able to give you a 100 percent definitive answer.
5          THE COURT:  All right.  I'll excuse you, sir.
6          The next gentleman is Richard Roth; is that correct,
7     sir?
8          PROSPECTIVE JUROR:  Yes, sir.
9          THE COURT:  Where do you live, sir?
10         PROSPECTIVE JUROR:  Waukegan.
11         THE COURT:  How old are you?
12         PROSPECTIVE JUROR:  52.
13         THE COURT:  What is your educational background?
14         PROSPECTIVE JUROR:  High school.
15         THE COURT:  And your employment, sir?
16         PROSPECTIVE JUROR:  State of Illinois.
17         THE COURT:  And what do you do for the State?
18         PROSPECTIVE JUROR:  I'm an equipment operator.
19         THE COURT:  Are you able to devote three to four
20    weeks to this case?
21         PROSPECTIVE JUROR:  It could be difficult.  Me and my
22    wife are guardians for an adult disabled child, and we work
23    opposite shifts so we can take care of him.
24         THE COURT:  All right.  I'll excuse you, sir.  Thank
25    you.

1            Call two more, please.

2            THE CLERK:  James Jervis.

3            And Elizabeth Carter-Marriner.

4            THE COURT:  Sir, would you take the first seat?  You

5    are James Jervis; is that correct, sir?

6            PROSPECTIVE JUROR:  Yes, sir.

7            THE COURT:  Where do you live, sir?

8            PROSPECTIVE JUROR:  Shorewood, Illinois.

9            THE COURT:  And how old are you?

10           PROSPECTIVE JUROR:  31.

11           THE COURT:  What is your educational background?

12           PROSPECTIVE JUROR:  College.

13           THE COURT:  And what is your business or occupation?

14           PROSPECTIVE JUROR:  Diesel mechanic, shop foreman.

15           THE COURT:  Are you able to devote three weeks for

16   this trial?

17           PROSPECTIVE JUROR:  No, sir.

18           THE COURT:  Pardon?

19           PROSPECTIVE JUROR:  No, sir.

20           THE COURT:  Okay.  I'll excuse you.

21           The next person is Elizabeth Carter-Marriner?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Where do you live?

24           PROSPECTIVE JUROR:  Aurora, Illinois.

25           THE COURT:  How old are you?

1              PROSPECTIVE JUROR:  54.

2              THE COURT:  What is your educational background?

3              PROSPECTIVE JUROR:  12 years.

4              THE COURT:  And what is your business or employment?

5              PROSPECTIVE JUROR:  Senior customer service at

6    Fifth/Third.

7              THE COURT:  Who do you work for?

8              PROSPECTIVE JUROR:  Fifth/Third Bank.

9              THE COURT:  Are you able to devote three weeks or

10   more to this case?

11             PROSPECTIVE JUROR:  Yes, sir.

12             THE COURT:  Have you heard about this case?

13             PROSPECTIVE JUROR:  No, sir.

14             THE COURT:  Do you -- did you recognize anybody who

15   was introduced to you?

16             PROSPECTIVE JUROR:  No, sir.

17             THE COURT:  Have you or a family member ever worked

18   in a police capacity?

19             PROSPECTIVE JUROR:  No, sir.

20             THE COURT:  Have you or any family member ever worked

21   for the City of Chicago?

22             PROSPECTIVE JUROR:  No, sir.

23             THE COURT:  Have you or your family member ever had a

24   negative experience with a Chicago police officer?

25             PROSPECTIVE JUROR:  No, sir.

1        THE COURT:  Any police officer anywhere?

2        PROSPECTIVE JUROR:  No, sir.

3        THE COURT:  Do you have a view of the City of Chicago

4   police and, if so, is it negative, positive, or neutral?

5        PROSPECTIVE JUROR:  Neutral.

6        THE COURT:  Have you or your family member ever been

7   a crime victim?

8        PROSPECTIVE JUROR:  No, sir.

9        THE COURT:  Have you or any family member ever been

10  arrested for a serious crime?

11       PROSPECTIVE JUROR:  No, sir.

12       THE COURT:  Do you know anyone who has committed or

13  attempted suicide?

14       PROSPECTIVE JUROR:  No, sir.

15       THE COURT:  Do you know anyone who has suffered a

16  serious traumatic brain injury?

17       PROSPECTIVE JUROR:  No, sir.

18       THE COURT:  Have you served on a jury before?

19       PROSPECTIVE JUROR:  No, sir.

20       THE COURT:  Have you ever filed a lawsuit or been

21  sued?

22       PROSPECTIVE JUROR:  No, sir.

23       THE COURT:  If plaintiff establishes liability and

24  serious damages, would you be willing to award substantial

25  damages?

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  If, on the other hand, the plaintiff

3     fails to establish liability, would you be willing to find in

4     favor of the City of Chicago and award no damages?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  Any reason you couldn't be fair to either

7     side in this case?

8          PROSPECTIVE JUROR:  No, sir.

9          THE COURT:  Would you call one more, please?

10         THE CLERK:  Trina Stauersboll.

11         THE COURT:  My name is somewhat difficult, too.

12         PROSPECTIVE JUROR:  Yeah.  I just --

13         THE COURT:  Trina Stauersboll-Heredia?

14         PROSPECTIVE JUROR:  Heredia.

15         THE COURT:  How close?

16         PROSPECTIVE JUROR:  You are -- Stauersboll is

17    perfect, but Heredia.

18         THE COURT:  Heredia?

19         PROSPECTIVE JUROR:  Heredia.

20         THE COURT:  Okay.  Where do you live?

21         PROSPECTIVE JUROR:  South suburbs.

22         THE COURT:  And how old are you?

23         PROSPECTIVE JUROR:  40.

24         THE COURT:  What is your educational background?

25         PROSPECTIVE JUROR:  High school.

1           THE COURT:  And what is your business or occupation?

2           PROSPECTIVE JUROR:  I own a salon.

3           THE COURT:  Are you able to devote three to four

4   weeks?

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  Would that be a financial hardship on

7   you?

8           PROSPECTIVE JUROR:  I'm the only employee there.  I'm

9   self-employed, so I'm closed today.

10          THE COURT:  All right.  I'll excuse you.  Thank you.

11          Call one more, please.

12          THE CLERK:  Susan Sternal.

13          No?  Oh, there we go.  You can come up this way,

14  through the middle and around.

15          PROSPECTIVE JUROR:  This is never going to be

16  comfortable, to walk up through the middle.

17          THE COURT:  You are Susan Sternal?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Where do you live?

20          PROSPECTIVE JUROR:  Garfield Ridge.

21          THE COURT:  And how old are you?

22          PROSPECTIVE JUROR:  47.

23          THE COURT:  What is your educational background?

24          PROSPECTIVE JUROR:  Bachelor's.

25          THE COURT:  And what is your business or occupation?

1          PROSPECTIVE JUROR:  I'm a service technician in a

2    retail store.

3          THE COURT:  What type of retail?

4          PROSPECTIVE JUROR:  I work at Apple.

5          THE COURT:  Pardon?

6          PROSPECTIVE JUROR:  I work at Apple.

7          THE COURT:  Oh, okay.  Are you able to devote three

8    weeks or so to this trial?

9          PROSPECTIVE JUROR:  I am not.  I have elderly

10   parents, and I have a dog that is having surgery on her back

11   legs tomorrow morning.  I was trying to find another ride for

12   them to get --

13         THE COURT:  I'll excuse you.  Thank you.

14         Call one more, please.

15         THE CLERK:  Kristina Finnerman.

16         THE COURT:  You are Kristina Finnerman; is that

17   correct?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Where do you live?

20         PROSPECTIVE JUROR:  North suburbs.

21         THE COURT:  How old are you?

22         PROSPECTIVE JUROR:  27.

23         THE COURT:  What is your educational background?

24         PROSPECTIVE JUROR:  Bachelor's degree.

25         THE COURT:  And what is your business or occupation?

1              PROSPECTIVE JUROR:  Special education teacher.

2              THE COURT:  All right.  Are you able to devote three

3    weeks or so to this trial?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Do you -- have you heard anything about

6    this case?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Did you recognize anyone who was

9    introduced?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Who was that?

12             PROSPECTIVE JUROR:  Marty Gould.  I went to high

13   school with him.

14             THE COURT:  That was -- when was that?

15             PROSPECTIVE JUROR:  Almost ten years ago.

16             THE COURT:  Okay.  Do you socialize with him?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Often or occasionally?

19             PROSPECTIVE JUROR:  Yeah, occasionally.  I'm friends

20   with his brother, younger brother.

21             THE COURT:  All right.  Let me ask you this.  Is

22   there -- would you feel an obligation to pay closer attention

23   to his side of the case than the other side, or do you think

24   you could be completely neutral?

25             PROSPECTIVE JUROR:  I think it's just a little

1   uncomfortable, to be honest.

2           THE COURT:  All right.  I'll excuse you.  Thank you.

3           Call one more, please.

4           THE CLERK:  Laura Guijosa.

5           THE COURT:  I'm going to -- is it Guijosa?

6           PROSPECTIVE JUROR:  Guijosa.

7           THE COURT:  How do you --

8           PROSPECTIVE JUROR:  In Spanish, Guijosa.

9           THE COURT:  Guijosa.  And where do you live?

10          PROSPECTIVE JUROR:  In Summit.

11          THE COURT:  How old are you?

12          PROSPECTIVE JUROR:  51.

13          THE COURT:  What is your educational background?

14          PROSPECTIVE JUROR:  My associate's in early childhood

15  education.

16          THE COURT:  And what is your business or occupation?

17          PROSPECTIVE JUROR:  No, I don't work.  I'm sorry.

18          THE COURT:  You're not working currently, is that --

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Are you able to devote three to four

21  weeks to this case?

22          PROSPECTIVE JUROR:  No, I don't think so, no.

23          THE COURT:  Why?

24          PROSPECTIVE JUROR:  Why?  Because I don't speak good

25  English, I don't think so, 100 percent.

```
1              THE COURT:  All right.  I'll excuse you.  Thank you.
2         Call one more.
3              THE CLERK:  Dong Han, H-a-n.
4              THE COURT:  You are Dong Han; is that correct?
5              PROSPECTIVE JUROR:  Yes.
6              THE COURT:  Where do you live?
7              PROSPECTIVE JUROR:  A northwest suburb.
8              THE COURT:  And how old are you?
9              PROSPECTIVE JUROR:  36.
10             THE COURT:  What is your educational background?
11             PROSPECTIVE JUROR:  Bachelor's.
12             THE COURT:  And business or occupation?
13             PROSPECTIVE JUROR:  I'm currently a general manager
14   at a retail.
15             THE COURT:  What type of retail is it?
16             PROSPECTIVE JUROR:  Clothing.
17             THE COURT:  Okay.  Is that here in -- where is that
18   located?
19             PROSPECTIVE JUROR:  Northbrook Court.
20             THE COURT:  Okay.  Are you able to devote three weeks
21   or so to this trial?
22             PROSPECTIVE JUROR:  No.
23             THE COURT:  And why is that?
24             PROSPECTIVE JUROR:  We're currently short staffed,
25   and it will be restraining on everybody.
```

1      THE COURT:  All right.  I'll excuse you.  Thank you.

2      Call one more, please.

3      THE CLERK:  Gary Raphael.

4      THE COURT:  You are Gary Raphael; is that correct?

5      PROSPECTIVE JUROR:  Yes.

6      THE COURT:  Where do you live, sir?

7      PROSPECTIVE JUROR:  Glencoe.

8      THE COURT:  And how old are you?

9      PROSPECTIVE JUROR:  62 for four more days.

10     THE COURT:  Almost happy birthday.

11     PROSPECTIVE JUROR:  Thank you.

12     THE COURT:  What is your educational background, sir?

13     PROSPECTIVE JUROR:  MBA.

14     THE COURT:  And what is your business or occupation?

15     PROSPECTIVE JUROR:  I'm president of ADM

16  International.  We're a general contractor with the federal

17  government for interior furnishings.

18     THE COURT:  All right.  Are you able to devote three

19  weeks or so to this trial?

20     PROSPECTIVE JUROR:  It would be difficult.  I'm -- my

21  dad lives in Florida.  My wife and I were scheduled to go down

22  there on the 16th to help with some damage that was done to

23  the house.

24     THE COURT:  I'll excuse you.

25     Call one more, please.

1          PROSPECTIVE JUROR:  Thank you.

2          THE CLERK:  Jan Dobon-Slabowski.

3          JUROR RAPHAEL:  May I ask this gentleman one

4    question, though, please, before I go?

5          THE COURT:  You are Jan Dobon-Slabowski.  Is it Jan?

6          PROSPECTIVE JUROR:  Jan, Jan.  Everything works.

7          THE COURT:  Where do you live, sir?

8          PROSPECTIVE JUROR:  Close to Schaumburg.

9          THE COURT:  And what -- how old are you, sir?

10          PROSPECTIVE JUROR:  68.

11          THE COURT:  What is your educational background?

12          PROSPECTIVE JUROR:  Master's degree in mechanical

13    engineering.

14          THE COURT:  And what is your business or occupation?

15          PROSPECTIVE JUROR:  I am retired right now.

16          THE COURT:  From what are you retired?

17          PROSPECTIVE JUROR:  Engineering.

18          THE COURT:  Engineering is a broad --

19          PROSPECTIVE JUROR:  Mechanical engineering.

20          THE COURT:  Okay.  Are you able to devote three to

21    four weeks to this case?

22          PROSPECTIVE JUROR:  That would be difficult.

23          THE COURT:  Pardon?

24          PROSPECTIVE JUROR:  I was hospitalized -- I was

25    hospitalized in Loyola Hospital for a major infection.  I got

1  E. coli bacteria.

2          THE COURT:  All right.  I'll excuse you.

3          PROSPECTIVE JUROR:  I was advised to rest.

4          THE COURT:  I'll excuse you.

5          Call one more.

6          THE CLERK:  David Sexton.

7          THE COURT:  You are David Sexton; is that right?

8          PROSPECTIVE JUROR:  Yes, sir.

9          THE COURT:  Where do you live, sir?

10         PROSPECTIVE JUROR:  LaSalle.

11         THE COURT:  And what is your business or occupation?

12         PROSPECTIVE JUROR:  I'm a route driver.

13         THE COURT:  And how old are you?

14         PROSPECTIVE JUROR:  52.

15         THE COURT:  What's your educational background?

16         PROSPECTIVE JUROR:  High school.

17         THE COURT:  Are you able to devote three to four

18  weeks, sir?

19         PROSPECTIVE JUROR:  No, sir.

20         THE COURT:  Okay.  And that is why, sir?

21         PROSPECTIVE JUROR:  I live with my mother.  She's 86.

22  She recently had a stroke.

23         THE COURT:  All right.  I'll excuse you.  Thank you.

24         Call one more.

25         THE CLERK:  Sam Williams.

1      THE COURT:  You are Sam Williams; is that correct,

2  sir?

