**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FIRST MIDWEST BANK, as Guardian of the Estate and Person of Michael D. LaPorta, a disabled person,** | |
| **Plaintiff,** | **Case No. 14 C 9665** |
| **v.** | **Judge Harry D. Leinenweber** |
| **CITY OF CHICAGO, a Municipal Corporation,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

After seven years of litigation and a month-long trial, a jury found in Plaintiff Michael LaPorta's favor on his claim that the City of Chicago had *de facto* policies that sustained serious flaws in its police force, namely: failing to investigate officers accused of misconduct; failing to discipline officers who deserved it; and failing to maintain an adequate Early Warning System to identify and correct problematic behavior. The jury further found that the last two of those policies constituted the moving force behind a January 2010 incident in which CPD Officer Patrick Kelly shot LaPorta in the head, causing severe and lasting injuries. For these injuries, the jury awarded LaPorta $44.7 million in damages. Before the Court are the parties' post-trial motions. Going forward, this opinion presumes familiarity with this Court's other rulings in this case, especially *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017) (summary judgment ruling)

and *LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014 (N.D. Ill. 2015) (motion to dismiss ruling).

**I.   CHICAGO'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Federal Rule of Civil Procedure 50(a) allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1).   Under the stringent judgement-as-a-matter-of-law standard, the court construes the facts strictly in favor of the party that prevailed at trial. *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011) (citations omitted). "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id.* (citations omitted).   However, the court disregards all evidence favorable to the moving party that the jury is not required to believe. *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).   At bottom, the court determines whether a rational jury could have found for the plaintiffs.   *Id.* (citation omitted).

**A.   Failure to Prove Constitutional Violation**

The City recycles its first JMOL argument from the summary judgment stage, contending once more that LaPorta's theory of liability cannot get off the ground given that under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 201-02 (1989), local governments cannot be liable for failing to prevent due process

- 2 -

violations effected by private actors. Simply enough, the City contends that Kelly acted only as a private citizen during the evening in question, and as such his coincidental profession plays no part in the liability analysis. But as the Court already described, this misses the mark by mischaracterizing LaPorta's claim. *See LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 986-87 (N.D. Ill. 2017) (denying summary judgment to City on same argument). LaPorta's *Monell* claim asserts that it is the City itself—and not Kelly—that supplies the "color of law" requirement under § 1983. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1519 (7th Cir. 1990) (describing analogous *Monell* claim). Under LaPorta's theory, "the City's policies caused the harm." *Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *14 (N.D. Ill. Mar. 31, 2017). Such a claim is not appropriately considered under *DeShaney,* and as such the City's objection predicated upon the same cannot defeat LaPorta's claim nor entitle the City to judgment as a matter of law. *See Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 601810, at *5-6 (N.D. Ill. Feb 23, 2012) (St. Eve., J.).

**B. Evidence of Kelly's Reckless Indifference**

The City argues in the alternative that even if *DeShaney* does not apply, LaPorta failed to produce sufficient evidence that Kelly acted intentionally or with reckless indifference when he shot LaPorta. (Chicago also argues that the "reckless indifference" standard has no place in the due process analysis; the Court dispatches this argument below at Part II.A.2.) First, LaPorta presented expert testimony undermining Kelly's version of events (Balash Tr. 1879:12-1880:11 (explaining that contrary to Kelly's statement that LaPorta picked up

and cocked the gun, said model cannot be manually cocked in the manner Kelly described), 1887:6-21 (expressing disbelief at Kelly's story that his firearm had twice malfunctioned during Kelly's recruit school training)), and concluding that the shooting was no suicide (*id.* 1892:1-1912:13 (describing the evidence and concluding that Kelly shot LaPorta)). The jury also heard evidence from Defendant's witnesses that undermined the case for this being an accidental shooting. (*See* Brudenell Tr. 2689:18-21 (agreeing that the shooting did not occur as a result of someone dropping the gun); Wyant Tr. 2641:19-2642:3 (testifying that he had never heard of a Sig Sauer P226—the model of Kelly's firearm—misfiring).) Moreover, Kelly took the stand. On cross-examination, LaPorta's counsel asked whether Kelly removed the gun from its holster, held it in his hand, and then pulled the trigger and shot LaPorta in the head. Kelly responded by invoking the Fifth. As this is a civil case, the jury was permitted to take an adverse inference from Kelly's invocation. *See Hillman v. City of Chicago*, 834 F.3d 787, 793 (7th Cir. 2016) (citations omitted); *see also infra* at Part II.B.1.

Beyond all this, the City objects that LaPorta never painted a clear enough picture of Kelly's alleged motive in carrying out this shooting. But LaPorta did not have to prove motive to prevail in this case, and the circumstantial evidence adduced at trial certainly forms a sufficient basis for a reasonable jury to find that Kelly deliberately or with reckless indifference shot LaPorta in the head. *See Harvey*, 377 F.3d at 707.

### C. Failure to Maintain an EWS

LaPorta presented substantial evidence of the City's failure to maintain an Early Warning System. This evidence included the findings from an April 2016 report put out by the City-created Police Accountability Task Force ("PATF"), which noted that:

> No dedicated system exists to identify and address patterns or practices. While they are charged with investigating police misconduct, IPRA [the Independent Police Review Authority] and BIA [the Bureau of Internal Affairs] historically have not engaged in efforts to identify officers whose records suggest repeated instances of misconduct or bias. They also historically have not engaged in efforts to identify broader patterns or practices either of misconduct. The persistent failure of IPRA and BIA to examine pattern and practice evidence substantially contributes to the police accountability vacuum in Chicago.

(Tr. 2356:18-2357:3.) Alderman Moore, a member of the Chicago City Council, concurred with these findings. (Moore Tr. 887:23-888:15.) In the same vein, a January 2017 report issued by the DOJ and the U.S. Attorney's Office for the Northern District of Illinois observed that:

> The lack of a functional early intervention system coupled with inadequate supervision has placed officers and members of the public at risk. These longstanding systemic deficiencies in CPD's early intervention systems have prevented CPD from taking two steps that are crucial to ensuring officer safety and wellness as well as ensuring policing that is effective and lawful. First, CPD does not adequately and accurately identify officers who are in need for this type of action and, second, CPD does not consistently or sufficiently address officer behavior where CPD identifies negative patterns. Because of these failures, CPD officers are able to engage in problematic behavior with impunity which can and do escalate into serious misconduct. This has dramatic consequences for the public.

(Tr. 2249:1-15.)

Chicago takes issue with the PATF and DOJ reports, arguing that neither zeroes in on the proper time frame—that being the few years preceding the 2010 shooting, when perhaps some intervention could have

changed Kelly's behavior and thus averted LaPorta's injury all together. This rejoinder is not as effective as Chicago hopes. First, as described in greater detail below, the PATF report reviewed CPD records dating back to 2007, and the DOJ report referred in sweeping terms to "longstanding" and "systemic" deficiencies in CPD policies. (*See infra* at Part II.B.3.) And second, LaPorta developed evidence beyond these reports that back up his contention that Chicago lacked an effective EWS during the pertinent years. Tisa Morris, the former chief administrator for the Office of Professional Standards, testified that during her tenure from 2004 to 2007, she was not aware of any system in place to identify and discipline repeat offenders. (*Id.* 1163:18-20, 1176:25-1177:1, 1229:24-1230:9.) Lou Reiter, LaPorta's police-practices expert, backed up the ineffective-EWS conclusion as well, stating that during his 25 years working with CPD, he observed "historic and systemic deficiencies . . . in the areas of administrative investigations, or CR investigations, and not implementing an early warning system and of condoning or encouraging the code of silence." (Reiter Tr. 306:8-17.)

Chicago also tries to rebut LaPorta's evidence by explaining that the City maintained two systems during the pertinent time frame: The Behavioral Intervention System and the Personal Concerns Program, which together comprised an EWS. But Reiter cast doubt on the efficacy of these systems, explaining that they were used very rarely. (*See, e.g.*, Reiter Tr. 328:22-329:10 (testifying that because the odds of being put into BIS were "negligible," BIS provided officers no deterrent for bad conduct).) Ultimately, this, as well as Chicago's other objections to the strength of LaPorta's case, go to the weight of the evidence

presented. But weighing the evidence is a task for the jury, and one that it reasonably carried out. The Court will not second-guess their determination. That is not the Court's role. *See Schandelmeier-Bartels*, 634 F.3d at 376. Chicago's renewed JMOL Motion is denied in relevant part.

### D. Failure to Discipline

In the second version of LaPorta's *Monell* claim, he charges that Chicago had a widespread practice of failing to discipline adequately those officers who committed misconduct. The jury was persuaded by this theory also. As above, the City claims the jury spoke in error, that LaPorta failed to adduce sufficient evidence to permit a reasonable jury to find in his favor on this theory. Once more, the Court disagrees.

The PATF report presented at trial painted a bleak picture of CPD's disciplinary practices. In many cases, the report found that officers are simply not disciplined for sustained complaints. (Tr. 2349:14-21.) That owes in part to an "opaque, drawn-out, and unscrutinized disciplinary process" that frequently enables officers "to avoid meaningful consequences." (*Id.* 2349:18-21.) The report also called that process "haphazard," "unpredictable," and "arbitrary." (*Id.* 2245:6-7, 2354:18-19.) Contrary to Chicago's objection described above, the report focused on the relevant time frame, examining data from 2007 through 2010. (*Id.* 2349:6-2360:17; Emanuel Statement Tr. 249:3-251:24.) Beyond this, LaPorta held out evidence of Kelly's disciplinary record as an exemplar. Kelly accumulated eighteen CRs in the five years prior to the shooting. But according to Reiter, Kelly was not properly disciplined for any of these complaints. (Reiter Tr. 318:2-15.)

From this evidence, a reasonable jury could conclude that the City had a practice of failing to discipline officers adequately. That is all LaPorta must now show to prevail against the City's renewed JMOL Motion. The Motion is denied in relevant part.

### E. Failure to Investigate

Finally, LaPorta argued, and the jury agreed, that the City had a widespread practice of not only failing to discipline malfeasant officers, but also of failing to investigate misconduct in the first place. LaPorta's statistics expert testified that 46% of the complaints filed from 2004 to 2011 concluded with a finding of "no affidavit" and were not investigated. (Rothman Tr. 2199:7-21.) Chicago rebuts that this number is unfairly inflated: State law blocks investigation into such unsupported complaints, Chicago explains, so the City's nonfeasance results from legal proscription and not from some anti-investigatory policy. But 50 ILCS 725/6, the state law Chicago relies upon, clearly applies only in the absence of an on-point collective bargaining agreement between the City and the Fraternal Order of the Police. There is such an agreement here. (Reiter Tr. 387:12-19 (describing the collective bargaining agreement).) That agreement loosens the state law stranglehold on police-conduct investigations by permitting the chief administrators of IPRA and BIA to override the affidavit requirement where such override is deemed "necessary and appropriate." (*Id.*) And according to Former CPD Commander Eugene Roy, CPD supervisors can recommend that investigations proceed even when the complaint is not supported by sufficient evidence. (Roy Tr. 955:7-10.) These workarounds permit Chicago to investigate no-affidavit complaints, but the City

rarely does so. (*See* Reiter Tr. 387:9-19 (reciting from PATF report that the IPRA/BIA override is rarely used and not to the extent it could and should be).) Indeed, the DOJ report explains that such overrides are not encouraged among IPRA investigators, and those investigators are not trained on how to obtain such overrides anyway. (Tr. 2246:8-16.)

To any extent, the City's failures to investigate extend beyond its high rate of nonfeasance vis-à-vis those complaints unsupported by affidavit. As the DOJ report concluded, "The City does not investigate the majority of cases it is required by law to investigate. . . . Those cases that are investigated suffer from serious investigative flaws that obstruct objective fact finding." (Tr. 2242:25-2243:5.) The report further stated that the City's investigative techniques are often biased, and the concluding reports are often drafted in a manner favorable to the officer by omitting conflicting or contrary evidence. (Tr. 2358:12-21.) The PATF report propounded similar findings. (*See, e.g.*, Tr. 2357:12-14 ("Since its inception, IPRA has had the power to examine patterns of complaints when investigating police misconduct but has not exercised it.").)

The City fails to muster any other argument on this score that goes to the sufficiency of the evidence rather than to its weight. As such, a reasonable jury could have concluded, as did the jury here, that Chicago had a widespread policy or practice of failing to investigate officer misconduct. The City's renewed JMOL Motion is thus denied in relevant part.

### F. Deliberate Indifference

To place the next building block in LaPorta's case, he had to demonstrate that the City was deliberately indifferent to the harms that might befall those persons who come into contact with under-trained and under-disciplined officers. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); *Sigle v. City of Chicago*, No. 10 C 04618, 2013 WL 1787579, at *2 (N.D. Ill. Apr. 25, 2013) (applying same "deliberate indifference" standard to a failure-to-discipline theory). The jury found the City deliberately indifferent in two respects: first, as to the failure to maintain an adequate EWS, and second, as to the failure to discipline adequately. As elsewhere in its motion, the City contends that no jury could have reasonably reached these conclusions.

The PATF report opined that CPD generally lacks a culture of accountability, "largely because no one in top leadership has taken ownership of the issue." (Tr. 2360:1-4.) It continued: "[a]lthough so-called problem officers are either well-known to their supervisors and CPD's leadership or easily identified, few steps are being taken to proactively manage and redirect those officers' conduct." (*Id.* 2360:1-17.) That was so even though "[t]he effective tools for providing greater oversight and supervision to officers are well-known and widely used in other jurisdictions." (*Id.* 2360:1-17.) Alderman Moore, who served as the City Council's 30(b)(6) designee, testified that police misconduct "has been ongoing for a long time, probably as long as we've

had a police department. . . . 180 years." (Moore Tr. 887:15-22.) The Alderman also agreed that IPRA and BIA have not historically engaged in efforts to identify broader patterns or practices either of misconduct or racially biased policing within CPD. (*Id.* 888:3-15.)