3      PROSPECTIVE JUROR:  Yes.

4      THE COURT:  Where do you live?

5      PROSPECTIVE JUROR:  South side.

6      THE COURT:  And how old are you?

7      PROSPECTIVE JUROR:  57.

8      THE COURT:  What is your educational background?

9      PROSPECTIVE JUROR:  Junior college.

10      THE COURT:  And what is your business or occupation?

11      PROSPECTIVE JUROR:  I am a Christian missionary for

12  Campus Crusade of Christ.

13      THE COURT:  And is that a --

14      PROSPECTIVE JUROR:  It's a missionary.

15      THE COURT:  -- position where you travel a lot?

16      PROSPECTIVE JUROR:  Yes.

17      THE COURT:  Are you able to sit for three to four

18  weeks here?

19      PROSPECTIVE JUROR:  I -- it would be very difficult.

20      THE COURT:  Why is that, sir?

21      PROSPECTIVE JUROR:  At this time of year, we are

22  raising support and going out to the cities and countries that

23  have had the disasters.

24      THE COURT:  All right.  I'll excuse you.

25      Call one more, please.

```
1              THE CLERK:  James Shennan.

2              THE COURT:  You are James Shennan?

3              PROSPECTIVE JUROR:  Yes, sir.

4              THE COURT:  Where do you live, sir?

5              PROSPECTIVE JUROR:  DuPage County.

6              THE COURT:  And how old are you?

7              PROSPECTIVE JUROR:  21.

8              THE COURT:  What is your educational background?

9              PROSPECTIVE JUROR:  Some college.

10             THE COURT:  And what is your business or occupation?

11             PROSPECTIVE JUROR:  I am currently unemployed, but I

12     go to school full-time.

13             THE COURT:  Are you able to sit for three to four

14     weeks then?

15             PROSPECTIVE JUROR:  No, sir.

16             THE COURT:  That's because you're currently

17     schooling?

18             PROSPECTIVE JUROR:  Uh-huh.

19             THE COURT:  Okay.  I'll excuse you.  Thank you.

20             THE CLERK:  Michael Schomer.

21             THE COURT:  You are Michael, is it, Schomer?

22             PROSPECTIVE JUROR:  Yes, sir.

23             THE COURT:  Where do you live?

24             PROSPECTIVE JUROR:  Plainfield.

25             THE COURT:  And how old are you, sir?
```

```
1              PROSPECTIVE JUROR:  61.

2              THE COURT:  What is your educational background?

3              PROSPECTIVE JUROR:  Junior college.

4              THE COURT:  And what is your business or occupation?

5              PROSPECTIVE JUROR:  Retired firefighter.

6              THE COURT:  Are you able to sit for three weeks or

7    so?

8              PROSPECTIVE JUROR:  Yes, sir.

9              THE COURT:  Okay.  Do you know anything about this

10   case?

11             PROSPECTIVE JUROR:  No, sir.

12             THE COURT:  Did you recognize anyone who was

13   introduced to you?

14             PROSPECTIVE JUROR:  No, sir.

15             THE COURT:  Have you or any family member ever worked

16   in a police capacity?

17             PROSPECTIVE JUROR:  I had three cousins who were

18   Chicago police.

19             THE COURT:  Okay.  Are they close to you?

20             PROSPECTIVE JUROR:  Distant.

21             THE COURT:  Distant?

22             PROSPECTIVE JUROR:  They live north side, I live

23   south side.

24             THE COURT:  Do you socialize with them?

25             PROSPECTIVE JUROR:  No, sir.
```

1      THE COURT:  Okay.  Are they regular police officers,
2   is what they are?

3      PROSPECTIVE JUROR:  They were Chicago PD, yes.

4      THE COURT:  Have you or your family ever worked for
5   the City of Chicago?

6      PROSPECTIVE JUROR:  I have numerous family members
7   who are current or retired Chicago firefighters.

8      THE COURT:  Firefighters.  Okay.  Have you or any
9   family member ever had a negative experience with a Chicago
10  police officer?

11     PROSPECTIVE JUROR:  No, sir.

12     THE COURT:  Your view of the City of Chicago Police
13  Department, would you call it negative, positive, or neutral?

14     PROSPECTIVE JUROR:  Neutral.

15     THE COURT:  Okay.  Have you or any family member ever
16  been a crime victim?

17     PROSPECTIVE JUROR:  Yes, sir, twice.  The first time
18  was a family garage burglarized in 1970, and in 1984, my
19  apartment was burglarized when I lived in San Antonio.

20     THE COURT:  Did they catch the person in any of the
21  occasions?

22     PROSPECTIVE JUROR:  No, sir.

23     THE COURT:  Have you or any family member ever been
24  arrested for a serious crime?

25     PROSPECTIVE JUROR:  No, sir.

1      THE COURT:  Do you know anyone who has committed or

2   attempted suicide?

3      PROSPECTIVE JUROR:  My uncle killed himself in 1982

4   with a shotgun, a bullet to the head.

5      THE COURT:  Do you have any specialized knowledge of

6   suicide as a result of that experience?

7      PROSPECTIVE JUROR:  No, sir, other than in my

8   capacity as a firefighter, I've seen numerous suicides.

9      THE COURT:  All right.  But you don't have any

10  particular knowledge of why a person --

11     PROSPECTIVE JUROR:  No, sir.

12     THE COURT:  -- would do something like that?  Okay.

13     Do you know anyone who has suffered a serious

14  traumatic brain injury?

15     PROSPECTIVE JUROR:  Not personally, no.

16     THE COURT:  And that would be through your work?

17     PROSPECTIVE JUROR:  Yes, sir.

18     THE COURT:  People who get hurt in a fire?

19     PROSPECTIVE JUROR:  Yes.

20     THE COURT:  Have you served on a jury before?

21     PROSPECTIVE JUROR:  No, sir.

22     THE COURT:  Have you ever filed a lawsuit or have you

23  ever been sued?

24     PROSPECTIVE JUROR:  No, sir.

25     THE COURT:  If plaintiff establishes liability and

1  serious damages, would you be willing to award substantial

2  damages?

3             PROSPECTIVE JUROR:  Yes, sir.

4             THE COURT:  If, on the other hand, plaintiff fails to

5  establish liability, would you be willing to find in favor of

6  the City of Chicago and award no damages?

7             PROSPECTIVE JUROR:  That's correct, yes.

8             THE COURT:  Any reason you couldn't be fair?

9             PROSPECTIVE JUROR:  No, sir.

10            THE COURT:  And just one other question.  The fact

11  that you have relatives who are Chicago policemen, would you

12  think that would influence you in any way, shape, or form as

13  to how you would decide this case?

14            PROSPECTIVE JUROR:  No, sir.

15            THE COURT:  Can I see the lawyers at sidebar, please?

16       (Proceedings heard at sidebar:)

17            THE COURT:  By the way, your motion on the one juror

18  to -- for cause is denied.

19            MR. ROMANUCCI:  Denied.  That's fine.

20            THE COURT:  Yes.  They're out, also.

21            Any further questions?

22            MR. ROMANUCCI:  I think with Mr. Schomer or Schomer,

23  I would seek to excuse him for cause.  I don't know if this is

24  appropriate now.

25            THE COURT:  Yes, it would be now.

1          MR. ROMANUCCI:  I would seek to excuse him for cause

2     because it looks like he has personal knowledge on both sides

3     of the aisle with respect to people who know suicide, and he

4     knows -- he's experienced so many suicides in his employment,

5     plus he knows many people, not only on the Chicago Police

6     Department but also fire department.  Numerous witnesses will

7     be testifying for both CPD and CFD.

8          THE COURT:  Okay.  I would deny your motion for

9     cause.  The City --

10         MR. ROMANUCCI:  The only follow-up question I would

11    have for him, your Honor --

12         THE COURT:  Yes.

13         MR. ROMANUCCI:  Does he know a witness by the name of

14    Victoria Janozik.  She's with Chicago fire.

15         THE COURT:  Write that down for me there, would you?

16         Janozik is the name.  Any questions you wish?

17         MS. ROSEN:  No, Judge.

18         THE COURT:  Okay.

19       (Proceedings heard in open court:)

20         THE COURT:  Just one follow-up question, Mr. Schomer.

21    Do you know a firefighter named Victoria Janozik?

22         PROSPECTIVE JUROR:  No, sir.

23         THE COURT:  Okay.  Thank you.  Do you want to write

24    out your requests, and I will...

25         (Pause.)

1          THE COURT:  Okay.  Would you swear in

2    Ms. Carter-Marriner and Mr. Schomer, please?

3        (Jurors sworn.)

4          THE COURT:  Okay.  We've now completed jury

5    selection.  I want to thank the people in the back for your

6    patience.

7          And for the 10 of you, you are the jury, and your

8    home away from home will be the jury room in the back.  You'll

9    be shown in a moment where that is.  And when you're in here,

10   that will be locked, so you can keep your valuables back

11   there.

12         A couple of things I want to impress upon you.  The

13   most important thing is to keep an open mind and don't allow

14   anybody to talk to you about the case and don't talk to

15   anybody about the case.  When I say "don't talk to anybody

16   about the case," I want to emphasize that you should not get

17   on any of the social network things like Twitter and that sort

18   of thing and broadcast your experiences.

19         You can do that after the case is over, but I'm going

20   to ask you, until that time, to devote your full attention to

21   the evidence here that you're going to hear in this case and

22   don't discuss it with anybody, including yourselves among the

23   jury until after you've heard all of the evidence.

24         It's very important that you keep an open mind until

25   you hear all of the evidence because first, you will hear the

1   plaintiff's witnesses.  Then after that, you will hear the

2   defense witnesses.  So you should keep an open mind throughout

3   the entire case until you've heard every witness, but it's

4   also very important -- and do not do any personal research.

5   Don't Google any name you may hear to see if you can find out

6   what the news -- or what somebody may have said on the

7   internet because what you read on the internet is what we call

8   hearsay, and it may or may not be true because it's not under

9   oath and it's not under -- subject to cross-examination.

10          The only evidence you should consider is evidence

11  that's testified to under oath in a court and is subject to

12  cross-examination.  Anything that you hear or is said outside

13  of court, you read in a newspaper or you read on the internet

14  and so forth is rumor at best, and it's something that if you

15  look up that kind of thing, you might get a little mixed up,

16  "Did I hear it in court, or did I read it on the internet?"

17          So I'm going to ask you, stay off your computers as

18  far as doing any research or any discussion with anybody as to

19  your experiences in this case.  Again, when the case is over,

20  you'll have plenty of time to do whatever -- talk to anybody

21  you want and give your experiences and so on and so forth.  So

22  I'm going to ask that you not do so until then.

23          We're going to now break for lunch, and then you will

24  come back at, say -- it's now 5 after -- or 10 after 1:00, so

25  we'll come back at 10 after 2:00 and at that time, you'll hear

1    the opening statements of the lawyers who will tell you in

2    great detail of what this case is about.

3          So again, would you show them the jury room?

4          And we'll see you at 10 after 2:00.

5      (Proceedings heard in open court.  Jury out.)

6          THE COURT:  Just for the record, Mr. Romanucci, your

7    motion to reconsider the Court's denial of your motion to

8    excuse for cause Mr. Schomer is denied.

9          MR. ROMANUCCI:  Thank you, your Honor.

10          THE COURT:  All right.  At 10 after 2:00, we will

11    have opening statements.  Anybody want to put anything on the

12    record at this point?

13          MS. ROSEN:  Yes, Judge.  I just want to say that I

14    received an email that I believe Mr. Romanucci was copied on

15    from Mr. Monaco who was one of the attorneys that was here

16    this morning on the Doe case.  He has been sending us

17    discovery that was answered in the Doe case where

18    Mr. Romanucci's firm is on the service list because they moved

19    to intervene.

20          So I haven't had a chance, obviously, to review it

21    all, but there are discovery responses by Mr. Doe who we all

22    believe is Mr. Kelly that answer questions about this

23    incident.  And in light of the fact that there's this issue

24    about whether or not he's going to take the Fifth or not, the

25    City has no knowledge, and these documents have never been

1  produced.  And this morning, Mr. Romanucci said the only thing

2  that he received out of that case was the complaint.

3           So I just want to raise that now.  We're going to

4  take a look at it now over the break, but I have serious

5  concerns about the fact that they have discovery from

6  Mr. Kelly related to information he is providing in that

7  litigation about the circumstances of the events that

8  transpired on January 12th, 2010, and the City was not

9  provided it, and Mr. Romanucci this morning said he had

10 nothing about the complaint.

11          MR. ROMANUCCI:  I believe that Ms. Rosen is

12 misinterpreting my words, your Honor.  As I said, the only

13 document that I will be using is the complaint.  That's what I

14 said.

15          THE COURT:  I thought you said the only document that

16 was relevant to this case --

17          MR. ROMANUCCI:  Was the complaint.  That's what I

18 said.

19          THE COURT:  Well, is there other stuff that's

20 relevant to the case, I guess is -- that you received?

21          MR. ROMANUCCI:  I don't know that I have received

22 anything.  Debra, where is -- Debra, do we have other

23 discovery?

24          MS. THOMAS:  Yes.

25          THE COURT:  Well, why don't you --

1           MR. ROMANUCCI:  I'm not -- I don't intend to use it.

2           MS. ROSEN:  Judge, that's really not the standard.

3 If he doesn't -- maybe I want to use it.

4           THE COURT:  Yes.  I mean, that's -- why don't you go

5 over that over the next hour so you can tell me if there's --

6 if there is something or there is nothing.

7           MR. ROMANUCCI:  That's fine.

8           THE COURT:  All right.

9           MR. ROMANUCCI:  And then, your Honor, I'm going to

10 tender to Ms. Rosen based on the motions in limine this

11 morning, with regard to our opening, we have a PowerPoint to

12 do with it, so I'm going to tender it to Ms. Rosen to see if

13 she has any objection to it.

14           THE COURT:  All right.  Very good.  Thank you.

15         (Recess from 1:11 p.m. to 2:10 p.m.)