Further, the jury heard testimony that the City Council had been warned about the sore need to ameliorate CPD's deficient policies, including by implementing an effective EWS. In June 2007, the City Council held public hearings concerning the deficiencies of the Office of Professional Standards ("OPS"), the precursor to IPRA. (Moore Tr. 892:15-24.) According to Alderman Moore, the complaints voiced at those hearings contributed to the creation of IPRA. (*Id.* 893:3-21.) One such complainant expressed his "profound fear" that IPRA would "simply recreate and perpetuate another inadequate and ineffective system like [OPS] that we have suffered with since 1974." (*Id.* 894:22-895:10.) Moore was present for that hearing; at trial, he told the jury: "We knew there were problems." (*Id.*)

Taken together, this testimony provides a legally sufficient evidentiary basis to allow a reasonable jury to find that the City knew it lacked an effective EWS and failed to discipline malfeasant officers adequately, and yet took no action to right these deficiencies. That carries LaPorta past the renewed JMOL Motion as far as the deliberate indifference requirement is concerned. FED. R. CIV. P. 50(a).

### G. Causation

Though the jury agreed LaPorta had proven three systemic failures—the failures to investigate, to discipline, and to maintain an EWS—the jury found that only the latter two of those failures caused Kelly to

shoot LaPorta. (Verdict Form, Dkt. 446.) Chicago challenges those two causation findings.

As the Court earlier observed, "[t]he critical question is whether the City's *de facto* policies . . . were the 'moving force' behind Kelly's actions such that execution of the policies 'inflicts the injuries that the government as an entity is responsible [for] under § 1983.'" *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) (quoting *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)). There must be a "direct causal link" between the alleged policy or practice and the constitutional violation. *Id.* (quoting *Obrycka*, 2012 WL 601810, at *9). Further, "a finding of culpability simply cannot depend on the mere probability that any officer adequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 412 (1997) (emphasis in original). The jury concluded LaPorta met these requirements at trial, and the Court will not disturb that finding.

To begin, LaPorta offered evidence demonstrating that the City's policies may generally encourage officers to feel immune from consequences. The PATF report noted that "[w]hen case after high-profile case results in punishment that does not match the gravity of the misconduct, it sends a message that the police can act with impunity. . . . It also leaves those who break the rules emboldened to continue doing so." (Tr. 2355:6-14.) The DOJ report shared in this conclusion, opining that CPD's failure to identify officers in need of behavioral

intervention enabled those officers "to engage in problematic behavior with impunity which can and do[es] escalate into serious misconduct[, which] has dramatic consequences for the public . . . ." (*Id.* 2249:8-15.) Alderman Moore agreed with that logic. (Moore Tr. 877:19-23 (remarking that if an officer engaged in misconduct and was not held accountable, he "would feel a little bit more of a freedom to engage in further misconduct"); *accord* Reiter Tr. 348:18-349:1 (concluding same).)

Beyond this, LaPorta presented testimony that Kelly, specifically, was one such officer emboldened by the City's failure to discipline or correct his behavior via an effective EWS, and that this conditioning led Kelly to shoot LaPorta. The jury heard that Kelly was subject to eighteen complaints and yet was never disciplined or put into an EWS program. True, Kelly was twice referred to the BIS program, but Reiter explained that Kelly never actually attended the counseling those programs recommended for him. (Reiter Tr. 326:3-19.) Two of Kelly's eighteen complaints—one in September 2005 and the other in June 2006—concerned an alcohol-intoxicated Kelly battering personal associates during off-duty time. (O'Neill Tr. 3214:19-3224:25, 3247:2-17.) After the latter incident, an examining psychologist noted that Kelly "may have problems related to alcohol and control" and would benefit from intervention designed to teach him "other ways of resolving conflicts with significant others in his life." (*Id.* 3255:12-3257:20.) According to the evidence at trial, the City never provided that intervention in any form, be it meaningful entry in an EWS program, discipline, or otherwise. Reiter explained that such repeated failures to investigate and discipline reinforces in officers a sense of impunity that extends

to their off-duty behavior (Reiter Tr. 306:7-25), and that CPD's failures with respect to Kelly specifically contributed to his personal sense of impunity. (*Id.* 325:21-326:2; *see also id.* 346:5-347:3 (describing that one consequence of lacking an adequate EWS is that officers such as Kelly would be encouraged to act with impunity).)

In sum, this testimony suggested that Chicago's administrative failings were the moving force behind Kelly's actions. Keeping in mind the Court's obligation on a JMOL motion to construe the facts strictly in favor of the party that prevailed at trial, the Court refuses to overrule the jury's causation finding. A reasonable jury could have reached this conclusion; that is enough. Chicago's JMOL Motion is denied.

## II. CHICAGO'S MOTION FOR NEW TRIAL

Chicago contends it is entitled to a new trial due to a bevy of errors this Court allegedly committed in instructing the jury and making evidentiary rulings. A motion for a new trial should only be granted where the verdict is against the manifest weight of the evidence, *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 921 (7th Cir. 2000), or where the trial court's evidentiary rulings or jury instructions resulted in prejudicial error, *see Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414 (7th Cir. 2015); *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012). The district court has great discretion in determining whether to grant a new trial. *Valbert v. Pass*, 866 F.2d 237, 239 (7th Cir. 1989) (citation omitted). In weighing such motions, the court views all evidence in the light most favorable to the prevailing party, *Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008),

- 14 -

and keeps in mind that "civil litigants are entitled to a fair trial, not a perfect one," *Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993).

## A. Errors in the Jury Instructions and the Verdict Form

District courts enjoy great latitude in choosing the wording of jury instructions. *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997) (citation omitted). New trials are not granted for alleged errors in jury instructions unless, considering those instructions in full, "it appears that the jury was misled and its understanding of the issues was seriously affected to the prejudice of the complaining party." *McGershick v. Choucair*, 9 F.3d 1229, 1232 (7th Cir. 1993) (citation and internal quotation marks omitted). The verdict form is considered in light of the instructions given. *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 827 (7th Cir. 2010).

Federal Rule of Civil Procedure 51 requires litigants to object to jury instructions before the instructions are given. FED. R. CIV. P. 51(b)-(c); *see LeBlanc v. Great W. Express*, 58 F. App'x 221, 223 (7th Cir. 2003) (applying Rule 51 to verdict-form objections). The objection must be "stat[ed] distinctly." FED. R. CIV. P. 51(c)(1); *see Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 729 (7th Cir. 2002) (explaining that the objection "must be specific enough that the nature of the error is brought into focus"). Moreover, "it is not enough simply to submit an alternative instruction." *Schobert*, 304 F.3d at 729 (citation omitted). When a litigant misses its chance to object timely, the tardy objection is reviewed on a plain error standard. *See Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 434 (7th Cir. 2009) (citing FED. R. CIV.

P. 51(d)(2)). That requires the Court to determine from an examination of the entire record whether the defective instruction had a probable impact on the jury's finding. *See id.* (citations omitted); *see also United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990) (citation omitted). "Plain error review of jury instructions is 'particularly light-handed.'" *Lewis*, 590 F.3d at 433 (quoting *United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009) (citation omitted)).

### 1. *Verdict Form Deficiencies*

Chicago alleges it suffered prejudice because the Court confused the jury by instructing them as to deliberate indifference and yet did not provide them with a separate interrogatory on the verdict form asking after their deliberate indifference finding. In rebuttal, LaPorta contends that Chicago waived this objection and in the alternative that the failure to provide the additional interrogatory does not rise to the level of prejudicial error requiring a new trial. *See Mgmt. Hospitality of Racine*, 666 F.3d at 440.

Whether Chicago waived this objection is a close call. LaPorta contends that the City not only failed to object to the verdict form, but actually submitted this version of the verdict form to the Court, meaning that Chicago proposed the same verdict form to which it now objects. (*See* Tr. 3371:14-17 (statement from the Court that: "I believe that [the verdict form] submitted by the defendant is clearer than the plaintiff's, so the Court will give the one submitted by the defendant.").) LaPorta's characterization is not wholly accurate. True, Chicago submitted this verdict form; but the City did so in conformance with the Court's earlier and specific orders given to both parties in

chambers. (*See* 12/12/2017 Status Hearing Tr. 6, Dkt. 521-2 (acknowledging that the Court essentially crafted the final verdict form).) As such, the Court will not take Defendant's submission of the ultimately-selected form as an unmitigated endorsement of that form.

That being said, Chicago did not do its utmost to make its objection clear. After the Court selected the defense-submitted form and asked whether either party wanted to add anything on the record, counsel for the City remarked vaguely that "the verdict form itself, we drafted that pursuant to the Court's order yesterday." (Tr. 3372:5-6.) The City somewhat clarified this objection later, explaining that "we did try to come up with a different . . . proposed verdict form in light of the Court's ruling that would have included specifically . . . a question 4 . . . a deliberate indifference finding specifically by the jury." (Tr. 3577:23-3578:5.) While this objection could have been more precisely stated, the Court finds this articulation particular enough to bring the nature of the alleged error into focus and thus avoid waiver under Rule 51. *Schobert*, 304 F.3d at 729.

Though Chicago did not waive the objection, the City cannot succeed on the objection's merits. To determine whether a verdict form was confusing, courts consider it in light of the instructions given. *Happel*, 602 F.3d at 827 (citations omitted). The nub of this inquiry is whether "the jury was misled in any way and whether it had [an] understanding of the issues and its duty to determine those issues." *Id.* (citation and internal quotation marks omitted). Looking through this lens, the Court cannot agree that its instructions and verdict form confused the jury. The Court's deliberate-indifference instruction

closely tracked the Seventh Circuit's pattern instruction and clearly stated that the City could not be held liable unless LaPorta proved by a preponderance of the evidence that:

> [t]he Chicago City Council knew that because one or more of the [alleged policies] existed and was allowed to continue, it was highly predictable that its off-duty officers would violate the bodily integrity of persons they came into contact with because there was a pattern of similar constitutional violations or it was highly predictable even without a pattern of similar constitutional violations.

(Jury Instructions 18, Dkt. 444; *accord* Seventh Circuit Civil Pattern Jury Instruction 7.25 (propounding substantially similar model instruction).) This language properly instructed the jury concerning the issues before it. The absence of the specific words "deliberate inference," which are likewise notably absent from the Seventh Circuit's pattern instruction, does not confound the charge. And the absence of an additional interrogatory on the verdict form asking after this instruction does not create an error serious enough to mislead the jurors and work prejudice upon the City. *See McGershick*, 9 F.3d at 1232. When viewing the instructions and the form together, the jury was properly advised of the task before them. That suffices. The Motion for New Trial is denied in relevant part.

### 2. Jury Instructions Concerning Standard for Evaluating Kelly's Conduct

Chicago next contends a new trial is warranted by the Court's alleged error in instructing the jury that LaPorta had to prove Kelly intentionally *or with reckless indifference* shot LaPorta. As the emphasis suggests, it is the second phrase with which Chicago takes issue. The City submits that "reckless indifference" is simply inapt here, and the Court should have instead instructed the jury on a "shocks

the conscience" standard of culpability under *City of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). Before advancing to the merits of this dispute, the Court notes that as above, LaPorta charges that Chicago waived this objection. The Court and both parties discussed this and the other proposed instructions at length in chambers and, as Chicago now recounts, it there objected to the reckless indifference instruction. However, the City failed to reiterate that objection with clarity on the record the following morning (*see* Tr. 3356:1-3372:22) as required to avoid waiver under Rule 51. *Schobert*, 304 F.3d at 729 (proposing an alternative instruction is not enough to overcome waiver when objection not clearly stated). Still, there is an exception to this formal-objection requirement: The objection may survive waiver if (1) the party's position was made clear to the court and (2) any further objection would have been unavailing and futile. *See Carter v. Chi. Police Officers*, 165 F.3d 1071, 1078 (7th Cir. 1998) (citations omitted). Chicago made its objection clear off-record, it just simply failed to rearticulate that objection the next day. The Court is thus loath to charge Chicago with waiver here, where defense counsel might have presumed—albeit unwisely, given Rule 51's requirements—that reiterating the objections would be futile given the Court's earlier, off-the-record rulings.

Ultimately, whether the Court is lenient on this point does not affect the success of Chicago's objection. The objection fails, whether on the plain error standard applied to forfeited objections, *Lewis*, 590 F.3d at 433 (citing FED. R. CIV. P. 51(d)(2)), or on the prejudice standard

applied to typical, and not waived, allegations of error, *McGershick*, 9 F.3d at 1232.

There is nothing inherent to a failure-to-discipline *Monell* claim demanding that the plaintiff prove the specific officer who effectuated the harm acted in a way that shocked the conscience, or was even reckless. *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Such claims assert that the municipality itself is the state actor; it is the municipality's action in maintaining a deficient policy that supplies § 1983's "color of law requirement," *Gibson v. City of Chicago*, 910 F.2d 1510, 1519 (7th Cir. 1990), and it is the municipality's deliberate indifference that is the lynchpin for liability, *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (citations omitted).

This particular suit, however, calls for an examination of Kelly's mental state because of LaPorta's particular theory of the case: that Chicago's administrative failings caused Kelly to believe he could act with impunity, including on the occasion of the shooting. Kelly cannot both have acted feeling free of consequences *and* acted negligently; something more than negligence was required. Had LaPorta instead theorized that Kelly accidentally shot him as a result of the City's deliberate indifference with respect to its failures to train officers to handle their firearms safely, LaPorta would only need to prove Kelly shot LaPorta negligently. Chicago no doubt objects to this hypothetical on the basis that negligence cannot violate the Due Process Clause. *See Ruehman v. Sheahan*, 34 F.3d 525, 528 (7th Cir. 1994) ("Negligence . . . does not violate the due process clause."). But in this case, the constitutionally-violative mental state is supplied by the deliberately-

- 20 -

indifferent City, not by the officer who implements the harms the City ignores. Kelly's mental state is only spurred onto the stage by LaPorta's particular theory of why (or how) Kelly acted the way he did. With this in mind, the Court instructed the jury on a reckless indifference standard. *Compare* Jury Instructions 18, Dkt. 444, *with Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir. 1988) ("An act is reckless in the pertinent sense when it reflects complete indifference to risk[.]"). In the context of this case, that instruction was not improper.

In the final twist to this argument, Chicago contends that even if it was not error to instruct the jury that the City could not be held liable unless Kelly acted with at least reckless indifference, the Court still erred by failing to define "reckless indifference." The City complains that without that further clarification, the jury might have understood the City could be held liable so long as Kelly acted "recklessly"—*i.e.*, like a "loose cannon" (Roy Tr. 957:1-959:10)—irrespective of Kelly's *intent* in so acting. The Court disagrees.

Before addressing the merits of this argument, the Court notes that Chicago did not raise this objection at trial. Though, as laid out above, the Court is disinclined to label as forfeit those arguments extensively developed in chambers, the Court will not extend the same leniency to jury-instruction objections that Chicago never introduced until present. If Chicago found the deliberate indifference instruction to be opaque, the onus was on the City to say so before the Court delivered it to the jury. FED. R. CIV. P. 51(b)-(c). The Court

accordingly reviews Chicago's argument on a plain error standard. *United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990) (citation omitted).