16               * * * * * * *

17             C E R T I F I C A T E

18        I, Judith A. Walsh, do hereby certify that the

19 foregoing is a complete, true, and accurate transcript of the

20 proceedings had in the above-entitled case before the

21 Honorable HARRY D. LEINENWEBER, one of the judges of said

22 Court, at Chicago, Illinois, on October 2, 2017.

23 /s/ Judith A. Walsh, CSR, RDR, F/CRR      November 8, 2017
Official Court Reporter
24 United States District Court
Northern District of Illinois
25 Eastern Division

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    MICHAEL A. LAPORTA,            )  Docket No. 14 C 09665
     as Guardian of the estate and )
4    person of Michael D. LaPorta, a)
     disabled person,              )
5                                   )
                    Plaintiff,      )  Chicago, Illinois
6                                   )  October 2, 2017
              v.                    )  2:11 p.m.
7                                   )
     CITY OF CHICAGO, a municipal   )
8    corporation, GORDON LOUNGE,    )
     INC., d/b/a BREWBAKERS,        )
9                                   )
                    Defendants.     )
10

11                   VOLUME 1-B
           TRANSCRIPT OF PROCEEDINGS - Trial
12    BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

13
     APPEARANCES:
14

15   For the Plaintiff:    ROMANUCCI & BLANDIN, LLC, by
                           MR. ANTONIO M. ROMANUCCI
16                         MR. MARTIN D. GOULD
                           MR. BRUNO R. MARASSO
17                         MS. NICOLETTE A. WARD
                           MS. DEBRA L. THOMAS
18                         321 North Clark Street
                           Suite 900
19                         Chicago, IL 60654

20
                           SALVATO, O'TOOLE & FROYLAN, by
21                         MR. CARL SALVATO
                           53 West Jackson Blvd.
22                         Suite 1750
                           Chicago, IL 60604
23

24

25

```
 1    APPEARANCES (Continued):

 2    For the Defendant City of Chicago:

 3                         ROCK FUSCO & CONNELLY, LLC, by
                           MS. EILEEN E. ROSEN
 4                         MS. STACY A. BENJAMIN
                           MR. JAMES B. NOVY
 5                         MS. THERESA BEROUSEK CARNEY
                           321 North Clark Street
 6                         Suite 2200
                           Chicago, IL 60654
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Court Reporter:     LISA H. BREITER, CSR, RMR, CRR
                           Official Court Reporter
21                         219 S. Dearborn Street, Room 1944
                           Chicago, IL 60604
22                         (312) 702-8865
                           judith_walsh@ilnd.uscourts.gov
23

24

25
```

1          (In open court outside the presence of the jury.)

2              THE CLERK:  Court is back in session.  Please be

3      seated.

4              MS. ROSEN:  Can we talk about something before we

5      start?

6              THE COURT:  Yeah.  Did you get your situation squared

7      away?

8              MR. ROMANUCCI:  I think so, your Honor.  As it turns

9      out, counsel had the same discovery that we did because

10     Mr. Monaco provided it, from what I found out, to both of us

11     so...

12             THE COURT:  So there's nothing --

13             MS. ROSEN:  I'm sorry, Judge, that's absolutely

14     incorrect.  He provided it to me this morning while we were

15     sitting here.  I didn't get it.  They've had this discovery

16     since June.

17             It was never disclosed.  There are -- there are

18     discovery responses from Mr. Doe.  And quite frankly, I don't

19     even know how much of this I can talk about because I don't

20     know what the scope of the protective order is in the state

21     court case.

22             I was not a part of the -- and was not given notice to

23     the motion to intervene.  There's e-mail exchanges between

24     Mr. Gould at Mr. Romanucci's office and the parties in the

25     other case wherein it appears based on the e-mail that the

143

1    state court judge, Judge, O'Hara ruled that the plaintiff in

2    this case could use -- the plaintiff in our case here could use

3    the discovery that he was obtaining in our case as long as they

4    struck the caption of the complaint and kept the

5    confidentiality.

6         I was not there for any of that, but there's certainly

7    in the discovery responses that I've been able to read,

8    which -- off of my phone and what we've been able to print in

9    the hour that we've known about this, there is relevant

10   discovery as it relates to the issues in this case.

11        And we are severely prejudiced by the fact that this

12   discovery was not produced to us.  The fact that plaintiff has

13   made the representation that they didn't intend to use it is

14   completely irrelevant.  This morning I specifically asked the

15   Court to ask Mr. Romanucci if what he was saying was that the

16   only document he received from that state court case was the

17   complaint, and he affirmatively said to the Court that the only

18   document he received was the complaint.

19        THE COURT:  No, that isn't what he said.  What he said

20   was the only -- I understood the only relevant document was the

21   complaint, and that was the only one he was going to use.  Now,

22   if there's stuff that's relevant, I don't know.

23        MR. ROMANUCCI:  The other thing is, your Honor, if you

24   recall, we filed a motion to use the Jason Doe complaint in

25   this case.  And you denied that motion saying that you would

1    revisit that matter at trial whether or not even the Jason Doe

2    complaint would be relevant to this case.

3           THE COURT:  Well, whatever, it's kind of late to be

4    arguing discovery matters.  So we're going to proceed with the

5    opening statements.  The jurors are all back.

6           MS. ROSEN:  Judge, I have one other issue.  I was

7    handed just at the break this, which is representative of a

8    PowerPoint presentation that apparently is intended to be used

9    in the opening.

10          I have objections to numerous slides in this

11    PowerPoint presentation.  There's evidence that's not been

12    admitted that we object to.  There's argument all over the

13    place.  There's dep transcripts.  There's phone records that

14    we've objected to.

15          So I mean, there are certain slides that we don't

16    object to, but this -- there's -- the majority, half, a third,

17    I don't know, is objectionable.

18          MR. ROMANUCCI:  Your Honor, we amended this -- the

19    PowerPoint presentation to conform with your motions in limine.

20    Right after the motions, we conformed it so that there's no

21    inadmissible evidence.

22          THE COURT:  Whatever.  The opening statements are not

23    evidence.  I will tell the jury that, and I will tell them not

24    evidence, and if any matter in the opening statements is not in

25    evidence, then they must disregard it.  I'll have to do that,

145

1    but that's normal.  Most of the time, I mean, people, you know,

2    they comment on evidence about what they're going to have.

3    They're not supposed to argue.

4         MS. ROSEN:  But, Judge, there's dep transcripts from

5    the case.

6         THE COURT:  What?

7         MS. ROSEN:  Deposition transcripts of witnesses.

8         THE COURT:  There's nothing wrong with that if they're

9    admissible.  I mean, if it's evidence that's going to be in...

10        MS. ROSEN:  But, Judge, it's not.  These are live

11   witnesses that are going to testify.  There's -- you can't --

12   there's deposition testimony that we don't know what these

13   witnesses are going to say.  There's charts about records.

14        THE COURT:  You should know what a witness is going to

15   say if they've had their deposition taken.  If he's just -- if

16   he's indicating what the witnesses are going to say based on a

17   deposition, then he can do that as far as I can see.

18        I don't see anything wrong with that unless -- well,

19   obviously if the witness isn't a proper witness, that wouldn't

20   be appropriate, but I can't -- so you have to let him go at it,

21   and you can raise an objection if he's putting something in

22   that you don't think's going to be in evidence.

23        But that's -- again, I will tell them now and I will

24   tell them at the end of the case that what the lawyers say is

25   not evidence.  If they suggest something and it's not going to

1    go into evidence, then they will -- you can show to the jury

2    that he didn't tell you the correct information.

3              MS. ROSEN:  But, Judge, this is slide after slide

4    after slide of things that we've objected to in the pretrial

5    order.

6              THE COURT:  Well, I mean, are they in conformance with

7    the motion in limine.  If they're not, then he --Mr. --

8              MS. ROSEN:  It's not just the motions in limine,

9    Judge.  On the pretrial order, we have objections to phone

10   records.  There are like -- there's brain scans of Mr. LaPorta.

11   I mean, this goes on and on and on.  This is not for opening.

12   None of this has been admitted.

13             THE COURT:  It doesn't have to be admitted because you

14   haven't admitted anything yet.  I mean, the whole opening

15   statement is based upon information that's not admitted.  So

16   I'm going to let him go ahead, and if there's inappropriate

17   stuff in there, then I'll either strike it or tell the jury

18   specifically disregard it or not, as the case may be.  So let's

19   get going.  I promised the jury we would move along rapidly, so

20   do you want to bring the jury in.

21             How long will your opening take, Mr. Romanucci?

22             MR. ROMANUCCI:  90 minutes, your Honor.

23             THE COURT:  All right.  We'll go then, and then we'll

24   have a recess after his opening.

25             (Jury enters courtroom at 2:18 p.m.)

```
1              THE COURT:  You can sit wherever you want.  You have
2    don't have to sit where you were selected, just where
3    comfortable.  Please, everybody be seated.
4              Members of the jury, you're about to hear the opening
5    statements.  This is the opportunity that the lawyers have to
6    tell you in advance what they think the evidence will show or
7    prove during the course of the trial.
8              They're designed to be helpful to you because it will
9    give you an overview because the evidence doesn't always come
10   in in a perfectly logical or chronological order.  So it's
11   helpful to have an overview which the lawyers can prescribe to
12   you so that you can understand the relevance of specific bits
13   of evidence as they come in.
14             Now, one word of caution is the attorneys are not
15   witnesses in the case.  They're not under oath, and they're not
16   subject to cross-examination.  So what they say at the opening
17   statement and at the closing arguments and at other times
18   during the course of the trial is not evidence.
19             So if an attorney makes an assertion of fact that they
20   expect the evidence to show and at the conclusion of the case,
21   it's your agreement or understanding that that particular fact
22   or facts were not proved or not brought into the evidence of
23   the case, then you ignore what the attorneys have to say.
24   Because they cannot supply evidence because they're not
25   witnesses.  But they can obviously tell you what they believe
```

Opening Statement - Plaintiff

1    the evidence will be, which is their appropriate role at the

2    opening statement.

3            Now, the plaintiff has the burden of proof during the

4    course of the trial, so the plaintiff goes first.  And then

5    after the plaintiff, then you'll hear the defendant and the

6    opening statements.  And that's the same with the evidence of

7    the case and same with the closing arguments.

8            So the plaintiff may give the opening statement.

9    Mr. Romanucci, are you giving it?

10           MR. ROMANUCCI:  Your Honor, yes.

11           THE COURT:  All right.  You may proceed.

12           MR. ROMANUCCI:  And I am ready, your Honor.  Thank

13   you.

14               OPENING STATEMENT ON BEHALF OF PLAINTIFF

15           MR. ROMANUCCI:  Your Honor, thank you.  Ladies and

16   gentlemen, good afternoon.  On behalf of myself and our entire

17   legal team -- I introduced you to them earlier -- I also want

18   to introduce you to a couple of new people.  They're at the

19   table that you did not get a chance to meet this morning.

20           One of them is Patti LaPorta.  This is Michael

21   LaPorta's mom.

22           MRS. LAPORTA:  Hi, how are you?

23           MR. ROMANUCCI:  Mikey or Michael LaPorta -- Michael D.

24   LaPorta is sitting in the courtroom in the first row there.  I

25   thank you in advance for your attention and for the attention

149

Opening Statement - Plaintiff

1   that you'll be giving all of the evidence that you will hear,

2   and you will hear from many witnesses throughout the course of

3   this case also.

4       I also want to thank the attorneys for the City for

5   being here.  And you're going to hear many of the witnesses who

6   will be called in this case testifying against the City of

7   Chicago for violating constitutional laws by allowing a pattern

8   of violent behavior from a Chicago police officer to go

9   unchecked for years.

10      And during that period of time that this violent

11  behavior went unchecked, this officer was never, ever

12  disciplined.  And what that did by never meting out any

13  discipline, it caused very serious, permanent harm to Mikey

14  LaPorta, who is sitting in this courtroom today.

15      It caused him lifelong brain damage, paralysis and

16  lifelong care from his parents and his family.  The evidence

17  will show that the City knew about this violent behavior.  They

18  knew about this pattern of behavior that went unchecked for

19  years.  And they allowed this loose cannon, ticking time bomb

20  police officer to remain on the force, and they never did

21  anything about it.

22      Now, ladies and gentlemen, make no mistake.  There are

23  many, many good police officers out there, and we all have

24  respect for the good ones.  But it's the bad ones, the ones

25  that must be captured, the ones that must be caught and stopped

Opening Statement - Plaintiff

1    before they cause that type of permanent harm.  That's what

2    this case is about.

3                  This case is about a badge, a badge given to Patrick

4    Kelly by the City of Chicago and all the powers and privileges

5    that come with that badge.  This case is about the City of

6    Chicago giving all of its officers the power and the legal

7    authority to possess and own a service weapon, a service

8    weapon, which is required by the Chicago Police Department.

9                  You can't be a Chicago Police Department officer until

10   you buy one of their guns that they say that you must have.  A

11   service weapon, that same service weapon that was purchased

12   that was used to shoot Michael LaPorta.

13                 This case is about the City of Chicago giving its

14   officers the power and legal authority to load that gun with

15   the type of ammunition that the City prescribes that it use.

16   This case is about one of those peace officers, a sworn public

17   servant, who knew he had the power to act without fear of

18   punishment or discipline or reprimand because he had the

19   brotherhood of the Chicago Police Department behind him.

20                 And it was this brotherhood that existed within the

21   City of Chicago Police Department where they protect their own.

22   And by protecting their own, they hide.  And the evidence will

23   show that by hiding, it causes harm.

24                 The Department rules say that unless you are on duty,

25   your service weapon must be on your person, secured in a

151

Opening Statement - Plaintiff

1  holster, locked in a safe if you're at home with it or have a

2  mechanism called a trigger lock on it.  It's not acceptable if

3  you're at home to leave your gun unsecured.

4       The rules also state that officers must never be

5  intoxicated while off duty with his or her service weapon

6  unsecured, even if it's in their own house.  It may sound

7  strange, but that's the rule.  City of Chicago rule says police

8  officers on or off duty must never be intoxicated.  The rules

9  are that an officer may be called to save a life at any time,

10 and if that's necessary, they can't be intoxicated.

11      You will hear substantial evidence that these rules

12 are often ignored and violated as a result of the City of

13 Chicago failing to discipline officers when the circumstances

14 warranted because the City of Chicago maintains a code of

15 silence.  Now, the code of silence prevents officers from being

16 investigated.  When they are investigated, it prevents them

17 from getting disciplined because they can't ever get

18 disciplined if somebody stops it.  If there's a hindrance

19 before the discipline process, it can never happen.

20      The City of Chicago has allowed it to continue

21 unchecked, not just for during the time that Patrick Kelly shot

22 Michael LaPorta, but you'll hear evidence that this code of

23 silence has been existing in the City of Chicago not even for

24 years, ladies and gentlemen, but decades.  It's become a

25 culture in the City of Chicago.

152

Opening Statement - Plaintiff

1    　　　The City fails to have a sufficient early intervention

2    or warning system.  So you will hear lots of evidence that one

3    of its police officers -- and his name is Patrick Kelly --

4    repeatedly acted with impunity because he learned that

5    misconduct, regardless of how severe or even criminal, it goes

6    unpunished.

7    　　　And that's a picture of Patrick Kelly.  He was rarely

8    investigated, never disciplined and always protected.  He had

9    someone pulling strings for him the entire time he was on the

10   Chicago Police Department.  But I'm going to tell you, ladies

11   and gentlemen, that many times I'm not going to be able to

12   offer you an explanation as to why things happened, but they

13   did to him very inexplicably.

14   　　　So today the evidence will show that the City, had it

15   acted appropriately and properly, Officer Kelly never would

16   have had the service weapon to shoot Michael LaPorta.  So this

17   case is a story about the service weapon that was used to shoot

18   Michael LaPorta and the City ordered Kelly to purchase before

19   he could become a sworn peace officer.

20   　　　This is a picture of the actual gun.  This is the only

21   picture that the Chicago Police Department took of that gun on

22   the night of the shooting.  That's it.  We don't have any other

23   pictures of the gun.