When reviewing a challenge to a jury instruction, courts "must view the instruction as a whole and consider the challenged instruction 'both in the context of the other instructions given and in light of the allegations of the complaint, opening and closing arguments and the evidence of record.'" *U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 727 (N.D. Ill. 2007) (quoting *Sims v. Mulcahy*, 902 F.2d 524, 533 (7th Cir. 1990)). From the Complaint onward, LaPorta's case always turned upon the idea that Kelly felt empowered to act with impunity—that he could engage in wrongdoing without facing the consequences. (*See, e.g.*, 7th Am. Compl. ¶ 77 ("[Chicago's administrative failings] caused Patrick Kelly, and other officers similarly situated, to act with impunity and to feel and act as though their acts of misconduct would go unpunished and uninvestigated.").) Plaintiff's counsel framed the case in that way from beginning, (Pl.'s Opening Tr. 152:3-6 ("Kelly [] repeatedly acted with impunity because he learned that misconduct, regardless of how severe or even criminal, it goes unpunished"), 197:14-16 ("[T]he City is liable because Patrick Kelly knew that he could mess around and get away with it")), to end, (Pl. Closing Tr. 3439:16-22 ("[Kelly] was not disciplined for any of his acts of violence or domestic battery, even after the City had notice time after time of his propensity for this violent, reckless, bad behavior. . . . Officer Kelly was acting with impunity in a way in which he knew he was immune from consequences without fear of repercussion.")). The Court believes that within the context of this suit, the jury

understood that Kelly's awareness of his own misconduct was the fulcrum upon which the merits turned. Chicago's suggestion that the "reckless indifference" instruction would somehow dupe the jury into ignoring this otherwise omnipresent theory of liability is not credible enough for the Court to agree the City suffered a "miscarriage of justice." *Medley*, 913 F.2d at 1260 (reciting plain error standard). Providing that instruction without further clarification did not constitute plain error in this case.

### 3. *Spoliation and Probable Cause Instructions*

Chicago also asserts it suffered prejudice because the Court erroneously instructed the jury as to spoliation of three pieces of evidence: Kelly's phone and text messages; Kelly's service weapon, and a CPD-created video of the shooting scene. After describing those pieces of evidence, the Court instructed the jury:

> [T]he City of Chicago contends that it had no lawful basis to obtain Kelly's texts and no texts occurred after the 911 call; Kelly's service weapon was returned after all possible ISP testing was completed; and a video never existed.

> You may assume that such evidence would have been unfavorable to the City of Chicago if you find by a preponderance of the evidence that: One, the City of Chicago intentionally failed to preserve the evidence or permitted the evidence to be destroyed; and two, the City of Chicago intentionally failed to preserve the evidence or permitted the evidence to be destroyed in bad faith.

(Jury Instructions 16, Dkt. 444.) Chicago does not object to the language of this instruction—and wisely so, given how closely the instruction tracks the Seventh Circuit's pattern instruction. (*Compare id.*, *with* Seventh Cir. Pattern Instruction 1.20.) The City simply contends the instruction should not have been given at all. The Court disagrees.

- 23 -

Before giving a spoliation instruction, courts require "a showing of an intentional act by the party in possession of the allegedly lost or destroyed evidence[.]" *Spesco, Inc. v. General Elec. Co.*, 719 F.2d 233, 239 (7th Cir. 1983). Absent such a showing, the instruction can be unduly argumentative. *Id.* LaPorta made the requisite showing here. One senior officer at the scene of the shooting testified that he "wanted [the scene] worked up as if it were a homicide." (McNicholas Tr. 719:10-12.) Another said at the scene that Kelly should be considered a suspect in the shooting. (Doherty Tr. 2585:6-15.) Despite this clear acknowledgment of the need to investigate Kelly's involvement, Chicago and its officers failed to take the routine step of preserving that suspect's phone and messages—a failure made more suspect by the City's corresponding preservation of *LaPorta's* phone as part of CPD's investigation into the crime of attempt suicide. (Weber Tr. 1036:12-1037:20.)

As for the missing video: Chicago simply contends it never existed. (*See* Kaput Tr. 7902-791:10; Barsch Tr. 2966:12-17 (both representing that no video was created to their knowledge).) But LaPorta produced CPD documents obtained in discovery that state the contrary. (CPD Case Supplementary Report, Trial Ex. PTX 126 at 7, Dkt. 508-11 (reciting among "evidence": "O/A and C/U video of scene").) The spoliation instruction identified the respective parties' positions and then properly permitted the jury to weigh the credibility of the conflicting evidence and determine whether an adverse inference was appropriate. This is exactly the mechanism anticipated by the Pattern Instructions, and it was not error to apply it here.

- 24 -

Finally, the gun. According to LaPorta's trial exhibits, CPD seized Kelly's firearm on January 13, 2010. But then, on June 7, 2013, more than two years after LaPorta filed this case in state court, CPD simply gave the gun back. (CPD Property Inventory Record, Trial Ex. PTX 98, Dkt. 508-3.) Chicago contends it had no duty to hold on to Kelly's firearm. This strains credulity. The gun was the operative piece of evidence in what had, by the time of CPD's surrender of the weapon, already been alleged to be an intentional shooting. These facts certainly suffice for the requisite showing to warrant the spoliation instruction.

In sum, LaPorta passed the bar for an instruction on all three pieces of evidence. And even if that were not the case, Chicago has failed to demonstrate that this error—if one existed—so confused the jury's understanding of the issues as to work serious prejudice upon the City. *McGershick*, 9 F.3d at 1232.

Chicago adds to its spoliation objection a perfunctory claim that it suffered prejudice from the Court's refusal to instruct the jury on the meaning of probable cause. The City contends that without this instruction, the spoliation instruction could have improperly led the jury to conclude that the City had a duty to retain the three pieces of evidence discussed above. First, the Court is not persuaded by the jury-confusion argument: As already set forth, the spoliation instruction adequately explained what task the jury faced. Second, no part of the jury's verdict hinged upon probable cause determinations, so their understanding of this legal issue is oblique to their verdict in this case. The probable cause instruction was properly refused.

#### 4.  *Patricia LaPorta Damages Instruction*

The City next contends the Court erred in refusing to instruct the jury that LaPorta's mother, Patricia, has no claim for damages in this case and that testimony concerning her pain and suffering should not be considered when reaching the damages verdict.  LaPorta responds that the Court instructed the jury to determine damages based on harms sustained by LaPorta alone, so a further "Patricia instruction" was not necessary. The Court agrees.  Not only was the jury charged with calculating only *LaPorta's* damages, the verdict form itemized the potentially compensable areas of injury, and none of those mentioned Patricia.  This argument cannot justify the Court ordering a new trial.

In conclusion, the Court finds that none of the above instructions, when taken either in isolation or all together, constitute prejudicial error warranting a new trial.

#### B.  Evidentiary Rulings

Chicago takes issue with several of the Court's evidentiary rulings throughout the trial and contends that even if not independently, these errors cumulatively amount to prejudice against the City and thus justify a new trial.  A new trial may be ordered when an evidentiary error had a "substantial influence over the jury, and the result reached was inconsistent with substantial justice." *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (citation and internal quotation marks omitted).  When a party seeking a new trial makes a cumulative-effect argument, that movant must show: "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [the] trial

- 26 -

fundamentally unfair." *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012) (citation and internal quotation marks omitted). The cumulative-effect analysis requires an examination of the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the court dealt with the errors during trial, including the efficacy of any remedial measures; and the strength of the winning party's case. *Id.*

### 1. *Kelly's Invocation of the Fifth Amendment*

In a civil case, "the jury is permitted to hear evidence of a witness's invocation of the privilege and may draw an adverse inference from it." *Hillmann v. City of Chicago*, 834 F.3d 787, 793 (7th Cir. 2016) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify[.]")) (citations omitted). Such inferences may be drawn even when the witness invoking the privilege is a nonparty. *Cf. Fujisawa Pharm. Co. v. Kapoor*, No. 92 C 5508, 1999 WL 543166, at *9 (N.D. Ill. July 21, 1999) (stating that drawing an adverse inference from a nonparty's silence against a party is permissible when the two share an identity of interests) (citing *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993); *Kontos v. Kontos*, 968 F. Supp. 400, 406 (S.D. Ind. 1997)). As with most evidentiary rulings, the decision whether to permit the inference falls within the district court's broad discretion. *Evans v. City of Chicago*, 513 F.3d 735, 740 (7th Cir. 2008) (citation omitted).

The City objects that the Court's instruction permitted the jury to draw an adverse inference against the City itself, which Chicago contends to be a prejudicial error. First, Chicago's interpretation of the instruction is contrary to its clear language, which permitted the jury to draw said inference against only Kelly. (Jury Instructions 15, Dkt. 444 (instructing that when a person asserts his Fifth Amendment rights, "you are permitted to assume that his testimony would be unfavorable *to him* in any manner that you deem reasonable and supported by the evidence" (emphasis added)).) Second, even if this instruction permitted the jury to take an adverse inference against the City—which it did not—there would still be no error here. One party's Fifth Amendment invocation may be imputed to another party when the two share certain allied interests sufficient to justify the inference's trustworthiness and advance the search for truth. *See Kontos*, 968 F. Supp. at 406 (quoting *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997)). Courts engaging in this inquiry have eschewed bright-line rules in favor of a case-by-case analysis demanding that the party urging the inference justify it. *State Farm Mut. Auto. Ins. Co. v. Abrams*, No. 96 C 6365, 2000 U.S. Dist. LEXIS 6837, *21 (N.D. Ill. May 11, 2000) (collecting cases).

LaPorta justified the inference here. He could not prove *Monell* liability unless he could first establish that Kelly shot LaPorta with at least reckless indifference. Thus, when Kelly took the stand, his interests and the City's aligned. If Kelly admitted to shooting LaPorta deliberately, he would have exposed himself to criminal liability and the City to civil liability under *Monell*. The relevant interests were

- 28 -

in lockstep. The Court agrees with LaPorta that in these circumstances, the adverse inference from Kelly's invocation could have been permitted against the City. Though, as stated above, the Court did not go this far; the instruction permitted an adverse inference only against Kelly, not Chicago. In this regard, the City has fallen short of carrying its heavy burden in justifying a new trial. *See BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 697 F. Supp. 2d 1001, 1025 (N.D. Ill. 2010) (citations omitted).

### 2. LaPorta's Competency to Testify

Chicago contends that the shooting stripped LaPorta of his competency and as such the Court should not have allowed him to testify. The City argued as much in its motions *in limine*, but the Court believes now, as it did then, that LaPorta was competent to give testimony. Federal Rule of Evidence 601 "creates a broad presumption of competency." *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 570 (7th Cir. 2009). "Competency of a witness to testify . . . is a limited threshold decision . . . as to whether a proffered witness is capable of testifying in any meaningful fashion whatsoever." *Sauer v. Exelon Generation Co., LLC,* 280 F.R.D. 404, 407 (N.D. Ill. 2012) (quoting *United States v. Banks*, 520 F.2d 627, 630 (7th Cir. 1975)). Indeed, the Advisory Committee's note to Rule 601 clarifies that "[n]o mental or moral qualifications for testifying as a witness are specified . . . . *A witness wholly without capacity is difficult to imagine*. The question is one particularly suited to the jury as one of weight and credibility[.]" FED. R. EV. 601 (emphasis added). That note also remarks

that "[d]iscretion is regularly exercised in favor of allowing the testimony" over capacity objections. *Id.*

Witness-capacity objections face long odds, though the City contends those odds should have played out in its favor here. Dr. Heilbronner testified that LaPorta's injuries undermined his capacity to recall reliably the events leading up the shooting. (Heilbronner Tr. 3037:1-3047:8.) But the doctor also testified that it is "really difficult to say with any certainty exactly when [LaPorta's] memories are reliable and when they aren't"; he also conceded that it was not impossible that LaPorta remembered the events leading up to the shooting. (*Id.* 3046:1-3052:18.) The question, ultimately, is whether LaPorta's professed memories of the relevant events were reliable. That question goes to the proper weight to be afforded to LaPorta's recollections, which makes this a question for the jury. *See* Fed. R. Ev. 601; *see also United States v. Dawson*, 434 F.3d 956, 958 (7th Cir. 2006) (stating that Committee notes to the rules of evidence are "entitled to our respectful consideration"). There is no error here.

### 3. *Admission of the DOJ and PATF Reports*

The heart of the next debate is Federal Rule of Evidence 803(8), which creates a hearsay exception for records or statements of a public office. Reports fit within that exception when they contain factual findings resulting from a legally authorized investigation, so long as the party seeking to exclude the report has not shown it lacks trustworthiness. *See Daniel v. Cook Cty.*, 833 F.3d 728, 740 (7th Cir. 2016); *Lockwood v. McMillan*, 237 F. Supp. 3d 840, 846-49 (S.D. Ind. 2017). Permissible reports may contain both opinions and conclusions.

- 30 -

*Daniel*, 833 F.3d at 740 (citation omitted). Still, hearsay statements contained within an admissible report are not themselves made admissible by Rule 803(8). *See Lockwood*, 237 F. Supp. 3d at 849. At trial, the Court found that the DOJ and PATF reports fell within the 803(8) exception and accordingly permitted Plaintiff's counsel to read portions of each into the record. For a number of reasons, Chicago contends that was prejudicial error, though notably the City does not contend that these reports lacked trustworthiness. The Court is not persuaded by any of Chicago's arguments.

First, the City contends that the Court impermissibly allowed counsel to read into the record hearsay statements from the reports under the guise of 803(8). But the City points to zero instances of hearsay in its briefing—indeed, while the read-in portions of the reports recited some hearsay *sources* (*see, e.g.*, Tr. 2240:1-2242:3 (DOJ report summarizing report writers having met with a range of lay and expert sources)), those selections do not actually include the hearsay *statements* to which they allude.