24   　　　You will learn that -- excuse me.  You will learn that

25   Officer Kelly's gun was eventually returned to him by the

153

Opening Statement - Plaintiff

1   Chicago Police Department before the finale, before the end not

2   only of this case, but also the criminal case.  They gave it

3   back to him.

4          Now, because this is the only picture we have of the

5   gun, we've brought to you a replica of the gun.  This is what

6   it looks like.  This is a replica of the gun that Patrick Kelly

7   used that night.  The City of Chicago, they may choose to bring

8   in a real weapon.  We chose to bring this one.

9          And we'll explain to you, we'll have an expert talk to

10  you about how this gun works, what type of gun it is.  It's

11  called a P226 Sig Sauer.  It's either a DAO or a DAK model, and

12  it will be explained to you how this gun works and some of the

13  safety mechanisms that may or may not exist on it.

14         This case is a story about Officer Kelly and how once

15  he got his service weapon and his badge in 2005 from the City

16  of Chicago, he breached his power, breached his authority and

17  wreaked violence on the citizens of Chicago over and over

18  again.  And this is whether he was on duty or off duty.

19         And he especially committed acts of violence on people

20  who were even friends with him or even his domestic partners.

21  This unchecked behavior resulted in at least 18 complaint

22  registers being filed against Patrick Kelly before the shooting

23  of Michael LaPorta.  So that means that 18 different people

24  took the time to register complaints against him and file

25  complaints against him in five years as a police officer.  Five

Opening Statement - Plaintiff

1    full years.

2         So he was getting complaints against him at the rate

3    of five to six times per year, the 19th one being when the

4    bullet entered Michael LaPorta's head.  And that's what's

5    caused now Michael LaPorta his lifelong pain, suffering and

6    disability, disfigurement and clearly a lifelong, lifelong

7    paralysis in a wheelchair.

8         So this case is about justice and how you, as jurors

9    sworn as officers of this court, can right a horrible wrong of

10   the policies that exist within the City of Chicago from

11   preventing these loose cannon, ticking time bomb police

12   officers from misconduct.  The evidence will show that what

13   happened here was preventable because it was clearly

14   predictable and foreseeable.

15        It was not the first time Patrick Kelly had committed

16   off-duty intoxicated acts of violence on people before.  This

17   is not a case of Patrick Kelly being on the clock or off the

18   clock.  The City will tell you that they don't have

19   responsibility in this case because Patrick Kelly was off duty.

20        Ladies and gentlemen, don't be hooked by that argument

21   because that's not what this case is about.  This is about the

22   City of Chicago and what they knew before January of 2010 which

23   allowed Patrick Kelly to stay on the department.  That's what

24   this case is about.  And I'll explain this to you more fully as

25   I talk to you today and at the end of this case when I get my

Opening Statement - Plaintiff

1    last chance to talk to you as I do today.

2         So it happened before and the City knew through their

3    various agencies.  So let me explain to you some of the

4    agencies that Patrick Kelly became familiar with while he was a

5    City of Chicago police officer.  The first one being the one

6    that he worked for, which is the Chicago Police Department.

7         And what you'll hear is that the Chicago Police

8    Department is budgeted by the City of Chicago.  So if I say

9    "City of Chicago" and "Chicago Police Department," Patrick

10   Kelly is an employee really of the City of Chicago through its

11   police department.

12        The next one is the Bureau of Internal Affairs.  The

13   BIA or Internal Affairs is the agency within the City of

14   Chicago that's actually under the umbrella of the CPD, and they

15   discipline police officers for certain infractions.

16        A couple of examples are BIA will cite you if you

17   don't show up in roll call, if you're not wearing the right

18   type of uniform.  If you swear, that could be an infraction

19   that the Bureau of Internal Affairs will look at.

20        The next one is the Office of Professional Standards,

21   which interestingly no longer exists.  But it did exist for

22   part of Patrick Kelly's time as a police officer, which is

23   relevant to this case.  So the Office of Professional Standards

24   was dissolved in 2007.  And you'll hear testimony that the

25   reason it was dissolved is because there was a lack of trust in

Opening Statement - Plaintiff

1   that department and how they investigated officers who had

2   committed misconduct.

3          Because OPS was the organization that investigated

4   officers who had committed violent acts while on duty such as

5   domestic violence or whether they were involved in a

6   police-involved shooting while on duty. That would be the type

7   of investigation OPS would look at. But they're gone. They're

8   no longer there.

9          The last one is the Independent Police Review

10  Authority, also known as IPRA. Now, IPRA was formed after OPS

11  as its replacement. And IPRA also is an organization that

12  investigates police officers for infractions that involve

13  violence or harm, whether on duty or off duty.

14         And you'll hear evidence that IPRA is no longer in

15  existence either for the very same reasons that OPS was not,

16  because of the lack of trust in how IPRA was conducting

17  investigations of Chicago police officers.

18         So what would happen? So if BIA, OPS or IPRA did

19  initiate an investigation, it would result in a finding. And

20  there are various findings that could be made through the

21  beginning of one of these investigations.

22         One of them could be what's called sustained. That's

23  the one that says that we found enough evidence to say that

24  this officer committed the act that was complained of. The

25  next one would be not sustained, that the officer -- actually

Opening Statement - Plaintiff

1   can't say that the officer did not commit it because, by

2   definition, what you will hear is if it's not sustained,

3   there's just not enough evidence to say whether that officer

4   did it or not.

5          The next one would be unfounded, that the allegation

6   was found to be false or not factual.  The next one would be

7   that there's no affidavit.  This is important also because in

8   order for a complaint register to initiate, you would need

9   someone to make the complaint, and that would be after they

10  made the complaint, they would need to sign an affidavit.

11         And if they do sign the affidavit, the investigation

12  continues.  And if there's no affidavit, then the investigation

13  stops because that person for some reason or another decides

14  not to proceed with their affidavit.  And the last one being

15  exonerated.  The incident occurred as alleged, but was lawful

16  and proper.

17         I told you that this story is not about whether

18  Kelly -- Officer Kelly was on duty or off duty in January of

19  2010 'cause that's not the case.  Here's where the case begins,

20  in 2005 when Officer Kelly started his first full year of

21  employment as a Chicago police officer.

22         He finished the academy sometime you'll hear, I

23  believe it was July or maybe August of 2004.  So in his first

24  full year of being a police officer in 2005 in January, there

25  was a complaint register.  That's what the CR is, so I don't

Opening Statement - Plaintiff

1  repeat it so you know what it means.

2          There was a complaint register filed against him No. 1

3  for a violent arrest.  It continues on in June, he was cited

4  again for an obscene gesture.  Then it continued failing to

5  file a report.  There was a violent arrest in August.

6          And then there is Fran Brogan.  Fran Brogan is an

7  important name for you, ladies and gentlemen, because she was

8  Patrick Kelly's girlfriend at this time.  And by definition, by

9  legal definition, because she was his girlfriend, she also

10  becomes his domestic partner.  Even though they may or may not

11  live together, she's his domestic partner.  And if you batter

12  your domestic partner, you then commit an act of domestic

13  violence.

14          And that's what happened here.  Fran Brogan complained

15  against Patrick Kelly that he beat her, hit her, struck her

16  with an unknown object which caused her head to bleed.  It

17  knocked her to the ground.  It bloodied her head, and the next

18  one you'll see it significantly bloodied her blouse.

19          So you'll hear a lot of evidence about this particular

20  incident because Fran Brogan, as I told you, not only

21  complained against Patrick Kelly, she was hospitalized.  And

22  Patrick Kelly, you will hear, was never arrested for this

23  incident.

24          He could not -- he was never even referred to the Cook

25  County State's Attorney because the Chicago police made a

Opening Statement - Plaintiff

1   decision to not arrest him, nor did they even assume their own
2   prosecution of the case on behalf of Fran Brogan.  So it never
3   got to that point.
4           So one of the things I'll ask you to consider,
5   continue to consider throughout this case is what would have
6   happened to just a regular citizen, somebody who was in the
7   same situation, albeit horrible, would that citizen have been
8   given the same treatment as Patrick Kelly received here and as
9   he continued to receive throughout his career as a police
10  officer.
11          So the next year now is 2006.  In April, there's a
12  violent arrest, continues with failing to arrest and then
13  there's Patrick Brogan.  And the last name matches Frances
14  because this is brother and sister.  Patrick Brogan was
15  involved, was inside Patrick Kelly's home.  They got into an
16  argument, a dispute.
17          Patrick Kelly picked up a television remote control,
18  and he threw it at Patrick Brogan's head.  And those are the
19  injuries that Patrick Brogan suffered.  You can see.  And in
20  this particular instance, Patrick Kelly was arrested.  However,
21  it stopped there.
22          Patrick Brogan at some point decided to not continue
23  on with it, and he said, I'm not going to testify in a criminal
24  court, so the investigation stopped.  There was a
25  characteristic between Patrick Brogan and Fran Brogan that I

Opening Statement - Plaintiff

1    want to mention to you.  You'll hear evidence that both times

2    Patrick Kelly was intoxicated when he committed these acts of

3    battery against the Brogans.

4            The next incident is he threatened to plant evidence.

5    The next one is derogatory comments to an arrestee.  Oh, and

6    there's an allegation of false arrest also in 2006.  Before we

7    move on to the next year, I'd like to remind you that the

8    evidence will show that throughout these first two years and

9    these number of CRs, which we're at 11 right now, no

10   discipline, no punishment, no missing a day of pay, remaining a

11   Chicago police officer the entire time.

12           In 2007, there's an incident with Mr. Jesus Rios.

13   This was an on-duty incident with Mr. Rios.  As opposed to the

14   two Brogans, which were off duty and inside his home, this is

15   an on-duty incident where Mr. Rios complained that during an

16   arrest, Patrick Kelly beat, hit him and kicked him about the

17   face and head causing these types of injuries.

18           Next in 2007, he was accused of planting evidence and

19   being verbally abusive, making allegations of false arrest,

20   threatened to mace and verbally abuse someone.

21           Now we're into 2008, a summary punishment action

22   request.  That's the flag, the triangle, just to distinguish

23   between a complaint register and a SPAR.  A SPAR is an

24   allegation that one officer makes upon another.  So very

25   similar to BIA, these are lesser infractions which could

Opening Statement - Plaintiff

1    involve not showing up at roll call, for example.

2           And the punishment for a SPAR can be as low as a

3    reprimand to as high as three-day suspension, but that's the

4    maximum.  So Kelly was involved in a SPAR also, failure to

5    inventory property, violent arrest, another violent arrest and

6    then another SPAR.

7           And then in 2009, there was an IPRA log.  And then in

8    2009, another SPAR, abusive and racist language towards an

9    arrestee, a log.  A SPAR in December of 2009, and then this

10   event, the event that caused Michael LaPorta's injury, that

11   occurred in January of 2010.

12          Those five years, 2005, 6, 7, 8, 9, there are some

13   recurring characteristics in those CRs.  And you'll hear

14   evidence during the trial, not here right now, because these

15   are just my words to you, as his honor said.  But you'll hear

16   evidence that there are recurring characteristics amongst the

17   types of CRs he gets involved in.

18          And what are some of the those characteristics?  Well,

19   this is not a Cubs versus Sox issue.  This is not the

20   Eisenhower Expressway cutting the City of Chicago between North

21   Side and South Side.  But unfortunately, this does have

22   something to do with the South Side of Chicago.

23          Patrick Kelly lives in the South Side of Chicago.  He

24   works in the South Side of Chicago.  He feels empowered and

25   emboldened by living and working and carrying a service weapon

162

Opening Statement - Plaintiff

1   and a badge on the South Side of Chicago.  And he uses that

2   against people, and you'll hear evidence of that.

3          There's violence in him.  We'll show you how many acts

4   of violence are contained within those CRs, and it's more just

5   in the three that we highlighted.  Those are three that we just

6   showed you today right now.

7          The misuse of firearm with Jesus Rios.  With Jesus

8   Rios, the other part of the allegation I didn't tell you about

9   was that he was accused -- Patrick Kelly was accused of putting

10  his gun against Jesus Rios' head and threatening to kill him.

11  He uses abusive and bigoted language throughout his career and

12  also in this case.

13         That's one of the characteristics that you'll hear

14  about.  Intimidation.  And one of his methods of intimidation

15  is by chest bumping people.

16         Personal relationships.  Fran Brogan was a personal

17  relationship.  Patrick Brogan was a personal relationship.

18  Mikey LaPorta was supposed to be his best friend.

19         Alcohol.  There's going to be lots of evidence about

20  alcohol in this case.  Patrick Kelly was intoxicated during

21  Fran Brogan, during Patrick Brogan.  He's an admitted alcoholic

22  for years.  The City of Chicago knew about that.  And he was

23  intoxicated on January 12, 2010, on the night that Michael

24  LaPorta was shot.

25         Indeed, if the right thing had been done years before

Opening Statement - Plaintiff

1   Michael LaPorta was shot in the head, applying the law as
2   equally to all, whether police officer or citizens, Officer
3   Kelly would never have been able to own a gun or bullets.
4   You'll hear today that the City had programs in place to
5   identify officers such as Officer Kelly who showed patterns of
6   misconduct known as repeaters.  But the evidence will show they
7   failed to utilize these programs.
8          The City somehow either ignored or they failed to
9   recognize these patterns in Patrick Kelly which caused this
10  shooting and which we are telling you -- and I'll explain to
11  you further -- it was unconstitutional what they did.
12         You will see that Officer Kelly is one of those bad
13  apples that the Chicago Police Department chose to keep on the
14  force giving him the continuing ability to abuse people more
15  vulnerable than he was without any sort of discipline or
16  punishment.  He acted with impunity.  That's basically the
17  definition of impunity.  You can continue to act in the manner
18  you wish because there's no fear of any consequences at the
19  end.
20         You will hear evidence that multiple City employees in
21  policing had no clue that these early warning systems either
22  existed or were in place.  So the City will tell you, they'll
23  argue, we're not liable, we're not wrong for everything that
24  plaintiff is complaining of because we had the systems in
25  place, and we'll go through them with you.  That's what they're

Opening Statement - Plaintiff

1    going to tell you.

2            But the fact is that these systems paid nothing more

3    than lip service.  Because they were there, they were in

4    writing, but the people who were at the heads of the

5    department, they didn't know about them and never used them.

6            You're going to hear from multiple, multiple City

7    witnesses, city employees.  Tisa Morris.  So before OPS was

8    dissolved, she was the chief of the Office of Professional

9    Standards.  And what did she say about an early warning type

10   system specifically called BIS, behavioral intervention?  She

11   said, I don't know what it is.  This is the chief who said that

12   she doesn't know what a behavior intervention system is.

13           Bruce Dean.  He was a carryover employee, so he worked

14   both with OPS.  Once they shut that down, they carried him over

15   to IPRA.  What does he say?  I did not believe an early warning

16   system existed, and I still don't believe that one exists.

17           Maria Olvera, she was one of the investigators for

18   both OPS and IPRA, another carryover employee.  She said, I

19   never received training on identifying patterns of misconduct.