Chicago also contends the factual and legal issues represented in these reports lack a "close fit" to the issues present in LaPorta's suit. *See Daniel*, 833 F.3d at 742. This second objection largely centers on the reports' allegedly irrelevant temporal focus: Neither report focuses on those years leading up to the January 2010 shooting, Chicago claims, so they cannot substantiate LaPorta's claims concerning the City's policies predating that event. But the PATF report reviewed IPRA records dating back to 2007. (*See* Tr. 2350:1-7 (recounting data reviewed in PATF report); Emanuel Statement Tr. 250:7-18 (summarizing scope of PATF

- 31 -

report).)  Chicago's timeliness argument has more traction with the DOJ report, which professes to be based on data dating back to December 2010. (*Compare* Tr. 2242 (describing report's review of police misconduct complaints during the five years preceding the DOJ investigation), *with* Tr. 2238:12-22 (stating investigation began in December 2015).)  However, the DOJ report findings do not limit themselves to these data, but rather express "*longstanding, systemic* deficiencies" in CPD policies.  (Tr. 2249:1-7.)  The Court thus again finds the report, which, much like the PATF report, consists of directly-relevant subject material, a close enough fit to the issues at bar in the case to fall within 803(8).

And even if this ruling was made in error, the Court believes it was harmless.  The portions of the DOJ report read into the record espouse substantially similar conclusions to those reached in the PATF report.  The jury would have heard the PATF conclusions whether or not the DOJ report was admitted, so the addition of the cumulative, second report does not rise to the level of prejudicial error.  *Cf. United States v. Pessefall*, 27 F.3d 511, 516 (11th Cir. 1994) (finding no reasonable probability of prejudice stemming from jury's consideration of extrinsic, but cumulative, evidence); *United States v. Pitman*, 475 F.2d 1335, 1337 (9th Cir. 1973) (rejecting argument for reversal predicated upon inadmissible evidence allowed in at trial that was cumulative of other, admissible evidence, and the record did not otherwise reflect prejudice against appellant).

Finally, Chicago objects that the PATF report cannot qualify under the 803(8) exception because PATF did not receive City funding and does not speak for the City.  This argument fails.  The City created PATF for

the express purpose of reviewing the system for accountability, oversight, and training in place for Chicago's police officers. The resulting findings, summarized in the PATF report, were thus "made by a public officer resulting from a legally authorized investigation," and the incidental inclusion in PATF of non-governmental personnel is "beside the point." *Simmons v. City of Chicago*, No. 14 C 9042, 2017 WL 3704844, at *8 (N.D. Ill. Aug. 28, 2017) (ruling on *motion in limine* that the PATF report fit the exception under 803(8).)

### 4. *Expert Testimony*

Next, Chicago argued the Court committed prejudicial error in admitting certain expert testimony from two witnesses, Dr. Ziejewski, LaPorta's biomechanics expert, and David Balash, LaPorta's crime-scene forensics expert.

Three parts of Dr. Ziejewski's testimony offend the City: (1) Ziejewski's testimony that it was unlikely that LaPorta, who generally used his right hand to shoot guns while hunting, would have used his left hand to shoot himself; (2) Ziejewski's participation with LaPorta's counsel in an in-court demonstration exemplifying the doctor's opinion of details concerning the shooting; (3) Ziejewski's testimony concerning the gunshot's angle of trajectory.

The first of these challenges zeroes in on eleven lines of Ziejewski's testimony:

Q. What's your second opinion – I'm sorry, third?

A. This would be unlikely for Mr. LaPorta with right-handed gun handling habit to use his left hand on January 12th, 2010.

Q. Did you review deposition testimony of his family?

A. Yes.

- 33 -

Q. And did that deposition testimony reveal that he had a habit or a tendency to use a hand when operating a gun or a rifle?

A. Yes.

Q. Which was that?

A. Right hand.

(Ziejewski Tr. 626:5-15.)

The City contends that this opinion went beyond the scope of the expert's testimony. But as the Court held in ruling on the motions *in limine*, an expert on human body biomechanics such as Dr. Ziejewski can rely on statements by LaPorta's family for the basic fact that LaPorta is right-hand dominant. (Mot in Limine Tr. 17:7-19.) "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusion based on that analysis are factual matters to be determined by the trier of fact[.]" *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Next, the City objects to the doctor's in-court demonstration of the shooting, contending that said demonstration was not properly disclosed in advance of trial. But as LaPorta points out, the demonstration simply consolidated physical evidence already described and relied upon by the doctor—all of which he discussed without objection from Chicago. (*See, e.g.*, Ziejewski Tr. 614:1-618:14 (testifying concerning LaPorta's body position, the blood evidence, tissue recovered at the scene, and gunshot residue).) The Court committed no error by permitting that demonstration to go forward.

Finally, but in the same vein, the City contends that the doctor should not have been permitted to testify that the bullet traveled at

- 34 -

an angle of somewhere between 35 and 45 degrees because this opinion, too, went undisclosed before trial. The doctor conceded on the stand that he had not previously testified to this angle; he also clarified that he derived that figure by measuring the path of the bony fragments depicted in LaPorta's CT scan. (*Id.* 633:5-633:23, 634:3-11.) If allowing this testimony constituted error, however, it was not prejudicial. LaPorta also adduced testimony from his forensic science expert, David Balash, who provided substantially similar shooting-angle testimony. (*See* Balash Tr. 1900:18-1901:9.) Delayed disclosures are prejudicial when said delay impacts the receiving party's ability to prepare for trial. *Cf. Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996) (upholding pre-trial refusal to exclude tardily-disclosed evidence when party seeking exclusion could not demonstrate any prejudice); *LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 9506787, at *2 (N.D. Ill. Sept. 7, 2010) (granting pretrial motion to exclude tardily-disclosed evidence because the delay prejudiced opponent's ability to prepare for trial). No such prejudice arose from LaPorta's late disclosure here. Because Balash's substantially similar opinion was timely disclosed, the City did not want for advance notice of this cross-examination topic. The danger of prejudice from an at-trial surprise was thus extinguished, as the disclosure of Dr. Ziejewski's opinion would have been cumulative.

As for David Balash, Chicago lodges two complaints, concerning: (1) Balash's testimony regarding the flaws in CPD's investigation of the LaPorta shooting; and (2) his comments that the prosecuting state's attorney had a faulty understanding of gunshot residue ("GSR") evidence.

With the first challenge, the City focuses on Balash's critiques of a number of shortcomings in the CPD investigation, including the failure to collect and preserve evidence and the belief that because the CPD improperly labeled the shooting as a suicide, the investigation necessarily received shorter shrift in the department than it would have had it been labeled as a possible homicide. LaPorta introduced Balash as an expert in crime-scene forensics; during his 25 years as a police officer, Balash frequently processed crime scenes, meaning he had made a career of observing, collecting, and preserving evidence in investigations which included both suicides and homicides. (Balash Tr. 1857:19-1858:25, 1860:9-24.) Given this breadth of experience, Balash was certainly qualified to opine on the best practices for evidence collection and crime-scene processing, which is all Chicago objects to here.

Chicago's objection to Balash's testimony concerning the prosecutor's understanding of GSR evidence similarly falls short. The City complains that Balash predicated this opinion on a misunderstanding of a form the prosecutor filled out in documenting her decision not to approve criminal charges against Kelly. Indeed, Balash conceded at trial that he did not review that prosecutor's deposition transcript, and so he lacked insight into her later-provided clarifications of her thinking at the time she filled out the contested form. (Balash Tr. 1993:5-8.) But this is prime grounds for cross-examination, not disqualification of an otherwise expert opinion. Ultimately, this is a battle of the proper weight to be afforded to Balash's testimony on this score, and it is within the jury's province to make such determinations. The Motion

for New Trial is denied insofar as it objects to expert testimony presented by either Dr. Ziejewski or Mr. Balash.

### 5. Miscellaneous Objections

Chicago levies two additional challenges to this Court's rulings which do not fit neatly under any of the above headings. The first of these is the City's belief that the Court should have bifurcated the trial: the refusal to do so amounted to an abuse of discretion, Chicago contends, as it allowed the jury to hear and be swayed by evidence of LaPorta's extensive damages even before the City had been found liable. But bifurcation is the exception and not the rule. *See Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 620 (N.D. Ill. 2000) (collecting cases). And the decision to bifurcate rests soundly within the trial court's discretion. *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000). In this case, the Court properly instructed the jury to perform its duty impartially and to put the issue of damages to the side unless and until it concluded Chicago was liable. (Tr. 3580:2-14, 3588:19-25.) As always, the Court presumes that "jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions . . . and strive to understand, make sense of, and follow the instruction given them." *United States v. Puckett*, 405 F.3d 589, 599 (7th Cir. 2005) (citation omitted); *see Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010) (applying same presumption in a civil case). It cannot be that bifurcation is required every time a plaintiff's injuries are severe, and Chicago has not provided any authority suggesting as much. The bifurcation ruling is not grounds for a new trial.

Second, Chicago contends it was error for the Court to allow LaPorta's counsel to read a letter, written by counsel in LaPorta's voice, to the jury in closing argument. In this letter "from LaPorta" to LaPorta's family, counsel demonstrated what counsel understood to be LaPorta's wishes and regrets after the shooting. (Tr. 3492:1-21.) Chicago argues the letter was designed only to stir the jury's passions, was not based on any evidence, and amounted to an improper and prejudicial request for sympathy. *See Cole v. Bertsch Vending Co.*, 766 F.2d 327, 334 (7th Cir. 1985) (stating, in case where attorney "openly asked the jury to feel sympathetic towards his clients," that "[r]equesting sympathy for a defendant is improper especially where such argument may have a prejudicial impact upon the result") (citations omitted). First off, the Seventh Circuit has "repeatedly explained that improper comments during closing argument rarely rise to the level of reversible error." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008) (citation and internal quotation marks omitted). "To constitute reversible error and warrant a new trial, statements made during closing argument must be 'plainly unwarranted and clearly injurious.'" *Warfield v. City of Chicago*, 679 F. Supp. 2d 876, 888 (N.D. Ill. 2010) (quoting *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 730 (7th Cir. 1999)). The letter at issue here, though creative, does not rise to that prejudicial level. It was not spun from whole cloth, but rather based on evidence concerning LaPorta's desire and inability to have a family (P. LaPorta Tr. 1361:10-21), his ambition to run his father's company (*id.* 1342:4-25), and the details of daily care LaPorta now requires (*id.* 1381:3-1388:20; Howland Tr. 2006:2008-10). Beyond this, the Court properly

- 38 -

advised the jury that closing argument is not evidence. (Tr. 3582:11-15; *Soltys*, 520 F.3d at 745 ("[C]urative instructions to the jury mitigate harm that may otherwise have resulted from improper comments during closing argument. . . . [And when such instructions are given,] we presume that the jury obeyed the court.") (citations and internal quotation marks omitted).) Reading this letter was not plainly unwarranted and clearly injurious; it provides no basis for a new trial.

In sum, the Court finds that none of the evidentiary-ruling errors Chicago alleges, whether considered discretely or cumulatively, worked prejudice upon the City warranting a new trial. The new trial Motion is denied in relevant part.

### C. Jury Findings Were Against the Manifest Weight of the Evidence

Under Federal Rule of Civil Procedure 59(a), this Court will set aside a verdict as contrary to the manifest weight of the evidence "only if no rational jury could have rendered the verdict." *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 314 (7th Cir. 2011) (citation and internal quotation omitted). In seeking to carry this hefty burden, Chicago largely repackages those arguments it raised in its renewed JMOL Motion. As before, those arguments find no purchase here.

Chicago objects, first, to the jury's finding that the City failed to maintain an Early Warning System, or "EWS." As before, the City contends that LaPorta's evidence focused on an irrelevant time frame; zeroed in too much on Kelly, particularly, and failed to speak to a citywide failure, generally; and demonstrated that even Reiter, LaPorta's own police-practices expert, believed the City's EWS to be

- 39 -

adequate.  The Court has already reviewed and found each of these arguments unpersuasive or simply inaccurate and sees no need to recycle that analysis.  Through Reiter especially, LaPorta adduced evidence that Chicago had historic and system deficiencies in failing to implement an EWS; the jury's ultimate agreement with him is not against the manifest weight of the evidence.

Next, Chicago takes issue with the jury's finding that the City failed to discipline its officers when appropriate.  Chicago argues that LaPorta only ever adduced evidence concerning the City's failures to discipline after *allegations* of misconduct were made, as opposed to any *findings* of misconduct.  Such evidence, according to Chicago, fits only within LaPorta's failure-to-*investigate* theory, and has no place in the failure-to-*discipline* theory.  There are two problems with that argument.  First, it is too clever by half: Though these two theories are discrete, it is not true that the evidence in support of one cannot also support the other.  If, for example, the City never investigated any officer accused of misconduct, that fact would support both theories: The City failed to investigate all allegations and, because of that systemic nonfeasance, never disciplined any deserving officer.  Second, Chicago's argument simply misstates the evidence.  As explained above, LaPorta indeed adduced evidence showcasing the City's "opaque, drawn-out, and unscrutinized disciplinary process" that frequently enabled officers "to avoid meaningful consequences."  (Tr. 2350; *see supra* at Part I.D.)  On this basis, a rational jury could have reached the verdict returned in this case; no new trial is warranted.

### III. LaPORTA'S BILL OF COSTS

Federal Rule of Civil Procedure 54(d)(1) provides that a prevailing party may obtain reimbursement for certain litigation costs at the conclusion of a lawsuit. The Rule establishes a "presumption that the prevailing party will recover costs, and the losing party bears the burden of an affirmative showing that taxed costs are not appropriate." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir. 2005) (citing *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991)). In evaluating an application for costs, the Court must first determine whether the claimed expenses are recoverable and, second, whether the costs requested are reasonable. *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000) (citation omitted). "The prevailing party bears the burden of demonstrating the amount of its recoverable costs because the prevailing party knows, for example, how much it paid for copying and for what purpose the copies were used." *Telular Corp. v. Mentor Graphics Corp.*, No.01 C 431, 2006 WL 1722375, at *1 (N.D. Ill. June 16, 2006). Given the burden on the prevailing party, requested costs should not be awarded when they cannot be reasonably obtained by reference to the submitted, supporting documentation. *Harkins v. Riverboard Servs., Inc.*, 286 F. Supp. 2d 976, 980 (N.D. Ill. 2003). The Court has "wide latitude" in fixing a reasonable award. *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (citations omitted).

LaPorta seeks $748,979.03 in costs. In what proves to be a recurring theme, however, LaPorta often falls short of his burden to show these costs with the minimal particularity required for the Court

to determine whether they are reasonably necessary and thus compensable. LaPorta submits, principally, two filings in support of its bill of costs: a 13-page summary spreadsheet and 550 pages of check requests, receipts, and invoices. Those latter documents are not organized, as far as the Court can see, according to any particular scheme: Neither date nor subject matter governs them, and the summary spreadsheet does not provide any cross-references to them. This submission often further obscures an already-translucent costs analysis, as set forth below.