20           Dan Kobel.  Dan Kobel is another carryover.  And Dan

21   Kobel was the chief investigator -- or he was one of the

22   investigators in this particular shooting incident here

23   involving Michael LaPorta.  And he had been familiar with

24   Patrick Kelly on other cases.  What does he say?  I'm not aware

25   of a mechanism or alert system that specified officers with a

Opening Statement - Plaintiff

1    history of CRs.

2          And then Ray Broderdorf, he's with Internal Affairs,

3    with the Bureau of Internal Affairs.  You'll hear him say that

4    he was not aware of an early warning system in place.

5          Ladies and gentlemen, it was this attitude, the lack

6    of knowledge and awareness that led to the events of

7    January 12, 2010.  So what happened on that day?  Well, on the

8    night of January 11th, our client, Michael LaPorta and his

9    cousin Kyle and Officer Kelly and four of Officer Kelly's

10   off-duty police officer friends all went drinking out at bars

11   on South Western Avenue in Chicago.

12         Later on after the clock ticked past midnight when it

13   became January 12th, at about 4:30 in the morning, something

14   went really wrong, very, very, very wrong.  Michael LaPorta was

15   inside Patrick Kelly's house at about 4:30 in the morning when

16   Patrick Kelly shot Mikey LaPorta.

17         Only two people were inside the house when this

18   happened.  That was Patrick Kelly and Michael LaPorta.  Mikey

19   was taken to the hospital in grave condition.  Officer Patrick

20   Kelly remained on the scene.  Officer Kelly was intoxicated.

21   His blood alcohol level was measured that night.  Actually it

22   was measured later that day.

23         At the moment that Patrick Kelly shot Michael LaPorta,

24   his blood alcohol level was somewhere determined to be between

25   a .17 and a .24, which is two to three times the legal

Opening Statement - Plaintiff

1   intoxication level had he been driving a motor vehicle.

2          And you can see that the City of Chicago indeed did

3   take Patrick Kelly's blood alcohol at 12:19 p.m. on January 12,

4   2010, nearly eight hours after the event occurred.  The

5   extrapolation from the Illinois State Police shows that his

6   blood alcohol level was between .17 and .24.

7          The evidence will show that not only was Patrick Kelly

8   intoxicated, but he left his gun unsecured, unholstered, laying

9   somewhere on a piece of furniture or possibly even in his own

10  waistband inside what's called a pancake holster.

11         Why is a pancake holster relevant?  Because you hear

12  that pancake holsters are used underneath your clothing

13  typically while you're off duty so that you can't see that

14  you're actually having a gun or that you have a gun in your

15  waistband.  It's a low profile, unsecured holster versus the

16  type of holster that officers wear when they're on the street

17  which are secure.

18         You just can't walk up to a holster -- or to a gun and

19  pull it out of a holster.  It's going to get stuck because

20  there are secure mechanisms.  They don't exist on a pancake

21  holster.

22         The evidence will show that having his gun unsecured

23  and being intoxicated were a clear violation of the rules that

24  I previously showed you.  And these are the rules right in

25  front of you right there, ladies and gentlemen.

Opening Statement - Plaintiff

1          So what happened while Patrick Kelly was intoxicated

2    at 4:30 that morning, and after that shooting happened was

3    just -- it was chaos.  Officer Kelly at first very calmly --

4    and you're going to hear his 911 call very shortly.  It was a

5    very calm, cool and collected call that he made to 911 from his

6    cell phone stating that Michael LaPorta had just shot himself

7    with Patrick Kelly's gun, that he had committed suicide.

8          And he told the 911 operator, "My friend is dead."

9    While he was on the phone with the 911 operator, Kelly found

10   out, he somehow discovered that Michael LaPorta was not dead

11   and he was breathing.  And that's when the chaos broke out.

12   Michael LaPorta was alive.

13         He was breathing, and he only discovered this when he

14   was on the call with the operator.  He would later in a sworn

15   statement that he gave to investigators in this case flatly

16   deny that he ever said Michael LaPorta was dead.

17      (Audio recording played in open court.)

18         MR. ROMANUCCI:  Officer Kelly identified himself as a

19   police officer at least two times, possibly three times in that

20   initial phone call to the 911 operator.  Officer Kelly did to

21   the 911 operator what his past shows he does, a past the City

22   knew about.

23         He became verbally and physically abusive towards

24   others as a way to intimidate, to get his way without any fear

25   of repercussion.  So this started as a calm call because

Opening Statement - Plaintiff

1    Patrick Kelly did not immediately contact 911 after the gun

2    went off.  You'll learn that he told investigators that after

3    the gun went off, he says, well, I went into shock, but he

4    doesn't know for how long and he can't tell us for how long.

5           You'll hear later on that he claims also that he had

6    time to assess the situation.  He collected his thoughts.  But

7    Patrick Kelly also lied about calling 911.  He tells some

8    people that he called 911 immediately.  He tells others that he

9    went into shock.

10          He also lied to them about Mikey being dead.  His lies

11   and inconsistent stories started immediately because he had to

12   tell a story, a one-sided one albeit, and that was the story

13   that he had to tell to the detectives and the investigators so

14   he could cover his tracks.  And they believed him.  They

15   believed Patrick Kelly.

16          You'll hear the varying accounts that Patrick Kelly

17   gave regarding what happened.  We're just going to show you a

18   few of them.  I just want to go through a few of these accounts

19   right now.  So he's identified a couple of places where this

20   gun would be.  It was either inside his nightstand or on top of

21   the nightstand located in the bedroom.

22          Because what Patrick Kelly says is that Mikey LaPorta

23   walked into his bedroom, picked up a gun, put it up against the

24   side of his head and pulled the trigger.  No warning.  No

25   statement.  No nothing at all.

Opening Statement - Plaintiff

1    One of the things that Patrick Kelly says is that

2    Michael LaPorta followed or went into the bedroom to pet

3    Patrick Kelly's dog.  The other story is that the dog followed

4    Michael LaPorta into the bedroom.  And you'll hear later on why

5    all of these inconsistencies become very important.

6    Another one of the discrepancies is his history of

7    drinking.  Why would he hide that he was drinking that night?

8    He told the investigators that interviewed him for this

9    particular event that he was not intoxicated, and he went so

10   far as to say that he has never been intoxicated in his life.

11   Indeed, one of his best friends, one of the individual

12   police officers who was out with him that night, Allyson

13   Bogdalek, she testified that Patrick Kelly entered rehab after

14   this shooting.

15   So these lies and inconsistencies run contrary to the

16   City of Chicago rules.  As a sworn police officer, though,

17   Patrick Kelly was held to a higher standard than others.  He

18   has a duty to respect others every single minute of the day

19   because that's what the City requires.  So and those are some

20   of the rules that we want to show you.  Because he is a police

21   officer 24 hours a day.

22   You'll hear witnesses testify that once you have a

23   badge, once you have that badge and you are given the legal

24   authority to carry a service weapon, there's no switch that you

25   can turn on and off and say, I'm gonna take two hours off and

Opening Statement - Plaintiff

1   not be a Chicago police officer, because you're always sworn as

2   a Chicago police officer.

3           And Sergeant Ray Broderdorf, one of the individuals

4   who -- he's the individual who actually gave Patrick Kelly his

5   blood alcohol test eight hours after the event occurred, said

6   in a question, "Why would the application of conducting

7   investigations of administrative and/or criminal matters of

8   members of the Chicago Police Department apply to members who

9   are off duty?"  His response, you will hear, is that, "Members

10  of the department are bound by the rules and regulations on or

11  off duty."

12          So the Chicago Police Department has a very lengthy

13  set of rules and regulations, and those rules apply 24 hours a

14  day.  And that is another reason why sworn officers are never

15  to be intoxicated either on or off duty ever.  But you'll learn

16  as early as 2005, the same year he became an officer, that was

17  the first time that Patrick Kelly admitted that he was an

18  alcoholic, and that happened after the Frances Brogan incident.

19          He has tried to deny that he ever was an alcoholic

20  when he was deposed in this case.  When he gave sworn

21  testimony, he has tried to deny that he was intoxicated on the

22  night in question by saying that he believes he had no more

23  than two beers that entire night from about 11:00 p.m. until

24  the event occurred at about 4:30.

25          He has tried to deny that he has ever been intoxicated

Opening Statement - Plaintiff

1   at all.  When asked, "Have you ever been intoxicated from

2   drinking alcoholic beverages," his answer was no.  And he was

3   asked, "Would it be correct that you are unaware of the

4   personal feeling of what it is like to be intoxicated?"  And he

5   said that is true, that is correct.

6          Now, the four police officers that were out with him

7   that night, the off-duty police officers, they all lied for

8   him, too.  Because they were all questioned in this case by the

9   investigators of IPRA, and they all lied for Patrick Kelly

10  saying he had no more than one to two beers at each bar they

11  went to because they wound up going to two bars.

12         First one was McNally's, and then when that one closed

13  down at about 2:00 o'clock, they went to another bar called

14  Brewbakers.  And then when that closed down, that's eventually

15  when they wound up at Patrick Kelly's house sometime around

16  between a quarter to 4:00 and 4:00 a.m. in the morning.

17         So all of his police officer friends gave consistent

18  testimony that they've never seen him drunk, they'd never seen

19  him drink to excess, and that night he only had one to two

20  beers at each location.

21         The City wants you to believe that on the night in

22  question, that Officer Kelly was so drunk, that he acted this

23  way because he was so upset over his friend.  What we will show

24  you is that it was because he had no fear of punishment.

25         You heard on the 911 call how he swore, yelled and was

Opening Statement - Plaintiff

1   abusive towards the operator.  He hung up on her, but not

2   before screaming -- and excuse me -- "fuck, Mike."  Why would

3   he say that?  He called her back a second time, taking a moment

4   or two more to figure out now what to do now that Michael

5   LaPorta was alive.

6          He swore, yelled and was abusive towards the first

7   responder paramedics that arrived on the scene.  When they came

8   to his home, at first he was trying to prevent them from coming

9   in.  And then once they did come in, he was interfering with

10  the first responders, that he interfered with them when they

11  brought Mikey outside.

12         You'll hear testimony that he also became abusive, and

13  he yelled at the first responding police officers who arrived

14  on scene.  And finally when the supervising sergeant -- she's

15  the white shirt.  When she arrived on scene -- her name is

16  Charmane Kielbasa -- he called her very horrible words, which

17  are difficult to repeat, and you'll hear many more of them

18  during the course of this trial.

19         But he called her a skanky North Side bitch and whore.

20  And then he went after her.  The testimony is that he started

21  flailing his arms at her, and then he tried to chest bump her.

22  And he got so abuse -- he got so abusive with her that the

23  other officers who were on the scene, the finally had to do

24  something.

25         They took him down.  They took him down to the ground,

Opening Statement - Plaintiff

1   and they arrested him.  And they arrested him for assault on

2   his supervising sergeant.  That still didn't stop him.  Once

3   they put him in the back of the car, he started kicking the car

4   trying to blow out the window so he could get out.

5        So he was arrested for assault on his supervising

6   sergeant, never charged with resisting arrest.  So the coverup

7   began that night to shield Patrick Kelly from the truth of that

8   night, that he's the one who shot Michael LaPorta.

9        How did the coverup start?  Well you've already seen

10  some of his inconsistencies, which are lies.  Then he made

11  phone calls and text messages.  Right after 911, he made -- he

12  sent out four text messages.  Actually he sent out many, many

13  text messages and many phone calls.

14       But the first ones were to the officers that he was

15  out with that night.  Then he started making phone calls at a

16  very rapid rate.  And you'll see how quickly those phone calls

17  were being made.  And once those phone calls were being made,

18  those phone -- those people on the other end started making

19  other phone calls and this humongous web of phone calls was

20  created by Patrick Kelly that night.

21       He made a phone call and texted a former girlfriend

22  who lived not too far away from his home.  And her uncle -- her

23  family had a history of police officers.  One was a retired

24  sergeant.  And within minutes of this event happening, she,

25  along with her retired Chicago Police Department uncle, showed

174

Opening Statement - Plaintiff

1   up on the scene, and the uncle was talking to Chicago police

2   officers about what was happening.

3          But the lies these officers made under oath to hide

4   the truth.  The detectives, the detectives who arrived on scene

5   after the first responders did who changed the designation of

6   the scene from an attempt homicide to an attempt suicide

7   without conducting any investigation.

8          Now, I will give you this, that during the course of

9   this trial, if it is your belief that the interview that the

10  detectives made with Patrick Kelly after this event within

11  hours was sufficient investigation, then you can accept that

12  that's what the designation change was made of.  That's it.

13         There was no other evidence that the detectives made

14  to change the designation from an attempt homicide to an

15  attempt suicide other than Patrick Kelly saying Michael LaPorta

16  shot himself.  That's it.

17         Because the first responding lieutenant on the scene,

18  Thomas McNicolas, do you know what he said?  He said, This

19  needs to be investigated as an attempt homicide so that we get

20  as much information as possible from the top down.  But then

21  when the detectives come, the scene gets released to them.

22         And then also to the sergeants in Area South who

23  wanted to make sure that Patrick Kelly was from a family of

24  police officers because he was -- he was in what was called an

25  interview room.  He didn't go in the lockup when they brought

Opening Statement - Plaintiff

 1  him to Area South after he was arrested.  They put him inside

 2  an interview room.

 3          And eventually you'll hear the officer -- the

 4  sergeants came in, and Kelly demanded that they call his

 5  father, who also is an ex-Chicago police officer, and that they

 6  call his attorney.

 7          And before the officer said that, he asked Patrick

 8  Kelly, "Is your father police?"  And Patrick Kelly said yes,

 9  that he's retired.  The phone calls and text messages I

10  mentioned earlier can be seen here.  I didn't know we had the

11  clip.

12      (Video recording played in open court.)

13          MR. ROMANUCCI:  So when you combine so far the events

14  from this night, even just from that early part of it, from

15  4:30 in the morning until just a little bit after 7:00 a.m.,

16  you can see what's happening.  Dozens of calls and texts being

17  made and sent after the incident to numerous witnesses.

18          The calls and texts that were from and to Kelly's

19  phone, hopefully we'll be able to have something larger for you

20  to see later on.  But you can see that in the middle there in

21  the third column from the left are two 911 calls, and you can

22  see that the first one went in at about 4:37 a.m. and lasted

23  for about 113 seconds.

24          Then the second one came in approximately maybe about

25  a minute later and 247 minutes, and then you'll have

Opening Statement - Plaintiff

1   explanation about the phone records where you see the duration

2   after the 911 calls of zero.  Those are text messages being

3   sent.  So the zeros are text messages.  And then you can see

4   that there are calls being made to and from his phone over a

5   certain period of time all the way into the 5:00 o'clock

6   morning hour.

7            And that is the web that began by Patrick Kelly.  He's

8   in the middle.  I don't have a pointer here, but he's in the

9   middle right there.  And those are just the phone calls that

10  were made by Patrick Kelly to and from.

11           And then Melissa Spagnola is the girlfriend, and you

12  can see that one phone call made out at 5:01 a.m. from Patrick

13  Kelly then resulted in all of those calls made by her to him

14  and then out into the web.