### A. Costs for Experts

LaPorta seeks $590,725.04 in costs under this umbrella. Those costs comprise three subcategories: (1) expert witness fees; (2) "attorney fees" for potential—but ultimately never called upon—expert witness Gregory E. Kulis; and (3) costs associated with a focus group or "mock jury" preparation. The first two of these can be handled in one fell swoop. Recovery for expert expenses in § 1983 cases is limited to fees provided by § 1920 and § 1821. *Fields v. City of Chicago*, No. 10 C 1168, 2018 WL 253716, at *11 (N.D. Ill. 2018) (reducing expert costs to $40-per-day witness fee permitted by 28 U.S.C. § 1821(b)). LaPorta's submissions do not clarify how many days each of his experts spent toiling on his case, nor even how many experts LaPorta actually retained. For what it is worth, LaPorta contends in his reply that he retained twelve. (Bill of Costs Reply at 2, Dkt. 545.) In his submissions, however, the Court counts nineteen: Gregory E. Kulis and Associates, Ltd. (though listed under "Attorney Fees" in LaPorta's submissions, Chicago points out, and LaPorta does not contradict, that Kulis was not retained as counsel but rather as an expert in this case); Baron Epstein;

- 42 -

David E. Balash; Edward D. Rothman; Howland Health Consulting, Inc.; Independent Forensics; Law Enforcement Risk Management Group; Legal and Liability Risk Management Institution; Mark R. Perez; MicroTrace, LLC; MZ Engineering; Neurological Professionals; Noble Consulting & Expert Witness Service; Ricardo G. Senno; Richard B. Lazar; Robert L. Heilbronner; Vincent DiMaio; Vocational Economics, Inc.; and WD Forensic, Inc. (Exs. to Chicago's Bill of Costs Objections at 9-11, Dkt. 516.) To any extent, the Court presumes LaPorta knows best who he did and did not retain, no matter what his submissions say; in the absence of further detail, the Court awards LaPorta $40 in fees for 3 days for each of the 12 experts he says he retained in this matter. Awarding $120 per expert accounts for each expert's testimony and some reasonable time spent preparing. *Se-Kure Controls, Inc. v. Vanguard Prod. Grp., Inc.*, 873 F. Supp. 2d 939, 956 (N.D. Ill. 2012) (permitting recovery for expert witness preparation time). In sum, that expert fee award amounts to $1,440.00.

As for LaPorta's mock trial(s)/focus group(s): Chicago contends that the sought-after costs within this subcategory total $35,338.27. (*See* Bill of Costs Objections at 5.) The Court reaches a different figure, calculating $60,570.25 by adding together the five line items in LaPorta's bill of costs labeled as either "mock trial" or "focus group." (Exs. to Chicago's Bill of Costs Objections at 12-14, Dkt. 517.) To any extent, while the attorney time for such practice sessions is billable as reasonable attorney fees in complex cases such as this one, *Wells v. City of Chicago*, 925 F. Supp. 2d 1036, 1046 (N.D. Ill. 2013), the other affiliated costs are not recoverable. Presumably, LaPorta

accounted for the related billables in his petition for attorneys' fees, which the Court takes up below. That is left for later. For now, none of the $60,570.25 will be awarded as costs.

### B. Travel and Lodging for Witnesses and Counsel

Sections 1821 and 1920(3) authorize the award of costs to reimburse witness for their reasonable travel, lodging, and subsistence expenses. 28 U.S.C. §§ 1821, 1920(3). Travel costs for attorneys, however, are not recoverable, *Movitz v. First Nat'l Bank of Chi.*, 982 F. Supp. 571, 577 (N.D. Ill. 1997) (citing 18 U.S.C. § 1920), so those costs will not be allowed, *see, e.g.*, Bill of Costs Objections at 1, 9-12 (expenses for attorney Gould's Uber ride; for Gould and attorney Romanucci's car rentals; and for Romanucci's travel to Los Angeles and Phoenix for depositions). Further, a number of LaPorta's line entries reflect travel expenses of witnesses (often for depositions) presumably to avoid imposing the same costs on attorneys. (*See, e.g.*, *id.* at 9 (witness Balash travels to Chicago four months before the start of trial).) Because, absent that cost-shifting, the attorney would have borne the cost of travel in non-compensable fashion, these witness costs will not be permitted. *Movitz*, 982 F. Supp. at 577 (citation omitted).

The Court will, however, allow reasonable travel, lodging, and subsistence expenses for witnesses who traveled to Chicago *for trial*. From the Court's review of LaPorta's submissions, such travel expenses total $667.03, reflecting trial travel expenses for Dr. Rothman and Howland Health Consulting, Inc. (Bill of Costs Objections at 12.) Chicago has not raised any specific objections to these costs, and the Court finds them to be reasonable. They shall be allowed.

- 44 -

As for the sought-after lodging and subsistence costs: "A subsistence allowance may be paid to a witness when an overnight stay is required at the place of attendance, up to the maximum *per diem* amount prescribed by the Administrator of General Services, in accordance with 5 U.S.C § 5702(a)." *Richman v. Sheahan*, No. 98 C 7350, 2010 WL 2889126, at *3 (N.D. Ill. July 14, 2010) (citing 28 U.S.C. § 1821(d)(1)–(d)(3)). The maximum *per diem* rate allowable in Chicago in October and November of 2017, when this trial occurred, was $300, which included fees for lodging, meals, and incidental expenses. *See* U.S. General Services Administration, Fiscal Year 2018 Domestic Per Diem Rates, (2018), *available at https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-rates-lookup/?action=perdiems_report&state=IL&fiscal_year=2018& zip=&city=; cf. Richman*, 2010 WL 2889126, at *3 (conducting similar *per diem* inquiry). The Court will not allow subsistence costs above that amount, and accordingly awards as follows, which are the witness expenses supported by the submitted documentation: $600.00 for Dr. Ziejewski's two-day stay in Chicago; $900.00 for Mr. Rothman's three-day stay; $900.00 for Mr. Reiter's three-day stay; and $900.00 for Ms. Howland's three-day stay, all for a total of $3,300.00. (*See* Bill of Costs Objections at 11.) Those expenses for meals and lodging recited in LaPorta's documents but exceeding these values shall not be allowed. (*See id.* at 11-12.)

Finally, LaPorta seeks costs for attorneys' meals. But such expenses are not compensable and will be denied. *Fields*, 2018 WL 253716, at *11 ("[P]resumably those involved would have had to eat even had they not been involved in this case.").

- 45 -

### C. Deposition Transcript Costs

LaPorta claims $66,081.59 in costs under this umbrella. A prevailing party may recover "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2). Local Rule 54.1(b) provides for recovery of the transcript at a cost not to exceed "the regular copy rate as established by the Judicial Conference of the United States and in effect at the time the transcript or deposition was filed unless some other rate was previously provided for by order of court." *DSM Desotech, Inc. v. 3D Sys. Corp.*, No. 08 CV 1531, 2013 WL 3168730, at *4 (N.D. Ill. June 20, 2013).

Chicago objects to these costs, arguing that they represent numerous non-compensable expenses and, further, that the lion's share of these costs should be denied because the documentation LaPorta submitted is neither specific nor organized enough to permit the City or the Court to parse the compensable expenses from those that are not. As a general matter, many of Chicago's objections have merit. First, costs for deposition transcript word indexes are not recoverable absent a showing that they were reasonably necessary in this case—a showing LaPorta has not made. *Porter v. City of Chicago*, No. 8 C 7165, 2014 WL 3805681, at *2 (N.D. Ill. Aug. 1, 2014) (collecting cases). Costs for deposition exhibits likewise must be established as reasonably necessary, but LaPorta failed to muster a specific explanation for these as well. *See Lewis v. City of Chicago*, No. 04 C 6050, 2012 WL 6720411, at *7 (N.D. Ill. Dec. 21, 2012). Next, costs for electronic copies or "e-transcripts" are not recoverable, *see The Medicines Co. v. Mylan Inc.*,

- 46 -

No. 11 CV 1285, 2017 WL 4882379, at *4 (N.D. Ill. Oct. 30, 2017) (citation omitted), nor are delivery or handling costs, *Correa v. Ill. Dep't of Corrections*, No. 05 C 3791, 2008 WL 299078, at *2 (N.D. Ill. Jan. 29, 2008); *Riley v. UOP LLC*, 258 F. Supp. 2d 841, 845 (N.D. Ill. 2003). LaPorta also seeks costs for video recording of depositions, but generally, "[c]ourts in this circuit will not award costs for videotaping depositions where a transcript was also purchased." *Martinez v. City of Chicago*, No. 14 CV 369, 2017 WL 1178233, at *20 (N.D. Ill. Mar. 30, 2017) (citation and internal quotation marks omitted) (brackets in original). LaPorta ordered transcripts for each of the depositions for which he seeks videotaping costs, but he cannot recover both expenses; the videotaping costs will not be allowed.

What remains after the above have been subtracted are simply costs for the deposition transcripts themselves (*sans* the indexes). But as foreshadowed, most of LaPorta's invoices fail to break out the non-recoverable costs for word indexes, thus blocking the Court from determining which portion of those invoices should be allowed as costs and which refused. Nor does LaPorta's summary spreadsheet provide useful clarification. That sheet presents four pertinent data for each entry: the date (of what, it is not clear, although the Court assumes these are invoice dates); the "source name," meaning the payee; "memo," meaning the subject of the transcript; and the total cost for that transcript. These entries omit, however, any helpful means of actually navigating the muddled batch of 550 pages of invoices, receipts, and check requests LaPorta submits in support of his bill of costs. (*See* Ex. A to LaPorta's Bill of Costs, Dkts. 465-467 (receipts filed across three different

docket entries).)  If LaPorta's summary spreadsheet at least included pincite references to these documents for each expenditure, the Court could compare and review them.  Absent this, the Court is left largely to guess which transcripts were reasonably necessary and thus compensable, and guesswork is not a proper method for fixing costs.

Notably, even after Chicago levied these objections, LaPorta made no effort in reply to clarify which receipts correspond to which transcripts, or to explain what portion of each of those opaque invoices represents non-recoverable word indexes.  Given that failure, LaPorta has not met his burden to show the amount of his recoverable costs as far as these invoices are concerned.  None of the costs reflected therein will be allowed.  Eliminating those indecipherable invoices leaves behind twenty-seven invoices which, as Chicago points out, actually itemize their respective index costs.  Of the $9,448.45 total those itemized invoices represent, $334.00 is for word indexes, $350.00 for electronic copies, $294.00 for processing and handling, and $145.20 for exhibits.  After subtracting these non-recoverable expenses from the $9,448.45 (see collected cases, above), we are left with $8,325.25 and, because all of the prices-per-page reflected in these invoices come in below the limits set by the Judicial Conference, *see* Local Rule 54.1(b) (permitting recovery of transcript costs only up to the Judicial Conference per-page limit); *Mylan*, 2017 WL 4882379, at *4 (summarizing limits), the Court will allow this remaining sum.

### D.  Hearing Transcripts

LaPorta seeks $232.05 in costs for seven pre-trial hearing transcripts.  "Courts in this District have generally awarded costs for

transcripts of [relatively routine motion hearings] only when the prevailing party articulates some specific necessity—for example, where the written record of the status call or motion hearing was the basis for, or relevant to, some subsequent motion or filing, or to supply out-of-state counsel with a record of the proceedings." *Hillmann v. City of Chicago*, No. 04 C 6671, 2017 WL 3521098, at *7 (N.D. Ill. Aug. 16, 2017) (collecting cases). LaPorta makes no effort to explain his need for these transcripts, and, absent some explanation of a specific need, the Court, having reviewed the transcripts at issue (insofar as the Court was able to identify them from LaPorta's submissions), believes "careful notes by counsel" would have sufficed. *See id.* These pre-trial transcript costs will not be allowed.

### E. Copying and Exemplification

The Court may allow costs fees for copying and exemplification of papers necessarily obtained for use in the case. 28 U.S.C. § 1920(4). But to receive its copying costs, LaPorta must "identify the nature of each document copied, the number of copies of each document prepared, the copying cost per page, and the total copying cost." *Druckzentrum Harry Jung GmbH & Co. KG v. Motorola, Inc.*, No. 09 CV 7231, 2013 WL 147014, at *7 (N.D. Ill. Jan. 11, 2013) (citation and internal quotation marks omitted). This LaPorta failed to do. Instead, he simply provided a base calculation indicating that he paid for 70,961 black and white pages at $0.05 per page and 1,492 color pages at $0.15 per page for a total of $3,771.85. This threadbare recitation in no way informs the Court as to the nature of these documents or as to how many copies of each document were ordered. But, acknowledging that LaPorta certainly

must have reasonably copied *some* materials during this seven-year litigation, the Court will allow 50% of the sought-after copying costs, or $1,885.93.

As for exemplification: LaPorta is correct that many types of presentations may fall within the allowable exemplification costs contemplated by § 1920(4). *See Cefalu v. Village of Elk Grove*, 211 F.3d 416, 428 (7th Cir. 2000). But first, the Court must determine whether the exemplification was "vital to the presentation" or "merely a convenience or, worse, an extravagance." *Id.* (citation omitted). "Among the factors that the judge might consider in evaluating the necessity of a particular type of exemplification is whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed." *Id.* When the prevailing party fails to identify the exhibits for which it claims costs, this exercise becomes impossible, and courts deny the award of costs. *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 750 F. Supp. 2d 962, 981 (N.D. Ill. 2010) (citing *Vigortone Ag Products, Inc. v. PM Ag Products, Inc.*, No. 99 C 7049, 2004 WL 1899882, at *8 (N.D. Ill. Aug. 12, 2004)). Such is the shortcoming for nearly all of LaPorta's sought-after exemplification costs, which comprise: unspecified "trial boards," "3-D Graphics," five generic "video" costs, and $1,500.00 for the "Day in the Life" video shown at trial. (*See* Exs. to Chicago's Bill of Costs Objections at 2-3, Dkt. 517.) All but the last of these are too generically labeled for the Court to determine whether they were vital and thus compensable. The last depicted the difficulties LaPorta faces each day as a result of his injuries. The Court agrees that these difficulties were best

laid out for the jury in video form, and so, because the subject matter called for videographic means of illustration, the associated $1,500.00 in associated exemplification costs will be allowed.