15           So this case has many issues for you to decide, but

16  there are five main categories which it rests upon.  And I'm

17  going to give you those -- those broad -- broad scope

18  categories right now so you can keep these in mind as the case

19  progresses.

20           The first one is whether the City had an adequate

21  mechanism to detect police officers who were not fit to be

22  police officers, the one that we're referring to as the early

23  warning system.

24           The second one is whether the City had a code of

25  silence, which was the cause of this needless harm.  The third

Opening Statement - Plaintiff

1   was whether the City should have terminated Patrick Kelly at

2   any time before January 12, 2010, so that he could not have had

3   a gun or bullets to shoot with.

4          Four, whether the City should have been disciplined --

5   or should have disciplined Patrick Kelly for his repeated acts

6   of misconduct before so that he knew that there were

7   consequences for punishment for his misconduct.  And five,

8   whether the City should have investigated Patrick Kelly for

9   those repeated acts of misconduct.

10         Ladies and gentlemen, we are very confident that we

11  have overwhelming evidence that Patrick Kelly shot Michael

12  LaPorta.  But we are going to show you that it was the City's

13  actions based upon these issues here which caused this needless

14  harm.

15         This is all the moving force is because you're going

16  to hear that term used throughout this case.  You're going to

17  hear the City say to you, we were not the moving force in the

18  cause of these injuries, but indeed, the opposite is true.  We

19  will show you that the moving force is nothing more than a

20  direct link.  It is the cause for something to occur.

21         The City's policies of not disciplining and not having

22  an early warning system ultimately were the moving force behind

23  this tragedy and the link which led to Michael LaPorta being

24  shot.  So simply, had Patrick Kelly been disciplined or caught

25  as one of these repeaters, had the City been transparent in its

178

Opening Statement - Plaintiff

1   investigations of Patrick Kelly, not favored police officers

2   treated all equally, as I had said before, I would not be

3   standing here today in the well of this courtroom speaking to

4   you about Mikey LaPorta.

5           Patrick Kelly would have been stripped of his police

6   powers and knocked off the force years ago.  An average citizen

7   not protected by the code of silence would not have been

8   afforded these same protections Kelly has and had, and that

9   will be evident throughout this case.

10          What will we have to show you in order to prove our

11  issues?  That's very important for you.  Because at the end of

12  this case, his Honor will give you instructions, very detailed

13  instructions.  But I want to explain to you a little bit about

14  what those unconstitutional policies were because you're going

15  to need to keep those in mind as the case develops.

16          So we have to show you by a preponderance of the

17  evidence -- and I'll explain that to you, too.  There's a lot

18  that you're hearing today already.  But we have to show to you

19  that the City of Chicago had an unconstitutional policy,

20  practice or custom.

21          Another word is did they have a culture.  Was there

22  something that they did repeatedly which created this custom.

23  And what we're saying, if you see the screen in front of you,

24  that that unconstitutional policy, practice or custom caused

25  Michael LaPorta's injury.

Opening Statement - Plaintiff

1    Now, you'll see those five issues that we just showed

2    you in the prior screen, they're going to come up right here

3    one at a time.  Those are the five issues right there, the

4    early warning system, the code of silence, the failure to

5    terminate, the failure to discipline, failure to investigate.

6    And what you're going to hear is that in order for

7    Michael LaPorta to prevail in this case, we need not show you

8    that all of those happened.  We only need to show you that one

9    of them happened.  And so if one or all of these was the moving

10   force, if you find that one or all of these was connected to

11   Michael LaPorta's injury after his Honor instructs you, you

12   will be able to find and prevail in favor of Michael LaPorta.

13   By the end of this case, you will have learned that

14   the City of Chicago and its police department keeps a set of

15   rules, both written and unwritten.  For officers who have been

16   alleged to commit crimes and another for those who are not

17   police, and that's what's known as the code of silence or the

18   Thin Blue Line.

19   That is the cause and the moving force, the driving

20   force, we believe, which is the link of unnecessary harms when

21   a blind eye is turned from illegal conduct.  It protects and

22   shields police officers from accountability and allows them to

23   act with impunity.  Again, no fear and no consequences.

24   We have taken the opportunity during the course of

25   this case to hire experts where we have asked them to look at

Opening Statement - Plaintiff

1   either evidence or look at depositions, look at photographs and

2   look at data, data that comes from the City of Chicago.  And

3   one of those experts you'll hear from is Ed Rothman.  He's a

4   statistician.

5           He's going to testify that a small percentage of

6   officers get an extraordinary number of complaints filed

7   against them.  Officer Kelly is one of those extraordinary

8   officers.  You'll hear that during the time period that he was

9   a police officer before this event occurred, in those five

10  years, he was in the top five percent of offenders, meaning

11  that 95 percent of other officers behaved better than him.

12          And that's going back to what I said earlier.  We have

13  respect for the good officers.  But the ones that are bad, the

14  ones that should be caught, that's what the City didn't do

15  here.  It failed to do it.

16          You won't just have one expert to believe.  While it's

17  true we did retain this expert, you'll hear more about numbers.

18  You'll hear from a City Council member, Alderman Joseph Moore.

19  He will testify that the code of silence is a reference to the

20  belief that officers have an understanding amongst each other

21  that they will not report misconduct or rat on each other.

22  That's his definition of the code of silence.

23          We also have other methods to bring you evidence that

24  a code of silence existed in the City of Chicago.  Remember

25  earlier I said it just didn't exist for a year or two, but it's

Opening Statement - Plaintiff

1    been a decades-long culture?  We have some evidence to bring to

2    you.  And one of those is through what's called a Police

3    Accountability Task Force Report.  This is a commission that

4    our mayor, Mayor Rahm Emanuel, actually asked for.

5            He asked for this after certain events of horrible

6    police misconduct occurred in this City in 2015.  He wanted a

7    top-down overview of the Chicago Police Department.  And what

8    he did, he commissioned a task force, and this task force

9    issued its report in April of 2016.

10           And the relevant finding to this case that the Police

11   Accountability Task Force found that the City of Chicago

12   maintains a code of silence not for years, but as a

13   decades-long culture.

14           In January of 2017, just this year, the Department of

15   Justice from Washington, DC, came into this City, and they also

16   investigated the Chicago Police Department.  And they conducted

17   a wide-ranging investigation of the police department.

18           But what was relevant about their findings to this

19   case, they found the same thing that the PATF found, that the

20   City of Chicago maintains a code of silence for years and years

21   and years, for decades.

22           And finally we have Mayor Rahm Emanuel himself.  In

23   December of 2015, the day that he announced the Police

24   Accountability Task Force, he also had some words with respect

25   to the code of silence.  And Mayor Rahm Emanuel spoke these

182

Opening Statement - Plaintiff

1    words to the City Council in December of 2015.  "That the

2    problem is sometimes referred to as the Thin Blue Line.  The

3    problem is other times referred to as the code of silence.  It

4    is this tendency to ignore.  It is the tendency to deny.  It is

5    the tendency in some cases to cover up the bad actions of a

6    colleague or colleagues.  Permitting or protecting even the

7    smallest acts of abuse by a tiny fraction of our officers leads

8    to a culture where extreme acts of abuse are more likely."

9            Ladies and gentlemen, that's exactly what this case is

10   about.  A small group of police officers where one event after

11   another after another increases in intensity.  And that's why

12   the City is responsible for police officers' private life when

13   he shoots somebody inside the privacy of his own home on

14   January 12th at 4:30 in the morning.

15           They permitted and protected Officer Kelly's repeated

16   acts of misconduct, and it led to an extreme act of abuse.  The

17   City allowed a known violent police officer to retain his

18   service weapon to shoot a civilian when they knew he was

19   dangerous.

20           So what could have prevented this?  An early warning

21   system, one that actually worked, one that actually was in

22   effect, not just written on paper.  One that just didn't pay

23   that lip service.  Because if it's on paper and the rules

24   aren't applied, well, then it doesn't matter.

25           As a citizen, if you see someone repeatedly running a

Opening Statement - Plaintiff

1   red light and never getting ticketed, that red light's going to

2   continue to be run over and over and over again.  That's what

3   happened here.  Patrick Kelly repeated acts of misconduct over

4   and over again.

5          An early warning system which identifies unfit police

6   officers is a mandatory and critical system that keeps us all

7   safe because it is the City that gives the power to these

8   officers, and it's also their responsibility to oversee them.

9   A proper early warning system identifies officers like Kelly.

10         It identifies instances of code of silence, and it

11  identifies the unconstitutional behaviors that we're discussing

12  here today.  This early warning systems make sure that not only

13  does the City hire officers who are qualified, but then it

14  takes decisive action on those who are dangerous.

15         In order to understand the code of silence and these

16  early warning systems a bit better, we're also going to call an

17  individual to the witness stand by the name of Lou Reiter.  Lou

18  Reiter is an expert.  We asked him to review records in this

19  case.

20         And he has served on the Los Angeles Police Department

21  for over 20 years in every position from patrol all the way up

22  to deputy chief of Los Angeles.  There may not be anyone more

23  qualified to discuss the policies and practices of the Chicago

24  Police Department than Mr. Reiter in this country.

25         He has testified in hundreds of cases regarding

Opening Statement - Plaintiff

1  hundreds of police departments, reviewed thousands CRs even

2  from just this City alone and has testified and seen police

3  departments in almost every country -- every state in this

4  country.  For the past 30 years, his job has been to examine

5  police departments, period.

6          So Mr. Reiter's going to explain the devastating

7  effect the code of silence can have on a police department.  So

8  he'll explain to you that it creates a mindset of impunity in

9  its officers.  So if there's a code of silence in place where

10 officers know that they'll be protected either by their own or

11 their superiors or by the City, which is what we're saying, it

12 creates officer impunity.

13         He'll also tell you that if there's a code of silence,

14 it leads to constitutional violations such as the one that I

15 told you earlier.  And so what happens?  Unless you have an

16 early warning system or you discipline or you investigate, the

17 code of silence will continue.

18         And the only way to stop the code of silence is to

19 stop the impunity and the constitutional violations.  That's

20 the only way to do it.  That's what he's going to explain to

21 you.

22         These systems, whether they are called early warning

23 systems or early intervention systems they're all -- they're

24 implemented all throughout the country.  It is standard

25 procedure for police departments to have some way to track

Opening Statement - Plaintiff

1   their officers that had allegations of misconduct.  So the City

2   will tell you about the systems that they believe they had in

3   place that worked, that we say that they did not work, if they

4   were simply items on paper.

5          But some of them are BIS, which you've heard, which is

6   Behavioral Intervention System.  Another one is PC, which is

7   Personnel Concerns.  Another one is NFID, which is -- I'm

8   sorry, NDFP, which is non-disciplinary findings, and then FFD,

9   which is fitness for duty.

10          These are all plans that the City says it had in

11   place.  And you'll hear that from Mr. Reiter, and he'll explain

12   that these programs, none of them were sufficient.  By the end

13   of this trial, it will be obvious because the officer in this

14   case, Officer Kelly, was allowed to continue to be an officer

15   even after all the allegations he had against him.

16          In fact, the evidence will show that by 2007, the

17   systems the City had in place, the ones that I just told you,

18   well, they were barely being used because nobody else was being

19   trained on them.  And that's what some of those earlier people

20   said, Well, I wasn't even trained on them.

21          You saw earlier that in five short years as an

22   officer, at least 18 citizens complained against him ranging

23   from people who said he committed domestic battery, pointed

24   guns at people's head threatening to kill them, using offensive

25   and vulgar language towards people or was otherwise violent

Opening Statement - Plaintiff

1  while being an admitted alcoholic, all during the time he owned

2  a service weapon that the City said he could legally carry.

3       And those highlighted boxes are the allegations that

4  we believe showed where he used force, whether he was on duty

5  or off duty.  And it doesn't stop there because right there it

6  stops at No. 18.  I already told you about No. 19, which is

7  this one.

8       Well, it continued on because Patrick Kelly remains a

9  Chicago police officer, and he has had another nine CRs against

10 him since that time.  He's still a Chicago police officer.

11      On the ones that you see in front of you, not once was

12 he disciplined, nor was there any evidence that he was ever

13 enrolled in any of the systems and programs the City had in

14 place for even officers who feel that they needed it because of

15 the stress of being a police officer.

16      Folks, ladies and gentlemen, there's no point in

17 having these programs in place unless they're used as they were

18 designed to.  You will hear overwhelming evidence that this

19 officer did not have the demeanor, disposition or temperament

20 to be an officer sworn to protect and serve.

21      What all of this adds up to, as you may be wondering,

22 is what happened on January 12, 2010.  There will be a lot of

23 focus on that date throughout this trial, and rightfully so.

24 Because there should be.  That's why Mikey is here today.

25      Why does Patrick Kelly's past even matter?  It matters

Opening Statement - Plaintiff

1   because his past is the evidence which we will show which the

2   City is at fault for.  The City had a chance to separate itself

3   from Patrick Kelly, not only after he beat his girlfriend, but

4   after he did the same to her brother, but also after Jesus Rios

5   and after any one of those other violent incidents that he had

6   all before this one here.

7          Had he been convicted, he never would have been able

8   to possess a handgun or the bullets to put in that gun ever.

9   If you're a police officer and your gun is taken away, it's a

10  death sentence.  That's what the rules say.  If you cannot

11  carry a gun, you cannot be a police officer.  You become a

12  civilian.  I mean, he couldn't even be an armed security guard.

13         You'll hear today that federal law mandates that any

14  individual convicted of domestic violence, whether a

15  misdemeanor or a felony, is not allowed to own a gun, and there

16  are no exceptions for police officer.  And that federal law is

17  called the Lautenberg Act.

18         Had the complaint of Officer Kelly's domestic assault

19  against his girlfriend been sustained and had it been referred

20  to the Cook County State's Attorney, been arrested and charged,

21  this event might never have happened.  But the Chicago Police

22  Department instead chose to turn a blind eye because the

23  consequences of him being arrested and then referred for

24  prosecution would have been devastating to him.

25         And he remains on the force.  The rules say that an

Opening Statement - Plaintiff

1   officer must be above reproach.  Even after Patrick Brogan,

2   after he got in that fight with Patrick Brogan, the City will

3   say, Well, we're not responsible for Patrick Kelly's behavior

4   with Patrick Brogan because Patrick Brogan is the one who

5   instigated it.

6           But the rules say that an officer always has to be

7   above reproach.  They have to render the highest order of

8   police service at all times.  They had another chance when he

9   was sued for placing his service weapon up against Jesus Rios'

10  head, threatening to kill him.

11          They had another chance after he called a suspect, an

12  African-American person a derogatory name that starts with the

13  "N" word.  And after the countless violent arrest, the threats

14  to plant evidence and the list goes on and on, they never took

15  the chance that they had to separate themselves from this

16  officer.

17          Finally, they had another chance to separate

18  themselves from Patrick Kelly after he shot Michael LaPorta,

19  after he admitted to his doctors that he was an alcoholic.  And

20  you'll hear evidence and you'll learn that he's still employed

21  by the Chicago Police Department.  And as I told you, now he's

22  accumulated an additional eight or nine complaint registers

23  even since this time.