### F.  Service of Process

LaPorta initially sought $3,125.96 in costs for subpoena service fees.  But Chicago pointed out this number should be reduced by $1,083.85 because service fees cannot exceed $55.00 per hour, *see Specht v. Google Inc.*, No. 09 C 2572, 2011 WL 2565666, at *4 (N.D. Ill. June 27, 2011)*,* and also because LaPorta sought costs for service upon individuals who never actually testified (at deposition or otherwise).  In reply, LaPorta concedes to Chicago's objections and agrees his service of process costs should be reduced by $1,083.85.  The Court has reviewed the applicable supporting documents and concurs, so LaPorta shall be awarded $2,042.11 under this category.

### G.  Miscellaneous Costs

LaPorta seeks $2,306.25 for videoconferencing costs accrued from the long-distance deposition of Illana Rosenweig, who lives in Singapore. But courts in this District have declined to award such costs, be they for phone charges or room rentals.  *See Hillmann*, 2017 WL 3521098, at *5-6 (collecting cases).  This cost is declined.

Next are LaPorta's $4,391.14 in "case costs" from Salvato & O'Toole.  LaPorta universally fails to describe these costs with the specificity needed for this Court to determine their reasonable necessity.  These costs are also declined.

Three other costs are similarly vague and must be declined: $12.76 for unspecified "Daley Center Copies"; $17.78 for some "supplies"; and $9,252.00 for a nowhere-explained "investigation."

Based on the above, the Court allows LaPorta $19,160.32 in total costs.

## IV.  LaPORTA'S PETITION FOR ATTORNEYS' FEES

The Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, allows the award of reasonable attorney's fees to the prevailing party in various kinds of civil rights cases, including suits brought under § 1983. *Fox v. Vice*, 563 U.S. 826, 832-33 (2011) (citation and internal quotation marks omitted). The statute serves the dual purpose of reimbursing plaintiffs for vindicating important civil rights and holding accountable violators of federal law. *See id.* However, a defendant "need only compensate plaintiff for fees to the extent plaintiff succeeds; losing claims are not compensable." *Kurowski v. Krajewski*, 848 F.2d 767, 776-77 (7th Cir. 1988).

In awarding fees under § 1988, a court's first step is to determine whether the party seeking fees is entitled to "prevailing party" status. *Gibson v. City of Chicago*, 873 F. Supp. 2d 975, 982 (N.D. Ill. 2012). Under one formulation approved by the Supreme Court, "plaintiffs may be considered prevailing parties for the purpose of awarding attorneys' fees if they succeed on any significant issue in the litigation which achieves some of the benefit the parties sought in bringing suit." *Baker v. Lindgren*, 856 F.3d 498, 503 (7th Cir. 2017) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). This is not a close question here,

where LaPorta won a $44.7 million verdict on his *Monell* claims. He is clearly the prevailing party in this litigation.

To calculate reasonable attorneys' fees under § 1988, courts apply the "lodestar method," which multiplies the attorneys' reasonable hourly rates by the number of hours they reasonably expended. *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1310 (7th Cir. 1996) (citing *Hensley*, 461 U.S. at 433). The party requesting fees carries the burden of establishing their reasonableness. *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 518 (7th Cir. 1993). Once the Court has arrived at a base lodestar figure, it may enhance that figure in the rare instance that the lodestar fails to "take into account a factor that may properly be considered in determining a reasonable fee." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553-54 (2010).

Plaintiff seeks a total of $4,515,567.50 in attorneys' fees, calculated as follows:

| Attorney | Hourly Rate | Hours | Total per Attorney |
|---|---|---|---|
| *from Romanucci & Blandin*: | | | |
| Antonio Romanucci | $750 | 2021.55 | $1,516,162.50 |
| Stephan Blandin | $750 | 288.30 | $216,225.00 |
| Gina DeBoni | $500 | 7.40 | $3,700.00 |
| Debra Thomas | $500 | 2788.25 | $1,394,125.00 |
| Michael Holden | $425 | 7.05 | $2,996.25 |
| Bruno Marasso | $400 | 278.00 | $111,200.00 |
| Bhavani Raveendran | $350 | 28.55 | $9,992.50 |
| Martin Gould | $350 | 1410.70 | $493,745.00 |
| Nicolette Ward | $350 | 661.45 | $231,507.50 |
| Rebekah Williams | $350 | 57.40 | $20,090.00 |
| Kelly Armstrong | $350 | 16.70 | $5,845.00 |
| | | | |
| *from Salvato & O'Toole*: | | | |
| Carl Salvato | $600 | 466.60 | $279,960.00 |
| Paul O'Toole | $600 | 3.00 | $1,800.00 |
| Jason E. Hammond | $400 | 3.00 | $1,200.00 |
| Matt Popp | $350 | 18.50 | $6,475.00 |

*from Schiller Preyar*:

| | | | |
|---|---|---|---|
| Brendan Schiller | $500 | 51.90 | $29,950.00 |
| Susan Ritatta | $350 | 20.60 | $7,210.00 |
| Lillian McCartin | $400 | 10.90 | $4,360.00 |
| Tia Haywood | $350 | 30.70 | $10,745.00 |

*Across All Firms*:

| | | | |
|---|---|---|---|
| Law Clerks | $125 | 700.25 | $87,531.25 |
| Paralegals | $125 | 675.08 | $84,385.00 |
| Admin. Staff | $125 | 42.90 | $5,362.50 |

## A. Hourly Rates

The Court begins by examining counsels' claimed hourly rates. In determining a reasonable hourly rate, attorneys' fees awarded under Section 1988 "are to be based on market rates for services rendered." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283 (1989) (citations omitted). "The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care*, 90 F.3d at 1310 (quoting *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993)). The next best evidence of a reasonable fee is the rate charged by lawyers in the community of comparable skill, experience, and reputation. *Id.* Previous fee awards are also "useful for establishing a reasonable market rate." *Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 491 (7th Cir. 2009).

At the outset, Chicago contends, correctly, that LaPorta's efforts to justify the proposed rates largely miss the mark. LaPorta submits affidavits from two Chicago-based, class-action litigators, who both attest to the reasonableness of the proposed figures. (*See generally* Exs. 24, 25, Cherry & Zolna Decls., Dkts. 549-1.) But while the rates charged by other community lawyers can be helpful benchmarks, those attorneys' attestations to what rates are and are not reasonable is less

persuasive. And to any extent, the two attorneys in question are class-action counsel, not civil-rights litigators. This distinction matters: "The reasonable fee is capped at the prevailing market rate for lawyers engaged in the type of litigation in which the fee is being sought." *Cooper v. Casey,* 97 F.3d 914, 920 (7th Cir. 1996) (citation omitted).

LaPorta tries to prop up his suggested billing rates by reference to lawsuits having nothing to do with police misconduct or even, in many cases, Chicago. First, the costs of lawyering are not uniform across the country, which is why market rate comparisons should be made to lawyers of comparable skill, experience, and reputation *in the same community*. *Jeffboat*, 553 F.3d at 491. And second, as Judge Matthew Kennelly recently observed in a similar case, "the relevant frame of reference is civil rights / police misconduct litigation, not commercial litigation." *Fields*, 2018 WL 253716, at *3.

Last, LaPorta points out that his proposed rates fall within the *Laffey* matrix, "a chart of hourly rates for attorneys and paralegals in the Washington, D.C. area that was prepared by the United States Attorney's Office for the District of Columbia to be used in fee-shifting cases." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 649 (7th Cir. 2011). But as this Court has pointed out, the Seventh Circuit has not formally adopted the *Laffey* matrix, and the rates charges therein are "significantly higher than those charged in this district." *Baker v. Ghidotti*, No. 11 C 4197, 2015 WL 1888004, at *3 (N.D. Ill. Apr. 24, 2015) (quoting *Gibson*, 873 F. Supp. 2d at 984), *aff'd in part, vacated in part sub nom. Baker v. Lindgren*, 856 F.3d 498 (7th Cir. 2017).

Beyond this and a few arguments concerning the propriety of the proposed rates for his lead counsel, LaPorta does not offer any specific arguments concerning the rates for his individual lawyers. He largely allows those attorneys' affidavits to speak for themselves. Chicago, however, makes several attorney-specific arguments. Against this backdrop, the Court must determine what rates are reasonable.

*Antonio Romanucci and Stephan Blandin.* Neither attorney provides specific rates they actually charged any past or present client. Rather, Romanucci suggests that he effectively charged $1000/hour in a set-fee matter. The Court finds more useful than this Chicago's identification of *Fields,* in which the court awarded attorney Jon Loevy a rate of $550 for his work on a multi-year civil rights case that involved *Monell* claims against the City and culminated in a month-long trial. 2018 WL 253716, at *3. The *Fields* court took care to note that Mr. Loevy is "one of the top (if not *the* top) plaintiff's attorneys for police misconduct suits in Chicago." *Id.* at 3 (emphasis in original). Based on this comparison and factoring in Romanucci's attested-to lengthy experience in civil-rights litigation, the Court sets his rate equal to Mr. Lovey's at $550 an hour. The Court sets Blandin's rate at $450 per hour, with the discount from Romanucci's rate reflecting Blandin's lesser experience with police misconduct litigation. (*See* Blandin Aff. at 86-88, Dkt. 549-1.)

*Michael Holden.* Holden, like attorneys Steven Art and Cindy Tsai in the *Fields* case, has about eight years of litigation experience. Those attorneys' rates were set at $325 per hour in *Fields,* and the Court will set the same rate for Holden here.

*Bruno Marasso.* Unlike Holden, who has been practicing for ten years, Marasso started working as a lawyer in 2012. The two attorneys in *Fields* with a similar range of experience received hourly rates of $275. The Court does not see the same distinction as does the City between those attorneys' degrees of specialization and Marasso's, so the Court will adopt the $275/hour rate.

*Martin Gould.* Gould has a few years' less experience than Marasso. His rate shall be set at $225/hour.

*Nicolette Ward.* Ward has been a member of the bar since only 2016—two years less than Gould—though she avers that she has spent the majority of that brief time in practice working on police misconduct matters. The Court sets her rate at $200/hour.

*Gina DeBoni.* Chicago contends DeBoni should be compensated at a depressed rate because her work amounts to drafting letters and reviewing documents. But DeBoni's affidavit indicates that she was a managing attorney at the firm during this case and her work included communicating with opposing counsel and participating in case strategy sessions. These are not the tasks of a paralegal and should not be reduced to such. Based on her 15+ years of practice but relatively little civil-rights experience, the Court sets her rate at $350.

*Rebekah Williams & Kelly Armstrong.* LaPorta has not produced an affidavit for either of these attorneys nor any description of who they are or what their background is. The Court thus cannot determine a reasonable fee nor say that LaPorta has met his burden of producing evidence to support the proposed rates for these attorneys. The Court will not award fees for either.

*Bhavani Raveendran.* Raveendran has been an attorney about as long as Marasso and has as much civil-rights litigation experience, if not more. His rate will be set at $275/hour.

*Debra Thomas.* Thomas has been practicing since 2002. In this case she appears to have focused her efforts on discovery review and organization, as well as some witness preparation. Her affidavit does not evince much experience with civil rights litigation beyond her participation in this case. Though she has more lawyering years under her belt than some, her experience falls short of Blandin's or Romanucci's. The Court sets her rate at $300/hour.

*Law Clerks & Paralegals.* Both parties agree that this hourly rate should be $125. This rate is supported by case law, and the Court will adopt it. *See Awalt v. Marketti*, No. 11 C 6142, 2018 WL 2332072, at *4 (N.D. Ill. May 23, 2018).

*Staff Assistants & Office Managers.* Fees for such employees are non-compensable overhead. *See Fields*, 2018 WL 253716, at *5. These fees will not be awarded.

*Carl Salvato & Paul O'Toole.* These attorneys originated this litigation but quickly referred it to Romanucci & Baldwin, who acted as counsel in this case and took it to trial. Though experienced litigators, neither Salvato nor O'Toole has any attested-to experience with civil-rights litigation. Both attorneys' rates are set at $300/hour.

*Jason E. Hammond & Matt Popp.* As with Rebekah Williams & Kelly Armstrong, LaPorta has not provided an affidavit or other explanatory documentation for either of these attorneys. The Court cannot assess

the reasonableness of their rates, therefore, and will not award their fees.

*Brendan Shiller.*  A few years ago, another court in this district considered Shiller's experience at some length in a different civil rights suit and settled on a rate of $385/hour, even though Shiller had done "none of the trial work" in that case.  *Montanez v. Chi. Police Officers Fico (Star No. 6284), Simon (Star No. 16497)*, 931 F. Supp. 2d 869, 875-76 (N.D. Ill. 2013), *aff'd sub nom. Montanez v. Simon*, 755 F.3d 547 (7th Cir. 2014).  The Court finds that discussion and Shiller's decade-plus of litigation experience instructive and sets his rate at $385/hour.

*Susan Ritatta, Lillian McCartin, & Tia Haywood.*  The billing entries provided for these three associates suggest that nearly all of their work in this case consisted of providing deposition abstracts to Romanucci & Blandin.  Such tasks are generally "left to legal assistants, who bill their time at a much lesser rate than a member of the Bar." *Lockrey v. Leavitt Tube Employees' Profit Sharing Plan*, No. 88 C 8017, 1991 WL 255466, at *6 (N.D. Ill. Nov 22, 1991) (Rovner, J.).  The Court will accordingly set each of these attorneys' rates at $125/hour, an appropriate number for such work.

### B.  Hours Billed

The hours-worked component of the lodestar calculation excludes hours "not reasonably expended," such as hours that are "excessive, redundant, or otherwise unnecessary," *Awalt*, 2018 WL 2332072, at *1 (quoting *Hensley*, 461 U.S. at 434), as well as hours expended by counsel on tasks "that are easily delegable to non-professional assistance,"

- 59 -

*Evans v. Portfolio Recovery Assocs., LLC*, No. 15 C 4498, 2017 WL 2973441, at *3 (N.D. Ill. July 12, 2017) (quoting *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 553 (7th Cir. 1999)).  The prevailing party has the burden of proving the reasonableness of the time expended in litigation, *Fields*, 2018 WL 253716, at *2 (citing *Hensley*, 461 U.S. at 433, 437), and that party's billing records must be sufficient to allow the court to determine as much, *Gibson*, 873 F. Supp. 2d at 986.