24          We will prove this case to you so that you will be

25  able to reach a verdict of liability against the City at the

Opening Statement - Plaintiff

1   end of all the evidence by a preponderance of the evidence.

2   And again, his Honor will instruct you as to what that burden

3   is.  But keep in mind that when we say to you that we must

4   prove, that we must prove unconstitutional policies were the

5   ruling force in this particular incident for these issues, when

6   I say proof, his Honor will instruct you that proof is almost

7   an analogy of a football game.

8          If you carry the ball over the 50-yard line, 50 yards

9   and one inch, that's the proof.  If it goes to the 60-yard

10  line, 70, 80, 90, that still -- still we sustain our burden of

11  proof, which is a preponderance of the evidence.  It's not the

12  one that we hear on TV all the time, beyond a reasonable doubt.

13         So preponderance of the evidence standard, some people

14  also describe it with the scales of justice.  So if Lady

15  Justice were holding the scales and they were equal, which is

16  how you should start this case, is on equal footing.  And as

17  you begin to judge the evidence, those scales will begin to

18  tip.

19         And if they tip and they stay there, that's who you

20  will find for at the end of this case, whether it will be for

21  Michael LaPorta or whether it could be for the City of Chicago.

22  And if the scale is tipped that much by the time that we're

23  done presenting the evidence, both sides, that's who you will

24  find for.  That's our burden of proof.  Not the beyond a

25  reasonable doubt, which is the much heavier and stronger

Opening Statement - Plaintiff

verdict.

You will hear from the City about the rules that it had in place and that many of the rules were written for the officers, but they were protected by the Fraternal Order of Police.  That's the union.  That's the union that the City had, and they made concessions to that union in exchange for salary reductions.

Joseph Moore, the City alderman I told you about, he'll come in and tell you that many, many times we had to make concessions to the union in exchange for lower salary.  So they gave the police officers greater protections such as the ones that you'll hear in this case so that we could pay them less money.  That will be his testimony.

So the City will tell you that we have rules.  We discipline officers.  We don't condone a code of silence.  And they're going to point to their rules.  Again, the rules that police officers have is Rule 6, they can't disobey any order; Rule 14 which is known as "the lie you die" rule.  Because if you make a false report of any kind, you should be separated.  And then Rule 22, failure to report to the department any violation of rules.

I would expect -- I would expect the City to point to those rules and tell you that they have them, and they should tell you those rules.  But they don't follow them.  They're not enforced.  So there's no choice but to deny because they have

Opening Statement - Plaintiff

1   to deny because there is no writing, there is no rule that says

2   don't partake in the code of silence.  Because if it did, then

3   it wouldn't be the code of silence.

4          Indeed, it is an unwritten rule that has been in

5   practice for decades.  It's never discussed amongst the police

6   and denied amongst all of them.  You'll hear testimony from

7   people that will be asked the question, "What is the code of

8   silence?"  And you may hear a variety of answers.

9          Some of them will say these are police officers.  Some

10  will say, "Well, I've never heard of it," or they'll say, "I'm

11  not familiar with it," or they'll say, "Wasn't that a Chuck

12  Norris movie?"  Those are some of the varying responses that

13  you'll get to the code of silence.

14         Some of them will tell you that they've heard about

15  it, and some will give you the answers that I just gave you.

16  It is an unwritten rule where officers do not betray their

17  brothers in blue.  That in and of itself is a moving force and

18  the customs and habits of Chicago police officers and how

19  they -- how they interact with members of the public who are

20  not their own.

21         The evidence today will also show that the

22  investigators at the scene missed a lot of evidence, crucial

23  evidence, evidence that could have told us what really happened

24  that night.  But they either chose to ignore or just not

25  investigate it.

Opening Statement - Plaintiff

1      So there's a lot of evidence.  And again, this is just
2  some of the evidence that we believe the evidence will show
3  that was missed.  First of all, there was a fleece jacket that
4  Officer Kelly was wearing when his mugshot was taken at about
5  12:00 p.m. or 1:00 p.m.
6      That fleece was never tested.  It was never
7  inventoried.  It was never checked for blood or gunshot
8  residue.  The City will claim that it was what's called bum's
9  clothing, that it was given to Patrick Kelly as a courtesy
10  because they took his other clothes.
11      Officer Kelly's socks.  Now, Mikey LaPorta's clothes
12  were inventoried that night.  The Chicago police went to the
13  hospital and they took all his clothes, and they inventoried
14  the socks.  But Officer Kelly was found not to be wearing socks
15  in January, in the month of January.
16      I can't tell you and there will be no answer whether
17  or not he was wearing socks, but nobody asked the question why
18  not.  Did he change them or did he not have any on?  His
19  laundry -- because Mikey and Pat Kelly were the only ones in
20  the house that night, there's no evidence in the record and the
21  detective file that anybody went and searched the laundry
22  machine or the dryer for either wet clothes or washed clothes.
23      Blood on clothing.  The 911 call, the operator told
24  him put pressure on him.  And Kelly said, "I am."  Well, there
25  was no blood on Patrick Kelly's clothing, none whatsoever,

Opening Statement - Plaintiff

1    except for one small field of blood that our experts found, not

2    theirs.  Our experts found a small, very faint field of blood

3    right around his left knee.  That's it.  There was no other

4    blood.

5                And this is despite the fact that you're going to hear

6    evidence of how Patrick Kelly says Mikey shot himself, that he

7    was within feet of him when the gun discharged, and there's yet

8    no blood.  And he was applying pressure on him, and there's no

9    blood on him anywhere.

10                Officer Kelly's phone and text.  Those kind of go

11   together.  Because when the detectives were on scene --

12   actually the forensic investigators were there along with the

13   detectives.  And one of the forensic investigators, this FI

14   Dunigan, he collected the two phones.  There were two phones

15   that he picked up.  One was Kelly's and one was LaPorta's, and

16   he gave them to Detective Weber.

17                And what happened to those phones?  LaPorta's was

18   placed in the inventory and was scrupulously photographed.  All

19   of the text messages were photographed.  His phone records were

20   subpoenaed.

21                Kelly's phone went back to Kelly.  Those text messages

22   that I told you about, the City can't do it, and I won't be

23   able to ever, ever explain to you what was in those text

24   messages.  They're gone.

25                Fingerprints on the gun.  If this were the real gun,

Opening Statement - Plaintiff

1   Patrick Kelly states, his testimony is that Mikey LaPorta held

2   the gun in his left hand -- and please excuse -- held the gun

3   in his left hand, raised it, put it up to approximately here,

4   held it at this kind of angle and pulled the trigger twice.

5   Click, nothing happened.  Click, the second time the gun went

6   boom.

7            Holding the gun like this, the gun was super-glued by

8   the Illinois State Police, which is one of the most sensitive

9   forms that you can actually put on anything to determine

10  whether or not it was -- left any latent fingerprints.  None

11  were able to be identified.

12           Next.  Oh, no tissue, no blood on the gun.  So the way

13  Kelly says it happened, it happened like this.  It happened

14  like this.  There wasn't any blood found on the gun.  There was

15  no tissue.  There was no brain matter found on the gun.  There

16  was nothing at all.

17           But you're going to hear something else about this gun

18  which is very disturbing.  The evidence will show that in 2013,

19  the gun was released back to Patrick Kelly before this case was

20  over, before we could get our hands on it to test it like we

21  did with the clothes.  We were never given the opportunity to

22  determine if there was blood or tissue on the gun through our

23  own testing.

24           Gunshot residue.  You would think that if the gun was

25  being held in the left hand, the gun was being held in the left

195

Opening Statement - Plaintiff

1    hand and the trigger was pulled with the left hand, that there

2    will be gunshot residue either on the left hand, on the left

3    side of the neck, or especially the clothing that Michael

4    LaPorta was wearing that night.  He was wearing two T-shirts.

5            But instead, there was no gunshot residue found on his

6    left hand, on his left sleeve.  No gunshot residue on the right

7    hand.  But there was gunshot residue found on Mikey LaPorta's

8    right sleeve.  There was one field of gunshot residue found on

9    the right sleeve.

10           By the end of this case, eventually we're going to be

11   able to give you a reasonable explanation as to why there was

12   gunshot residue on the right sleeve.  Patrick Kelly, no gunshot

13   residue anywhere.

14           There were no pictures.  The forensic investigators

15   who were in there took no pictures of the entire house.  There

16   was no pictures of the bathrooms.  There's no indication

17   whether or not there was wetness in any of the sinks or tubs or

18   anyone made an attempt to maybe remove particles of gunshot

19   residue or wash blood off of them.  Nobody made any indication

20   as such.

21           And then the video.  The Chicago Police Department

22   indicates that they put into evidence -- you can see -- an

23   overall and closeup video of scene.  OA is overall.  CU is

24   closeup video of scene.  That's under evidence along with the

25   photos.  There's no video that we can show you.  It's gone.

196

Opening Statement - Plaintiff

1    It's either gone or doesn't exist or never taken, despite the

2    fact that the police records show that there was a video.

3            So now imagine if this was an ordinary citizen, ladies

4    and gentlemen.  Today the evidence will show that the Chicago

5    Police Department was unable to properly investigate one of its

6    own.  And one of the detectives in this case, Henry Barsch,

7    will tell you that when they interviewed Patrick Kelly within

8    an hour of this happening, they believed his story.  They said,

9    Oh, yeah, he was very truthful, and that was it.  And that's

10   how this case was classified, as an attempt suicide.

11           Each and every piece of evidence listed on that screen

12   could have brought us closer to understanding what happened.

13   Instead, we're left with this.  Nothing.  Because of the City's

14   failure, because of the City's code of silence, we're left with

15   more questions than answers.

16           But the evidence we do have will show exactly why the

17   City is responsible for the off-duty, alcohol-fueled actions of

18   Kelly that left our client permanently injured.  By allowing

19   the code to exist, it gave him the comfort and sense that he

20   could violate people's rights, the sense, the comfort, the

21   feeling that he could lie because he would not be disciplined,

22   and that's the impunity.  That was the culture which was

23   encouraged and was the dirty little secret which is always

24   denied.

25           So it was protect and serve.  You see that emblem and

Opening Statement - Plaintiff

1   that logo on Chicago Police Department vehicles.  Protect and

2   serve.  But Patrick Kelly had no fear because he had the band

3   of brothers watching his back.  The City created the conditions

4   for this to happen, and they gave him the bravado to act this

5   way because he felt -- he felt no respect for authority.

6           And there are multiple examples throughout this case

7   of his lack of respect and authority towards citizens and those

8   who are closest to him throughout this case.  After all, don't

9   forget he had a badge, a gun and a license to kill.

10          You will hear throughout this case that this officer

11  got away with illegal behavior, immoral behavior, reckless

12  behavior, swearing, intoxication while off duty, and he lied

13  and never once was disciplined.

14          Even if they were messing around that night, the City

15  is liable because Patrick Kelly knew that he could mess around

16  and get away with it.

17          MS. ROSEN:  Objection, your Honor.

18          THE COURT:  That's arguments.  Proceed.  That's

19  argument.

20          MR. ROMANUCCI:  Thank you, your Honor.

21          The City will say that we follow the law, that

22  officers have unions that protect them and that we can't get in

23  the way.  That's going to be their argument.

24          Well, that argument makes sense if you don't trade

25  concessions for salary.  They did that knowing, and that's

198

Opening Statement - Plaintiff

1    exactly the protection that officers like Kelly received

2    because of the one-sided collective bargaining agreements that

3    the City negotiated with the union so they could pay officers

4    less money.

5            I'm want to briefly discuss some of the physical

6    evidence -- some of the other physical evidence we have for you

7    before I talk a little bit more about Mikey.  Now, we went out

8    and obtained a lot of the physical evidence because the City of

9    Chicago didn't.

10           So we hired the experts such as biomechanical

11   engineers, weapons experts, DNA experts, blood spatter experts.

12   We went and asked the people that we thought that could give us

13   the best types of answers.  So this is from -- very briefly,

14   you'll become familiar with it, but this is a sketch of Patrick

15   Kelly's house.  And this is what the scene looks like after the

16   shooting occurred.

17           And those A, B, Cs that you see on there will be

18   described to you by Dr. Ziejewski, who's the biomechanical

19   engineer.  And he will explain to you the viscosity of fluids.

20   In other words, which way -- how do fluids behave and how do

21   they work when they come out of someone, in this instance, what

22   happens when blood comes out of someone's head.

23           And he'll give you the explanation of what all these

24   patterns are and how they fit into this case.  And before you

25   move on to the next slide, you can see the gun, which is at the

Opening Statement - Plaintiff

1    bottom of the picture.  And then the holster, which is at the

2    top.  That holster also was never checked for fingerprints and

3    was never inventoried.  You would think that if the gun was

4    inside the holster, as Patrick Kelly said, that that holster

5    would have been also analyzed.

6            And these are more pictures of the scene.  The shoe

7    that was there -- it kind of went by quickly.  The shoe that

8    was there was never analyzed as to whether or not it had any

9    blood tracks on it or who it belonged to.

10           And then the next slide, you can see -- you'll see

11   evidence.  This one particular officer's holding a tape measure

12   because where it shows 72 in the bottom right, that's a piece

13   of Michael LaPorta's scalp that was found on the opposite

14   window sill.  The City of Chicago never undertook any sort of

15   trajectory analysis or even asked why or how did that end up

16   there.

17           Dr. David Balash and Dr. Ziejewski will talk about

18   some of the evidence, and some of the evidence are the injuries

19   that Michael sustained.  And here is the angle.  Now, I'm not

20   the best person to describe this, but you might be asking

21   yourself, Well, why is the bullet wound on the right side?

22   That's because CT scans, they do their scans in reverse.

23           So you'll -- it will be explained to you that this is

24   actually on the left side of the head.  And we've been able to

25   measure that the entry of the angle into Michael LaPorta's head

Opening Statement - Plaintiff

1    was approximately 25-degrees.  Well, why is that important?

2    Because we should know.  It gets us closer to answering the

3    question whether the gun could have been held at this odd

4    angle.

5              Why is that further important?  Mikey LaPorta, he's

6    right-handed.  He eats left-handed, but he's an avid -- just

7    avid, avid hunter, gun handler.  He owns multiple of them, and

8    he only, only uses his right hand to handle weapons.

9              You'll also hear from Jason Beckert, who will walk you

10   through some of the blood evidence that was found in the

11   analysis done on the clothing recovered.  So this is a picture

12   that we were able to obtain that we got.  This is not from

13   Officer Dunigan or Weber or Barsch.

14             This is our experts who reviewed the clothing that

15   Patrick Kelly was wearing that night.  And the next slide will

16   show you the one field, the tiny, almost invisible field of

17   blood that was found on there on his right knee.  There was

18   also one found on his buttocks.  That was determined not to be

19   Michael LaPorta's blood.

20             The one on the front was because we actually had

21   Michael LaPorta swabbed for DNA so that we could try and match

22   anything we could to the scene so we could get closer to

23   solving this puzzle.  And we found out that the blood on the

24   back does not match, but the one on the front, that one stain

25   on his knee does.