Chicago starts by arguing that LaPorta should not be able to recover for those hours billed before LaPorta added the *Monell* claims (after which the City removed the matter from state court).  Before that point, LaPorta pursued claims against the City for "willful and wanton conduct," against Kelly for negligence, and against those bars LaPorta and Kelly visited prior to the shooting for dram shop violations.  (*See generally* State Ct. Compl., Dkt. 1-1.)  The City contends that the hours spent litigating these issues in state court were not reasonably related to LaPorta's ultimate success on the *Monell* claims and should be excluded from the lodestar calculation.  The Court disagrees.

Though LaPorta did not take his initially-brought, state-law claims to trial, the inquiry for determining fees in light of partial success is still instructive.  That inquiry asks whether the unsuccessful (or, here, the un-pursued) claims involve "a common core of facts or [are] based on related legal theories."  *Wallace v. Mulholland*, 957 F.2d 333, 339 (7th Cir. 1992) (citation and internal quotation marks omitted).  In a practical sense, this inquiry contemplates how much less time LaPorta's counsel might have expended had he brought the *Monell* claim from the beginning.  *See Flanagan v. Office of the Chief Judge of the Circuit*

*Court of Cook Cty.*, 663 F. Supp. 2d 662, 670 (N.D. Ill. 2009). Though LaPorta's pre-*Monell* suit involved claims grounded in different legal theories, most of them focused on a common core of facts, and counsels' development of these facts related directly to the ultimately-raised § 1983 action. These efforts included depositions of relevant fact witnesses, including LaPorta's father and Kelly, successful litigation over the production of Kelly's IPRA file, and investigations into the shooting and LaPorta's subsequent injuries. Counsel used the fruits of all of these efforts at trial on the *Monell* claims, and the Court will not cut out the hours billed in their production. *See Gilfand v. Planey*, No. 07 C 2566, 2012 WL 5845530, at *10 (N.D. Ill. Nov. 19, 2012) (citations omitted).

Chicago's second objection carries more weight. "When a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage." *Harper v. City of Chi. Heights*, 223 F.3d 593, 605 (7th Cir. 2000). The City contends that counsels' billing entries are plagued by vague and improper entries and, as a result, should be cut from the proposed 9,588.78 hours down to 5,862.20. Though the Court disagrees with the magnitude of the City's proposed reduction, some downward adjustment is proper. What follows is a consideration of the City's objections; when LaPorta meaningfully replied to these objections, the Court considered and noted them also. When subtractions are made to specific paralegals or law clerks, the Court factored those subtractions into the "law clerk" or "paralegal" categories, given that

all members of each category bill at the same rate and there was no need to break this category down by individual biller.

### 1. Antonio Romanucci

The City objects to 646.13 of the requested 2021.55 hours for Mr. Romanucci. The first gripe is for 400 hours he billed from 2010-2017 for emailing. Chicago suggests, and LaPorta does not contest, that Romanucci arrived at this figure by searching his inbox for emails related to this case and multiplying the resulting 4,000 emails by 0.1 hours a piece. But many of the emails required zero of Romanucci's efforts and should not be awarded, including: notices of docket entries, notices that people within Romanucci's office accepted calendar invitations for meetings, and extraneous communications unrelated to the LaPorta case. The Court sees many meritorious emails in these records, however, and attorneys must be able to communicate with the opposition and their peers in litigating a case. The Court accordingly reduces these 400 email hours by 25%, allowing 300 of them.

Next, Chicago requests that the Court cut Romanucci's 128.5 hours billed in the pre-*Monell*, state-court case, for the same reasons discussed above. As above, the Court will allow those hours over Chicago's objection.

Third, the Court agrees with Chicago that Romanucci cannot bill the 110.33 hours that are attended by only a blank time-entry.

Fourth, aside from the blank entries, Chicago objects to 18.9 hours as vague. The Court agrees; the entries Chicago identifies (*e.g.*, "Preparation of Letterhead-Blank" and "all about msj today") lack a

description sufficient for the Court to judge their reasonableness. These 18.9 hours will not be allowed.

Fifth, Romanucci billed 100 hours for travel to depositions. "The presumption . . . should be that a reasonable attorney's fee includes reasonable travel time billed at the same hourly rate as the lawyer's normal working time." *Henry v. Webermeier*, 738 F.2d 188, 194 (7th Cir. 1984). However, some of Romanucci's entries seem to reflect more travel time than was warranted. In one, perhaps simply clumsy, entry, Romanucci bills 36 hours for one day's worth of combined travel, deposition, and preparation. (*See* Pl. Ex. 29A5, 1/24/17.) There are other entries in which Romanucci similarly failed to break out travel from deposition and prep time; those entries, even assuming 10 hours of prep time, still include upwards of 10 hours of travel for each. Romanucci does not clarify any of these in reply, so the Court reduces these 100 hours to 50.

Sixth, perhaps showcasing Chicago's attentiveness to Romanucci's records, the City objects to 0.65 hours comprising three entries for "Preparation of Check Request." The Court agrees this is a ministerial task best left to an administrative assistant. The 0.65 hours will be subtracted.

Last, Romanucci billed 2.0 hours for preparing Mr. and Mrs. LaPorta for a television interview. These hours will be subtracted as well.

In all, the Court subtracts 281.88 from Romanucci's total, leaving a sum of 1,739.67 billable hours.

### 2. Stephan Blandin

Chicago objects to 228.3 of Blandin's 288.3 billed hours, largely on the basis that Blandin had relatively little speaking time during trial. But Blandin, a founding partner of his firm and an experienced litigator, billed for "trial strategy support" and "witness trial prep," both legitimate uses of his time, even though neither requires an in-court speaking role. That time will be allowed. Chicago concedes that the remaining 60 hours of Blandin's time, representing preparation for and participation in actual trial proceedings, are reasonable. For those reasons, all 288.3 of Blandin's hours will be allowed.

### 3. Gina DeBoni

Chicago attempts to nibble at the margins once more by objecting to 0.7 hours of DeBoni's 7.40 total hours for time spent reviewing a letter regarding "hand delivery of motions," for preparing a letterhead, and for reviewing her firm's retention agreement with LaPorta. Reviewing the letter and discussing the retention agreement with her client are billable tasks. The balance are administrative and are not. The Court strikes 0.15 hours, allowing DeBoni a total of 7.25.

### 4. Debra Thomas

The 2,788.25 billable hours for Thomas present a sticking point for the parties; after Chicago levied its objections to her time, LaPorta expended eight pages of his thirty-five-page reply trying to knock those objections down. The Court has reviewed Thomas's underlying timesheets and agrees that her time must be substantially reduced. These hours consist of over 13,000 entries spanning 725 pages, so the Court necessarily discusses them here absent a granular level of detail. At

least 12% of the entries are overly vague (including entries marked simply "work on discovery matters"), and another 8% are duplicative. In reply, LaPorta explains that Thomas was an integral part of his strategy team. But if her work was as substantive as LaPorta says, then these vague and duplicative billing entries needed to say as much. Those entries are what the client sees and form the basis for what the client pays. The Court doubts that many clients would stomach consistently vague entries attended by later, parol explanations. Chicago's other objection centers on Thomas's 72 billed hours for deposition prep, which the City contends to be superfluous given that Thomas attended only one deposition in this case. But there is no requirement that the attorneys who work on the preparation for a deposition need to actually attend. There are many tasks—writing deposition outlines prime among them—that may be completed and properly billed by an attorney other than the one who ultimately conducts the deposition. These 72 hours will not be stricken, but the Court will reduce Thomas's hours, given the above, by 20%, resulting in an allowed total of 2,230.6 hours.

### 5. *Michael Holden*

1.45 hours of Holden's billing entries are either blank or represent simple, clerical tasks. These hours are excluded, leaving a total of 5.6 hours.

### 6. *Bruno Marasso*

The Court will not deduct any of Marasso's hours. They provide sufficient insight into his activities and, contrary to Chicago's assertions, his hours should not be docked for including internal firm conferences. Nor is Marasso's habit of block-billing prohibited (though

the Court notes it is not ideal). *See Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006) ("Although 'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice."). The full 278 hours will be awarded.

### 7. *Bhavani Raveendran*

Chicago does not object to Raveendran's hours, and the Court sees in her billing sheets no reason for a deduction. Her 28.55 billable hours are allowed.

### 8. *Martin Gould*

Chicago objects to 309.85 of the requested 1,410.7 hours for Gould, but these objections are overstated: For the same reasons expressed already, the Court will not dock Gould for his time billed for intrafirm conferences or for reasonable travel time to depositions. However, Gould bills 175.3 hours all under the single description "Emails Sent: 2014-2017," which provides the Court no insight into what Gould was communicating about, or with whom. Given Romanucci's seemingly inadvertent inclusion of irrelevant emails in his own email-time calculation, and the fact that he and Gould are attorneys at the same firm and thus are likely to share billing practices, some reduction is appropriate. As with Romanucci, the court reduces Gould's email time by 25%, resulting in 131.48 hours. The Court deducts 5% from the non-email billables for vague entries. Accounting for these subtractions, the Court allows Gould 1,305.11 hours.

### 9. *Nicolette Ward*

Ward billed 661.45 hours in this case. 41.05 of those hours had originally been attended by blank entries; upon request from the City,

Ward clarified that each of those entries should read "Review of Email Correspondence." This suffers from the same deficiencies as Gould and Romanucci's email entries. The Court accordingly cuts those 41.05 hours by 25%. According to Chicago's detailed review, Ward's time also includes 118.4 hours of duplicative entries and 6.55 hours of administrative tasks (*i.e.*, "docketing"). LaPorta does not dispute those characterizations. Though the Court has not crawled through every single entry as Chicago professes to have done, the Court's review of Ward's records confirms the general accuracy of the City's count. The Court thus subtracts 50 hours for duplicative entries, as well as the 6.55 hours for administrative tasks. The result is 594.64 billable hours.

### 10. *Law Clerk Bryce Hensley*

Only one of Chicago's objections holds sway for this biller. On October 26, 2017, Hensley billed 9 hours for "Trial/Closing." But there were no closings that day; instead, the jury deliberated in the morning and rendered their verdict in mid-afternoon. Absent any clarification from Hensley, the Court strikes 8 of those 9 hours on the understanding that Hensley came to court for the delivery of the verdict. His total allowed hours are 691.05.

### 11. *Paralegal Keocco Larry*

The Court agrees with Chicago that there are a few duplicative entries for Larry and accordingly reduces the claimed 46.6 hours to 40.6.

### 12. *Paralegal Karle Longnion*

To start, Longnion's billables will be reduced by 139.25 hours, which comprise non-compensable time for printing, scanning, preparing binders, and filing documents. *See Delgado*, 2006 WL 3147695, at *2.

LaPorta also seeks recompense for 116.5 hours for the undated and unspecified preparation and issuing of subpoenas and notices. Even over lengthy litigation like this one, it strains credulity that Longnion spent over 14 days in combined manhours cranking out subpoenas. Though she might have reasonably done so, the Court cannot say she did given the sparsity of her time entries. The Court cuts the 116.5 hours by half. Finally, Longnion block-billed 174.5 hours for "preparing for and assisting at trial," again without specifying the dates or actual tasks she completed. The Court cuts these 174.5 hours by half as well. In sum, LaPorta may bill the City for 170.75 of Longnion's claimed 455.50 hours.

### 13. Paralegal Matt Dominguez

The City objects to one entry in which Dominguez claims to have worked 23 hours in one day on "preparing and issuing trial subpoenas." Though the City is incredulous, it is of course possible that Dominguez worked these hours in one day. But because some specificity would have been helpful to the Court's inquiry of determining whether this is a reasonable fee, however, the Court will cut those 23 by 10%. Chicago also seeks to exclude 14.73 of Dominguez's hours submitted by LaPorta only after he sought to fix other deficient entries. These the Court will not exclude. The total allowance for Dominguez is 110.88 hours.

### 14. Carl Salvato

Chicago's first objection to Salvato's time focuses again on those hours spent in pre-*Monell*, state-court litigation. As described above, that litigation was related to the *Monell* claims ultimately pursued in this Court, so the state-court hours will not be stricken. Next, Chicago

- 68 -

contends that Salvato's 212.8 hours for deposition prep and attendance should be stricken because Salvato did not participate in those depositions. But again, the fact that Salvato did not conduct these depositions does not mean he played no role in preparing co-counsel or the witness for the same. These hours will be left intact. The Court will strike 3 hours relating to a meeting with press and fundraisers which bears no direct connection to litigating LaPorta's claims. LaPorta is entitled to fees for 463.6 of Salvato's 466.6 billable hours.

### 15. Paul O'Toole

O'Toole billed only 3 hours—these represent his meeting with the LaPorta family and walking them through signing a retainer, power of attorney, and a medical authorization form. These 3 hours are reasonable.

### 16. Jason Hammond & Matt Popp

As described above, the Court has set both Hammond and Popp's reasonable rates at $0/hour, so their time will be disallowed entirely.

### 17. Attorneys at Shiller Preyer

Brendan Shiller himself billed 51.9 hours for work on motions *in limine* and jury instructions, reviewing transcripts, and case management. His 51.9 hours will not be reduced. Nor will the collective 102.7 hours for his coworkers (attorneys Ritatta, McCartin, and Haywood, as well as paralegals), whose rates have been uniformly set at $125/hour in recognition that nearly all of their work consisted of working on deposition abstracts. *See Lockrey*, 1991 WL 255466, at *6.