Opening Statement - Plaintiff

1      You may ask yourselves why is Michael LaPorta's family
2  suing?  He and his family are suing, they're here in this
3  courtroom because the City of Chicago Police Department, the
4  lawyers, they all deny that they did anything wrong.  Not just
5  on January 12th, 2010, but at any time before that.
6      They deny that they violated Mikey's constitutional
7  rights.  They deny that his harms could have been prevented,
8  and they continue to deny that they caused any harms.  But they
9  also deny that they owe any, any financial responsibility to
10  Michael LaPorta for the harms that were caused that night.
11      But they don't challenge those numbers at all.  They
12  may say that the numbers are too high, but they don't bring
13  forth any experts to challenge any of his harms, any of his
14  losses, anything.  You are here today because you will be the
15  deciders whether justice will be served.
16      The defense will tell you that no matter what could
17  have happened on January 12th, 2010, nothing could have changed
18  Michael LaPorta being shot, that it would have happened anyways
19  and that they cannot control the independent actions of their
20  off-duty officers.
21      You will see evidence of the code of conduct which all
22  officers must abide by, and you will clearly see that Patrick
23  Kelly's off-duty behavior was the responsibility of the City of
24  Chicago and its police department.  Had they acted reasonably,
25  it would not have left Mikey LaPorta paralyzed.

Opening Statement - Plaintiff

1        Mikey LaPorta now will never have the chances that he

2  once thought he was going to have, chances that he probably now

3  will never, ever know.  Maybe he'll never be married, his own

4  children, baptisms, graduations and Disney trips.

5        Mikey will never have those opportunities on his own.

6  But what you will hear about Mikey from numerous witnesses is

7  that he is a warrior.  He is a fighter.  He is loyal and one of

8  the hardest workers that people have ever seen.

9        Before this incident, he worked for his dad.  He

10  worked for a company called Bell Paving, which is his dad's

11  asphalt company.  And you'll hear from one of his best friends

12  tell you that Mikey was the hardest worker he's ever seen, that

13  he loved work.

14        He and his father, would they butt heads because they

15  worked together?  They sure would.  But every day, he shows up

16  at work and he did his job.  And he loved his work and he loves

17  his family.  He's loyal.  Despite the fact that his doctors

18  have told him that he will never walk again, Mikey is

19  determined to walk.

20        He tells everyone and anyone he can that he will walk

21  again.  And you will hear that he loved life, the outdoors,

22  hiking, fishing, hunting.  I told you about hunting.  He was an

23  avid hunter.  He was an expert with guns and rifles.  He owned

24  multiple guns and rifles in his home.  He was a safe handler of

25  guns and never, ever cavalier about anything to do with them.

203

Opening Statement - Plaintiff

1    Patrick Kelly that night has him holding a gun with

2    his left hand, with his left hand.  That's an inconsistency.

3    You will hear repeatedly today how he only shot right-handed.

4    Mikey loves his family just as much then as he does

5    now.  And that first picture that you saw before I began to

6    talk a little bit more about Mikey, that one right there, that

7    was the last picture of Mikey before he was shot.

8    That was taken just hours before because that picture

9    is the same picture that can be taken almost on every -- on any

10   year on January 11th because it's Big Mike's birthday.  And

11   that's Mike LaPorta's dad all the way on the left on the front

12   with the cap.  And they eat at the same restaurant every year

13   for his birthday at Palermo's, and that was the four of them

14   together.

15   He tells -- Mikey tells his mother every day, he tells

16   his dad every day how much he loves them.  He kissed his mother

17   good-bye every single time.  He never missed the chance to do

18   that.  So determined is this man to lead his life that another

19   one of his goals you'll hear is to have his own apartment.

20   But again, you will hear from experts that Mikey will

21   likely never, ever live alone.  In fact, he will never live

22   alone.  His condition is so serious that he needs care 24 hours

23   a day, seven days a week throughout the entire year.

24   If somebody wanted to leave him alone just to go fill

25   up their car with a tank of gas, they can't do that.  That

204

Opening Statement - Plaintiff

1   can't happen because if he needs something, he needs it

2   immediately.  It can't happen in a matter of minutes.

3           When he needs something in the middle of the night,

4   because his family sleeps upstairs and they converted the

5   downstairs into his hospital room and his bedroom, he has to

6   call upstairs.  When it comes to eating, about the best Mikey

7   can do is feed himself, pretty much like a child in a high

8   chair.  If you put food in front of him, he can eat it.

9           So determined is this man that when he was in the

10  emergency room, Dr. Schaeffer, who was his surgeon, told his

11  entire family that Mikey's condition was so grave that they

12  weren't even going to operate on him because he wasn't going to

13  live.  Well, he lived, and there he is.

14          Mikey now has few choices left in life, an almost

15  complete inability to control it, but forever dependence on

16  Patti, Mike Senior, and his younger brother Chris.  What

17  happens when they are gone is going to be, as you will hear, an

18  unimaginable thought for them, possibly a nursing home.

19          Dr. Senno, one of the experts you will hear from in

20  this case, will tell you the care Mikey gets at home is

21  exceptional.  His family takes such outstanding care of him

22  that his life will be prolonged as a result.

23          There will be a reduction in bed sores and infections

24  because of their care, for example.  However, that doesn't mean

25  he needs no medical care.  In fact, he needs constant medical

Opening Statement - Plaintiff

1    care.  And like I told you, the bottom part of his house,

2    that's kind of his now.  That's where his hospital room is, and

3    it's all filled with supplies and things that he needs on a

4    daily basis.

5         All of this is very expensive.  In order to keep him

6    healthy and alive, it costs money.  And it's very expensive,

7    ladies and gentlemen.  One of the medical consultants we hired

8    to evaluate his lifetime medical care, Wendie Howland, will

9    tell you that it will cost up to $20 million for Mikey's future

10   medical care.  And that's what it will take to keep him safe.

11        You will also hear that Mikey suffered a work injury

12   in 2007.  That required surgery to his neck.  And he took some

13   pain medication after that particular injury, but that was in

14   2007.  The City wants you to believe that Mikey's pain was the

15   cause for himself -- for him shooting himself on January 12th,

16   2010.

17        And I will claim to you that that is just a fantasy

18   defense, one that will not hold true.  Because Mikey was

19   working in between that time, working every day as much as he

20   can.

21        They also claim that he broke up with his girlfriend

22   on the night of January 12th, 2010.  His girlfriend was Julie.

23   And they'll tell you that because of that, Mikey was upset,

24   that that was another cause for him holding a gun up to his

25   head and pulling the trigger.  And again, I submit to you that

Opening Statement - Plaintiff

you will not hear evidence sufficient to make that conclusion at all.

You would think that if Mikey had pain for so long and so bad and if he was this upset about a girlfriend breakup or even pain, whichever one happened, that his mom would have known, his dad would have known, his brother. He would have left a note. He would have left a signal or a sign, and there was none of that. He didn't say good-bye to anybody that night forever.

So we will be seeking money to compensate Mikey. Our system of justice allows Mikey's parents, as his natural guardians, and also the bank, which is representing Mikey's estate, to seek money damages if he was harmed by the defendant's conduct. Mikey must now live with this condition for the rest of his life because the medical evidence shows he is permanently disabled.

What is for sure is that Mikey cannot live on his own as he continues to grow older. He will forever be dependent on his family, and that's the best case scenario that we can probably ever offer him. Mikey and his parents are seeking closure for this portion of his life because the rest of it will be filled with surgeries, adaptations, fittings, medical care. You name it.

You may hear and see some things during the course of this trial that may make you uncomfortable about what it takes

207

Opening Statement - Plaintiff

1    to take care of Mikey.  For example, Mikey has to have a bowel

2    program, and the only way that he can have that bowel program

3    is for his mother to take care of it.  And she has to remove it

4    every day digitally.

5         Every day she has to fit Mikey with a condom in order

6    for him to go through his catheter program.  Every day he needs

7    to be washed and cleaned so that he doesn't get dirty in any

8    way so he reduces the risk of infection.

9         The only way to do that is to carry him around their

10   house in what's called a lift.  That's the lift that has to be

11   placed underneath him and then brings him into the bathroom.

12   That's why what this case is about is how much money will it

13   take to make him safe, comfortable and compensated for his

14   harms and restore justice.

15        For the most part, the defendants will not dispute

16   Mikey's harms.  As I told you, they have retained no experts

17   nor will they challenge or contradict his medical expenses or

18   his life care plan.  They'll tell you that the dollar amounts

19   are too high.  It doesn't cost $20 million to take care of him.

20   Give him less than that.

21        What you will hear is expert testimony from people

22   that we believe are the best in their field at arguing these

23   losses and causations and medical needs.  You'll hear from

24   Dr. Schaeffer, Dr. Adair, his speech and physical therapists.

25   They can explain to you directly what it takes to take care of

208

Opening Statement - Plaintiff

1   Mikey on a daily basis.

2          And you'll also see during the course of this trial

3   what a day in the life of Mikey is like.  We're not going to

4   show you a whole day.  We're going to show you in condensed

5   form.  But you'll see through video evidence what it's like to

6   take care of Mikey on a daily basis so that you can get maybe

7   just a little bit of a feel for what he has to go through every

8   single day in order to stay healthy, alive and even be here on

9   a day like today.

10         One way to explain what Mikey has gone through and

11  what his needs are is through a very simple analysis of what I

12  call ABC.  If I had a chart right up here right now and if I

13  wrote the ABCs in a line, I could probably start filling in

14  each and every letter with a harm or a condition that Mikey

15  has, whether it's infection, whether it's paralysis.  We could

16  fill in the ABCs.  That's how significant his harms are.

17         Not only is Mikey LaPorta permanently disabled, but he

18  also has significant disfigurement.  And that disfigurement is

19  from having the top half of his head blown off, which is now

20  covered by a metal plate.  He has pain and he suffers, and all

21  of this is lifelong, also.

22         What his family will tell you, what Patti and Chris

23  and his family members will tell you is that he has pain every

24  single day, and sometimes he screams in pain.  But Mikey also

25  has deep inner feelings, too.  In fact, he has very deep

Opening Statement - Plaintiff

1    feelings.

2           The girlfriend he had the night that this happened,

3    Julie, the girlfriend that the City wants you to believe that

4    he was broken up with that night, well, to this day they still

5    talk every single day.

6           In fact, Julie stayed with Mikey for over six months

7    after this accident and didn't leave him until Big Mike told

8    her that she had to go because there was nothing else that she

9    could do for him and she had to start living her own life.

10          While she stayed with him, she taught him because

11   she's a teacher, and she helped him very slowly get back his

12   ability to speak.  Mikey still loves Julie.  If he could, I'm

13   sure he would tell you he could marry her, except Julie lives

14   in Texas now, and she's married, but not to Mikey.  But it's

15   understood they still get to talk every day, and he gets to

16   imagine that, too.

17          But every single day, this man fights every single day

18   for his life.  Dr. Adair is now even counseling Mikey on having

19   children because Mikey insists that his future will be with his

20   own children.  When all is said during this trial and I come

21   back to you in closing arguments and I speak to you one more

22   time and ask you for substantial compensation, I'm going to ask

23   you for compensation in excess of $90 million because that's

24   what it will take to restore justice and fix the harms that the

25   City caused as a result of his unconstitutional violations.

Opening Statement - Plaintiff

1    When I come back to you and talk to you, by that time

2  I will have given you the evidence that you need to feel

3  comfortable awarding him.  Your verdict, which is your voice,

4  will be the pronouncement of justice in this case.

5    It will be left to your collective wisdom and judgment

6  in the end to determine whether the defendant's conduct was

7  wrong.  If you find it was, you will return a verdict in

8  Mikey's favor.  I will ask all of you to keep your commitment

9  and promise that you made to his Honor this morning before you

10  were sworn and after you were sworn that you will listen to the

11  evidence and the words of the witnesses before you make your

12  decisions.

13    We will not ask you to feel sorry for Mikey, but in

14  the end, when you have decided whether Mikey should have

15  control over his life or the City, we'll be here waiting for

16  your verdict either way.  Mikey and his family have waited

17  years for this moment.  His day is in court now.  This is the

18  only chance that he gets at this.  There are no second chances.

19    It is the function of the lawyers to bring forth the

20  evidence received to meet the burden of proof.  That's our job.

21  Do not hold it against Mikey for how long this trial will last,

22  whether it's three weeks and a day or three weeks and two days

23  or if it does go into that fourth week.

24    We will do our best to respect everyone in this

25  process as we decide which of the 150 witnesses that have been

Opening Statement - Plaintiff

1   looked at in this case and the hundreds of thousands of pages

2   of documents are relevant to you.  We believe at the end of

3   this case, we will have brought to you overwhelming evidence

4   that the City is liable for the unconstitutional conduct which

5   was the moving force for Mikey LaPorta's injuries.  Thank you,

6   ladies and gentlemen.

7           THE COURT:  Ms. Rosen, how long will your opening

8   take?

9           MS. ROSEN:  Probably about an hour.

10          THE COURT:  I think probably have to -- because

11  obviously we need to take a recess now, and that would probably

12  not conclude so there wouldn't be time to do that tonight.  So

13  I think we will suspend.  At 10:00 o'clock tomorrow, we will

14  have the opening statement from the defense.

15          So members, try to be back about five minutes to

16  10:00 tomorrow morning, and we'll start promptly at 10:00.

17  You'll hear the opening from the City.  Please don't discuss

18  the case and the other don'ts that I gave you.  Don't do any

19  independent research.  Don't go on social media, et cetera.

20  Have a nice evening.

21      (Jury exits courtroom at 4:06 p.m.)

22          THE COURT:  Anybody want to put anything on the

23  record?  You're going to go through whatever it is that you

24  have from the other case and show them or whatever it is.

25          MR. ROMANUCCI:  I don't.  Let me see if I have it.  Do

212

Opening Statement - Plaintiff

1    we have it?

2              MS. ROSEN:  Is that the document production, too?

3    It's my understanding there were documents produced and you

4    were provided documents.  I'm just asking.

5              THE COURT:  We don't need to do that now, but satisfy

6    yourself that you've got everything you should have gotten.

7              MR. ROMANUCCI:  Sure.  We'll take care of it.

8              THE COURT:  Pardon?

9              MR. ROMANUCCI:  We'll take care of it.

10             THE COURT:  All right.  We'll see you at 10:00 o'clock

11   tomorrow --

12             MR. ROMANUCCI:  Thank you, your Honor.

13             THE COURT:  -- for the City's opening.  Thank you.

14        (Adjourned at 4:08 p.m.)

15                        * * * * * * * * * *

16                    C E R T I F I C A T E

17        I certify that the foregoing is a correct transcript of the

18   record of proceedings in the above-entitled matter.

19

20   /s/ LISA H. BREITER                    November 3, 2017
     LISA H. BREITER, CSR, RMR, CRR
21   Official Court Reporter

22

23

24

25