## C. Lodestar Adjustment

Based on the corrected hourly rates, Plaintiff's lodestar is recalculated as $2,558,991.50:

| Attorney | Hourly Rate | Hours | Total per Attorney |
|---|---|---|---|
| *from Romanucci & Blandin*: | | | |
| Antonio Romanucci | $550 | 1,739.67 | $956,818.50 |
| Stephan Blandin | $450 | 288.30 | $129,735.00 |
| Gina DeBoni | $350 | 7.25 | $2,537.50 |
| Debra Thomas | $300 | 2230.60 | $669,180.00 |
| Michael Holden | $325 | 5.60 | $1,820.00 |
| Bruno Marasso | $275 | 278.00 | $76,450.00 |
| Bhavani Raveendran | $275 | 28.55 | $7,851.25 |
| Martin Gould | $225 | 1305.11 | $293,649.75 |
| Nicolette Ward | $200 | 594.64 | $118,928.00 |
| Rebekah Williams | $0 | 0.00 | $0.00 |
| Kelly Armstrong | $0 | 0.00 | $0.00 |
| | | | |
| *from Salvato & O'Toole*: | | | |
| Carl Salvato | $300 | 463.60 | $139,080.00 |
| Paul O'Toole | $300 | 3.00 | $900.00 |
| Jason E. Hammond | $0 | 0.00 | $0.00 |
| Matt Popp | $0 | 0.00 | $0.00 |
| | | | |
| *from Schiller Preyar*: | | | |
| Brendan Schiller | $385 | 51.90 | $19,981.50 |
| Susan Ritatta | $125 | 20.60 | $2,575.00 |
| Lillian McCartin | $125 | 10.90 | $1,362.50 |
| Tia Haywood | $125 | 30.70 | $3,837.50 |
| | | | |
| *Across All Firms*: | | | |
| Law Clerks | $125 | 692.25 | $86,531.25 |
| Paralegals | $125 | 382.03 | $47,753.75 |
| Admin. Staff | $0 | 0 | $0.00 |

Having determined the lodestar, the Court must contend with LaPorta's request for a 200% lodestar enhancement. For LaPorta, as for any prevailing party, this is a tough road to hoe. The Supreme Court has made clear that there is a "strong presumption" that the lodestar figure is reasonable, and that presumption may be overcome only "in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a

reasonable fee." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553–54 (2010). The party seeking enhancement bears the burden of proof and can shoulder that burden only by presenting "specific evidence that the lodestar fee would not have been 'adequate to attract competent counsel.'" *Id.* at 554 (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984) (citation omitted)).

LaPorta presents no such evidence but argues instead that the sizeable verdict he won reflects the excellence of his counsel, which should be rewarded with an enhancement. But "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case. . . . not [one providing] 'a form of economic relief to improve the financial lot of attorneys.'" *Id.* at 552 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 555 (1987)). Beyond this, the *Perdue* Court cautioned that neither the novelty and complexity of a case nor the quality of an attorney's performance should be used as the basis for enhancement because such considerations are normally already accounted for in the reasonable hourly rate. *Id.* at 553 (citing *Del. Valley*, 478 U.S. at 566).

In brief, LaPorta has fallen short of carrying his burden to show that this is one of those rare instances in which the reasonable fee award is not fairly calculated by the lodestar method. The request for enhancement is denied.

Absent any enhancement, the total attorneys' fee award is $2,558,991.50, as laid out above.

## V. CHICAGO'S MOTION FOR REMITTITUR

Finally, Chicago moves for remittitur, arguing the $44.7 million damages award should be reduced to $28.13 million. Traditionally, trial courts may only disturb damage awards that are monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence. *Fleming v. Cty. of Kane*, 898 F.2d 553, 561 (7th Cir. 1990) (citing *Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989)). Beyond this, courts must also consider whether the award is out of line with awards in similar cases. *Id.* (citations omitted). In considering Chicago's Motion, the Court keeps in mind the Seventh Circuit's admonition that the jury's verdict is entitled to deference given that the measure of damages is inherently "an exercise in fact-finding," which is the jury's province. *Matter of Innovative Constr. Sys.*, 793 F.2d 875, 877-88 (7th Cir. 1986) (citation and internal quotation marks omitted).

Specifically, the jury awarded: $12 million for past and future medical expenses; $1.5 million for past and future lost earnings; $100,000 for disfigurement; $100,000 for increased risk of harm; $12 million for past and future pain and suffering; $15 million for past and future loss of a normal life; and $4 million for shortened life expectancy. Chicago objects to the last three sums only, contending they should be remitted to $5.32 million, $7.45 million, and $1.6 million, respectively. In support of its Motion, Chicago marshals two main arguments: First, Chicago contends the jury improperly sought to punish the City, rather than simply make LaPorta whole; and second, Chicago contends that these awards are too far afield of damages awards

- 72 -

in comparable cases.  As described below, the Court is not convinced that the jury's verdict should be disturbed.

### A. Whether the Jury Enhanced the Damages Award to "Send Chicago a Message"

As a municipality, Chicago is immune from punitive damages in § 1983 actions. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  This means that when faced with a municipal defendant, juries may award only compensatory damages supported by the evidence. *See Joan W. v. City of Chicago,* 771 F.2d 1020, 1025 (7th Cir. 1985). Chicago contends that the jury in this case transgressed this rule upon invitation of LaPorta's counsel, who said the following during closing argument:

> The message has to be sent: You cannot do this again, whether it's with Patrick Kelly or any of the other officers that rise about him in the number of complaints because there are many, many more officers out there, ladies and gentleman, that are worse that Patrick Kelly.
> . . .
> And if you do not fully compensate Mike LaPorta for the harms that the City of Chicago caused, your message then will fall on deaf ears.  That's what you have to do.  If you want to stop and staunch the violation of constitutional rights and actually stop cases like this from coming into a courtroom, you will then award full compensation.

(Tr. 3446:4-3448:13.)  Chicago objected to these selections of counsel's closing.  (*Id.*)  The City's argument really consists of two parts: First, that LaPorta's counsel should not have made these comments; and second, that as a result of counsel's closing sentiments or otherwise, the jury inflated their verdict to "send a message" to the City.

The Court agrees with Chicago as far as the first part of this argument is concerned.  Asking the jury to send a message, even within

the context of "fully compensat[ing] LaPorta, was not proper. "[C]ompensatory damages," which is all LaPorta is entitled to in this case, "are limited to actual losses and the argument that the jury should 'send a message' is a punitive damages argument." *Smith v. Rosebud Farmstand*, No. 11 CV 9147, 2017 WL 3008095, at *24 (N.D. Ill. July 14, 2017) (granting remittitur motion) (citation and internal quotation marks omitted), *aff'd sub nom. Smith v. Rosebud Farm, Inc.*, No. 17-2626, 2018 WL 3655147 (7th Cir. Aug. 2, 2018); *Martinez v. City of Chicago*, No. 14 CV 369, 2016 WL 3538823, at *14 (N.D. Ill. June 29, 2016) (ruling on motion *in limine* that plaintiff cannot ask jury to "send a message" to the City) (citations omitted). But the fact that counsel made this argument in closing does not necessarily mean the jury took up the invitation.

In *Smith,* for example, the court granted remittitur after counsel urged the jury to "send a strong message." 2017 WL 3008095, at *24. But it was not that snippet of argument alone that motivated the court to remit the damages award. Rather, the court found the improper argument likely influenced the jury based on the size of the compensatory award and "the lack of specific, articulable injuries" the plaintiff had demonstrated. *Id.* Neither of those indications is present here. As the Court discusses at some length in the section below, LaPorta's damages award, while high, was not excessive. Further, LaPorta's injuries provide a stark contrast to *Smith*. LaPorta adduced evidence at trial making pellucid the extent of his severe and permanent injuries. Though the comments his attorney made in closing were not appropriate, the record and the verdict simply do not support the City's conclusion

- 74 -

that the jury took those comments to heart and factored punitive damages into their compensatory award. The Court will not grant remittitur on this basis.

### B. Comparison to Other Damage Awards

Though the verdict's comparison to other awards is a helpful benchmark and one the Court must consider, *Fleming*, 898 F.2d at 561; *see Delougherby v. City of Chicago*, 422 F.3d 611, 619 (7th Cir. 2005) (reciting said comparisons among other considerations generally reflected upon in ruling on remittitur motions), this factor "is not as important as the review of the evidence in the case at hand," *Adams v. City of Chicago*, 798 F.3d 539, 545 (7th Cir. 2015).

> The problem [with comparing damage awards in other cases] is that one can always find excessive force cases with verdicts at different levels. This amounts to anecdotal evidence at best. Even that kind of evidence might show that it is hard to find a single case with damages as high as the one before the court (or as low, if the appeal is taken from an allegedly inadequate verdict), but caution should be the byword when looking at past awards.

*Id.*

First, the predicate for comparison: At trial, the jury received evidence that since the shooting, LaPorta requires round-the-clock care. (*See, e.g.*, P. LaPorta Tr. 1360:3-1371:7.) He has undergone nine surgeries (P. LaPorta Tr. 1357:18-20) and is afflicted with what his life-care planner described as an "all-encompassing and devastating injury" (Howland Tr. 2001:10-15). The shooting caused a traumatic brain injury, reducing LaPorta to a spastic triplegic. (Valika Tr. 1421:5-20; Howland Tr. 1997:12-17.) He is blind in one eye and deaf in one ear, and, though his condition has improved since the immediate aftermath

of the shooting, he will suffer pain for the rest of his life. (P. LaPorta Tr. 1388:10-15.) Dr. Senno testified that LaPorta's life expectancy fell somewhere between 6 and 17 years. (Senno Tr. 2411:7-2412:22.)

Now, Chicago cites to a litany of comparisons for each of the three awards it challenges, though the Court is not convinced these cases demonstrate the contrast Chicago contends. The Court summarizes a selection of comparison cases below, having adjusted the verdict amounts in each to 2017 dollars—the year of LaPorta's judgment—to account for inflation.

The City argues the pain and suffering award should be reduced from $15 million to $5.32 million. Verdicts on roughly comparable facts include:

- *Christensen v. Sherman Hospital* (Ill. Cir. Ct. 2003): Quadriplegic plaintiff awarded $9.32 million for pain and suffering. (Grp. Ex. B to Remittitur Resp. at 6-7, Dtk. 460-1.)
- *Darden v. City of Chicago* (Ill. Cir. Ct. 2017): Quadriplegic plaintiff suffered a severed spinal cord, paralysis below the waist, and severe neuropathic pain and was awarded $40 million for pain and suffering, though the parties thereafter settled before the state appellate court could weigh in on the verdict. (Grp. Ex. B at 14-15.)
- *Garner v. Carter* (Ill. Cir. Ct. 2002): Quadriplegic plaintiff without any cognitive deficits awarded $70.6M, of which $10.2M was for pain and suffering. (Grp. Ex. B at 10-11.)
- *Peterson v. Ress Enters. Inc.* (Ill. Cir. Ct. 1995): Quadriplegic plaintiff requiring 24-hour care awarded $9.7 million for pain and suffering. (Grp. Ex. B at 39-40.)

LaPorta's award for loss of a normal life was $15 million; the City contends that sum should be remitted to $7.25 million. Comparisons include:

- *Darden v. City of Chicago* (Ill. Cir. Ct. 2017): Plaintiff described above awarded $61 million for loss of a normal life. (Grp. Ex. B at 14-15.)
- *Bun v. Provena Health* (Ill. Cir. Ct. 2006): Plaintiff awarded $15.2 for loss of a normal life after a brain injury resulted in spastic quadriparesis, the inability to speak or eat, and a reduction to a vegetative state. (Grp. Ex. C at 25-26, Dkt. 460-1.)
- *White v. Christ Hospital* (Ill. Cir. Ct. 1997): Plaintiff who suffered loss of use of left arm and partial paralysis in the other arm awarded $3.05 million for loss of normal life. (Grp. Ex. C at 6.)
- *Hoffman v. Crane* (Ill. Cir. Ct. 2012): Plaintiff suffered paraplegia, vision impairment, permanent colostomy and bladder catheter, and the jury awarded her $10.66 million for loss of normal life. (Grp. Ex. C at 7-8.)

Finally, the jury awarded LaPorta $4 million for his shortened life expectancy, though they did not specify by exactly how many years they believed the shooting had shortened LaPorta's life. Dr. Senno testified that he expected LaPorta to lose 6-17 years of life. (Senno Tr. 2411:7-2412:22.) Presuming the jury credited this evidence, their award reflects somewhere between $666,666 and $235,294 per year. Chicago contends this $4 million award should be trimmed to $1.6 million, citing:

- *Skorek v. Edward-Elmhurst Healthcare* (Ill. Cir. Ct. 2017): Plaintiff awarded $7 million for 24-year loss of expected life, or roughly $292,000 per year. (Grp. Ex. D at 55-56, Dkt. 460-1.)
- *Ewing v. University of Chicago Medical Center* (Ill. Cir. Ct. 2016): Plaintiff awarded $2.83 million for loss of 18 years, or about $154,000 per year. (Grp. Ex. D at 1-2.)
- *Maldonado v. United States*, (N.D. Ill. 2010): Plaintiff awarded $505,850.00 for loss of three years, or about $169,000 per year. (Grp. Ex. D at 57.)

Within each category of damages described above, LaPorta's verdicts are among the higher awards listed, but they are not out of bounds. His pain and suffering award is about 50% higher than most of the awards described and yet is dwarfed by the $40 million award in *Darden*. Chicago

contends the *Darden* plaintiff's injuries were more severe than LaPorta's, but the Court is not so sure; to any extent, that plaintiff's injuries do not seem to be LaPorta's injuries thrice-over, which is what the award amount suggests. This type of *ex post* second-guessing is exactly the danger inherent to comparing verdicts; the exercise necessarily invites courts to step, often inappropriately, into the shoes of the jurors who already weighed the facts. This holds true for the Court's consideration of the loss of normal life award—LaPorta's award is in line with *Bun,* although that plaintiff was reduced to a vegetative state, a fate which LaPorta has evaded—and the loss of life expectancy award. The final award is particularly problematic for the Court to review given that the jury did not state with precision how many years they believed LaPorta has lost. If they believe he lost 17, then they awarded him $235,294 per year—within the range of these comparisons. If the jury believed instead that LaPorta has lost 6 years, their $666,666 per-year award is above the high end of these past verdicts. But without more guidance from the jury, the Court is left to guess after how they weighed the evidence. The Court should not and cannot take up this mantle. "'[A]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive.' To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur. There must be room for a jury's award to exceed the relevant range of cases when the facts warrant." *Adams,* 798 F.3d at 545 (quoting *Farfaras,* 433 F.3d at 566).

In short, as described throughout this opinion, the jury heard extensive testimony concerning LaPorta's severe and permanent injuries. The Court cannot say that their award decisions were not rationally connected to the evidence nor that they were monstrously excessive, so the remittitur motion is denied. *See Fleming*, 898 F.2d at 561.

## VI. <u>CONCLUSION</u>

For the reasons stated herein, Chicago's Renewed Motion for JMOL (Dkt. 499) and Motion for a New Trial (Dkt. 500) are denied. LaPorta's Bill of Costs (Dkt. 490) and Petition for Fees (Dkt. 549) are both granted in part and denied in part: The Court allows LaPorta $19,160.32 in costs and awards him $2,558,991.50 in attorneys' fees. Chicago's Motion for Remittitur (Dkt. 498) is denied.


**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 8/29/2018